ACCEPTED
06-15-00013-CV
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
9/16/2015 4:49:55 PM
DEBBIE AUTREY
CLERK

No. 06-15-00013-CV

**IN THE
COURT OF APPEALS
SIXTH DISTRICT OF TEXAS
TEXARKANA**

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
9/17/2015 8:22:00 AM
DEBBIE AUTREY
Clerk

—————————————————————————————————————————

**JOHN ALEXANDER SMITH,
Cross-Appellant**

**v.**

**CITY NATIONAL BANK OF SULPHUR SPRINGS,
Cross- Appellee**

—————————————————————————————————————————

**On appeal from the District Court of Hopkins County, Texas
62nd Judicial District
The Honorable Will Biard Presiding**

—————————————————————————————————————————

**BRIEF OF CROSS-APPELLANT**

—————————————————————————————————————————

**J. Mark Sudderth
Texas Bar No. 19461500**
NOTEBOOM – THE LAW FIRM
669 Airport Freeway, Suite 100
Hurst, Texas 76053
(817) 282-9700
(817) 282-8073 (facsimile)
Sudderth@Noteboom.com

Attorney for Cross-Appellant,
John Alexander Smith

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to Rule 38.1(a) of the Texas Rules of Appellate Procedure, the following is a list of all parties to the trial court's judgment, and the names and addresses of all trial and appellate counsel.

**Parties to the Trial Court's Judgment:**

| | |
|---|---|
| John Alexander Smith | Plaintiff/Cross-Appellant |
| City National Bank of Sulphur Springs | Defendant/Cross-Appellee |

**Trial and Appellate Counsel:**

| | |
|---|---|
| Charles M. Noteboom, J. Mark Sudderth, and Brian W. Butcher<br>Noteboom – The Law Firm<br>669 Airport Freeway, Suite 100<br>Hurst, Texas 76053<br>and<br>R. Wes Tidwell<br>Ellis & Tidwell, LLP<br>101 W. Houston<br>Paris, Texas 75460 | Attorneys for Plaintiff/Cross-Appellant John Alexander Smith |
| Coy Johnson and Clay Johnson<br>Johnson Law Firm, P.C.<br>609 Gilmer Street<br>Sulphur Springs, Texas 75482<br>and<br>Kevin L. Ferrier<br>222 E. Amherst, Suite 100<br>Tyler, Texas 75701<br>and<br>John R. Mercy<br>Mercy, Carter, Tidwell, L.L.P.<br>1724 Galleria Oaks Drive<br>Texarkana, Texas 75503 | Attorneys for Defendant/ Cross-Appellee City National Bank of Sulphur Springs |

## REQUEST FOR ORAL ARGUMENT

Cross-Appellant John Alexander Smith respectfully requests the opportunity to present oral argument.  TEX. R. APP. P. 39.7.

**TABLE OF CONTENTS**

IDENTITY OF PARTIES AND COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

REQUEST FOR ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

ABBREVIATIONS AND RECORD REFERENCES. . . . . . . . . . . . . . . . . . . . vii

STATEMENT OF THE CASE .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

ISSUE PRESENTED

      Whether the Trial Court Erred by Improperly Determining the Amount of
      Pre-judgment Interest to Be Awarded to Plaintiff. . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.     The Standard of Review Is De Novo.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.    The Trial Court Erred by Improperly Determining the Amount of
      Prejudgment Interest to Be Awarded to Plaintiff.. . . . . . . . . . . . . . . . . . . . . 6

      A.     Plaintiff's Application for Investigative Depositions constituted
           "written notice of a claim" under section 304.104 of the Texas
           Finance Code.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.     Pursuant to section 304.104 of the Texas Finance Code, the proper
           amount of prejudgment interest to be awarded to Plaintiff is
           $84,542.00, rather than $54,243.00. .. . . . . . . . . . . . . . . . . . . . . . . . 12

PRAYER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CERTIFICATE OF COMPLIANCE ... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

APPENDIX . ... . . . . . . . . . . . . . . .   (Separate Index Located in Front of Materials)

# INDEX OF AUTHORITIES

## Cases:

*Bevers v. Soule,*
909 S.W.2d 599 (Tex. App.–Fort Worth 1995). . . . . . . . . . . . . . . . . . . . 8, 9

*Brookshire Grocery Co. v. Smith,*
99 S.W.3d 819 (Tex. App.–Beaumont 2003). . . . . . . . . . . . . . . . . . . 6, 7, 8

*Freedom Com., Inc. v. Coronado,*
372 S.W.3d 621 (Tex. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Helena Chemical Co. v. Watkins,*
18 S.W.3d 744 (Tex.App.–San Antonio 2000). . . . . . . . . . . . . . . . . . . . . 4

*Hopkins v. Spring Indep. Sch. Dist.,*
736 S.W.2d 617 (Tex.1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.,*
962 S.W.2d 507 (Tex. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8

*K Mart Corp. v. Rhyne,*
932 S.W.2d 140 (Tex. App.–Texarkana 1996). . . . . . . . . . . . . . . . . . . 8, 9

*MCN Energy Enters., Inc. v. Omagro de Colombia, L.D.C.,*
98 S.W.3d 766 (Tex. App.–Fort Worth 2003). . . . . . . . . . . . . . . . . . . . . 5

*Pringle v. Moon,*
158 S.W.3d 607 (Tex. App.–Fort Worth 2005). . . . . . . . . . . . . . . . . . . . 4

*Quick v. City of Austin,*
7 S.W.3d 109 (Tex.1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Robinson v. Brice,*
894 S.W.2d 525 (Tex. App.–Austin 1995). . . . . . . . . . . . . . . . . 6, 7, 8, 9, 10

*Tex. Dep't of Transp. v. Needham,*
82 S.W.3d 314 (Tex.2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Toshiba Machine Co. v. SPM Flow Control, Inc.,*
  180 S.W.3d 761 (Tex. App.–Fort Worth 2005). . . . . . . . . . . . . . . . . . 5

**Statutes and Rule:**

TEX. R. EVID. 201.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

TEX. CIV. PRAC. & REM. CODE § 101.101.. . . . . . . . . . . . . . . . . . . . . . . . . . 11

TEX. FIN. CODE § 304.104. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

TEX. GOV. CODE § 311.011. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

# ABBREVIATIONS AND RECORD REFERENCES

## Abbreviations

Plaintiff/Cross-Appellant,
John Alexander Smith. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . "Smith" or "Plaintiff"

Defendant/Cross-Appellee
City National Bank of Sulphur Springs. . . . . . . "CNB," "Defendant" or "the Bank"

Appendix to this Brief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . "Appx."

## Record References

References to Clerk's Record. . . . . . . . . . . . . . . . . . . . . . . . . . "CR: [page #]"

References to Supplemental Clerk's Record. . . . . . . . . . . . . . . . . . "SCR: [page #]"

References to Reporter's Record . . . . . . . . . . . . . . . . . . . . . . . . "RR: [page #]"

## STATEMENT OF THE CASE

Smith brought a personal injury suit against the Bank for malicious prosecution.[1] Following a jury verdict,[2] and at the request of Plaintiff,[3] the trial court entered a judgment in Smith's favor which included $84,542.00 in prejudgment interest.[4]  The Bank filed a motion to modify the judgment, asserting that the trial court had used an incorrect starting date for calculating pre-judgment interest.[5] Smith opposed such motion.[6] After a hearing, the trial court granted the Bank's motion and entered an order modifying the judgment to include only $54,243.00 in prejudgment interest.[7]

The Bank has appealed the final judgment. In this cross-appeal, Smith complains only that the trial court improperly reduced the amount of prejudgment interest, which should be restored to the original and proper amount.[8]

---

[1]CR:403 (Plaintiff's Fifth Amended Original Petition)

[2]CR:535; Appx. C (Jury Charge and Verdict)

[3]CR:584; Appx. F (Plaintiff's letter to trial court submitting proposed judgment)

[4]CR:582; Appx. A (Court's Judgment)

[5]CR:605; Appx. G (Defendant's Motion to Modify Judgment)

[6]CR:615; Appx. H (Plaintiff's Response to Defendant's Motion to Modify Judgment)

[7]SCR:5; Appx. B (Order on Motion to Modify Judgment)

[8]CR:649 (Plaintiff's Notice of Cross-Appeal)

## ISSUE PRESENTED

Whether the Trial Court Erred by Improperly Determining the Amount of Prejudgment Interest to Be Awarded to Plaintiff.

## STATEMENT OF FACTS

On October 24, 2008, Smith served the Bank with Plaintiff's "Application For Investigative Depositions" under TEX.R.CIV.P. 202 which clearly and explicitly notified Defendant of Plaintiff's claim for malicious prosecution.[9]

In particular, paragraphs 6 through 14 of the application set out the factual bases of the claim in some detail – describing how the bank "caused a criminal complaint to be filed against John Alexander Smith," leading to Smith's arrest and indictment and proximately causing substantial damages, all while the bank "knew he was not guilty of the criminal offense" – and paragraph 14 specifically notified the bank of Smith's claim for malicious prosecution, stating, "Petitioner alleges that he believes that he has grounds for a lawsuit under the doctrines of false imprisonment, false arrest, and malicious prosecution."[10]

Smith ultimately sued the Bank for malicious prosecution.[11] Smith's

---

[9]CR:585; Appx. E (Petitioner's Application for Investigative Depositions – enclosed with Plaintiff's letter to trial court submitting proposed judgment).

[10]CR:586-588; Appx. E (Application pp. 2-4, paragraphs 6-14)

[11]CR:27 (Plaintiff's Second Amended Original Petition)

malicious prosecution case against the Bank went to trial, resulting in a jury verdict in Smith's favor.[12]

Following the verdict, Smith submitted a proposed form of judgment along with a copy of the Application For Investigative Depositions which had been served on the Bank on October 24, 2008, and a letter explaining how prejudgment interest should be calculated using a starting date six months after such notice.[13]

On December 15, 2014, the trial court entered a judgment which included $84,542 in prejudgment interest, in accordance with Smith's letter.[14] The Bank then filed a motion to modify the judgment, asserting that prejudgment interest should have been calculated from the date the Bank was sued, rather than six months after receiving Smith's petition to investigate claims.[15] Smith filed a response opposing such motion.[16] After conducting a hearing, the Court granted the Bank's motion and entered an order modifying the judgment so as to reduce prejudgment interest to $54,243.[17]

---

[12]CR:535; Appx. C (Jury Charge and Verdict)

[13]CR:584; Appx. F (Plaintiff's letter to trial court submitting proposed judgment)

[14]CR:582; Appx. A (Court's Judgment)

[15]CR:605; Appx. G (Defendant's Motion to Modify Judgment)

[16]CR:615; Appx. H (Plaintiff's Response to Defendant's Motion to Modify Judgment)

[17]SCR:5; Appx. B (Order on Motion to Modify Judgment)

The court calculated such prejudgment interest commencing on May 2, 2011, the date suit was filed against the Bank, rather than April 22, 2009, the date one-hundred-and-eighty days after the Bank received written notice of Smith's claim.[18]  Smith now appeals, complaining only that the trial court erred in modifying the judgment and awarding the incorrect amount of prejudgment interest.

## SUMMARY OF ARGUMENT

Prejudgment interest should have been calculated beginning on April 22, 2009, which is 180 days after October 24, 2008, the date the Bank received written notice of Smith's claim.

The application for investigative depositions served on the Bank constituted "written notice of a claim" under section 304.104 of the Texas Finance Code because it included an assertion of a right to be paid.  No "demand" for payment was required, nor was the actual filing of a lawsuit.  By specifically alleging that he had grounds for a lawsuit based on malicious prosecution, Smith provided notice of his claim under the prejudgment interest statute.

---

[18]The order does not set forth this calculation, but expressly grants Defendant's motion, which did.  See CR:607; Appx. G (Defendant's Motion to Modify Judgment, p.3).

**ARGUMENT**

## I.   The Standard of Review Is De Novo

As a general rule, a trial court's factual decisions regarding prejudgment interest – including determinations of whether there has been a delay, whether an award is supported by equity, whether the parties have agreed to a particular rate of interest, and other determinations that turn on disputed issues of fact – are reviewed under an abuse of discretion standard. *See, e.g., Helena Chemical Co. v. Watkins,* 18 S.W.3d 744, 760 (Tex. App. – San Antonio 2000), *aff'd., o.g.,* 47 S.W.3d 486 (Tex. 2001) ("The trial court's decision in refusing to offset from its interest calculations periods of delay caused by a litigant are reviewed under the abuse of discretion standard. ... Because the offset is discretionary rather than mandatory, we do not substitute our opinion for that of the trial court.")

On the other hand, when – as at bar – a trial court's decision regarding pre-judgment interest turns on legal rather than factual grounds, the de novo standard of review applies. *See, e.g., Pringle v. Moon,* 158 S.W.3d 607, 609 (Tex. App. – Fort Worth 2005, no pet.) ("The prejudgment interest rate is controlled by statute. ... Because statutory construction is a question of law, we review the trial court's decision de novo. *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex.2002)").

Regarding the specific issue in the case at bar, "the date from which statutory prejudgment interest should begin is a question of law that an appellate court must review de novo." *MCN Energy Enters., Inc. v. Omagro de Colombia, L.D.C.*, 98 S.W.3d 766, 773 (Tex. App. – Fort Worth 2003, pet. denied). *See also, Toshiba Machine Co. v. SPM Flow Control, Inc.,* 180 S.W.3d 761, 785 (Tex. App.–Fort Worth 2005, pet. granted, cause remanded) ("The abuse of discretion standard applies to the trial court's factual findings as they relate to prejudgment interest; but the de novo standard applies to the trial court's application of the law to the facts. ... The question is whether the letter constituted notice of SPM's claims as a matter of law. Therefore, as a practical matter, our review of the prejudgment interest issue in this case is de novo.")

Under the de novo standard of review, this court exercises its own judgment and redetermines each legal issue. *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex.1998).

**II.     The Trial Court Erred by Improperly Determining the Amount of Prejudgment Interest to Be Awarded to Plaintiff.**

**A.     Plaintiff's Application for Investigative Depositions constituted "written notice of a claim" under section 304.104 of the Texas Finance Code.**

The issue in this cross-appeal concerns the definition of "notice of claim" under the Texas Finance Code, which provides that prejudgment interest begins to accrue on the earlier of the date suit is filed, or the180th day after a defendant receives written "notice of a "claim."[19] The Bank's motion asserted that a "claim" requires a "demand for payment."[20] Smith disagreed, pointing out that "an assertion of a right to be paid" will also suffice.[21]

While the Finance Code contains no statutory definition, case law establishes that, in the prejudgment interest context, no demand is required as "claim" also includes "an assertion of a right to be paid.*"[22]*

---

[19]Tex. Fin. Code 304.104 (Appx. D)

[20]CR:607; Appx. G (Defendant's Motion to Modify Judgment, p. 3)

[21]CR:616; Appx. H (Plaintiff's Response to Defendant's Motion to Modify Judgment, p. 2)

[22]*See, e.g., Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 531 (Tex. 1998)("A 'claim' is 'a demand for compensation or *an assertion of a right to be paid*.'")(emphasis added); *Brookshire Grocery Co. v. Smith,* 99 S.W.3d 819, 824 (Tex. App.–Beaumont 2003, pet. denied)(In Tex.Fin.Code § 304.104, "[t]he term 'claim' describes a demand for compensation or *an assertion of a right to be paid*.")(emphasis added).  *See also*, *Robinson v. Brice,* 894 S.W.2d 525, 528 (Tex. App. – Austin 1995, writ denied).

The Texas Supreme Court addressed this meaning of "claim" in *Johnson &*

*Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507 (Tex. 1998), in

which it held that a statute of limitations tolling agreement constituted a "written

notice of claim" sufficient to trigger the accrual of prejudgment interest. The

agreement merely stated:

> Kenneco asserts that, to the extent underwriters are found not to be liable ...,
> J & H is liable to Kenneco for the amounts which Kenneco has claimed
> under the Policy.[23]

Although absolutely no "demand" for payment or compensation was made, the

Court held this language constituted a "claim" because it asserted a right to

compensation. The Court stated the rule that *either* a demand *or* an assertion of a

right will suffice:

> We hold that the agreement constitutes "written notice of a claim." A
> "claim" is "a demand for compensation or an assertion of a right to be paid."
> See *Robinson v. Brice*, 894 S.W.2d 525, 528 (Tex.App.—Austin 1995, writ
> denied). ... Through the standstill agreement, J & H received written notice
> that Kenneco was claiming a right to compensation.[24]

In its motion to the trial court, the Bank cited *Brookshire Grocery Co. v.*

*Smith,* 99 S.W.3d 819 (Tex. App.–Beaumont 2003, pet. denied) in support of its

assertion that "there must be a demand for payment or compensation;" however,

---

[23]*Johnson*, 962 S.W.2d at 531 (analyzing the common-law requirement of "written notice of a claim" to trigger prejudgment interest)

[24]*Johnson*, 962 S.W.2d at 531.

*Brookshire* actually confirms that *either* a demand *or* an assertion of a right to be paid will suffice, stating, "The term 'claim' describes a demand for compensation or an assertion of a right to be paid." *Brookshire,* 99 S.W.3d at 824, citing *Johnson*, 962 S.W.2d at 531 and *Robinson v. Brice,* 894 S.W.2d 525, 528 (Tex. App. – Austin 1995, writ denied).

This Court's opinion in *K Mart Corp. v. Rhyne*, 932 S.W.2d 140 (Tex. App.–Texarkana 1996, no pet.) also demonstrates that no demand for payment is required in order for a writing to constitute a "claim" for purposes of pre-judgment interest. In *K Mart*, this Court held that providing a medical release form which simply stated, "this information is to be used for the purposes of evaluating and handling my claim for injuries" constituted sufficient written notice of a claim to start prejudgment interest.[25] No "demand" for compensation or payment was made.

In reaching its decision in *K Mart*, this Court cited *Bevers v. Soule,* 909 S.W.2d 599 (Tex. App.–Fort Worth 1995, no pet.) In *Bevers,* as in *K Mart*, no demand for payment was made. Instead, the plaintiff simply sent a medical authorization along with some medical receipts and a letter stating the authorization was enclosed "so that you could obtain the necessary information to

---

[25]*K Mart,* 932 S.W.2d at 146.

properly consider my injury claim."[26]  The defendant argued the letter was not a "claim" because it "did not state the nature of the complaint or the amount of damages sought," but the court confirmed such is not required.[27]

The *K Mart* opinion references the Austin Court of Appeals' holding in *Robinson v. Brice* that mere "notice of an accident and injuries" is not sufficient to constitute notice of a claim, commenting that "*Robinson* requires written notice of a claim, i.e., a legal demand for payment or compensation." *K Mart,* 932 S.W.2d at 145.  This distinction between "notice of an accident" and a "demand for payment" should not be misunderstood as construing *Robinson* to always require a "demand."  The only issue in *Robinson* was whether an accident report constituted a notice of claim.  The *Robinson* opinion states, "Although the accident report notified Highlands that an accident had occurred, and that Brice had been injured, it was not notice of a demand for payment or compensation by Brice or on Brice's behalf, and thus was not notice of a claim;" however, this language must not be mis-construed as holding that a "demand" is always required, as the opinion goes on to expressly explain that either a demand *or* an assertion of a right to be paid

_____

[26]*Bevers,* 909 S.W.2d at 603.

[27]*Id.* (noting that, "Nothing in [the prejudgment interest statute] requires the claimant to demand an exact amount or list every element of damage claimed in order to trigger the notice of claim provision.")

will suffice:

> The statute does not define the term "claim," and therefore, we must construe it according to its ordinary meaning. Tex.Gov't Code Ann. § 312.002(a) (West 1988) [now *see* § 311.011]; *Hopkins v. Spring Indep. Sch. Dist.*, 736 S.W.2d 617, 619 (Tex.1987). The word "claim" ordinarily means a demand for compensation *or* an assertion of a right to be paid.
> ...
> The accident report fails as written notice of a claim ... because it is not notice of a demand for compensation *or* an assertion of a right to be paid.[28]

In the case at bar, Smith's "Application For Investigative Depositions," served on the Bank on October 24, 2008,[29] constituted a "claim," as defined in all these authorities. It plainly and explicitly notified the Bank of Plaintiff's claim for malicious prosecution. Indeed, it set out the factual bases of the claim in some detail – describing how the bank "caused a criminal complaint to be filed against John Alexander Smith," leading to Smith's arrest and indictment and proximately causing substantial damages, all while the Bank "knew he was not guilty of the criminal offense of hindering a secured creditor" – and specifically notified the Bank of Smith's claim for malicious prosecution, asserting, "Petitioner alleges that he believes that he has grounds for a lawsuit under the doctrines of false

---

[28] *Robinson,* 894 S.W.2d at 528 (emphasis added).

[29] CR:585; Appx. E (Petitioner's Application for Investigative Depositions – enclosed with Plaintiff's letter to trial court submitting proposed judgment).

imprisonment, false arrest, and malicious prosecution."[30]

Any argument that Smith's notification that he had grounds for a malicious prosecution lawsuit was not a "claim" because it was merely a "potential claim," has no merit. The Finance Code, by providing that interest begins to accrue on the earlier of 180 days after notice of a claim or the date suit is filed, specifically recognizes that "notice of a claim" does not require actually filing a claim. Before a lawsuit is filed, any claim may be referred to as "potential" – as where a party is attempting to investigate or negotiate before determining whether a lawsuit will actually be filed – but it is still a "claim." Written notice to the potential defendant asserting that a claim exists – as opposed to the actual filing and pursuit of a cause of action – is all that is required.

By way of close analogy, the Texas Tort Claims Act provides that a governmental unit is required to receive "notice of a claim" within six months of the incident giving rise to it. TEX. CIV. PRAC. & REM. CODE § 101.101(a). The statute provides that the notice must reasonably describe the injury or damage claimed, the time and place of the incident, and the incident, but contains no requirement that any sort of demand for payment be included, or that any lawsuit to pursue the claim be filed. *Id.*

---

[30]CR:586-588; Appx. E (Application pp. 2-4, paragraphs 6-14)

Just as "notice of a claim" under the Tort Claims Act does not require any demand, lawsuit, or other affirmative action to pursue or collect a claim, "notice of a claim" under the Texas Finance Code likewise requires only "notice" of a claim, not a "demand" or "pursuit" of a claim. The Bank clearly received written notice that Smith was asserting he held a malicious prosecution claim, as well as the basis for such claim, when it received Smith's written application containing such assertions on October 24, 2008.

**B.** **Pursuant to section 304.104 of the Texas Finance Code, the proper amount of prejudgment interest to be awarded to Plaintiff is $84,542.00, rather than $54,243.00.**

The trial court's original judgment properly calculated prejudgment interest at $84,542.00, and the court's math has never been in dispute. The calculations are included here in order to ensure full briefing.

Section 304.104 of the Texas Finance Code provides that prejudgment interest accrues beginning on the 180th day after the date a defendant receives written notice of a claim and ending the day before the judgment is signed.

As addressed above, the Bank received written notice of Plaintiff's claim on October 24, 2008. One-hundred-and-eighty days after this date was April 22,

2009.[31]

The trial court's judgment in this case was signed on December 15, 2014.[32] From April 22, 2009, to December 14, 2014, is 2,062 days. At the annual rate of five percent, yearly interest on $300,000.00[33] is $15,000.00.[34] Dividing that amount by 365 days, the daily interest amount is $41.00 (rounded down). Multiplying $41.00 by 2,062 days yields total prejudgment interest of $84,542.00. This was the amount originally ordered by the court, prior to granting the Bank's motion to amend, and is the proper amount of prejudgment interest.

## PRAYER

For the foregoing reasons, Cross-Appellant respectfully requests:

1.    that this Court modify the trial court's judgment so as to include $84,542.00 in prejudgment interest and affirm it as so-modified; and/or

---

[31]Cross-Appellant respectfully requests this Court to take judicial notice of the dates and mathematical calculations set forth in this section. *See Freedom Com., Inc. v. Coronado,* 372 S.W.3d 621, 623 (Tex. 2012) ("An appellate court may take judicial notice of a relevant fact that is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); TEX. R. EVID. 201.

[32]CR:582; Appx. A (Court's Judgment)

[33]The judgment awarded $300,000.00 in compensatory damages, not including interest. *Id.*

[34].05 x 300,000 = 15,000.

2.     that this Court reverse and render judgment, in part, so as to include

$84,542.00 in prejudgment interest, affirming the remainder of the judgment; and

3.     that Cross-Appellant recover the appellate costs incurred by him herein; and

4.     that Cross-Appellant have all other and/or further relief that the law and the

nature of this case may require.

Respectfully submitted,

/s/ J. Mark Sudderth
**J. Mark Sudderth**
**Texas Bar No. 19461500**
NOTEBOOM – THE LAW FIRM
669 Airport Freeway, Suite 100
Hurst, Texas  76053
(817) 282-9700
(817) 282-8073 (facsimile)
Sudderth@Noteboom.com

Attorneys for Cross-Appellant,
John Alexander Smith

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the attached document been served upon all counsel record on the 16th day of September, 2015, via e-service, to the attorneys of record for Cross-Appellee City National Bank of Sulphur Springs as follows:

John R. Mercy
Mercy, Carter, Tidwell, L.L.P.
1724 Galleria Oaks Drive
Texarkana, Texas 75503
E-mail: jmercy@texarkanalawyers.com

Coy Johnson
E-mail: coy@clayjohnsonlaw.com
Clay Johnson
E-mail: clay@clayjohnsonlaw.coim
Johnson Law Firm, P.C.
609 Gilmer Street
Sulphur Springs, Texas 75482

/s/ J. Mark Sudderth
J. Mark Sudderth

## CERTIFICATE OF COMPLIANCE

This document complies with the typeface requirements of TEX. R. APP. P. § 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes.

I certify that this brief was prepared with Corel WordPerfect X5, and that, according to that program's word-count function, the sections covered by TEX. R. APP. P. § 9.4(i)(1) contain 2,905 words, thus bringing the brief into compliance with the word-count limitations of that Rule.

/s/ J. Mark Sudderth
J. Mark Sudderth

# APPENDIX

A. Final Judgment (CR:582)

B. Order on Motion to Modify Judgment (SCR:5)

C. Jury Charge and Verdict (CR:535)

D. Tex. Fin. Code 304.104

E. Petitioner's Application for Investigative Depositions (CR:585)

F. Plaintiff's letter to trial court submitting proposed judgment (CR:584)

G. Defendant's Motion to Modify Judgment (CR:605)

H. Plaintiff's Response to Defendant's Motion to Modify Judgment (CR:615)

I. *Bevers v. Soule* (Tex. App.–Fort Worth 1995)

J. *Brookshire Grocery Co. v. Smith* (Tex. App.–Beaumont 2003)

K. *Freedom Com., Inc. v. Coronado* (Tex. 2012)

L. *Helena Chemical Co. v. Watkins* (Tex. App.–San Antonio 2000)

M. *Hopkins v. Spring Indep. Sch. Dist.* (Tex.1987)

N. *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.* (Tex. 1998)

O. *K Mart Corp. v. Rhyne* (Tex. App.–Texarkana 1996)

P. *MCN Energy v. Omagro de Colombia* (Tex. App.–Fort Worth 2003)

Q. *Pringle v. Moon* (Tex. App.–Fort Worth 2005)

R. *Quick v. City of Austin* (Tex.1998)

S. *Robinson v. Brice* (Tex. App.–Austin 1995)

T.    *Tex. Dep't of Transp. v. Needham* (Tex.2002)

U.    *Toshiba Mach. Co. v. SPM Flow Control, Inc.* (Tex. App.–Fort Worth 2005)

V.    TEX. R. EVID. 201

W.    TEX. CIV. PRAC. & REM. CODE § 101.101

X.    TEX. GOV. CODE § 311.011



CAUSE NO. CV 40681

| | | |
|---|---|---|
| JOHN ALEXANDER SMITH, | § | IN THE DISTRICT COURT |
| PLAINTIFF | § | |
| | § | HOPKINS DISTRICT CORNER |
| V. | § | COUNTY CLERK |
| | § | 62ND JUDICIAL DISTRICT |
| CITY NATIONAL BANK OF | § | |
| SULPHUR SPRINGS, | § | |
| DEFENDANT | § | HOPKINS COUNTY, TEXAS |

FILED
2014 DEC 15 PM 1:41

## FINAL JUDGMENT

On the 17th day of November, 2014, this cause came on to be heard. Plaintiff JOHN ALEXANDER SMITH appeared in person and by his attorney of record and announced ready for trial, and Defendant CITY NATIONAL BANK OF SULPHUR SPRINGS appeared by its attorney of record and announced ready for trial. A jury having previously been demanded, a jury consisting of twelve (12) qualified jurors was duly empaneled and the case proceeded to trial.

At the conclusion of the evidence, the court submitted the questions of fact in the case to the jury. The charge of the court and the verdict of the jury are incorporated herein for all purposes by reference. Because it appears to the court that the verdict of the jury was for the Plaintiff against the Defendant, judgment should be rendered on the verdict in favor of the Plaintiff JOHN ALEXANDER SMITH and against Defendant CITY NATIONAL BANK OF SULPHUR SPRINGS.

It further appears to the Court that the amount of damages to be recovered by the Plaintiff should be reduced by $100,000 in accordance with TEX. CIV. PRAC. & REM. CODE § 33.012(b).

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED by the court that Plaintiff JOHN ALEXANDER SMITH have and recover compensatory damages – including

*Final Judgment – Page 1*

**582**

$400,000 in such damages found by the jury, reduced by $100,000 as referenced above, as well as pre-judgment interest on $300,000 – from Defendant CITY NATIONAL BANK OF SULPHUR SPRINGS, in the sum of $84,542 , for Total damages of $384,542.

IT IS FURTHER ORDERED, ADJUDGED, and DECREED by the court that Plaintiff JOHN ALEXANDER SMITH have and recover exemplary damages from Defendant CITY NATIONAL BANK OF SULPHUR SPRINGS in the sum of $500,000.00.

IT IS FURTHER ORDERED that all costs of court spent or incurred in this cause are adjudged against Defendant CITY NATIONAL BANK OF SULPHUR SPRINGS.

IT IS FURTHER ORDERED that the total amount of the judgment here rendered will bear interest at the rate of 5.00 percent from March 15, 2014 until paid.

All relief requested in this case and not expressly granted is denied. This judgment finally disposes of all parties and all claims and is appealable.

All writs and processes for the enforcement and collection of this judgment or the costs of court may issue as necessary.

SIGNED on March 15, 2014

_____
JUDGE PRESIDING

*Final Judgment – Page 2*

**583**

B

NO. CV40681

FILED
2015 FEB 11 AM 10: 48

| | | |
|---|---|---|
| JOHN ALEXANDER SMITH | ) | IN THE DISTRICT COURT |
| | ) | |
| V. | ) | OF HOPKINS COUNTY, TEXAS |
| | ) | |
| CITY NATIONAL BANK OF | ) | |
| SULPHUR SPRINGS | ) | 62ND JUDICIAL DISTRICT |

## ORDER ON MOTION TO MODIFY JUDGMENT

On February 5, 2015, the Court considered Defendant City National Bank of Sulphur Springs' Motion to Modify Judgment. After considering the motion and argument of counsel, the Court is of the opinion that the motion should be granted.

IT IS, THEREFORE, ORDERED that Defendant City National Bank of Sulphur Springs' Motion to Modify is GRANTED.

IT IS FURTHER ORDERED that the Court's Judgment entered on December 15, 2014 is modified to show that the proper amount of prejudgment interest awarded to Plaintiff in this case is Fifty-four Thousand Two Hundred Forty-three Dollars ($54,243.00).

DATED: February 9, 2015

WILL BIARD, Judge Presiding

C

Filed 11/20/14
10:55 a.m.

| | | |
|---|---|---|
| JOHN ALEXANDER SMITH, PLAINTIFF | § § § | IN THE DISTRICT COURT |
| VS. | § § | 62ND JUDICIAL DISTRICT |
| CITY NATIONAL BANK OF SULPHUR SPRINGS, DEFENDANT | § § § § | HOPKINS COUNTY, TEXAS |

2014 NOV 20 PH 3:49
PATRICIA DORNER DISTRICT CLERK HOPKINS COUNTY, TEXAS
FILED

## GENERAL INSTRUCTIONS

LADIES AND GENTLEMEN OF THE JURY:

This case is submitted to you by asking questions about the facts, which you must decide from the evidence you have heard in this trial. You are the sole judges of the credibility of the witnesses and the weight to be given their testimony, but in matters of law you must be governed by the instructions in this Charge. In discharging your responsibility on this jury, you will observe all the instructions which have previously been given you. I shall now give you additional instructions which you should carefully and strictly follow during your deliberations.

1. Do not let bias, prejudice or sympathy play any part in your deliberations.

2. In arriving at your answers, consider only the evidence introduced here under oath and such exhibits, if any, as have been introduced for your consideration under the rulings of the Court; that is, what you have seen and heard in this courtroom, together with the law as given you by the Court. In your deliberations, you will not consider or discuss anything that is not represented by the evidence in this case.

3. Since every answer that is required by the Charge is important, no juror should state or

Received 11/20/14
3:40 p.m.

Page 1

535

8.    The presiding juror or any other who observes a violation of the Court's instructions shall immediately warn the juror who is violating the same and caution the juror not to do so again. When words are used in this charge in a sense that varies from the meaning commonly understood, you are given a proper legal definition, which you are bound to accept in place of any other meaning.

9.    Answer "Yes" or "No" to all questions unless otherwise instructed. Unless otherwise stated, a "Yes" answer must be based on a preponderance of the evidence. If you do not find that a preponderance of the evidence supports a "Yes" answer, then answer "No". The term "preponderance of the evidence" means the greater weight and degree of credible testimony or evidence introduced before you and admitted in this case. Whenever a question requires other than a "Yes" or "No" answer, your answer must be based on a preponderance of the evidence.

10.   A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

consider that any required answer is not important.

4. You must not decide who you think should win, and then try to answer the questions accordingly. Simply answer the questions, and do not discuss nor concern yourselves with the effect of your answers.

5. You will not decide the answer to a question by lot or by drawing straws, or by any other method of chance. Do not return a quotient verdict. A quotient verdict means that the jurors agree to abide by the result to be reached by adding together each juror's figures and dividing by the number of jurors to get an average. Do not do any trading on your answers; that is, one juror should not agree to answer a certain question one way if others will agree to answer another question another way.

6. You may render your verdict upon the vote of ten or more members of the jury. The same ten or more of you must agree upon all of the answers made and to the entire verdict. You will not, therefore, enter into an agreement to be bound by a majority of any other vote of less than ten jurors. If the verdict and all of the answers therein are reached by unanimous agreement, the presiding juror shall sign for the entire jury. If any juror disagrees as to any answer made by the verdict, those jurors who agree to all findings shall each sign the verdict.

7. These instructions are given you because your conduct is subject to review the same as that of the witnesses, parties, attorneys and judge. If it should be found that you have disregarded any of these instructions, it will be jury misconduct and it may require another trial by another jury; then all of our time will have been wasted.

## QUESTION 1:

Did City National Bank of Sulphur Springs maliciously prosecute John Alexander Smith?

"Malicious prosecution" occurs when one person initiates or procures, with malice, and without probable cause at the time the prosecution is commenced, the prosecution of an innocent person.

"Malice" means ill will, bad or evil motive, or such gross indifference to the rights of others as to amount to a willful or wanton act.

"Probable cause" means the existence of such facts and circumstances as would excite belief in a person of reasonable mind, acting on the facts or circumstances within his knowledge at the time the prosecution was commenced, that the other person was guilty of a criminal offense. The probable cause determination asks whether a reasonable person would believe that a crime had been committed given the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were instituted.

A person procures a criminal prosecution if his actions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred. A person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, unless the person fails to fully and fairly disclose all material information known to him or knowingly provides false information. A criminal prosecution may be procured by more than one person.

You are instructed that the criminal offense of Hindering a Secured Creditor occurs when a debtor, with intent to hinder enforcement of a lienholder's interest, destroys, removes, conceals, encumbers, transfers out of the State of Texas, or otherwise harms or reduces the value of collateral.

In addition, the offense of Hindering a Secured Creditor occurs when a debtor who does not have a right to sell or dispose of the secured property, or who is required to account to the secured party for the proceeds of a permitted sale or disposition, sells or otherwise disposes of the secured property, or does not account to the secured party for the proceeds of a sale or other disposition as required, with intent to appropriate the proceeds or value of the secured property

The law does not outlaw refusal by the debtor to reveal the location of collateral, nor does it outlaw the mere refusal to deliver property upon demand. Nor does it make the debtor's concealment of himself an offense.

Answer "Yes" or "No."

ANSWER: _____Yes_____

If you have answered "Yes" to Question 1, answer Question 2. Otherwise, do not answer Question 2.

**QUESTION 2:** What some of money, if paid now in cash, would fairly and reasonably compensate John Alexander Smith for his injuries, if any, that resulted from the occurrence in question?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Answer separately, in dollars and cents, for damages, if any.

a. Physical pain and mental anguish.

ANSWER: $ 150,000

b. Injury to reputation.

ANSWER: $ 250,000

**Answer the following question only if you unanimously answered "Yes" to Question 1. Otherwise, do not answer the following question.**

**To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.**

**QUESTION 3:**

Do you find by clear and convincing evidence that the harm to John Alexander Smith resulted from malice?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means ill will, bad or evil motive, or such gross indifference to the rights of others as to amount to a willful or wanton act.

Answer "Yes" or "No."

ANSWER: _Yes_

Answer the following question only if you unanimously answered "Yes" to Question 3. Otherwise, do not answer the following question.

**QUESTION 4:**

You are instructed that you must unanimously agree on the amount of any award of exemplary damages.

What sum of money, if any, should be assessed against City National Bank of Sulphur Springs and awarded to John Alexander Smith as exemplary damages for the conduct found in response to Question 3?

"Exemplary damages" means any damages awarded as a penalty or by way of punishment but not for compensatory purposes, Exemplary damages includes punitive damages.

Factors to consider in awarding exemplary damages, if any, are –

a. The nature of the wrong.
b. The character of the conduct involved.
c. The degree of culpability of the wrongdoer.
d. The situation and sensibilities of the parties concerned.
e. The extent to which such conduct offends a public sense of justice and propriety.
f. The net worth of City National Bank of Sulphur Springs.

Answer in dollars and cents, if any.

ANSWER: $500,000

## SPECIAL INSTRUCTIONS

After you retire to the jury room, you will select your own presiding juror. The first thing the presiding juror will do is to have this complete charge read aloud and then you will deliberate upon your answers to the questions asked.

It is the duty of the presiding juror - -

1.      to preside during your deliberations,

2.      to see that your deliberations are conducted in an orderly manner and in accordance with the instructions in this charge,

3.      to write and hand to the bailiff any communications concerning the case that you desire to have delivered to the Judge,

4.      to vote on the questions,

5.      to write your answers to the questions in the spaces provided,

6.      to certify to your verdict in the space provided for the presiding juror's signature or to obtain the signatures of all the jurors who agree with the verdict if your verdict is less than unanimous.

You should not discuss the case with anyone, not even with other members of the jury, unless all of you are present and assembled in the jury room. Should anyone attempt to talk to you about the case before the verdict is returned, whether at the courthouse, at your home, or elsewhere, please inform the judge of this fact.

When you have answered all the questions you are required to answer under the instructions of the judge and your presiding juror has placed your answers in the space provided and signed the verdict as presiding juror or obtained the signatures, you will inform the bailiff at the door of the jury room that you have reached a verdict, and then you will return into the courtroom with your verdict.

JUDGE PRESIDING

# CERTIFICATE NO. 1

We, the jury, have answered questions number 1 and number 2 as herein indicated, and herewith return same into court as our verdict.

(To be signed by the presiding juror if unanimous.)

_Sandra Buttrill_
PRESIDING JUROR

(To be signed by those rendering the verdict if not unanimous.)

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

# CERTIFICATE NO. 2

We, the jury, have answered question number 3 as herein indicated, and herewith return same into court as our verdict.

(To be signed by the presiding juror if unanimous.)

_Sandra Bittill_
PRESIDING JUROR

(To be signed by those rendering the verdict if not unanimous.)

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

CERTIFICATE NO. 3

We, the jury, have unanimously answered question number 4 as herein indicated, and herewith return same into court as our verdict.

(To be signed by the presiding juror if unanimous.)

_Sandra Butterill_
PRESIDING JUROR

# D

# V.T.C.A., Finance Code § 304.104

## § 304.104. Accrual of Prejudgment Interest

Except as provided by Section 304.105 or 304.108, prejudgment interest accrues on the amount of a judgment during the period beginning on the earlier of the 180th day after the date the defendant receives written notice of a claim or the date the suit is filed and ending on the day preceding the date judgment is rendered. Prejudgment interest is computed as simple interest and does not compound.

**Credits**
Amended by Acts 1999, 76th Leg., ch. 62, § 7.18(a), eff. Sept. 1, 1999.

E



CAUSE NO. C1138727

| | | |
|---|---|---|
| JOHN ALEXANDER SMITH | § | IN THE DISTRICT COURT |
| Plaintiff | § | |
| | § | |
| VS. | § | |
| | § | OF |
| | § | |
| CITY NATIONAL BANK OF | § | |
| SULPHUR SPRINGS, TEXAS | § | |
| and JERRY DEAN CONE | § | |
| | § | |
| Defendants | § | HOPKINS COUNTY, TEXAS |

## PETITIONER'S APPLICATION FOR INVESTIGATIVE DEPOSITIONS

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES JOHN ALEXANDER SMITH, hereinafter called "Petitioner" complaining

of CITY NATIONAL BANK OF SULPHUR SPRINGS, TEXAS and JERRY DEAN CONE,

hereinafter called "Respondents" or "Bank" or "Cone", and would respectfully show the Court as

follows:

I.

1.  Petitioner is a resident of Pflugerville, Travis County, Texas

2.  Respondent City National Bank of Sulphur Springs, Texas is a National Bank which has its

principal place of business at 1108 S. Broadway, Sulphur Springs, Texas 75482 and may be served

by and through its President, Lee Teets at 1108 S. Broadway, Sulphur Springs, Texas 75482.

3.  Respondent Jerry Dean Cone resides at 801 Kelli Circle, Sulphur Springs, Texas 75482

where he may be served.

4.  Venue is properly placed in Hopkins County, Texas because the intentional acts which form

the basis for this application occurred in Hopkins County, Texas.

**585**

5.  Petitioner files this application under the terms and provisions of Texas Rules of Civil Procedure § 202.2(d)(2). Petitioner seeks to investigate a potential claim by Petitioner against Respondents.

## II.

6.  The basis for this application is as follows: On May 15, 2005, City National Bank caused a criminal complaint to be filed against John Alexander Smith with the Hopkins County District Attorney's office. The complaint alleged that Petitioner hindered the bank, a secured creditor in violation of the Texas Penal Code § 32.33, a felony. The Bank claimed that Petitioner sold and disposed of a Toyota 860-12 needle embroidery machine that he had pledged to the bank to secure a promissory note. The Bank claimed that Petitioner disposed of the collateral with an intent to misappropriate the proceeds and not turn over the proceeds to the Bank as required by the terms and provisions of documents he had signed in connection with his loan with the Bank.

7.  Subsequently, the Hopkins County District Attorney and the Bank presented the complaint and their evidence to a Hopkins County Grand Jury with a recommendation that it return an indictment against Petitioner. Petitioner was indicted for the felony offense of hindering a secured creditor, a violation of the Texas Penal Code. The bank, District Attorney, and the Grand Jury recommended bail be set in the amount of $10,000.00.

8.  Petitioner was not advised of either the complaint filed against him by the Bank, or the later indictment returned by the Grand Jury. Petitioner became a criminal Defendant in a case styled: *State of Texas v. John Alexander Smith* pending in the 8th Judicial District Court of Hopkins County, Texas under cause number 06-18569.

586

9. When the criminal complaint against Petitioner was filed, a warrant for his arrest was issued. Likewise, when he was indicted a warrant for Petitioner's arrest was issued. The outstanding warrants were placed in the statewide notification system alerting certain law enforcement persons that there was an outstanding warrant against Petitioner.

10. On or about March 14, 2006, while on a fishing trip in Henderson County, Texas, Petitioner was stopped by the Texas Department of Public Safety Highway Patrol at a routine driver's license checkpoint. Though Petitioner's driver's license was verified on the State computer, the outstanding warrant was displayed. Petitioner was immediately taken into custody with no explanation. He spent ten days in jail in Athens, Henderson County, Texas, the county of his arrest. Later, he was transferred to the Hopkins County Jail in Sulphur Springs, Texas, the venue of the criminal case. Petitioner's bail on the alleged violation was set in the amount of $10,000. Petitioner was able to post bail but was required to timely report to the District Court each time the case was set for trial or pre-trial as a condition of his bail. Petitioner retained an attorney to represent him in the case. The case was called for trial fourteen times. The Petitioner and his attorney appeared each time the case was set for trial or pre-trial before the Court. Petitioner made approximately fifteen Court appearances. At each appearance, Petitioner pleaded not guilty, that he was ready for trial, and demanded a trial. The State never announced ready for trial. Instead, the State advised the Judge that the witnesses for the bank were not present and were not available, or that additional time was needed to prepare the case.

11. Finally, On January 3, 2008, the District Judge advised the District Attorney that the case against the Petitioner must be disposed of that day. This District Attorney offered the Petitioner the opportunity to plead guilty, which Petitioner refused to do. The Petitioner again announced that he was not guilty and that he was ready for a jury trial. The District Attorney again claimed that no

587

witnesses from the Bank could be produced, or that the Bank wished to discontinue the prosecution. The same day, January 3, 2008, the presiding Judge entered an order dismissing the prosecution and ordered the Petitioner to be released.

12. As a proximate result of the charges filed against him, Petitioner lost his security clearance and was ordered off of a construction site at Cape Canaveral, Florida. Petitioner works as a project supervisor. Most of his work has to do with government projects such as, missile installations, military housing, FEMA and the like. Being unaware of the charges, Petitioner was not able to contest or explain the charges until his later arrest and incarceration. Even after he learned of the charges, he was out of jail on bail and could not leave the State until the Court finally dismissed the charges. All of the time that Petitioner was under the effects of the criminal case, the Respondents knew he was not guilty of the criminal offense of hindering a secured creditor.

13. Well before the complaining indictment was filed, Petitioner believes that the Bank and its officers, and employees knew that the embroidery machine had been sold to a third-party by one of the Bank officers. Petitioner believes that the officer who sold the machine concealed the sale from Petitioner, Petitioner's attorney, and the District Attorney.

14. Petitioner alleges that the Respondents instigated criminal charges against him when they had no reasonable basis for doing so. As a result, he was charged with a serious criminal offense which resulted in his indictment and his incarceration. He then was required to face a Court and defend himself against all charges until the charges were finally dismissed in his favor. Petitioner alleges that he believes that he has grounds for a lawsuit under the doctrines of false imprisonment, false arrest, and malicious prosecution.

15. Petitioner desires to take the oral deposition of corporate representatives of Respondents under TRCP 199.2(b)(1). The Court is asked to require Respondents to produce a person or persons

588

who are most knowledgeable about the following subjects:

a.      The instance involving the alleged sale of the embroidery machine;

b.      The location of the embroidery machine just immediately prior to its sale;

c.      Any repossession of the embroidery machine by the Respondents;

d.      The names of all employees of Respondents who had anything to do with the filing of charges against Petitioner; and

e.      The names of all persons, either employed by Respondents or to be acting on Respondents behalf who had anything to do with the repossession and sale of the embroidery machine.

16.     One of the persons whom Petitioner desires to depose is Jerry Dean Cone, a Respondent.

17.     Petitioner believes he has thoroughly investigated the incident which is the basis for this application as best he can. However, he has not been able to locate the person who allegedly purchased the machine, nor records pertaining to the machines sale/purchase. It is Petitioner's belief that Respondents are well aware that the persons employed by the Bank who have knowledge that the embroidery machine was in fact repossessed by the Bank and sold by the Bank. Such facts are vital to Petitioners determining whether or not he will file a lawsuit against the Respondents.

### III.

18.     Petitioner requests the Court to:

a.      Set a hearing to determine this Motion;

b.      For an Order granting the Motion which orders the taking of depositions of the corporation previously identified at a location ordered by the Court if not agreed upon by the parties.;

589

c.    That a Subpoena be issued to Respondents requiring Respondents to produce all records which in any way pertain to the subject matter of this application; and

d.    Such other relief to which Petitioner may be entitled.

Respectfully submitted,

CLARK, LEA & PORTER
604 Woldert Street
P. O. Box 98
Tyler, Texas 75710
Phone 903.593.2514
Facsimile 903.595.1294

By: _____
Charles H. Clark
State Bar No. 04274000

Gregory S. Porter
State Bar No. 24002785

ATTORNEYS FOR PETITIONER

**590**

**F**



# NOTEB(O)M
— THE LAW FIRM —

November 25, 2014

Brian W. Butcher*
Thomas A. Herald
Charles M. Noteboom*
J. Mark Sudderth

Hon. Will Biard, Judge
62nd Judicial District Court
PO Box 391
Sulphur Springs, TX 75483

*F. le*

Re:     Proposed Judgment: Cause No. CV40681: *Smith v. City National Bank*

Dear Judge Biard:

As requested by the Court, Plaintiff hereby submits the enclosed proposed judgment. The dollar amounts are calculated as follows:

Actual damages found by the jury total $400,000.00. This amount is reduced by a credit of $100,000.00, which is the gross amount of Plaintiff's prior settlement with Defendant Charles Clark. Prejudgment interest is calculated on the remaining $300,000.00.

Section 304.104 of the Texas Finance Code provides that prejudgment interest accrues beginning on the 180th day after the date a defendant receives written notice of a claim and ending the day before the judgment is signed. In this case, City National Bank was served with Plaintiff's "Application For Investigative Depositions" which clearly and explicitly notified Defendant of Plaintiff's claim. A copy is enclosed. In particular, paragraphs 6 through 14 of the application set out the factual bases of the claim, and paragraph 14 specifically alleges a claim for "malicious prosecution." A copy of the officer's return is also enclosed, showing the bank was served and thus received notice of such claim on October 24, 2008.

One-hundred-and-eighty days after this date was April 22, 2009. From April 22, 2009, to Sunday, November 30, 2014, is 2048 days. At the annual rate of five percent, yearly interest on $300,000.00 is $15,000.00. Dividing that amount by 365 days, the daily interest amount is $41.00 (rounded down). Multiplying $41.00 by 2048 days yields total prejudgment interest of $83,968.00 through November 30, 2014. This is the amount included in the attached draft, which is prepared to be signed on Monday, December 1. If the judgment is signed earlier or later, the amount should be adjusted up or down accordingly, at the rate of $41.00 per day. (I also enclose an extra copy of the proposed judgment with blanks for the compensatory damages total and the date post-judgment interest commences, in case it is signed on a different date.)

In accordance with the verdict, the proposed judgment also includes punitive damages in the amount of $500,000.00. It also includes an award of all taxable court costs to Plaintiff and provides for post-judgment interest on the entire judgment at 5%.

Respectfully Submitted,

J. Mark Sudderth
Attorney for Plaintiff
State Bar No. 19461500

JMS/ms
Enclosures

cc: Coy Johnson (with enclosure)

G

NO. CV40681

FILED
AT 4:00 o'clock P M
JAN 12 2015

| | | |
|---|---|---|
| JOHN ALEXANDER SMITH | ) | IN THE DISTRICT COURT |
| | ) | |
| V. | ) | OF HOPKINS COUNTY, TEXAS |
| | ) | |
| CITY NATIONAL BANK OF | ) | |
| SULPHUR SPRINGS | ) | 62ND JUDICIAL DISTRICT |

## CITY NATIONAL BANK OF SULPHUR SPRINGS' MOTION TO MODIFY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now CITY NATIONAL BANK OF SULPHUR SPRINGS, Defendant, and asks this Court to modify the judgment entered on December 15, 2014, and would show unto the Court the following:

I.

Plaintiff, John Alexander Smith, sued Defendant, City National Bank of Sulphur Springs, for malicious prosecution.

II.

The case was tried to a jury beginning on November 17, 2014.

III.

The Court signed a judgment on December 15, 2014.

IV.

The Court should modify the judgment because it is incorrect. The Court has the power to modify the judgment as long as it retains plenary jurisdiction over the judgment. The Court retains plenary jurisdiction over the judgment in this case until January 14, 2015. (Upon the filing of Defendant's Motion for New Trial that jurisdiction will be extended until March 16, 2015).

**605**

V.

The judgment is incorrect because it does not award the correct amount of prejudgment interest.

VI.

The Court's judgment awards prejudgment interest in the amount of $84,542.00. This calculation was made upon Plaintiff's representation to the Court that interest should begin to accrue on April 27, 2009. (See attached Exhibit "A"). Plaintiff claims that on October 24, 2008 Plaintiff served an Application for Investigative Depositions upon the Defendant which constituted a claim under Texas Finance Code § 304.104. Section 304.104 provides that prejudgment interest accrues on the amount of the judgment during the period beginning on the 180th day after the date the defendant receives written notice of a claim or on the date the suit is filed, whichever occurs first.

VII.

The Court's miscalculation of prejudgment interest stems from the Plaintiff's belief that their Application for Investigative Depositions constituted a "claim." The belief is not supported by the case law. Typically the term "claim" describes a demand for compensation or an assertion of a right to be paid. See Johnson & Higgins of Texas, Inc. v. Kenaco Energy, Inc., 962 S.W.2d 507, 531 (Tex. 1998); see also Robinson v. Bryce, 894 S.W.2d 525, 528 (Tex. App. – Austin 1995, writ denied). The prejudgment interest statute does not have a definition of claim. Therefore, this Court must be led by the object and purpose of the prejudgment interest statute. DeLeon v. Harlingen Consol. Indep. School Dist., 552 S.W.2d 922, 925 (Tex. Civ. App. – Corpus Christi 1977, no writ) . The purpose of the prejudgment interest statute in addition to ensuring that plaintiffs are fully compensated is to (1) encourage settlements, and (2) expedite settlements and trials by removing incentives for defendants to delay. Johnson v. Higgins, 962 S.W.2d at 529. The purposes of the

statute are not served by determining that prejudgment accrues before the date the defendant receives notice of the claim. Christus Health Gulf Coast v. Carswell, 433 3d 585, 611 (Tex. 2013).

To constitute a claim for purposes of the prejudgment statute there must be a demand for payment or compensation. Brookshire Grocery Co. v. Smith, 99 S.W.3d 819 (Tex. Civ. App. – Beaumont 2003, pet. denied), citing Robinson, 894 S.W.2d at 528. Here the Application for Investigative Depositions contained no such demand for payment. Thereafter any claim was barred by the statute of limitations and no claim was made. The first time any demand for payment was made upon Defendant was in Plaintiff's Second Amended Original Petition. In that amended petition for the first time City National was made aware that a demand for payment was being made. That amended petition was filed on May 2, 2011. Prejudgment interest should have been calculated from that date.

## VIII.

Properly calculated the prejudgment interest should run from the date that suit was filed against Defendant. That date was May 2, 2011. Using that correct date under § 304.104 of the Texas Finance Code as the starting date would allow the Court to award $54,243.00 as prejudgment interest.

## IX.

For the above stated reasons, CITY NATIONAL BANK OF SULPHUR SPRINGS asks the Court to grant this motion, and sign a corrected judgment that includes the correct amount of prejudgment interest, and for such other and further relief to which it may show itself to be entitled.

Respectfully submitted,

John R. Mercy
Texas State Bar No. 13947200
MERCY ✳ CARTER ✳ TIDWELL, L.L.P.
1724 Galleria Oaks Drive
Texarkana, TX 75503
Telephone: (903) 794-9419
Facsimile: (903) 794-1268
E-mail: jmercy@texarkanalawyers.com


Coy Johnson
Texas State Bar No. 10698000
Clay Johnson
Texas State Bar No. 24007450
JOHNSON LAW FIRM, P.C.
609 Gilmer Street
Sulphur Springs, TX 75482-4121
Telephone: (903) 885-8866
Facsimile: (903) 584-1313

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing *City National Bank of Sulphur Springs' Motion to Modify Judgment* has been forwarded to:

Mr. J. Mark Sudderth
NOTEBOOM LAW FIRM
669 Airport Freeway
Hurst, TX 76053

Attorney for Plaintiff, this _____ day of January, 2015.

John R. Mercy


NOTEB(X)M
THE LAW FIRM

November 25, 2014

Brian W. Butcher*
Thomas A. Herald
Charles M. Noteboom*
J. Mark Sudderth

Hon. Will Biard, Judge
62ⁿᵈ Judicial District Court
PO Box 391
Sulphur Springs, TX 75483

**EXHIBIT**
**"A"**

Re:    Proposed Judgment: Cause No. CV40681; *Smith v. City National Bank*

Dear Judge Biard:

As requested by the Court, Plaintiff hereby submits the enclosed proposed judgment. The dollar amounts are calculated as follows:

Actual damages found by the jury total $400,000.00. This amount is reduced by a credit of $100,000.00, which is the gross amount of Plaintiff's prior settlement with Defendant Charles Clark. Prejudgment interest is calculated on the remaining $300,000.00.

Section 304.104 of the Texas Finance Code provides that prejudgment interest accrues beginning on the 180ᵗʰ day after the date a defendant receives written notice of a claim and ending the day before the judgment is signed. In this case, City National Bank was served with Plaintiff's "Application For Investigative Depositions" which clearly and explicitly notified Defendant of Plaintiff's claim. A copy is enclosed. In particular, paragraphs 6 through 14 of the application set out the factual bases of the claim, and paragraph 14 specifically alleges a claim for "malicious prosecution." A copy of the officer's return is also enclosed, showing the bank was served and thus received notice of such claim on October 24, 2008.

One-hundred-and-eighty days after this date was April 22, 2009. From April 22, 2009, to Sunday, November 30, 2014, is 2048 days. At the annual rate of five percent, yearly interest on $300,000.00 is $15,000.00. Dividing that amount by 365 days, the daily interest amount is $41.00 (rounded down). Multiplying $41.00 by 2048 days yields total prejudgment interest of $83,968.00 through November 30, 2014. This is the amount included in the attached draft, which is prepared to be signed on Monday, December 1. If the judgment is signed earlier or later, the amount should be adjusted up or down accordingly, at the rate of $41.00 per day. (I also enclose an extra copy of the proposed judgment with blanks for the compensatory damages total and the date post-judgment interest commences, in case it is signed on a different date.)

In accordance with the verdict, the proposed judgment also includes punitive damages in the amount of $500,000.00. It also includes an award of all taxable court costs to Plaintiff and provides for post-judgment interest on the entire judgment at 5%.

Respectfully Submitted,

J. Mark Sudderth
Attorney for Plaintiff
State Bar No. 19461500

JMS/ms
Enclosures

cc: Coy Johnson (with enclosure)

669 Airport Freeway. Suite 100 • Hurst. Texas 76053-3698 • (817) 282-9700 • FAX (817) 282-8073 • www.noteboom.com
*Board Certified in Personal Injury Trial Law by the Texas Board of Legal Specialization

**610**

# H

CAUSE NO. CV-40681

| JOHN ALEXANDER SMITH | § | IN THE DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| v. | § | |
| | § | HOPKINS COUNTY, TEXAS |
| CITY NATIONAL BANK OF | § | |
| SULPHUR SPRINGS | § | |
| *Defendant* | § | 62nd JUDICIAL DISTRICT |

2015 FEB -6 AM 10: 37
CHERYL FLETCHER
DISTRICT CLERK
HOPKINS COUNTY, TEXAS
FILED

### PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO MODIFY JUDGMENT

Plaintiff, John Alexander Smith, files this objection and response to Defendant City National Bank of Sulphur Springs' Motion to Modify Judgment, and would respectfully show as follows:

This Court's Judgment properly awards pre-judgment interest beginning on April 22, 2009, which is one-hundred-and-eighty days after October 24, 2008, the date Defendant received written notice of Plaintiff's claim.

### Plaintiff Provided Written Notice of His Claim

On October 24, 2008, City National Bank was served with Plaintiff's "Application For Investigative Depositions"[1] which clearly and explicitly notified Defendant of Plaintiff's claim for malicious prosecution. In particular, paragraphs 6 through 14 of the application set out the factual bases of the claim in detail – describing how the bank "caused a criminal complaint to be filed against John Alexander Smith," leading to Smith's arrest and indictment and proximately causing substantial damages, all while the bank "knew he was not guilty of the criminal offense of hindering a secured creditor" – and paragraph 14 specifically notified the bank of Smith's claim for malicious prosecution, stating, "Petitioner alleges that he believes that he has grounds for a lawsuit under the doctrines of false imprisonment, false arrest, and malicious prosecution."

---

[1] A copy is attached as Exhibit A.

---

By detailing the facts, asserting that the bank's conduct had proximately caused damages, and specifically stating that Smith had grounds to file a lawsuit against the bank for malicious prosecution, this document clearly was sufficient to notify the bank of Smith's claim in such regard. Having been apprised of such claim, the bank could have attempted to settle with Mr. Smith, had it chosen to do so. Instead, the bank apparently chose to delay the investigation, hoping no suit would be filed within the one-year statute of limitations.

## No "Demand for Payment" Is Required

Although the bank undeniably had notice of Smith's potential claim, Defendant's motion to modify the judgment asserts that, "to constitute a claim for purposes of the prejudgment interest statute there must be a demand for payment or compensation." This is assertion is incorrect, and contrary to the very authorities Defendant cites. Instead, as the case law explicitly states and holds, *either* a demand for compensation *or an assertion of a right to be paid* will suffice. No "demand" is required (although a demand will certainly suffice), and no specific dollar figure or element of damages need be mentioned.

The Texas Supreme Court addressed this rule in *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507 (Tex. 1997), in which it held that a statute of limitations tolling agreement constituted a written notice of claim sufficient to trigger pre-judgment interest. The agreement merely stated:

> Kenneco asserts that, to the extent underwriters are found not to be liable ..., J & H is liable to Kenneco for the amounts which Kenneco has claimed under the Policy.[2]

Although absolutely no "demand" for payment or compensation was made, the Court held this

---

[2]*Johnson*, 962 S.W.2d at 531.

language constituted a "claim" because it asserted a right to compensation. The Court stated the rule that *either* a demand *or* an assertion of a right will suffice:

> We hold that the agreement constitutes "written notice of a claim." A "claim" is "a demand for compensation or an assertion of a right to be paid." See *Robinson v. Brice,* 894 S.W.2d 525, 528 (Tex.App.—Austin 1995, writ denied). ... Through the standstill agreement, J & H received written notice that Kenneco was claiming a right to compensation.[3]

Defendant's motion cites *Brookshire Grocery Co. v. Smith,* 99 S.W.3d 819 (Tex. App.–Beaumont 2003, pet. denied) in support of Defendant's assertion that "there must be a demand for payment or compensation," but *Brookshire* actually confirms that either a demand *or* an assertion of a right to be paid will suffice, stating, "The term 'claim' describes a demand for compensation or an assertion of a right to be paid." *Brookshire,* 99 S.W.3d at 824, citing *Johnson,* 962 S.W.2d at 531 and *Robinson v. Brice,* 894 S.W.2d 525, 528 (Tex. App. – Austin 1995, writ denied).

Defendant's motion also mis-cites *Robinson v. Brice* for the incorrect assertion that a "demand" is required when in fact, as recognized and cited by the Texas Supreme Court in *Johnson, Robinson* actually held that simply asserting a right to compensation also constitutes a notice of claim. The *Robinson* court explained:

> The statute does not define the term "claim," and therefore, we must construe it according to its ordinary meaning. Tex.Gov't Code Ann. § 312.002(a) (West 1988); *Hopkins v. Spring Indep. Sch. Dist.,* 736 S.W.2d 617, 619 (Tex.1987). The word "claim" ordinarily means a demand for compensation *or* an assertion of a right to be paid.
> ...
> The accident report fails as written notice of a claim ... because it is not notice of a demand for compensation *or* an assertion of a right to be paid.[4]

---

[3] *Johnson,* 962 S.W.2d at 531.

[4] *Robinson,* 894 S.W.2d at 528 (emphasis added).

---

*Plaintiff's Response to Defendant's Motion to Modify Judgment*

In addition to these authorities, numerous other cases confirm that no demand for payment is required in order for a writing to constitute a "claim" for purposes of pre-judgment interest. For example, in *K Mart Corp. v. Rhyne*, 932 S.W.2d 140 (Tex. App.–Texarkana 1996, no pet.), the Texarkana Court of Appeals held that providing a medical release on a form which stated "this information is to be used for the purposes of evaluating and handling my claim for injuries" constituted sufficient written notice of a claim to start prejudgment interest, despite the fact that absolutely no "demand" for compensation or payment was made.[5]

In reaching this decision in *K Mart*, the Texarkana Court of Appeals cited *Bevers v. Soule*, 909 S.W.2d 599 (Tex. App.–Fort Worth 1995, no pet.) In *Bevers*, as in *K Mart* and *Johnson*, no demand for payment was made. Instead, the plaintiff simply sent a medical authorization along with some medical receipts and a letter stating the authorization was enclosed "so that you could obtain the necessary information to properly consider my injury claim."[6] The defendant argued the letter was not a "claim" because it "did not state the nature of the complaint or the amount of damages sought," but the court confirmed such is not required.[7]

In contrast to these and numerous other authorities which confirm that either a demand for payment *or* the assertion of a right to compensation will trigger pre-judgment interest, no authority has been located – and Defendant's motion cites none – actually holding that a demand is required. As discussed by the Texas Supreme Court in *Johnson*, the rule allowing for recovery of prejudgment

---

[5]*K Mart*, 932 S.W.2d at 146.

[6]*Bevers*, 909 S.W.2d at 603.

[7]*Id.* (noting that, "Nothing in [the prejudgment interest statute] requires the claimant to demand an exact amount or list every element of damage claimed in order to trigger the notice of claim provision.")

---

interest in personal injury cases "was driven primarily by the rationale that awarding prejudgment interest was necessary to fully compensate injured plaintiffs."[8] In addition, the prejudgment interest rule seeks to encourage settlements and expedite both settlements and trials by removing incentives for defendants to delay without creating such incentives for plaintiffs.[9] "The purposes of awarding prejudgment interest – full compensation to the plaintiff and expediting settlement and trial – are not 'served by determining that prejudgment interest accrues before the date the defendant receives notice, of the claim.'"[10] In this case, upon receipt of Plaintiff's application for depositions, the bank not only had detailed notice of Plaintiff's claims, they actually retained counsel and engaged in discussion and deposition scheduling with Plaintiff's counsel with regard to such claims. The bank certainly had sufficient notice to takes steps to address and attempt to settle Plaintiff's claims to avoid litigation, but never attempted to do so.

Throughout the entire pendency of this litigation, the bank has repeatedly sought delay after delay, while Plaintiff has gone without any compensation. Prejudgment interest is necessary to fully compensate Plaintiff, and this Court properly calculated it from a date six months after the bank received written notice of Plaintiff's claim, as the statute expressly requires. The judgment is proper, and Defendant's motion to modify it should be denied.

---

[8]*Johnson,* 962 S.W.2d at 529.

[9]*Id.*

[10]*Christus Health Gulf Coast v. Carswell,* 433 S.W.3d 585, 611 (Tex. App.–Houston [1st Dist.] 2014, pet. filed)

---

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully pray that Defendant's motion be in all respects denied. Plaintiff prays for all other and further relief to which he may be entitled.

Respectfully submitted,

J. Mark Sudderth
State Bar No. 19461500

NOTEBOOM – THE LAW FIRM
669 Airport Freeway, Suite 100
Hurst, Texas 76053
Telephone: (817) 282-9700
Facsimile: (817) 282-8073

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of February, 2015, in accordance with the Texas Rules of Civil Procedure, a true and correct copy of the above and foregoing instrument was served upon the following:

Coy Johnson
Clay Johnson
Johnson Law Firm, P.C.
609 Gilmer Street
Sulphur Springs, TX 75482
Facsimile 866-584-1313

John R. Mercy
Mercy, Carter, Tidwell, L.L.P.
1724 Galleria Oaks Drive
Texarkana, TX 75503
Facsimile 903-794-1268

J. Mark Sudderth

# Exhibit A



CAUSE NO. C1138727

JOHN ALEXANDER SMITH § IN THE DISTRICT COURT

Plaintiff §

VS. §

§ OF

CITY NATIONAL BANK OF §
SULPHUR SPRINGS, TEXAS §
and JERRY DEAN CONE §

§

Defendants § HOPKINS COUNTY, TEXAS

## PETITIONER'S APPLICATION FOR INVESTIGATIVE DEPOSITIONS

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES JOHN ALEXANDER SMITH, hereinafter called "Petitioner" complaining

of CITY NATIONAL BANK OF SULPHUR SPRINGS, TEXAS and JERRY DEAN CONE,

hereinafter called "Respondents" or "Bank" or "Cone", and would respectfully show the Court as

follows:

I.

1. Petitioner is a resident of Pflugerville, Travis County, Texas

2. Respondent City National Bank of Sulphur Springs, Texas is a National Bank which has its

principal place of business at 1108 S. Broadway, Sulphur Springs, Texas 75482 and may be served

by and through its President, Lee Teets at 1108 S. Broadway, Sulphur Springs, Texas 75482.

3. Respondent Jerry Dean Cone resides at 801 Kelli Circle, Sulphur Springs, Texas 75482

where he may be served.

4. Venue is properly placed in Hopkins County, Texas because the intentional acts which form

the basis for this application occurred in Hopkins County, Texas.

**622**

5. Petitioner files this application under the terms and provisions of Texas Rules of Civil Procedure § 202.2(d)(2). Petitioner seeks to investigate a potential claim by Petitioner against Respondents.

II.

6. The basis for this application is as follows: On May 15, 2005, City National Bank caused a criminal complaint to be filed against John Alexander Smith with the Hopkins County District Attorney's office. The complaint alleged that Petitioner hindered the bank, a secured creditor in violation of the Texas Penal Code § 32.33, a felony. The Bank claimed that Petitioner sold and disposed of a Toyota 860-12 needle embroidery machine that he had pledged to the bank to secure a promissory note. The Bank claimed that Petitioner disposed of the collateral with an intent to misappropriate the proceeds and not turn over the proceeds to the Bank as required by the terms and provisions of documents he had signed in connection with his loan with the Bank.

7. Subsequently, the Hopkins County District Attorney and the Bank presented the complaint and their evidence to a Hopkins County Grand Jury with a recommendation that it return an indictment against Petitioner. Petitioner was indicted for the felony offense of hindering a secured creditor, a violation of the Texas Penal Code. The bank, District Attorney, and the Grand Jury recommended bail be set in the amount of $10,000.00.

8. Petitioner was not advised of either the complaint filed against him by the Bank, or the later indictment returned by the Grand Jury. Petitioner became a criminal Defendant in a case styled: *State of Texas v. John Alexander Smith* pending in the 8th Judicial District Court of Hopkins County, Texas under cause number 06-18569.

9. When the criminal complaint against Petitioner was filed, a warrant for his arrest was issued. Likewise, when he was indicted a warrant for Petitioner's arrest was issued. The outstanding warrants were placed in the statewide notification system alerting certain law enforcement persons that there was an outstanding warrant against Petitioner.

10. On or about March 14, 2006, while on a fishing trip in Henderson County, Texas, Petitioner was stopped by the Texas Department of Public Safety Highway Patrol at a routine driver's license checkpoint. Though Petitioner's driver's license was verified on the State computer, the outstanding warrant was displayed. Petitioner was immediately taken into custody with no explanation. He spent ten days in jail in Athens, Henderson County, Texas, the county of his arrest. Later, he was transferred to the Hopkins County Jail in Sulphur Springs, Texas, the venue of the criminal case. Petitioner's bail on the alleged violation was set in the amount of $10,000. Petitioner was able to post bail but was required to timely report to the District Court each time the case was set for trial or pre-trial as a condition of his bail. Petitioner retained an attorney to represent him in the case. The case was called for trial fourteen times. The Petitioner and his attorney appeared each time the case was set for trial or pre-trial before the Court. Petitioner made approximately fifteen Court appearances. At each appearance, Petitioner pleaded not guilty, that he was ready for trial, and demanded a trial. The State never announced ready for trial. Instead, the State advised the Judge that the witnesses for the bank were not present and were not available, or that additional time was needed to prepare the case.

11. Finally, On January 3, 2008, the District Judge advised the District Attorney that the case against the Petitioner must be disposed of that day. This District Attorney offered the Petitioner the opportunity to plead guilty, which Petitioner refused to do. The Petitioner again announced that he was not guilty and that he was ready for a jury trial. The District Attorney again claimed that no

**624**

witnesses from the Bank could be produced, or that the Bank wished to discontinue the prosecution. The same day, January 3, 2008, the presiding Judge entered an order dismissing the prosecution and ordered the Petitioner to be released.

12. As a proximate result of the charges filed against him, Petitioner lost his security clearance and was ordered off of a construction site at Cape Canaveral, Florida. Petitioner works as a project supervisor. Most of his work has to do with government projects such as, missile installations, military housing, FEMA and the like. Being unaware of the charges, Petitioner was not able to contest or explain the charges until his later arrest and incarceration. Even after he learned of the charges, he was out of jail on bail and could not leave the State until the Court finally dismissed the charges. All of the time that Petitioner was under the effects of the criminal case, the Respondents knew he was not guilty of the criminal offense of hindering a secured creditor.

13. Well before the complaining indictment was filed, Petitioner believes that the Bank and its officers, and employees knew that the embroidery machine had been sold to a third-party by one of the Bank officers. Petitioner believes that the officer who sold the machine concealed the sale from Petitioner, Petitioner's attorney, and the District Attorney.

14. Petitioner alleges that the Respondents instigated criminal charges against him when they had no reasonable basis for doing so. As a result, he was charged with a serious criminal offense which resulted in his indictment and his incarceration. He then was required to face a Court and defend himself against all charges until the charges were finally dismissed in his favor. Petitioner alleges that he believes that he has grounds for a lawsuit under the doctrines of false imprisonment, false arrest, and malicious prosecution.

15. Petitioner desires to take the oral deposition of corporate representatives of Respondents under TRCP 199.2(b)(1). The Court is asked to require Respondents to produce a person or persons

who are most knowledgeable about the following subjects:

a. The instance involving the alleged sale of the embroidery machine;

b. The location of the embroidery machine just immediately prior to its sale;

c. Any repossession of the embroidery machine by the Respondents;

d. The names of all employees of Respondents who had anything to do with the filing of charges against Petitioner; and

e. The names of all persons, either employed by Respondents or to be acting on Respondents behalf who had anything to do with the repossession and sale of the embroidery machine.

16. One of the persons whom Petitioner desires to depose is Jerry Dean Cone, a Respondent.

17. Petitioner believes he has thoroughly investigated the incident which is the basis for this application as best he can. However, he has not been able to locate the person who allegedly purchased the machine, nor records pertaining to the machines sale/purchase. It is Petitioner's belief that Respondents are well aware that the persons employed by the Bank who have knowledge that the embroidery machine was in fact repossessed by the Bank and sold by the Bank. Such facts are vital to Petitioners determining whether or not he will file a lawsuit against the Respondents.

III.

18. Petitioner requests the Court to:

a. Set a hearing to determine this Motion;

b. For an Order granting the Motion which orders the taking of depositions of the corporation previously identified at a location ordered by the Court if not agreed upon by the parties.;

**626**

c.  That a Subpoena be issued to Respondents requiring Respondents to produce all records which in any way pertain to the subject matter of this application; and

d.  Such other relief to which Petitioner may be entitled.

Respectfully submitted,

CLARK, LEA & PORTER
604 Woldert Street
P. O. Box 98
Tyler, Texas 75710
Phone 903.593.2514
Facsimile 903.595.1294

By: _____
Charles H. Clark
State Bar No. 04274000

Gregory S. Porter
State Bar No. 24002785

ATTORNEYS FOR PETITIONER

**627**

CAUSE NO.    CV38727                                              *Return*

THE STATE OF TEXAS:                    ATTORNEY FOR PLAINTIFF OR DEFENDANT:

PATRICIA DORNER - DISTRICT CLERK            CHARLES H CLARK
POST OFFICE BOX 391                         604 WOLDERT
SULPHUR SPRINGS, TEXAS 75483                P. O. BOX 98
                                            TYLER   TX

C I T A T I O N     F O R     P E R S O N A L     S E R V I C E

    TO: CITY NATIONAL BANK OF SULPHUR
        SPRINGS REG AGT: LEE TEETS
        1108 S. BROADWAY
        SULPHUR SPRINGS,TX 75482

DEFENDANT:

        You are hereby commanded to appear before the Honorable Judicial
District Court of Hopkins County,Texas, to be held at the courthouse
of said County in the City of Sulphur Springs, Hopkins County, Texas,
by filing a written answer to the petition of plaintiff    at or
10 o'clock A.M. of the  Monday  next after the expiration of 20 days
after the date of  service hereof, a copy of which  accompanies this
citation, in Cause No.      CV38727.

SMITH,JOHN ALEXANDER                      CITY NATIONAL BANK OF
                               VS         SULPHUR SPRINGS,TEXAS AND
                                          JERRY DEAN

Filed in said Court on  10th day of October    , 2008   .

NOTICE TO DEFENDANT: You have been sued.  You may employ an attorney.
If you or your attorney do not file a written answer with the  clerk
who issued this citation by 10:00 A.M. on the Monday next following
the  expiration of  twenty days  after you were  served this citation
and petition, a default judgment may be taken against you.

WITNESS,  PATRICIA DORNER, DISTRICT CLERK OF THE DISTRICT COURT OF
HOPKINS COUNTY, TEXAS.

Issued  and given under my hand  and seal of said   Court at office,
this the  10th  day of October  A.D.   2008

                        PATRICIA DORNER - DISTRICT CLERK
                        HOPKINS COUNTY, TEXAS

                                                              Deputy

_____OFFICER/AUTHORIZED PERSON RETURN_____

Came to hand at _25_ o'clock __.M., on the _24_ day of _October_ , _2008_.
Executed at (address) _1108 S Broadway_ in _Hopkins_ County
at _2:30_ o'clock _P_.M. on the _24_ day of _October_ , _2008_ by
delivering to the within named _City National Bank - Lee Teets_ , in
person, a true copy of this  citation together with the accompanying copy of
of the petition, having first attached such copy of such  petition  to such
copy of citation and endorsed on such copy of citation the date of delivery.
TOTAL SERVICE FEE $ _____

                                        _____ Sheriff/Const/PPS
                                                             County, Texas
_Served 10/24/08_                       BY _____
_Time: 2:30 PM_                            Sheriff/Deputy/Const/PPS
_Paul Black  Sc #1983_                      _Sc 1983_

                                                                        **628**

# I

909 S.W.2d 599
Court of Appeals of Texas,
Fort Worth.

Lauren BEVERS, Appellant,
v.
Ronald B. SOULE, Appellee.
No. 2–94–160–CV. | Oct. 19, 1995.

Motorist who was involved in collision in which his automobile was struck from behind brought action against following driver, and the 96th District Court, Tarrant County, Jeff Walker, J., entered judgment on jury verdict for motorist. Following driver appealed, and the Court of Appeals, Richards, J., held that: (1) finding that collision was proximate cause of motorist's herniated disk was supported by evidence; (2) letter sent by motorist to following driver's insurer was sufficient to constitute notice of claim and allowed accrual of prejudgment interest beginning 180 days after receipt of letter; but (3) judgment would be reformed to reflect simple compounding of prejudgment interest and annual compounding of postjudgment interest.

Affirmed as reformed.

West Headnotes (12)

**[1]** **Appeal and Error**
🔑 Interrogatories and special verdicts
**Appeal and Error**
🔑 Sufficiency of Evidence in Support

In determining no evidence point, reviewing court is to consider only evidence and inferences that tend to support finding and disregard all evidence and inferences to contrary; if there is more than scintilla of evidence to support finding, claim is sufficient as matter of law, and any challenges go merely to weight to be accorded evidence.

1 Cases that cite this headnote

**[2]** **Appeal and Error**
🔑 Total failure of proof

No evidence point of error may only be sustained when record discloses that there is complete absence of evidence of vital fact, that court is barred by rules of law or evidence from giving weight to only evidence offered to prove vital fact, that evidence offered to prove vital fact is no more than scintilla of evidence, or that evidence establishes conclusively opposite of vital fact.

Cases that cite this headnote

**[3]** **Appeal and Error**
🔑 Sufficiency of Evidence in Support
**Appeal and Error**
🔑 Total failure of proof

There is some evidence to support finding, and no evidence point of error must be denied, when proof supplies reasonable basis on which reasonable minds may reach different conclusions about existence of vital fact.

Cases that cite this headnote

**[4]** **Appeal and Error**
🔑 Sufficiency of Evidence in Support
**Appeal and Error**
🔑 Great or overwhelming weight or preponderance

Assertion that evidence is insufficient to support fact finding can mean that evidence supporting finding is so weak or that evidence to contrary is so overwhelming that finding should be set aside and new trial ordered.

Cases that cite this headnote

**[5]** **Appeal and Error**
  🗝 Extent of Review
**Appeal and Error**
  🗝 Form and requisites

Reviewing court is required to consider all evidence in case in making determination of whether evidence is insufficient to support factual finding, and if reversing to detail that evidence in opinion.

Cases that cite this headnote

**[6]** **Damages**
  🗝 Personal Injuries and Physical Suffering

Finding that collision in which motorist's automobile was struck from behind by following vehicle was proximate cause of motorist's herniated disk was supported by testimony of following driver that her speed was in range of 25 to 30 miles per hour and that collision was "fairly hard," by testimony of motorist that prior to accident he had only suffered very minor back problems which had gone away, and by evidence that U-bolt on motorist's automobile was damaged as result of collision and that employment examination of motorist one year prior to accident had revealed no back problems.

Cases that cite this headnote

**[7]** **Antitrust and Trade Regulation**
  🗝 Notice and demand requirements; opportunity to cure

Notice provisions of Texas Deceptive Trade Practices Act require potential plaintiff to first identify nature of complaint and amount required to compensate him for his damages. V.T.C.A., Bus. & C. § 17.505(a).

Cases that cite this headnote

**[8]** **Interest**
  🗝 Form and sufficiency of demand

Nothing in statute governing accrual of prejudgment interest in personal injury cases requires claimant to demand exact amount or list every element of damage claimed in order to trigger notice of claim provision. Vernon's Ann.Texas Civ.St. art. 5069–1.05, § 6(a).

4 Cases that cite this headnote

**[9]** **Interest**
  🗝 Form and sufficiency of demand

Letter sent by motorist who was injured in automobile accident to insurance carrier of second driver involved was sufficient to constitute notice of claim, and prejudgment interest began accruing 180 days after receipt of letter, where letter contained information to allow insurer to begin considering motorist's injury claim and included signed copy of medical authorization form, even though letter did not state nature of complaint and amount of damages sought. Vernon's Ann.Texas Civ.St. art. 5069–1.05, § 6(a).

5 Cases that cite this headnote

**[10]** **Interest**
  🗝 Mode of computation in general

Legislature has specifically mandated that prejudgment interest in wrongful death, personal injury, property damage, and condemnation cases be computed only as simple interest. Vernon's Ann.Texas Civ.St. art. 5069–1.05, § 6(g).

Cases that cite this headnote

**[11]** **Interest**
🔑 Mode of computation in general
**Interest**
🔑 Compound interest

Judgment in favor of successful litigant in personal injury action should reflect two calculations with respect to interest; calculation for prejudgment interest on plaintiff's damages at applicable interest rate, computed as simple interest, and postjudgment interest on total sum at applicable interest rate, compounded annually, and beginning on date judgment is signed and until judgment is satisfied. Vernon's Ann.Texas Civ.St. art. 5069–1.05, §§ 3(a), 6(g).

Cases that cite this headnote

**[12]** **Interest**
🔑 Compound interest

Trial court erred in entering judgment in personal injury action which included prejudgment interest award which was based on annual compounding of interest; judgment was reformed to reflect calculation of prejudgment interest based on simple compounding, with postjudgment interest on judgment amount to be compounded annually. Vernon's Ann.Texas Civ.St. art. 5069–1.05, §§ 3(a), 6(g).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*600** John J. Drake, Shannon, Gracey, Ratliff & Miller, LLP, Fort Worth, for appellant.

Leland A. Reinhard, Catterton & Reinhard, Fort Worth, for appellee.
Before DAY, DAUPHINOT and RICHARDS, JJ.

**OPINION**

RICHARDS, Justice.

This appeal is from a personal injury case involving an automobile accident. Appellant Lauren Bevers ("Bevers") was the defendant in the trial court. Appellee Ronald Soule ("Soule"), plaintiff in the court below, alleged he suffered physical injuries caused by Bevers' negligence when her vehicle struck his vehicle in a rear-end collision. Trial was to a jury, which awarded Soule $187,500.00.

Bevers presents three points of error on appeal. In point of error one, she complains there was no evidence, or, in the alternative, insufficient evidence to support the jury's finding the accident was the proximate cause of Soule's injuries. In point of error two, she contends the trial court erred in ordering that prejudgment interest accrue on the date Soule first contacted her, rather than on the date suit was filed. In her third point of error, Bevers contends the trial court erred in ordering that prejudgment interest be compounded annually rather than as simple interest.

We affirm in part and reform in part.

The sufficiency challenge presented in Bevers' initial point of error requires review of the circumstances of the collision and the testimony relating to Soule's physical injuries.

On the morning of August 21, 1990, Soule was traveling to work in his American Motor Company Concord on Interstate Highway 35 near downtown Fort Worth. Because of heavy rush-hour traffic, he slowed down and ultimately came to a complete stop due to bumper-to-bumper congestion. When he looked into his rear-view mirror, Soule saw a Chevrolet Camaro approaching from behind at a speed suggesting the driver did not intend to stop. Soule initially estimated the speed of the Camaro at forty to fifty m.p.h., but later testified it may have been moving "something less than that." Because he expected the collision would throw his body forward, Soule braced himself for the impact. The Camaro, driven by Bevers, struck **\*601** Soule's car with enough force to cause his vehicle to strike the car previously stopped six feet in front of him. The force of the rear-end collision, contrary to Soule's initial expectation, forced his body back into the seat. He was then thrown forward by the secondary collision with the third car, but was partially restrained by his seat belt.

It appeared the collision caused only moderate damage to Soule's Concord; however, after Soule's wife told him that the rear end of the car did not appear to be properly following its front end, it was discovered that the impact had damaged the U–Bolt, which had to be replaced.

Initially, Soule did not believe he had been injured. Following the accident, he drove his wrecked vehicle through still-heavy traffic approximately four miles to his office. At about the time he arrived at his office, he began experiencing pain in his right calf and foot. Thinking the pain might go away, Soule continued to work; however, instead of improving, the pain in his right leg grew progressively worse. Later in the day, Soule felt a "kind of tightness" in his back that was not initially painful. Soule treated the tightness with Tylenol and made an appointment with the Northeast Medical Clinic, where his family doctor of fifteen years, Dr. David Law, was associated. Because Dr. Law's schedule would not have permitted Soule to see him for a week, Soule made an appointment with another associate, Dr. Tyson, for August 24, 1990.

Dr. Tyson ordered a series of x-rays and prescribed anti-inflammation and pain medication. Six days later Soule saw Dr. Law, who continued with the same medical treatment on an approximately once-a-month basis for three months. Thereafter, Dr. Law referred Soule to Dr. Juan Capello, an orthopedic surgeon.

Dr. Capello prescribed medications and suggested a four-month course of physical therapy; however, Soule continued having pain in his lower back and right leg. According to Soule, Dr. Capello did not believe there would be any further improvement and suggested that he simply learn to "live with" his injury. When the pain seemed to grow worse, Soule saw another orthopedic surgeon, Dr. Myron Glickfeld, who diagnosed the injury as a herniated disc which required surgery. Soule testified that he did not initially agree to surgery because a high school friend had become paralyzed from the chest down as a result of nerve damage. Because of his fear of nerve damage, Soule tried to control the pain with medications for the next eight months. When the pain got worse, Soule relented and was operated on by Dr. Glickfeld on August 19, 1992. Soule testified the surgery helped, but did not completely eliminate the pain.

Soule testified the only prior back symptoms he had ever experienced were two muscle pulls which occurred over two years prior to the auto accident. One was a muscle pull in the area of his abdomen from stretching and the other was "minor" pull in the back immediately behind the abdomen injury. He took medication for two weeks and never had another symptom from either injury since that time. Soule also testified that in July of 1989, he had applied for a job with American Airlines and had undergone a complete physical that included range of motion tests to diagnose any spine problems. No back problems were found and the airline's doctor found Soule's skeletal system to be "normal."

[1] In determining a "no evidence" point, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex.1992); *Orozco v. Sander,* 824 S.W.2d 555, 556 (Tex.1992); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). If there is more than a scintilla of such evidence to support the finding, the claim is sufficient as a matter of law, and any challenges go merely to the weight to be accorded the evidence. *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993).

[2] [3] A "no evidence" point of error may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to **\*602** prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990); Robert W. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 TEX. L. REV. 361 (1960). There is some evidence when the proof supplies a reasonable basis on which reasonable minds may reach different conclusions about the existence of the vital fact. *Orozco,* 824 S.W.2d at 556.

[4] [5] An assertion that the evidence is "insufficient" to support a fact finding can mean that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the finding should be set aside and a new trial ordered. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). We are required to consider all of the evidence in the case in making this determination and, if reversing, to detail that evidence in the opinion. *Jaffe Aircraft Corp. v. Carr,* 867 S.W.2d 27, 29 (Tex.1993).

[6] We find the evidence to be legally sufficient to support the jury's determination that the automobile accident was the proximate cause of Soule's injuries. Moreover, we are convinced the jury's finding concerning the issue of causation, in light of the entire record, should not be overturned for

factual insufficiency.

Bevers suggests three reasons why we should find the evidence factually insufficient: (1) the only evidence of causation was Dr. Glickfeld's opinion, which was based on the incorrect assumption that appellant's vehicle was traveling approximately fifty m.p.h. when she struck Soule; (2) her own expert, Dr. Charles Hatsell, testified that Bevers was traveling only fourteen to sixteen m.p.h. when she struck Soule, causing a "very minor" accident that could not have caused Soule's herniated disc; and (3) several other factors could have caused Soule's injuries: a previous fall from a ladder, an injury where a piano fell on him, and a jump from a high location.

Our review of the record shows each of Bevers' concerns involved contested issues presumably weighed by the jurors during their deliberations. For example, Soule's testimony at trial established a rational explanation why these prior injuries could not have contributed to his herniated disc. Soule testified the piano injury occurred when a piano fell on him while being moved and that the injury was not to his back. Similarly, Soule explained his fall from the ladder caused only a leg and head injury. The final incident involved a muscle in his abdomen and a muscle in his lower back, injuries that were fully healed two years prior to the automobile accident. Bevers' theory that the proximate cause of the herniated disc was not the auto accident was also rebutted by evidence that a complete physical conducted by American Airlines shortly before the automobile accident revealed no damage to Soule's skeletal system.

Dr. Hatsell's opinion that Bevers' vehicle was traveling at a speed of only fourteen to sixteen m.p.h. was also contested. Bevers herself estimated her car was traveling between twenty-five and thirty m.p.h. at the time she saw Soule's car approximately one car length ahead. What Dr. Hatsell surmised was a "very minor collision" Bevers recalled as being "fairly hard." Moreover, Dr. Hatsell's conclusion as to the speed of Bevers' vehicle did not take into account the broken U–Bolt on Soule's Concord. Hatsell's estimate of the speed of Bevers' car was based on his review of photographs provided by Bevers' attorney and initial body shop estimates of the property damage. Dr. Hatsell never examined Soule and never saw the damage to Soule's U–Bolt. Moreover, Soule's expert, Dr. Glickfeld, did not testify that Soule's injuries could have only been caused by a fifty m.p.h. collision.

Based on the above testimony, the medical records, and Soule's lay witness testimony that provided a logically traceable connection between the accident and his herniated disc, we cannot conclude the evidence was either legally or factually insufficient to support the jury's determination the auto accident was the proximate cause of Soule's injury. The overall impression left upon review of the entire record is that both sides were represented at trial by skilled and well-prepared **\*603** counsel who provided the jury with sufficient evidence to justify special issue answers favoring either party.

Point of error one is overruled.

In her second point of error, Bevers contends the trial court erred in ordering that prejudgment interest begin on April 28, 1991, the 180th day following Soule's return of a signed medical authorization form and claim letter to Bevers' insurance carrier, rather than on the date Soule filed suit.

Texas law allows for the accrual of prejudgment interest in personal injury cases as follows:

> [P]rejudgment interest accrues on the amount of the judgment during the period beginning on the 180th day after the date the defendant receives notice of the claim or on the day suit is filed, whichever occurs first, and ending on the date preceding the date judgment is entered.

Tex.Rev.Civ.Stat.Ann. art. 5069–1.05, § 6(a) (Vernon Supp.1995).

Bevers asks us to interpret "notice of claim" so as to require notice of the amount of damages sought as well as notice of the nature of the complaint. Bevers notes that Soule's earliest written correspondence with her insurance carrier was an October 30, 1990 letter written by Soule to Don Young, a claim specialist at State Farm Mutual Insurance Company. In pertinent part, the letter stated:

Re: Claim No.: 43–7080–020

Insured: Roy D. Bevers

De[a]r Mr. Young:

I enclose for your files one (1) signed copy of the

"Authorization" you sent me so that you could obtain the necessary information to properly consider my injury claim.

I also enclose for your processing copies of some of the medical receipts relative to my injury. As you will note, I am now seeing an orthopedist, Juan J. Capello, M.D. I am about to start a program of physical therapy.

Should you require any additional information, please let me know. My office number is [number listed].

Sincerely,

/s/ Ronald B. Soule

[7] Under Bevers' view, because the letter did not state the nature of the complaint or the amount of damages sought, the earliest date prejudgment interest could have been ordered to run was the date Soule filed suit. Bevers correctly notes that the notice provisions of the Texas Deceptive Trade Practice Act require a potential plaintiff to first identify the nature of the complaint and the amount required to compensate him for his damages. Tex.Bus. & Comm.Code Ann. § 17.505(a) (Vernon Supp.1995).

[8] [9] In response, Soule notes his cause of action was not brought under the Deceptive Trade Practices Act, and suggests Bevers' complaint would be better addressed to the legislature. We agree. Nothing in article 5069–1.05 requires the claimant to demand an exact amount or list every element of damage claimed in order to trigger the notice of claim provision. *See Robinson v. Brice,* 894 S.W.2d 525, 528 (Tex.App.—Austin 1995, writ denied). Therefore, the trial court's determination that written notice of the claim was triggered by Soule's letter and the signed medical authorization form was not improper.

In her final point of error Bevers argues the trial court erred in ordering that prejudgment interest be

compounded annually rather than as simple interest. Regarding prejudgment interest, Texas law provides that "the rate of pre-judgment interest shall be the same as the rate of post-judgment interest at the time of judgment *and shall be computed as simple interest.*" Tex.Rev.Civ.Stat.Ann. art. 5069–1.05, § 6(g) (Vernon Supp.1995) (emphasis added).

[10] In providing that judgments in wrongful deaths, personal injury, property damage, and condemnation cases be computed only as simple interest, the legislature has specially mandated that prejudgment interest in these types of cases must be computed as simple interest. *Enterprise–Laredo Assoc. v. Hachars Inc.,* 839 S.W.2d 822, 839 (Tex.App.—San Antonio 1992, writ denied); *see also* **\*604** *Transport Ins. Co. v. Faircloth,* 861 S.W.2d 926, 941–42 (Tex.App.—Beaumont 1993) (prejudgment interest in personal injury claim should have been calculated as simple interest under the statute, rather than ordered compounded annually), *rev'd on other grounds*, 898 S.W.2d 269 (Tex.1995).

The trial court's written judgment in the instant case, in part, provided that the prejudgment interest be compounded annually:

> Prejudgment interest on [Soule's] damages of $187,500.00 at the rate of 10% per annum, compounded annually, from April 28, 1991 to the date this judgment is signed in the amount of $58,955.40.

Soule urges us to uphold the trial court's judgment, based on the following language from the Texarkana Court of Appeals:

The current version of Article 5069–1.05, § 6(g) provides that "[t]he rate of prejudgment interest shall be the same as the rate of postjudgment interest at the time of judgment and shall be computed as simple interest." Tex.Rev.Civ.Stat.Ann. art. 5069–1.05, § 6(g) (Vernon Supp.1991). Section 3(a) provides that "judgments earn interest for the period beginning on the day the judgment is rendered and ending on the day the judgment is satisfied. Interest shall be compounded *annually*" (emphasis added).

*Sadler v. Duvall,* 815 S.W.2d 285, 294 (Tex.App.—Texarkana 1991, writ denied).

The *Sadler* court went on to reform the trial court's judgment "so that prejudgment interest is compounded annually as provided under the statute." *Id.*

We believe the *Sadler* holding is based on a misinterpretation of the statute. The reference to annual compounding in section 3(a) concerns *postjudgment* compounding, *i.e.,* the annual compounding of interest for the period beginning on the day the judgment is rendered and ending the day the judgment is satisfied. Prejudgment interest, on the other hand, is governed by section 6(g) of the same article. It provides that prejudgment interest be computed as simple interest at the same percentage rate as postjudgment interest.

[11] Therefore, a proper judgment in favor of a successful litigant in a personal injury cause of action should reflect two calculations: (1) prejudgment interest on plaintiff's damages at the applicable interest rate, computed as simple interest; and (2) postjudgment interest on the total sum at the applicable interest rate, compounded annually, beginning the date judgment is signed until the judgment is satisfied. Tex.Rev.Civ.Stat.Ann. art. 5069–1.05, §§ 3(a), 6(g) (Vernon Supp.1995).

[12] The judgment is reformed to reflect that prejudgment interest is reduced from $58,955.40 to $55,890.41. Thus, the judgment is further reformed so postjudgment interest is calculated on the total sum of $243,390.41 ($187,500.00 damages + $55,890.41 prejudgment interest), from March 5, 1994, the date judgment was signed, until such day the judgment is satisfied.

As reformed, the judgment is affirmed.

---

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

J

99 S.W.3d 819
Court of Appeals of Texas,
Beaumont.

BROOKSHIRE GROCERY COMPANY, Appellant,
v.
Robert Elton SMITH, Appellee.
No. 09–02–226 CV. | Submitted Jan. 8, 2003. |
Decided Feb. 20, 2003.

Employee who was allegedly injured while working brought negligence action against former employer and subsequent employer. After employee nonsuited subsequent employer, the 88th District Court, Hardin County, Earl B. Stover, III, J., entered judgment on a jury verdict for employee. Former employer appealed. The Court of Appeals held that: (1) under prior version of venue statute, venue was proper in subsequent employer's county; (2) employee waived improper joinder of parties argument by failing to object to joinder or request severance; (3) any error in exclusion of impeachment evidence was not reversible error; and (4) prejudgment interest was properly calculated from date that former employer received letters of claim from employee.

Affirmed.

West Headnotes (10)

**[1]** **Venue**
🗝 Particular Actions, Application To

Under venue statute applicable at time of suit, venue for employee's negligence suit against former employer was appropriate in county which had venue over subsequent employer that was joined as a defendant; if court had venue of a claim as to one defendant, court had venue over claims against all defendants. V.T.C.A., Civil Practice & Remedies Code § 15.061 (repealed).

Cases that cite this headnote

**[2]** **Venue**
🗝 Form and Requisites of Application in General

Depending on the state of the record at the time of the filing of a nonsuit, if an objection to venue has been filed and the plaintiff then takes a nonsuit and has not specifically denied the venue facts averred by the party seeking transfer, the venue facts alleged in the motion to transfer may be taken as true.

Cases that cite this headnote

**[3]** **Venue**
🗝 Particular Actions, Application To

Subsequent employer was properly joined as a defendant in negligence action by employee against former employer for injuries sustained while working, and was not joined solely to fix venue in subsequent employer's county, where former employer pled in its answer that employee's injuries were caused by or aggravated by subsequently occurring incidents and conditions, it was undisputed that employee worked for subsequent employer after working for former employer, and former employer filed no special exceptions requesting employee to plead more particularly how subsequent employer was negligent and caused injury. V.T.C.A., Civil Practice & Remedies Code § 15.061 (repealed).

Cases that cite this headnote

**[4]** **Appeal and Error**
🗝 Misjoinder of Parties

Former employer waived any claim as to employee's alleged improper joinder of subsequent employer in negligence suit involving dispute as to venue, where former employer never sought severance of parties or object to joinder.

Cases that cite this headnote

**[5]** **Appeal and Error**
👉 Negligence and Torts in General
**Appeal and Error**
👉 Evidence Immaterial to Issue

Trial court's failure to admit impeachment evidence in form of evidence that employee made false statement on his job application by failing to disclose his previous back injury was not reversible error, in employee's negligence action against former employer, which was a nonsubscriber to workers' compensation coverage, for injuries sustained when stacked boxes allegedly fell on employee, where employer's knowledge of back injury was not an issue given the circumstances of negligence alleged by employee, employee's own negligence was not at issue, employee's medical condition before injury at issue was fully presented to jury, and employee's credibility was repeatedly challenged during cross examination concerning his medical history, work history, and accident itself. Rules App.Proc., Rule 44.1(a).

Cases that cite this headnote

**[6]** **Appeal and Error**
👉 Evidence in General
**Appeal and Error**
👉 Prejudicial Effect

A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted.

Cases that cite this headnote

**[7]** **Appeal and Error**
👉 Same or Similar Evidence Otherwise Admitted
**Appeal and Error**
👉 Same or Similar Evidence Otherwise Admitted

Court of Appeals will not reverse a judgment for erroneous rulings on admissibility of evidence when the evidence is cumulative and the excluded evidence is not controlling on a material issue dispositive of the case.

Cases that cite this headnote

**[8]** **Appeal and Error**
👉 Costs and Allowances

A trial court's prejudgment interest award is reviewed under an abuse of discretion standard.

1 Cases that cite this headnote

**[9]** **Interest**
👉 Form and Sufficiency of Demand

The term "claim," as used in section of prejudgment interest statute providing that a defendant's receipt of a notice of claim or the day suit is filed is time when prejudgment interest accrues, describes a demand for compensation or an assertion of a right to be paid. V.T.C.A., Finance Code § 304.104.

2 Cases that cite this headnote

**[10]    Interest**
        Form and Sufficiency of Demand

Two letters that employee sent to former employer's agent on medical coverage matters constituted written notice of a claim so as to trigger accrual of prejudgment interest on employee's negligence claim against employer, where letters requested reimbursement for expenses relating to treatment of employee's injury sustained while working and stated medical procedures suggested by employee's doctor regarding injury. V.T.C.A., Finance Code §§ 304.102, 304.104.

2 Cases that cite this headnote

**Attorneys and Law Firms**

*820 Brian J. Brandstetter, Gwinn & Roby, Fort Worth, for appellant.

Curtis W. Leister, John Werner, Reaud, Morgan & Quinn, Inc., Beaumont, for appellee.
Before McKEITHEN, C.J., BURGESS and GAULTNEY, JJ.

**OPINION**

PER CURIAM.

Robert Elton Smith filed suit in 1994 against appellant, Brookshire Grocery Company, his nonsubscriber employer, for injuries he sustained on the job in 1992. Finding Brookshire Grocery negligent, a jury returned a verdict in Smith's favor. Brookshire Grocery brings three issues on appeal: venue, an evidentiary ruling, and the calculation of prejudgment interest. As we conclude none of the issues presented requires reversal, we affirm the trial court's judgment.

**Venue**

Smith initially filed suit against Brookshire Grocery Company in Jefferson County, Texas. Brookshire Grocery filed a motion to transfer venue. Before any hearing was held on the venue motion, Smith nonsuited the claim. He then filed suit in Hardin County against Brookshire Grocery Company and Brookshire Brothers, Inc. ("Brookshire, Inc.") Although Brookshire Grocery filed a motion to *821 transfer venue in the Hardin County suit, Brookshire, Inc. did not challenge venue and filed only an answer. Shortly thereafter, Smith nonsuited Brookshire, Inc. The trial court denied Brookshire Grocery's venue motion.

Appellant failed to include a reporter's record of the hearing on the motion to transfer venue. Smith maintains this failure requires our rejection of appellant's venue issue. The venue hearing was conducted in November 1994, but the trial was not held and the judgment not signed until April 2002. On June 5, 2002, Brookshire Grocery requested the venue hearing be included in the reporter's record on appeal. In a letter dated July 26, 2002, the court reporter explained she no longer had notes of the 1994 venue hearing. By statute, the court reporter is required to preserve the notes of the hearing for "three years from the date on which they were taken[.]" Tex. Gov't Code Ann. § 52.046(a)(4) (Vernon 1998). The Texas Supreme Court has stated that "[i]f a litigant has not requested the reporter to prepare a statement of facts within three years, nor specifically requested that the notes of a proceeding be preserved beyond three years, then the litigant is not free from fault if the notes are destroyed as the statute authorizes." _Piotrowski v. Minns,_ 873 S.W.2d 368, 371 (Tex.1993); _see Ganesan v. Vallabhaneni,_ 96 S.W.3d 345, 348–50 (Tex.App.-Austin 2002, pet. denied).

We need not decide venue on this preservation issue, however. Brookshire Grocery has asserted on appeal, supported by its attorney's affidavit, that no evidence was offered or admitted at the venue hearing. Appellant's assertion is not disputed by

Smith, and we take as true appellant's uncontradicted statement of fact. *See* Tex.R.App. P. 38.1(f). The clerk's record is complete. While we emphasize the importance of a complete record of the trial court proceedings and arguments presented at the venue hearing, we will address the merits of the venue issue in this case on the record presented here.

[1] The 1985 venue statute applies in this case. *See* Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3246–3251. When suit was filed in 1994, section 15.061, quoted below, set out the following rule regarding venue over multiple defendants:

> When two or more parties are joined as defendants in the same action or two or more claims or causes of action are properly joined in one action and the court has venue of an action or claim against any one defendant, the court also has venue of all claims or actions against all defendants unless one or more of the claims or causes of action is governed by one of the provisions of Subchapter B [mandatory venue provisions] requiring transfer of the claim or cause of action, on proper objection, to the mandatory county.[1]

The current statute, amended in 1995, provides that in a suit in which the plaintiff has established proper venue against a defendant, the court also has venue of all the defendants in all claims or actions arising out of the same transaction, occurrences, or series of transactions or occurrences. *See* Tex. Civ. Prac. & Rem.Code Ann. § 15.005 (Vernon 2002). Section 15.0641 of the 1995 venue statute also provides that in a suit in which two or more defendants are joined, any action or omission by one defendant in relation to venue, including a waiver of venue by one defendant, does not operate to impair or diminish the right of any other defendant to **\*822** properly challenge venue. *See* Tex. Civ. Prac. & Rem.Code Ann. § 15.0641 (Vernon 2002). The 1985 statute, which applies in this case, does not contain that provision.

[2] We note that appellant does not raise the procedural issue set out in *GeoChem Tech Corp. v. Verseckes,* 962 S.W.2d 541, 543–44 (Tex.1998). Depending on the state of the record at the time of the filing of a nonsuit, if an objection to venue has been filed and the plaintiff then takes a nonsuit and has not specifically denied the venue facts averred

by the party seeking transfer, the venue facts alleged in the motion to transfer may be taken as true. *GeoChem Tech Corp.,* 962 S.W.2d at 543. It is possible the procedural posture at the time of the nonsuit here was insufficient to establish venue in the county to which appellant then sought transfer; but we do not address the *GeoChem* issue as it has not been asserted in this case.

Smith made Hardin County his venue choice. Because Brookshire, Inc. did not object to venue in Hardin County by filing a transfer motion, the Hardin County trial court had venue over Brookshire, Inc. *See* Tex.R. Civ. P. 86(1). Under the applicable statute, if the court had venue of a claim as to one defendant, the court had venue over the claims against all defendants. *See* Tex. Civ. Prac. & Rem.Code Ann. § 15.061; *Polaris Inv. Management Corp. v. Abascal,* 892 S.W.2d 860 (Tex.1995). As the Supreme Court stated in *Polaris,* "Venue is a creature of legislative grace, and ... the power to make venue changes is purely statutory." *Id.* at 862. The Supreme Court stated in *Polaris* that the plain wording of section 15.061 appears to permit the joinder of additional claims, and the Court declined to reinterpret section 15.061 in such a way as to prohibit what Polaris characterized as the "tag-along" venue of the plaintiffs: "It is not within the province of this Court to reconstrue, rewrite, or contravene a venue statute when the intent of the Legislature is clear." *Id.; see also Bleeker v. Villarreal,* 941 S.W.2d 163 (Tex.App.-Corpus Christi 1996, writ dism'd by agreement); *but see WTFO, Inc. v. Braithwaite,* 899 S.W.2d 709 (Tex.App.-Dallas 1995, no writ) (Waiver of venue by one defendant does not prevent another defendant from challenging venue.); *Pearson v. Jones Co., Ltd.,* 898 S.W.2d 329 (Tex.App.-Eastland 1994, no writ) (Even though two of four defendants filed an answer without challenging venue, they could not waive other defendants' objections to venue.). In *Polaris,* the Supreme Court indicated any change in section 15.061 was up to the legislature. *See Polaris,* 892 S.W.2d at 862. In the 1995 venue statute, the legislature repealed section 15.061 and added sections 15.005 and 15.064; Section 15.061 applies here because this suit was filed before section 15.061 was repealed and before sections 15.005 and 15.064 were added. We find the language of the 1985 statute is clear.

[3] Brookshire Grocery further maintains Smith

failed to put on a prima facie case that Brookshire, Inc. was properly joined to justify appellant's "tag along" venue. From the record before us, we cannot determine that Brookshire, Inc. was joined solely to fix venue. Prior to dismissing Brookshire, Inc. from the suit, Smith's pleadings alleged negligence on the part of both appellant and Brookshire, Inc. We note Brookshire Grocery pleaded in its amended answer that any injury sustained by Smith was caused by or, in effect, aggravated by "subsequently occurring incidents and conditions." It is undisputed that Smith worked for Brookshire, Inc. in Hardin County after the injury at appellant's store in Smith County. Appellant filed no special exceptions requesting Smith to plead more particularly how **\*823** Brookshire, Inc. was negligent and caused injury to Smith.

[4] Appellant further argues that, in order to establish venue in Hardin County, Smith must establish he acted in good faith in joining Brookshire, Inc., the resident defendant. Appellant did not object to the joinder of Brookshire, Inc. and never sought a severance; appellant waived any claim regarding improper joinder. *See Rosales v. H.E. Butt Grocery Co.,* 905 S.W.2d 745, 751 (Tex.App.-San Antonio 1995, writ denied). We are unable to determine from this record there was any bad faith on the part of Smith in filing suit against Brookshire, Inc. and appellant in Hardin County.

We conclude the trial court did not err in maintaining venue in Hardin County. Issue one is overruled.

### Exclusion of Evidence

[5] In point of error two, Brookshire Grocery contends the trial court erred in excluding evidence that Smith falsified an answer on his job application by failing to disclose his previous back surgery. A question on the employment application asked whether Smith had ever been seriously injured on the job. Smith answered "no." In the bill of exception testimony, Smith indicated he gave the "no" answer because at the time he did not consider his injury to be serious. Upon reflection, he agreed the correct answer would have been "yes." The evidence arguably was admissible for the purpose of impeachment of Smith's credibility.

[6] [7] Even though the evidence was admissible, Brookshire Grocery must still show the exclusion of the evidence was harmful. *See Texas Dep't of Transp. v. Able,* 35 S.W.3d 608, 617 (Tex.2000). "[A] successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted." *Id.* In our review, we consider the entire record. *Id.* Ordinarily we will not reverse a judgment for erroneous rulings on admissibility of evidence when the evidence is cumulative and the excluded evidence is not controlling on a material issue dispositive of the case. *Id.*

Here, the evidence of the answer on the job application is not controlling on any material issue in the case. The answer does not address directly the elements of Brookshire Grocery's negligence. Whether Brookshire Grocery knew of his prior back injury was not an issue given the circumstances of the alleged negligence in this case: improperly stacked products fell on Smith and caused his back injury. Smith's own negligence was not an issue in this case against a nonsubscriber. *See* Tex. Lab.Code Ann. § 406.033 (Vernon Supp.2003). His medical condition before the injury at issue was fully presented to the jury, including testimony and records from doctors who treated him before and after the injury. Smith's credibility was repeatedly challenged during cross-examination concerning Smith's medical history, work history, and the accident itself. Based on the record before us, we conclude that the job application answer was not controlling on a material issue, and that Brookshire Grocery has failed to show that the excluded evidence probably caused the rendition of an improper judgment. We hold that under these circumstances the trial court's evidentiary ruling does not require reversal of this case and a new trial. *See* Tex.R.App. P. 44.1(a). Issue two is overruled.

### Prejudgment interest

[8] Brookshire Grocery also challenges the prejudgment interest award set out in the judgment. A trial court's prejudgment interest award is reviewed under an abuse of discretion standard. *See J.C. Penney \*824 Life Ins. Co. v. Heinrich,* 32

S.W.3d 280, 289 (Tex.App.-San Antonio 2000, pet. denied). Appellant argues the trial court erred by using an incorrect date from which to begin its calculations, and further erred by awarding prejudgment interest on future damages.

[9] [10] The Texas Finance Code provides that judgments in cases involving wrongful death, personal injury, and property damages are to include prejudgment interest. *See* Tex. Fin.Code Ann. § 304.102 (Vernon 1998 & Supp.2003). Prejudgment interest accrues on the amount of the judgment during the period beginning on the 180th day after the date the defendant receives written notice of a claim or on the day the suit is filed, whichever occurs first.*See* Tex. Fin.Code Ann. § 304.104 (Vernon 1998 & Supp.2003). The term "claim" describes a demand for compensation or an assertion of a right to be paid. *See Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 531 (Tex.1998); *see also Robinson v. Brice,* 894 S.W.2d 525, 528 (Tex.App.-Austin 1995, writ denied).

Brookshire Grocery argues prejudgment interest should be calculated from May 20, 1993, the date of a letter sent from Smith's lawyer to appellant. The letter notified Brookshire Grocery that the attorney had been retained to represent Smith in connection with claims regarding injuries Smith sustained on or about August 4, 1992.

Smith argues the trial court's determination of a November 1992 starting date is correct. In evidence are two letters Smith sent to Eddie Crawford, appellant's agent on the medical coverage matters. An October 1992 letter requested reimbursement for expenses relating to car mileage and to treatment for Smith's injury. A November 1992 letter was, in effect, Smith's progress report to Crawford concerning medical procedures contemplated by Smith's doctor and concerning Smith's willingness to see another doctor. Both the October and November 1992 letters were before the trial judge when he made the determination to use the November 1992 date as the starting point for calculating prejudgment interest.

Courts have considered various writings in determining what constitutes written notice of a

claim. In *Robinson,* 894 S.W.2d at 528, the Austin court stated that written notice of an accident and injuries is not sufficient to constitute notice of a claim under the prejudgment interest statute; there must be written notice of a lawful demand for payment or compensation. The *Robinson* court found that a letter—in which Robinson requested that the insurance carrier pay certain medical bills and inquired as to when the next lost wages check was due—constituted written notice of a claim. *Id.* at 529. The Fort Worth court has noted that nothing in the prejudgment interest statute requires the claimant to demand an exact amount or list every element of damage claimed in order to trigger the notice of claim provision; a signed medical authorization form, coupled with a letter asking the company to "properly consider [plaintiff's] injury claim," constituted notice under the statute. *Bevers v. Soule,* 909 S.W.2d 599, 603–04 (Tex.App.-Fort Worth 1995, no writ). The Texarkana court has concluded that a person's medical release prepared by her employer—stating that the information was to be used for purposes of evaluating and handling her claim for injury as a result of an accident—was sufficient notice under the statute. *See K Mart Corp. v. Rhyne,* 932 S.W.2d 140, 146 (Tex.App.-Texarkana 1996, no writ). In *Johnson & Higgins,* a standstill agreement (normally an agreement to maintain the status quo and temporarily suspend or stop a suit) stated the following: " 'Kenneco asserts that, to the extent underwriters are found not to be **\*825** liable [in the federal action]...., J & H is liable to Kenneco for the amounts which Kenneco has claimed under the Policy.' " *Johnson & Higgins,* 962 S.W.2d at 531. The Supreme Court held the agreement constituted written notice of a claim and triggered accrual of prejudgment interest. *Id.* We conclude that, taken together, the letters written by Smith to Crawford constitute written notice of a claim: they ask for reimbursement of expenses relating to treatment and they state procedures suggested by the doctor. We find the trial court did not abuse its discretion in calculating prejudgment interest from the November 1992 date.

Brookshire Grocery also contends article 5069–1.05 § 6 and its successor statute are unconstitutional, and that the trial court erred in awarding prejudgment interest on future damages. These constitutional arguments were rejected by the Supreme Court in *C & H Nationwide, Inc. v. Thompson,* 903 S.W.2d 315, 324 (Tex.1994). The Supreme Court held the statute by its terms provides for prejudgment interest

on future damages. _Id_. at 324–327. At the hearing on the motion to enter judgment, appellant's attorney acknowledged the issue was settled. He argues for a change in the law. But an intermediate appellate court must follow Supreme Court precedent. Issue three is overruled.

The judgment of the trial court is affirmed.

AFFIRMED.

Footnotes

1    _See_ Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3242, 3249, _repealed by_ Act of May 8, 1995, 74th Leg., R.S., ch.138, § 10, 1995 Tex. Gen. Laws 981 (current version at Tex. Civ. Prac. & Rem.Code Ann. §§ 15.005, 15.0641 (Vernon 2002).)

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.



372 S.W.3d 621
Supreme Court of Texas.

FREEDOM COMMUNICATIONS,
INC., d/b/a The Brownsville Herald
and Valley Morning Star, Petitioner,

v.

Juan Antonio CORONADO, et al., Respondents.

No. 09–0745. | June 22, 2012.

**Synopsis**

**Background:** Plaintiffs sued candidate for district attorney, publisher of newspapers, and former district attorney for defamation and invasion of privacy after plaintiffs were identified in candidate's newspaper advertisements as persons who had been arrested but not prosecuted for child abuse. Publisher moved for summary judgment. The 357th District Court, Cameron County, Abel Limas, J., denied the motion. Publisher filed an interlocutory appeal. The Corpus Christi–Edinburg Court of Appeals, 296 S.W.3d 790, affirmed. Publisher petitioned for review.

**Holdings:** The Supreme Court held that:

[1] judicial notice would be taken of trial judge's plea agreement in a federal racketeering case, and

[2] trial judge had an interest in the publisher's case, such that trial judge was constitutionally disqualified, trial judge's discretionary ruling on publisher's motion was therefore void, and the appellate courts accordingly lacked jurisdiction to address the merits of publisher's interlocutory appeal.

Vacated and remanded.

West Headnotes (9)

**[1]** **Evidence**
🔑 Proceedings in other courts

A court will take judicial notice of another court's records if a party provides proof of the records. Rules of Evid., Rule 201(b, d).

8 Cases that cite this headnote

**[2]** **Appeal and Error**
🔑 Void judgment or order

Appellate courts do not have jurisdiction to address the merits of appeals from void orders or judgments; rather, they have jurisdiction only to determine that the order or judgment underlying the appeal is void and make appropriate orders based on that determination.

8 Cases that cite this headnote

**[3]** **Appeal and Error**
🔑 Determination of questions of jurisdiction in general

Supreme Court must consider its jurisdiction to decide an appeal, even if that consideration is sua sponte.

4 Cases that cite this headnote

**[4]** **Judges**
🔑 Pecuniary Interest

A judge is interested in a case, and thus disqualified under the Texas Constitution, if an order or judgment in the case will directly affect him to his personal or pecuniary loss or gain. Vernon's Ann.Texas Const. Art. 5, § 11.

1 Cases that cite this headnote

**[5]** **Judges**
🔑 Effect on acts and proceedings of judge

A disqualified judge has no power to act in the case. Vernon's Ann.Texas Const. Art. 5, § 11.

Cases that cite this headnote

**[6]** **Judges**
🔑 Effect on acts and proceedings of judge

Discretionary judicial acts by a disqualified judge are void. Vernon's Ann.Texas Const. Art. 5, § 11.

Cases that cite this headnote

**[7]** **Judges**

🔑 Waiver of Disqualification or Objections

Disqualification of a judge is a jurisdictional issue that cannot be waived. Vernon's Ann.Texas Const. Art. 5, § 11.

Cases that cite this headnote

**[8]** **Evidence**

🔑 Proceedings in other courts

Supreme Court, on review of a decision of the Court of Appeals on newspaper publisher's interlocutory appeal from a denial of its motion for summary judgment in an action against it for defamation and invasion of privacy, would take judicial notice of the facts in trial judge's plea agreement in a federal racketeering case; publisher provided a copy of the plea agreement in its briefing to the Supreme Court and maintained that the facts were appropriate for judicial notice, trial judge would have been constitutionally disqualified from entering the summary-judgment order if he had an interest in the publisher's case, such a discretionary ruling by trial judge would be void, and appellate jurisdiction would lack jurisdiction to address the merits of the interlocutory appeal if the order were void. Vernon's Ann.Texas Const. Art. 5, § 11; V.T.C.A., Civil Practice & Remedies Code § 51.014(a)(6); V.T.C.A., Government Code § 22.225(c, d); Rules of Evid., Rule 201(b, d).

13 Cases that cite this headnote

**[9]** **Appeal and Error**

🔑 Void judgment or order

**Judges**

🔑 Pecuniary Interest

Trial judge had an interest in a case in which he denied a newspaper publisher's motion for summary judgment on claims against it for defamation and invasion of privacy, such that trial judge was constitutionally disqualified, trial judge's discretionary ruling on the motion was therefore void, and the Court of Appeals and the Supreme Court accordingly lacked jurisdiction to address the merits of publisher's

interlocutory appeal from the denial; trial judge, who pleaded guilty to federal racketeering charges and admitted that he accepted $8000 for, in part, making rulings favorable to the plaintiffs in publisher's case, including denying the summary-judgment motion, obtained a pecuniary gain as a direct result of his rulings. Vernon's Ann.Texas Const. Art. 5, § 11.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*622** Jeffery T. Nobles, Beirne Maynard & Parsons L.L.P., Houston, John A. Bussian III, The Bussian Law Firm, PLLC, Raleigh, NC, Christina Fontenot Crozier, Haynes and Boone, LLP, Houston, TX, Brian G. Janis, Brian G. Janis, PC, Brownsville, TX, for Freedom Communications, Inc., d/b/a The Brownsville Herald and Valley Morning Star.

Marc G. Rosenthal, Charles L. Levy, Juanita Lynn Watson, Rosenthal & Watson, PC, Austin, TX, Paul Lanaux Fourt, Law Office of Paul L. Fourt, Jr., Robert Julius Lerma, Brownsville, TX, Oscar De La Fuente Jr., Attorney at Law, Harlingen, David J. Healey, Fish & Richardson, P.C., Houston, TX, for Juan Antonio Coronado.

**Opinion**

PER CURIAM.

This interlocutory appeal is from the denial of a media defendant's motion for summary judgment regarding claims that it defamed the plaintiffs and invaded their privacy by publishing a political advertisement. We conclude that neither the court of appeals nor this Court has jurisdiction to consider the merits of the parties' arguments because the trial court judge accepted a bribe for ruling on the summary-judgment motion, constitutionally disqualifying him from this case and thus making his order void. We vacate the judgment of the court of appeals and remand the case to the trial court for further proceedings.

In 2008 Peter Zavaletta sought election to the position of Cameron County District Attorney. During the course of his election campaign he advertised in the Brownsville Herald and Valley Morning Star, two Freedom Communications, Inc. (Freedom) newspapers, that the incumbent District Attorney failed to prosecute child abuse cases. The

advertisement included the names of individuals who were arrested, but not prosecuted, for alleged child abuse. Juan Antonio Coronado, Francisco Solis Ramirez, Roberto Rivera III, and Ruben Contreras (collectively, Coronado) were among the persons identified in the advertisement. They sued Zavaletta, Freedom, and former District Attorney **\*623** Yolanda DeLeon, contending that the advertisement defamed them and invaded their privacy. Freedom moved for summary judgment on the grounds that the advertisement was accurate, true, and non-actionable under the United States and Texas Constitutions and Texas statutory and common law. The trial court judge, Abel Limas, denied the motion and Freedom filed an interlocutory appeal. *See* TEX. CIV. PRAC. & REM.CODE § 51.014(a)(6) (allowing for an appeal from an interlocutory order that denies a motion for summary judgment based upon a claim against a member of the electronic or print media arising under the free speech clause of the First Amendment to the United States Constitution or Article I, Section 8, of the Texas Constitution). The court of appeals affirmed, with one justice dissenting. 296 S.W.3d 790.

Freedom filed a petition for review in this Court and as part of its briefing provided a copy of a plea agreement filed in the United States District Court for the Southern District of Texas. The agreement shows that after the court of appeals issued its decision, Limas pleaded guilty to federal racketeering charges. He admitted in the plea that on May 8, 2008, he accepted $8,000 in cash for, in part, making rulings favorable to the plaintiffs in this case, including "denying [Freedom's] Summary Judgment [motion] on November 26th." The plea agreement is not in the appellate record and Coronado urges us not to consider it, arguing that Freedom's reference to the plea amounts to an impermissible attempt to obtain sanctions against them in this Court. Freedom maintains that the facts contained in the plea agreement are appropriate for judicial notice and it is not seeking sanctions or any other relief based on Limas's motives in ruling on the summary-judgment motion. Instead, Freedom argues that we should decide the merits of this appeal, but do so using "close appellate scrutiny" because Limas's guilty plea suggests his ruling on the summary-judgment motion was not the product of good faith.

 **[1]**  An appellate court may take judicial notice of a relevant fact that is "either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." TEX.R. EVID. 201(b); *see*

*Office of Pub. Util. Counsel v. Pub. Util. Comm'n of Tex.,* 878 S.W.2d 598, 600 (Tex.1994) (per curiam). Judicial notice of such a fact is mandatory if a party requests it and supplies "the necessary information." TEX.R. EVID. 201(d). Under this standard, a court will take judicial notice of another court's records if a party provides proof of the records. *See, e.g., MCI Sales & Serv., Inc. v. Hinton,* 329 S.W.3d 475, 497 n. 21 (Tex.2010); *WorldPeace v. Comm'n for Lawyer Discipline,* 183 S.W.3d 451, 459 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). Here, Freedom has provided a copy of Limas's plea agreement in federal district court and urges us to take judicial notice of the facts in the agreement.

 **[2]**   **[3]**  Freedom's request leads us to question whether we have jurisdiction to decide this appeal. That is because appellate courts do not have jurisdiction to address the merits of appeals from void orders or judgments; rather, they have jurisdiction only to determine that the order or judgment underlying the appeal is void and make appropriate orders based on that determination. *See State ex rel. Latty v. Owens,* 907 S.W.2d 484, 486 (Tex.1995); *see also Univ. of Tex. Sw. Med. Ctr. of Dallas v. Margulis,* 11 S.W.3d 186, 187 (Tex.2000) (per curiam) ("[E]ven when an appeal is interlocutory, we have jurisdiction to determine whether the court of **\*624** appeals [had] jurisdiction of the appeal."). And we must consider our jurisdiction, even if that consideration is sua sponte. *See Tex. Workers' Comp. Comm'n v. Garcia,* 893 S.W.2d 504, 517 n. 15 (Tex.1995).

 **[4]**   **[5]**   **[6]**   **[7]**  The Texas Constitution provides that "[n]o judge shall sit in any case wherein the judge may be interested." TEX. CONST. art. V, § 11. A judge is "interested" in a case—and thus disqualified under Article V, Section 11—if an order or judgment in the case will directly "affect him to his personal or pecuniary loss or gain." *Elliott v. Scott,* 119 Tex. 94, 25 S.W.2d 150, 152 (1930) (quoting *City of Oak Cliff v. State,* 97 Tex. 391, 79 S.W. 1068, 1069 (1904)). A disqualified judge has no power to act in the case. *Postal Mut. Indem. Co. v. Ellis,* 140 Tex. 570, 169 S.W.2d 482, 484 (1943). Discretionary judicial acts by a disqualified judge are void. *Tesco Am., Inc. v. Strong Indus., Inc.,* 221 S.W.3d 550, 555 (Tex.2006); *Buckholts Indep. Sch. Dist. v. Glaser,* 632 S.W.2d 146, 148 (Tex.1982). Thus, the disqualification of a judge is a jurisdictional issue that cannot be waived. *Postal Mut. Indem. Co.,* 169 S.W.2d at 484; *see Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 445 (Tex.1993).

 **[8]**  Limas's order denying Freedom's summary-judgment motion is the sole basis for appellate jurisdiction over this

interlocutory appeal. *See* TEX. CIV. PRAC. & REM.CODE § 51.014(a)(6); TEX. GOV'T CODE § 22.225(c), (d). If Limas's order is void, then the court of appeals did not have authority to consider the merits of Freedom's appeal from the order denying summary judgment, and neither do we. In these circumstances the facts in Limas's plea agreement are relevant, it is appropriate for us to take judicial notice of them, and we do so. *See* TEX.R. EVID. 201(b), (d), (f); TEX. CIV. PRAC. & REM.CODE § 51.014(a)(6); TEX. GOV'T CODE 22.225(c), (d); *see also SEI Bus. Sys., Inc. v. Bank One Tex., N.A.,* 803 S.W.2d 838, 841 (Tex.App.-Dallas 1991, no writ) ("As a general rule, appellate courts take judicial notice of facts outside the record only to determine jurisdiction over an appeal or to resolve matters ancillary to decisions which are mandated by law....").

 **[9]** The facts in the plea agreement show that Limas had an interest—an illegal interest, no less—in this case because he obtained a pecuniary gain as a direct result of his rulings, including his order denying Freedom's summary-judgment motion. *See Elliott,* 25 S.W.2d at 152. Therefore, he was disqualified and his discretionary ruling on the summary-judgment motion was void. *See* TEX. CONST. art. V, § 11; *Tesco Am., Inc.,* 221 S.W.3d at 555. Because the order on which Freedom bases its appeal is void, we cannot address the merits of the appeal and the court of appeals did not have authority to do so either—even though it had no way of knowing so. *See Univ. of Tex. Sw. Med. Ctr. of Dallas,* 11 S.W.3d at 187; *Postal Mut. Indem. Co.,* 169 S.W.2d at 484.

Accordingly, without hearing oral argument, we vacate the court of appeals' judgment and opinion. TEX.R.APP. P. 59.1; *see, e.g., Valley Baptist Med. Ctr. v. Gonzalez,* 33 S.W.3d 821, 822 (Tex.2000) (per curiam) (vacating the judgment and opinion of the court of appeals as advisory when the case had become moot before the opinion issued). We remand the case to the trial court for further proceedings. TEX.R.APP. P. 60.6.

**All Citations**

372 S.W.3d 621, 55 Tex. Sup. Ct. J. 975

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

L

18 S.W.3d 744
Court of Appeals of Texas,
San Antonio.

HELENA CHEMICAL CO. and Hyperformer
Seed Co., Appellants/Cross–Appellees,

v.

Kenneth WILKINS and Tom Wilkins, Individually
and d/b/a Chapotal Farms and Porciones 99
Properties; Geen Wilkins and Mark Wilkins,
Individually and d/b/a Tabasco and Wilkins Family
Limited Partnership, Appellees/Cross–Appellants.

No. 04–99–00107–CV.    |    March 8, 2000.

Farmers filed action against seed seller, alleging violation of Deceptive Trade Practices Act (DTPA), breach of warranties, and fraud. The 229th Judicial District Court, Starr County, John A. Pope, III, J., entered judgment on jury verdict awarding damages to farmers. Both sides appealed. The Court of Appeals, Hardberger, C.J., held that: (1) delay in submitting farmers' claim against seed seller to arbitration did not bar farmers' lawsuit; (2) witness was sufficiently qualified to testify as expert as to suitability of seed for dry land farming; (3) evidence was sufficient to show that seller's failure to comply with warranty, or a deceptive act or unconscionable action, was producing cause of farmers' damages; (4) language on seed bag, purchase ticket, invoices, and unsigned purchase agreement effectively disclaimed warranties; and (5) evidence was sufficient for jury to calculate, with reasonable certainty, award of damages for lost profits.

Affirmed.

Duncan, J., filed a dissenting opinion.

West Headnotes (26)

**[1]** **Appeal and Error**
  ◔ Cases Triable in Appellate Court

Question of whether a trial court has subject matter jurisdiction is a question of law subject to de novo review.

Cases that cite this headnote

**[2]** **Appeal and Error**
  ◔ Striking out or dismissal

Reviewing court construes a petition in favor of the plaintiff and, if necessary, reviews the entire record to determine if any evidence supports the trial court's jurisdiction to hear the cause.

Cases that cite this headnote

**[3]** **Appeal and Error**
  ◔ Jurisdiction

Unless the pleadings demonstrate the absence of jurisdiction, a reviewing court assumes the trial court properly had jurisdiction over the case.

Cases that cite this headnote

**[4]** **Statutes**
  ◔ Construction in View of Effects,
Consequences, or Results

Purpose of statutory construction is to ascertain legislative intent and where the intent is clear, it will be given effect, even if the result appears to be harsh.

Cases that cite this headnote

**[5]** **Alternative Dispute Resolution**
  ◔ Arbitration favored;  public policy

Public policy favors agreements to resolve legal disputes through agreements to arbitrate.

Cases that cite this headnote

**[6]** **Alternative Dispute Resolution**
  ◔ Partial arbitrability

Parties must arbitrate any claims that fall within the scope of the arbitration agreements, even though piecemeal litigation might result.

1 Cases that cite this headnote

**[7]** **Alternative Dispute Resolution**
  ◔ Failure to Arbitrate

If a party fails to submit a claim to arbitration in a timely fashion under the Agriculture Code, the code provides that the trial court may take remedial action in light of the circumstances of the delay or the conduct of the parties, but if a party fails to submit a claim to arbitration altogether, then the party may not maintain legal action. V.T.C.A., Agriculture Code §§ 64.002, 64.004.

Cases that cite this headnote

**[8]** **Alternative Dispute Resolution**
　　 Failure to Arbitrate

Delay in submitting farmers' claims against seed seller to arbitration as required by Agriculture Code until trial court granted motion to compel arbitration did not bar farmers' lawsuit, even though delay prompted arbitration board to refuse to arbitrate matter due to inability to investigate crops in field conditions, in light of Code's specific authorization for trial court to take such delay into account and court's ability to fashion remedy if necessary. V.T.C.A., Agriculture Code § 64.004.

Cases that cite this headnote

**[9]** **Appeal and Error**
　　 Rulings on admissibility of evidence in general

**Appeal and Error**
　　 Competency of witness

Whether the trial court properly admitted expert's testimony is subject to an abuse of discretion standard of review.

3 Cases that cite this headnote

**[10]** **Evidence**
　　 Speculation, guess, or conjecture

In reviewing admissibility of expert testimony, court examines the entire substance of the expert's testimony to determine if the opinion is based on demonstrable facts and does not rely solely on assumptions, possibility, speculation, and surmise.

3 Cases that cite this headnote

**[11]** **Evidence**
　　 Knowledge, experience, and skill in general

In determining whether a particular witness is qualified to testify as an expert, focus is on whether the expert's expertise goes to the very matter on which he or she is to give an opinion. Rules of Evid., Rule 702.

2 Cases that cite this headnote

**[12]** **Evidence**
　　 Physical facts

Witness was sufficiently qualified to testify as expert as to suitability of seed for dry land farming and its susceptibility to charcoal rot disease, even though he was not plant pathologist, where witness was plant scientist and agronomist and used his experience to formulate conclusion on basis of research, study of independent tests, and observations regarding seed's suitability for dry land farming. Rules of Evid., Rule 702.

2 Cases that cite this headnote

**[13]** **Evidence**
　　 Sources of Data

**Evidence**
　　 References to authorities on subject

**Evidence**
　　 Experiments and results thereof

Expert's testimony on suitability of seed for dry land farming was sufficiently reliable to be admissible, despite his discounting of certain testing of seed, where his conclusion flowed from his observation of those tests and other factors such as weather and weed control reports, disease publications, other testing, and comparisons with crops on adjacent farms.

Cases that cite this headnote

**[14]** **Antitrust and Trade Regulation**
　　 Weight and sufficiency

**Evidence**

👈 Nature, condition, and relation of objects

**Sales**

👈 Breach of warranty

Evidence was sufficient to show that seed seller's failure to comply with warranty, or a deceptive act or unconscionable action by seller, was producing cause of farmers' damages for purposes of Deceptive Trade Practices Act (DTPA) and breach of warranty claims; expert testimony and evidence of field trials indicated that seed might not have been suitable for dry land farming, contrary to actual representations in seller's promotional literature and made by sales representative. V.T.C.A., Bus. & C. § 17.41 et seq.

Cases that cite this headnote

**[15]** **Antitrust and Trade Regulation**

👈 Weight and sufficiency

**Sales**

👈 Breach of warranty

Evidence that neighbor had no adverse effect from rotating from cotton to grain and that seed seller recommended alleged over-planting by farmers was sufficient to rebut possibility of causes of farmers' low yields other than seller's seed, which thus supported farmers' Deceptive Trade Practices Act (DTPA) and breach of warranty claims against seed seller. V.T.C.A., Bus. & C. § 17.41 et seq.

Cases that cite this headnote

**[16]** **Antitrust and Trade Regulation**

👈 Comparisons; comparative advertising

**Sales**

👈 Statements as to kind, quality, condition, or value

Repeated oral and written statements by seed seller that particular seed was better for dry land farming than other seed brands did not amount to mere inactionable puffing for purposes of Deceptive Trade Practices Act (DTPA) and breach of warranty claims, in light of their specificity and disparate positions of knowledge

enjoyed by farmers and seller. V.T.C.A., Bus. & C. § 17.41 et seq.

Cases that cite this headnote

**[17]** **Fraud**

👈 Matters of Fact or of Opinion

Decisive test to determine whether seller's statements are mere inactionable puffing is whether the seller asserts a fact of which the buyer is ignorant or merely states an opinion or judgment on a matter of which the seller has no special knowledge and on which the buyer may be expected also to have an opinion and to exercise his judgment.

2 Cases that cite this headnote

**[18]** **Antitrust and Trade Regulation**

👈 Weight and sufficiency

Farmers' testimony was some evidence sufficient to find that seed seller took advantage of the lack of knowledge, ability, experience, or capacity of farmers to grossly unfair degree so as to support liability on unconscionability claim under Deceptive Trade Practices Act (DTPA). V.T.C.A., Bus. & C. § 17.41 et seq.

Cases that cite this headnote

**[19]** **Sales**

👈 Exclusion by contract or express warranty or refusal to warrant

Warranty language on seed bag, purchase ticket, invoices, and unsigned purchase agreement effectively disclaimed implied warranties of merchantability and fitness for a particular purpose, as well as express warranties, and thus precluded breach of warranty claim by farmers against seed seller.

Cases that cite this headnote

**[20]** **Damages**

👈 Effect of provisions of contract

Contractual limitation on damages is not effective as to statutorily created rights, such as a right to recover for deceptive acts.

Cases that cite this headnote

**[21]** **Damages**
  Loss of Profits

History of loss does not preclude a judgment for future lost profits.

Cases that cite this headnote

**[22]** **Damages**
  Loss of profits

Precise calculation of anticipated profits has never been essential to recovery by any business; it is sufficient if there is data from which the loss may be ascertained with reasonable certainty.

Cases that cite this headnote

**[23]** **Damages**
  Loss of profits

Evidence was sufficient for jury to calculate, with reasonable certainty, award of damages to farmers for lost profits resulting from seed seller's deceptive act or unconscionable action concerning suitability of seed sold to farmers; farmer's testimony allowed jury to consider yield attributable to other seed, recalculate lease payments, and regard elevator costs as either reflected in yield or refundable so as to be not part of net cost calculation.

Cases that cite this headnote

**[24]** **Interest**
  Suspension

Award of prejudgment interest during periods of delay is generally left to the discretion of the trial court.

5 Cases that cite this headnote

**[25]** **Appeal and Error**
  Costs and Allowances

Because the issue of an offset from interest calculations for delay caused by a litigant is discretionary rather than mandatory, a reviewing

court does not substitute its opinion on the matter for that of the trial court.

3 Cases that cite this headnote

**[26]** **Interest**
  Stay of proceedings

Trial court reasonably commenced award of prejudgment interest in favor of farmers in action against seed sellers as of date when court lifted abatement that had been imposed during attempt at arbitration of dispute, in light of role that each party played in pretrial delay, which could support conclusion that farmers had most discretion in determining when to submit claim for arbitration.

5 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*747**  Charles C. Murray, Lisa Powell, Atlas & Hall, L.L.P., McAllen, Keith Parr, Kevin P. McJessy, Chicago, Ill., for appellant.

John Skaggs, Skaggs & Garza, L.L.P., McAllen, for appellee.

Sitting: PHIL HARDBERGER, Chief Justice, CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice.

### OPINION

Opinion by: PHIL HARDBERGER, Chief Justice.

Helena Chemical Company and Hyperformer Seed Company (collectively "Helena") appeal the trial court's entry of judgment, in which Kenneth, Tom, Geen, and Mark Wilkins, as well as their respective business entities, (collectively "the Wilkins") were awarded $360,000 plus attorney's fees following a jury trial.

Helena raises five issues on appeal. In its fourth issue, Helena asserts that the Wilkins are barred from asserting their claims because of their alleged failure to fulfill the arbitration requirements of the Texas Agriculture Code. In its fifth issue, Helena claims the trial court abused its discretion in admitting testimony by the Wilkins' expert. In its first,

third, and second issues, Helena asserts that the evidence is legally and factually insufficient to support the jury's verdict as to causation, liability, and damages. On cross-appeal, the Wilkins claim the trial court erred in its manner of assessing pre-judgment interest.

## BACKGROUND

The Wilkins manage farms in Hidalgo and Starr Counties. Helena sells seed. The Wilkins purchased Cherokee grain sorghum [1] from Helena in 1992, 1993, and 1994. The Wilkins claim to have relied upon Helena's promotional literature, which states that Cherokee has "excellent dryland [ (farmland with little or no irrigation) ] yield potential." [2]

**\*748** Although the Wilkins' 1992 Cherokee crop produced a high yield, their 1993 and 1994 Cherokee crops suffered from reduced yields. The parties disagree as to the cause of the reduced yield. The Wilkins claim that the 1993–94 crops "failed to produce or perform as expected, or as represented by [Helena]." They argue that the Cherokee failed because it is not drought resistant or tolerant to charcoal rot.

Helena argues that the Cherokee seed failed because the Wilkins had planted cotton (which reduces soil moisture) a year earlier on a portion of the field, which reduced the Cherokee yield significantly on that part of the field. According to Helena, Cherokee is tolerant to charcoal rot (but is not immune) and grows well in dryland conditions (but not when the underlying soil has been depleted of its moisture in a previous cotton crop).

The Wilkins sued Helena on February 7, 1995, alleging that Helena had violated the Deceptive Trade Practices Act ("DTPA"), breached implied and express warranties, and committed fraud. On February 21, 1995, Helena filed a plea in abatement and motion to compel arbitration of the Wilkins' claims. On April 5, 1995, the trial court abated the proceeding and granted Helena's motion to compel. On August 30, 1996, the Wilkins submitted the matter to arbitration. On October 16, 1996, the Texas Plant and Seed Board declined to arbitrate the matter because the crops were not in "field conditions." The trial court subsequently lifted the abatement.

A jury found for the Wilkins on the different theories of recovery, except on the question of fraud and whether Helena had committed these acts knowingly. The jury awarded damages to the Wilkins in the amount of $360,000.

The trial court entered judgment against Helena, awarding prejudgment interest from October 23, 1996 (the day the Seed and Plant Board stated that the Wilkins' claims did not qualify for arbitration). Helena appeals; the Wilkins appeal as to the date from which prejudgment interest is computed.

## DISCUSSION

### 1. Arbitration

In its fourth issue, Helena asserts that the Wilkins are barred from asserting their claims because they failed to comply with the requirements imposed by the Texas Agriculture Code. The Agriculture Code provides, in part:

(a) When a purchaser of seed designed for planting claims to have been damaged by the failure of the seed to produce or perform as represented by warranty or by the label required to be attached to the seed under this subtitle or as a result of negligence, *the purchaser must submit the claim to arbitration as provided by this chapter as a prerequisite to the exercise of the purchaser's right to maintain a legal action* against the labeler....

(b) Any period of limitations that applies to the claim *shall be tolled* until the 11th day after the date of filing with the commissioner of the report of arbitration by the board of arbitration.

(c) A claim of damages due to the failure of the seed as described by Subsection (a) of this section *may not be asserted* as a counterclaim or defense in any action brought by a seller against a purchaser *until* the purchaser has submitted a claim to arbitration.

(d) When the court in which an action has been filed by a seller of seed described by Subsection (c) of this section receives from the purchaser **\*749** a copy of the purchaser's complaint filed in arbitration, accompanied by a written notice of intention to use the claim as a counterclaim or defense in the action, the seller's action shall be stayed. Any period of limitations that applies to the claim is suspended until the 11th day after the date of filing with the commissioner of the report of arbitration by the board of arbitration.

TEX. AGRIC. CODE ANN. § 64.002 (Vernon 1995) (emphasis added). The code requires seed bags to provide a notice alerting the farmer to the requirement of submitting

claims to arbitration. *See id.* § 64.003. The seed bag tendered as an exhibit to this court contains such a notice.

The Agriculture Code sets forth the arbitration procedure, in part, as follows:

(a) A purchaser *may begin arbitration* by filing ... a sworn complaint and a filing fee, as provided by department rule. The purchaser shall send a copy of the complaint to the seller by certified mail. Except in the case of seed that has not been planted, the complaint must be filed within the time necessary to permit effective inspection of the plants under field conditions.

....

(c) The commissioner shall refer the complaint and the answer to the arbitration board for investigation, findings, and recommendations.

....

(e) The report of the arbitration board shall include findings of fact, conclusions of law, and recommendations as to costs....

(f) In the course of its investigation, the ... board or any of its members may:

(1) examine the purchaser and the seller on all matters that the arbitration board considers relevant;

(2) grow to production a representative sample of the seed through the facilities of the commissioner or a designated university under the commissioner's supervision; or

(3) hold informal hearings....

....

(h) The arbitration board shall consider any field inspection or other data submitted by either party in its report and recommendation....

*Id.* § 64.006 (Vernon Supp.2000). The effect of arbitration is that:

> In any litigation involving a complaint that has been the subject of arbitration under this chapter, any party may introduce the report of arbitration as evidence of the facts found in

the report, and the court may give such weight to the arbitration board's findings of fact, conclusions of law, and recommendations as to damages and costs as the court determines advisable. The court may also take into account any findings of the board of arbitration with respect to the failure of any party to cooperate in the arbitration proceedings, including any finding as to the effect of delay in filing the arbitration claim or the arbitration board's ability to determine the facts of the case.

*Id.* § 64.004 (Vernon 1995). We did not locate any Texas case law reviewing these sections of the Agriculture Code as they relate to this case. If the Wilkins' claims are barred, then the trial court did not have subject matter jurisdiction to hear the case.

### a. Standard of Review

**[1]** **[2]** **[3]** The question of whether a trial court has subject matter jurisdiction is a question of law subject to de novo review. *See Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 928 (Tex.1998). We construe the petition in favor of the Wilkins and, if necessary, review the entire record to determine if any evidence supports the district court's jurisdiction to hear the cause. *See Texas Ass'n of Bus. v. Texas Air Control Board,* 852 S.W.2d 440, 446 (Tex.1993). Unless the pleadings demonstrate the absence of jurisdiction, we assume the trial court properly had jurisdiction over **\*750** the case. *See Peek v. Equipment Serv. Co.,* 779 S.W.2d 802, 804 (Tex.1989).

### b. Construction of Texas Agriculture Code

**[4]** The purpose of statutory construction is to ascertain legislative intent. *See Woods v. Littleton,* 554 S.W.2d 662, 665 (Tex.1977). Where the intent is clear, it will be given effect, even if the result appears to be harsh. *See Boudreaux v. Texas and N.O.R. Co.,* 78 S.W.2d 641, 644 (Tex.Civ.App.-Beaumont 1935, writ ref'd). In ascertaining this intent, the Legislature has provided that words and phrases shall be read in context and construed according the rules of grammar and common usage. *See* TEX. GOV'T CODE ANN. § 311.011(a) (Vernon 1998). A court may consider, among other things, the object sought to be obtained and the consequences of any particular construction. *See id.* § 311.023; *Cole v. Texas*

*Employment Comm'n,* 563 S.W.2d 363, 367 (Tex.Civ.App.-Fort Worth 1978, writ dism'd).

## (1) FRAMING THE ISSUE PROPERLY

 **[5]**   **[6]**   Public policy favors agreements to resolve legal disputes through agreements to arbitrate. *See EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 90 (Tex.1996); *Jack B. Anglin Co., Inc. v. Tipps,* 842 S.W.2d 266, 268 (Tex.1992). "Questions of arbitability must be addressed with a healthy regard for the federal policy favoring arbitration...." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). The parties must arbitrate any claims that fall within the scope of the arbitration agreements, even though piecemeal litigation might result. *See Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 220–21, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). If the Wilkins had not submitted a claim to arbitration *at all,* their claim would be barred. The legislature has stated very clearly that "the purchaser must submit the claim to arbitration as provided by this chapter as a prerequisite to the exercise of the purchaser's right to maintain a legal action." TEX. AGRIC. CODE ANN. § 64.002 (Vernon 1995).

The code states that "the complaint must be filed within the time necessary to permit effective inspection of the plants under field conditions." *See id.* § 64.006 (Vernon Supp.2000). Here, the Wilkins did not submit the claim to arbitration until well after the time that they began to notice Cherokee's poor performance. As a result, the issue before us is whether this *delay* in submitting the claim to arbitration acts as a catastrophic bar to the Wilkins' legal claim.

## (2) SEED ARBITRATION IS NON–BINDING

The arbitration scheme for seed claims recognizes that "farmers and seedmen agree that litigation is not the most desirable way to settle a complaint about seed." Op. Tex. Att'y Gen. No. DM–3 (1991). The arbitration process for seed, although a potential avenue for settlement without trial, also "provides for an unbiased third party *investigation.*" *Id.* (emphasis added) (citation omitted). Recognizing the benefits of mandatory non-binding arbitration, the American Seed Trade Association has worked with state legislators to enact statutes to aid in the investigation and resolution of seed claims. *See, e.g.,* AMERICAN SEED TRADE ASS'N, *Legislative Affairs* (visited February 1, 2000) <http:// www.amseed.com/annrept/ar98/ar98p7.html>; AMERICAN SEED TRADE ASS'N, *Legislative Affairs* (visited February 1, 2000) <http:// www.amseed.com/annrept/legis.html>.

In furtherance of the non-binding seed arbitration process, the statute requires only that the arbitration board produce a report containing "findings of fact, conclusions of law, and recommendations as to costs." TEX. AGRIC. CODE ANN. § 64.006 (Vernon 1995). Neither party is required to introduce the report of arbitration into evidence. *Id.* § 64.004. The court has discretion to "give such weight to the arbitration board's [report] as [it] determines advisable." *Id.* Even if the language in the **\*751**  first sentence of Section 64.004 ("has been the subject of arbitration") is read to require actual *arbitration* of the claim (as opposed to *submission* of the claim to arbitration), the second sentence explains what the court may do, *regardless* of whether the claim was submitted to arbitration. *See id.* The court is empowered to consider the parties' failure to cooperate, "including any finding as to the *effect* of delay in filing the arbitration claim or the *arbitration board's ability to determine the facts of the case.*" *Id.* (emphasis added). The arbitration contemplated by our legislature is not intended to replace the parties' right to have their day in court. In fact, the legislature expressly accounted for the possibility that a party might be delayed (or purposely delay) filing a claim for arbitration.

## (3) THE STATUTE PROVIDES A REMEDY FOR FAILING TO FILE A CLAIM IN A TIMELY FASHION

 **[7]**   A strict reading of the Texas Agriculture Code might lead one to believe that a farmer's failure to submit a claim to arbitration while the crop is in "field conditions" has the extreme effect of barring the claim altogether. Yet, the plain language of the statute reveals that there is a fundamental difference between failing to submit the claim in a timely fashion in comparison to failing to submit a claim at all. If a party fails to submit a claim to arbitration in a timely fashion, the trial court may take remedial action in light of the circumstances of the delay or the conduct of the parties. If a party fails to submit a claim to arbitration altogether, the party may not maintain legal action.

## (4) THE PARTIES' ACTIONS

 **[8]**   In the present case, conflicting testimony exists as to who was responsible for prolonging the investigation and negotiation before the suit was commenced. The parties do not dispute that the claim was not submitted to arbitration until approximately sixteen months after the trial court granted Helena's motion to compel arbitration. The parties instead differ as to who bears the responsibility for causing

for the delay. In the end, the State Seed and Plant Board refused to arbitrate the matter because they were unable to examine the crops in "field conditions." We note that the parties were apparently attempting to effectuate a non-trial resolution of the Wilkins' claims. We note also that Helena could have moved to dismiss the suit at any time after the trial court agreed to compel arbitration, rather than wait until the board issued its findings. Such a motion, if made before the Wilkins eventually sought arbitration, would have been very compelling because the Wilkins had not fulfilled the necessary conditions to maintaining their legal action.

In the present case, Helena waited until *after* the Board determined "that the request did not qualify for arbitration" (on October 16, 1996) before it moved to dismiss the Wilkins' lawsuit (on November 16, 1996). A positive outcome of the delay is that the parties were continuing to attempt resolution of the claim without the consequences of litigation. An unfortunate result of the delay is that the arbitrators could not investigate the crops under "field conditions." Helena could not, therefore, have a neutral expert investigate the efficacy of its seed. Helena was not, however, without remedy. The trial court could have considered all of the circumstances surrounding the delay in adjudicating the case.

We find that an arbitration board's inability to investigate crops in "field conditions" does not bar the plaintiff's claim in a case that falls under Chapter 64 of the Texas Agriculture Code. The defendant has adequate remedies that could have been pursued after the trial court ordered arbitration. In addition, the trial court has the necessary tools to fashion a remedy itself during trial if necessary. We choose to exercise restraint here. We do not wish to make law where our legislature has already spoken. The trial court was empowered to take such delay into account under **\*752** Section 64.004 of the Agriculture Code. Because the Wilkins submitted their claim to arbitration, we conclude that their claim is not barred. [3] The trial court had jurisdiction to hear the case.

## 2. Expert Testimony

In its fifth issue, Helena argues that the trial court abused its discretion in admitting the testimony of Wilkins' expert, Dr. Pleunneke ("Pleunneke"). His opinion was that Cherokee seed is not an appropriate grain sorghum for dry land crops where the Wilkins' farm is located (Starr County). [4] Helena argues that Pleunneke is unqualified to testify as an expert and that his testimony as an expert is unreliable. Helena does not complain that his testimony amounts to an unreliable scientific opinion.

### a. Standard of Review

[9] [10] Whether the trial court properly admitted Dr. Pleunneke's testimony is subject to an abuse of discretion standard of review. *See E.I. du Pont de Nemours and Co. v. Robinson,* 923 S.W.2d 549, 558 (Tex.1995); *Wal–Mart Stores, Inc. v. Garcia,* 974 S.W.2d 83, 86 (Tex.App.-San Antonio 1998, no pet.). We examine the entire substance of the expert's testimony "to determine if the opinion is based on demonstrable facts and does not rely solely on assumptions, possibility, speculation, and surmise." *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 712–13 (Tex.1997). The decision to admit evidence is in the discretion of the trial court. *See Robinson,* 923 S.W.2d at 558 (citing *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985)); *Ginsberg v. Fifth Court of Appeals,* 686 S.W.2d 105, 108 (Tex.1985). We have stated that an abuse of discretion exists when the court fails to analyze or apply the law correctly. *Muecke v. Hallstead,* No. 04–97–00483–CV, 2000 WL 328129, at \*2 (Tex.App.-San Antonio March 29, 2000, no pet. h.).

### b. Admissibility

[11] Texas Rule of Evidence 702 permits a witness who is "qualified as an expert by knowledge, skill, experience, training, or education" to testify "in the form of an opinion or otherwise" if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." TEX.R. EVID. 702. Such testimony must not be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or other factors. TEX.R. EVID. 403. There exists no bright-line test to guide us as to whether a particular witness is qualified to testify as an expert. *See James v. Hudgins,* 876 S.W.2d 418, 421 (Tex.App.-El Paso 1994, writ denied) **\*753** (noting that the absence of "definite guidelines for making the determination of whether a witness's education, experience, skill, or training qualify the witness as an expert"). We focus instead on whether the expert's expertise "goes to the very matter on which he or she is to give an opinion." *Broders v. Heise,* 924 S.W.2d 148, 153 (Tex.1996).

### c. Did the Trial Court Err in Admitting Dr. Pleunneke's Expert Testimony?

## (1) QUALIFICATIONS

 **[12]**   Helena argues that Pleunneke is unqualified to render an opinion regarding Cherokee's ability to tolerate charcoal rot. Helena also claims that because Pleunneke is not a plant pathologist, he is unqualified to render an opinion on diseases affecting plants.

At trial, the Wilkins had the "burden to show that [Pleunneke] possess[es] special knowledge as to the very matter on which he" testified. *Broders,* 924 S.W.2d at 152–53; *Negrini v. State,* 853 S.W.2d 128, 130–31 (Tex.App.-Corpus Christi 1993). The central issue regarding Pleunneke's qualifications is *not* whether he is qualified to render an opinion with respect to Cherokee's inherent susceptibility to charcoal rot. *Instead,* the issue regarding his qualifications is whether he is qualified to render an opinion regarding Cherokee's suitability for dry land farming. In determining Pleunneke's qualification to provide such an opinion an important factor to consider is his ability to conduct research, gather information, and assimilate the data in a meaningful manner relating to a plant's performance. Is he *able* to marshal the necessary observations in support of his conclusion?

Helena argues that Pleunneke's ability to testify as an expert is limited to those areas within his experience and training. *See* TEX.R. EVID. 702. Pleunneke is a plant scientist and an agronomist. He does not have to be a pathologist (one who studies plant disease). His occupational status does not undermine his ability to testify as an expert in this case. *See Nunley v. Kloehn,* 888 F.Supp. 1483, 1488 (E.D.Wis.1995) (stating that "[t]he focus ... is on the 'fit' between the subject matter at issue and the expert's familiarity therewith, and not on ... the expert's title"); *Broders,* 924 S.W.2d at 153 (cautioning that "[o]ur holding does not mean that *only* a neurosurgeon can testify about the cause in fact of death from an injury to the brain") (emphasis added); *Blan v. Ali,* 7 S.W.3d 741, 745 (Tex.App.-Houston [14th Dist.] 1999, no pet.) (indicating that a physician who serves as an expert witness need not be a specialist in a particular branch of the profession on which the physician offers testimony). Pleunneke has had experience, "on occasion" with charcoal rot in grain sorghum.

Agronomy is the "science of soil management and crop production." THE CONCISE OXFORD DICTIONARY 19 (7th ed.1988). The Wilkins offered evidence that Pleunneke has experience addressing issues regarding plant physiology, nutrition, and environmental factors that affect plant growth.

Although Pleunneke is not a plant pathologist, the trial court's decision to allow him to testify is not an abuse of discretion. The trial judge could have reasonably concluded that Pleunneke's background qualifies him to testify as to the viability of Cherokee seed in the harsh Starr County environment. Although susceptibility to charcoal rot, a plant disease, is the claimed Achilles' Heel of Cherokee, Pleunneke need not necessarily be a pathologist to testify to that effect. He used his experience to formulate a conclusion on the basis of research, study of independent tests, and observations regarding Cherokee's suitability for dry land farming. How disease affects plants is undoubtedly an important part of plant science and the ability to manage crop production effectively. We have permitted, for example, an orthopedic surgeon to give expert testimony regarding a radiologist's interpretation of x-rays and the radiologist's subsequent actions. *See* **\*754** *Silvas v. Ghiatas,* 954 S.W.2d 50, 53–54 (Tex.App.-San Antonio 1997, pet. denied) (stating that "[t]heir professions are interrelated and their specialties intertwined").

The trial court had the opportunity to consider whether Pleunneke was qualified to render expert testimony. We find that Helena's voir dire and cross-examination of Pleunneke could all have been factors that the jury considered as to the *weight* of his testimony. We conclude that because his qualifications match the area in which he offered testimony, the trial court did not abuse its discretion in allowing Pleunneke to testify as an expert.

## (2)  RELIABILITY

 **[13]**   Helena also argues that Pleunneke's testimony is unreliable. Helena does not argue that Pleunneke's testimony is *scientifically* unreliable, which would subject it to an analysis of the elements articulated in *E.I. du Pont de Nemours and Co., Inc. v. Robinson,* 923 S.W.2d 549 (Tex.1995). Yet, the testimony must still comport with the principle of reliability articulated in *Robinson. See Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 726 (Tex.1998). Even though the subject matter of Pleunneke's testimony is scientific in nature, a *Robinson* inquiry is not necessarily appropriate. *See id.* at 727. Following the lead of *Gammill,* the inquiry becomes whether an "analytical gap" exists; do Pleunneke's observations support his conclusions? *See id.* at 727.

Pleunneke explained that Cherokee seed performs (that is, has good characteristics of growth and a favorable yield) very well when there is adequate rainfall. In non-irrigated trials

where precipitation was infrequent, Cherokee did not perform (consistently) as well as other seed manufactured by Helena. This observation, by itself, would suggest that Cherokee is not suited to dry land farming because there is no expectation of consistent precipitation in a dry land farming environment.

Yet, Pleunneke agreed with the statement that certain "tests aren't really something that tells us very much about what might happen in Starr County." He testified, "They're generated statistics and should be taken with a grain of salt." He acknowledged that a range of performance exists for Cherokee, and that "[w]ith *that kind of variability* ... comparing them all ...," Pleunneke would have done more than rely on the tests. (emphasis added). He recommended inquiring of the local farmers "to see what varieties have been working for them on large acreages."

Because our inquiry is whether Pleunneke's observations support his conclusions, we find the testimony to be reliable. His observations include not only the trials in question, but encompass research into other sources (weather and weed control reports, disease publications, and testing). Pleunneke also based his testimony on comparisons with crops adjacent to the Wilkins' farm.

Based on Pleunneke's testimony and his supporting evidence, his opinion as an expert is reliable. Although Helena asserts that his discounting of the trials are fatal to his reliability, we understand his statement to be that there are *factors to consider other than merely the trials.* Because his conclusion flows from his observation of these other factors, as well as the trials, we conclude that the trial court did not err in admitting his testimony.

### 3. Sufficiency of Evidence (First, Second, & Third Issues)
Helena complains that the Wilkins' evidence is legally and factually insufficient to support the jury verdict as to causation, liability, and damages.

### a. Standard of Review
In considering a "no evidence" or legal sufficiency point, we consider only the evidence favorable to the decision of the trier of fact and disregard all evidence and inferences to the contrary. *See Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988). If more than a scintilla of evidence is offered on a fact, the court should overrule the issue. *See Kindred v.* **\*755** *Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983). In reviewing a "great weight" or factual insufficiency point, the

court should assess all the evidence and reverse for a new trial only if the challenged finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). "Under this analysis, we are not fact finders, we do not pass upon the credibility of witnesses, nor do we substitute our judgment for that of the trier of fact, even if there is conflicting evidence upon which a different conclusion could be supported." *Thrift v. Hubbard,* 974 S.W.2d 70, 76 (Tex.App.-San Antonio 1998, pet. denied).

### b. Causation and Liability (First and Third Issues)
The court submitted the following questions to the jury; the jury answered "yes" to each:

1. Did the defendant engage in any false, misleading, or deceptive act or practice that was a producing cause of damages to the plaintiffs? ["False, misleading, or deceptive act or practice" defined.]

2. Did the defendant engage in any unconscionable action or course of action that was a producing cause of any damages to the plaintiffs? ["Unconscionable action or course of action" explained.]

3. Was the failure, if any, of the defendant to comply with a warranty a producing cause of damages to the plaintiffs? ["Failure to comply with a warranty" defined.]

The jury answered "no" to the fourth question, which addressed fraud. Questions 5–8 concern damages and attorney's fees. An affirmative answer to any of the first three questions would have been sufficient to allow the jury to award damages. [5]

### (1) EVIDENCE SUFFICIENT TO SUPPORT CAUSATION? (JURY QUESTIONS 1–3)) [6]
 **[14]** The issue is whether legally and factually sufficient evidence exists to support the proposition that Helena's failure to comply with a warranty, or Helena's deceptive act or unconscionable action, was a producing cause of the Wilkins' damages. Because the trial court did not err in admitting Dr. Pleunneke's expert testimony (discussed earlier), sufficient evidence exists in support of the jury's verdict as to causation.

In addition to Pleunneke's testimony, the various field trials that were performed across Texas also support

the possibility that Helena knew that its seed may not be suited for dryland farming. Although some of these trials were discussed during the testimony of Pleunneke, others were referenced during the testimony of Helena's corporate representative. Ample evidence exists regarding *the actual representations* that Helena made regarding the seed (promotional literature and statements by sales representatives, for example). When evidence of Cherokee's lackluster dryland performance is included, these representations amount to *mis*-representations.

### (A) FAILURE TO EXPLAIN OTHER CAUSES

 **[15]** Helena asserts that the Wilkins' prior cotton crop is the cause of the poor yield. Helena also argues that one of the possible reasons for the Wilkins' poor yield is related to over planting in 1993. The Texas Supreme Court has stated that "if there are other plausible causes of the injury or condition that could be negated, the plaintiff must offer evidence *excluding* those causes with reasonable certainty." *Merrell Dow Pharm. v. Havner,* 953 S.W.2d 706, 720 (Tex.1997) (emphasis added); *see E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 559 (Tex.1995) **\*756** (regarding as speculation an expert who failed to rule out other causes of the damage); *Parker v. Employers Mut. Liab. Ins. Co.,* 440 S.W.2d 43, 47 (Tex.1969) (requiring other reasonable causal explanations to be excluded in order for a possible cause to be elevated to the status of "probable"). The Wilkins explained that the cotton-grain rotation is required by the local crop-management office; his neighbor rotated cotton and grain on certain portions of his acreage without adverse effects; and the alleged "over planting" occurred because the Wilkins followed the recommendations of Helena in planting their 1993 crop.

Here, the jury could have considered the explanations that the Wilkins offered to rebut the possibility of other causes. In light of these explanations, we do not believe that the verdict is against the great weight and preponderance of the evidence so as to be manifestly unjust.

### (B) NON–ACTIONABLE PUFFING

 **[16]** Helena also contends that its actions are non-actionable puffing. If the statements in question *lack* "the specificity of an affirmation of fact upon which a warranty could be predicated," then they may amount to puffing, and would not be actionable. *Id.* In the present case, Helena made multiple oral representations to Wilkins regarding Cherokee's suitability for dry land farming on his acreage.

More importantly, Helena made written representations in its seed catalogue that indicated Cherokee's suitability for dryland farming was *better* than the other seed brands it sold. Not every seed brand was purported to have "excellent" dryland yield potential. Helena's statements regarding the tolerance level of Cherokee to charcoal rot do not amount to imprecise or vague opinions. Instead, they are used for comparison purposes with other Helena brands, and were made on multiple occasions both orally as well as in writing. *Cf. Autohaus, Inc. v. Aguilar,* 794 S.W.2d 459, 463 (Tex.App.-Dallas 1990), *writ denied per curiam,* 800 S.W.2d 853 (Tex.1991).

 **[17]** The knowledge enjoyed by the buyer and seller is important in determining whether statements amount to puffing. The "decisive test ... is whether the seller asserts a fact of which the buyer is ignorant or merely states an opinion or judgment on a matter of which the seller has no special knowledge and on which the buyer may be expected also to have an opinion and to exercise his judgment." *Id.* (citing *Royal Bus. Machs., Inc. v. Lorraine Corp.,* 633 F.2d 34, 42 (7th Cir.1980)). Although the Wilkins should be expected to exercise their judgment as to which seed to plant, Helena had "special knowledge" in light of their seed's performance in previous trials.

We conclude that the statements do not amount to mere puffing because of their specificity and the disparate positions of knowledge enjoyed by the buyer and seller.

### (C) ACCURACY OF STATEMENTS

Helena argues that the weight of the evidence supports the accuracy of the statements relied upon by the Wilkins; the brochure language is qualified by the statement that the characteristics of the different seed are "averages" and "can vary depending upon location, date of planting, environmental conditions, [and] soil type." Although Wilkins does not respond to this point, Helena does not point to other statements allegedly relied upon the Wilkins (such as oral representations and recommendations made by Helena's representatives). Even if the brochure does not amount to a misrepresentation, other evidence of misrepresentations exists in the record (testimony by Wilkins and Helena sales representative) that is factually sufficient to support the jury verdict.

### (2) INSUFFICIENT EVIDENCE OF UNCONSCIONABILITY (JURY QUESTION 2)

**[18]** Helena asserts, without extensive briefing, that no evidence exists to support the jury's verdict regarding unconscionability. Because we have concluded that **\*757** Helena's actions did not amount to mere puffing, at least a scintilla of evidence exists (in the form of Wilkins' testimony) that would support the verdict that Helena took "advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree." Because Helena does not complain that the evidence is factually insufficient as to unconscionability, we need not consider whether more than a scintilla of evidence exists on this point. Even if it did not, the verdict would still be upheld as to the first question in the jury charge.

Helena argues that because it did not require payment for the seed in 1994, then there is no consideration paid in order to give rise to an unconscionability claim. Even if this is true, the damages awarded could be supported by the result the jury reached as to the first question.

## (3) RELEVANT WARRANTIES WERE EXCLUDED (JURY QUESTION 3)

**[19]** Helena argues that liability cannot be based on a breach of warranty because "relevant warranties were excluded." Although a seed company may exclude implied warranties by course of dealing and trade usage, we did not locate any evidence to this effect in the record. Helena also argues that it excluded the warranties by written document (here, on the seed bag, purchase ticket, and invoices). The purchase agreement (unsigned by the Wilkins) that is in the record provides "conditions of sale" that exclude the implied warranties of merchantability and fitness for a particular purpose in what is relatively conspicuous print. The Wilkins respond that "it would 'be difficult' to replace such a large volume of seed" at the stage when the seed is delivered.

The Uniform Commercial Code adopted in Texas permits a merchant to exclude or limit warranties on goods. *See* TEX. BUS. & COM.CODE ANN. § 2.316 (Vernon 1994).

We have previously applied a non-warranty clause in favor of a seed company. *See Asgrow Seed Co. v. J.R. Gulick,* 420 S.W.2d 438 (Tex.Civ.App.-San Antonio 1967, writ ref'd n.r.e.). In *Asgrow,* this court reversed a trial court's judgment in favor of a purchaser of seed; the sales contract, seed bags, and invoices all contained a non-warranty clause that provided, in part, "Asgrow gives no other or further warranty, express or implied." *Id.* at 440 n. 1, 444; *see also John Deere Co. v. Tenberg,* 445 S.W.2d 40, 42–43 (Tex.Civ.App.-

Beaumont 1969, no writ) (stating that the appellee "cannot rely upon breach of implied warranties because implied warranties were excluded in the written instrument" that the appellee signed and accepted).

We find that the warranty language effectively disclaimed the implied warranties of merchantability and fitness for a particular purpose, as well as express warranties. We conclude that a warranty upon which liability can be based does not appear to exist in support of jury question number 3. Recovery under the first and second jury questions is still possible.

### c. Damages (Second Issue)

We have found no error in the trial court's entry of judgment as to arbitration (fourth issue) or in the admission of expert testimony (fifth issue). We also have found that the evidence is legally and factually sufficient to support the jury verdict as to causation (Helena's first issue, relating to jury questions one and two). We now turn to the matter of damages. In its second issue, Helena argues that the Wilkins failed to prove the amount of their damages with reasonable certainty and the Wilkins' prior losses do not support lost profit damages. Helena also contends that damages should have been limited to the purchase price of the seed.

## (1) LIMITATION TO PURCHASE PRICE OF SEED

**[20]** Helena's limitation of liability to the purchase price of the seed is effective only to damages arising from the breach of warranty. *See Southwestern Bell Tel. Co. v. FDP Corp.,* 811 S.W.2d 572, 577 (Tex.1991). A contractual limitation on damages **\*758** is not effective to statutorily created rights, such as a right to recover for deceptive acts. *See id.* at 576. Because we have concluded that the judgment should be affirmed as to the first and second jury questions, we address the argument regarding sufficiency of the evidence relating to damages.

## (2) REASONABLE CERTAINTY REGARDING DAMAGES

**[21]** Helena argues that because the Wilkins have a history of net losses from 1993–96 [7] (which include years when they did not farm with Cherokee), they have failed to establish a history of profits. *See Texas Instruments, Inc. v. Teletron Energy Management,* 877 S.W.2d 276, 278–80 (Tex.1994). The *Teletron* court reiterated the rule established in *Southwest*

*Battery Corp. v. Owen,* 131 Tex. 423, 115 S.W.2d 1097, 1098–1099 (1938):

> In order that a recovery may be had on account of loss of profits, the amount of the loss must be shown by competent evidence with reasonable certainty. *Where the business is shown to have been already established and making a profit at the time* when the contract was breached or the tort committed, *such pre-existing profit, together with other facts* and circumstances, *may indicate with reasonable certainty the amount of profits lost.*

*Id.* at 279 (citation omitted) (emphasis added). Yet, at least one court of appeals has held that "the absence of a history of profits does not, by itself, preclude a new business from recovering lost future profits." *Orchid Software, Inc. v. Prentice–Hall, Inc.,* 804 S.W.2d 208, 211 (Tex.App.-Austin 1991, writ denied). The Fifth Circuit has recognized this trend in Texas law. *See Hiller v. Manufacturers Prod. Research Group of N. Am., Inc.,* 59 F.3d 1514, 1519, 1521 (5th Cir.1995) (declining to regard "the absence of a profit history ... as dispositive of the recoverability of lost profits" with respect to a new business). Because history of loss does not preclude a judgment for future lost profits, the issue becomes whether the Wilkins proved their damages properly and with certainty.

 **[22]**  **[23]**  "*[P]recise calculation* of anticipated profits *has never been essential* to recovery by any business. It is sufficient if there is data from which the loss may be ascertained with reasonable certainty." *Id.* (emphasis added) (citations omitted). In the present case, evidence exists from which the jury could have determined damages. Helena responds that the factors given to the jury, such as the possible yield of the crops, were speculative in nature, thus making an objective determination of the damages impossible.

Helena also argues that the Wilkins failed to account for net profits. "The general rule for assessing damages for crop losses, as expressed in a number of Texas precedents, is 'the market value of the lost portion of his crop, as measured at maturity of the crop, less the cost he would have had in harvesting and marketing the lost portion.' " *See International Harvester Co. v. Kesey,* 507 S.W.2d 195, 197 (Tex.1974). Another court has stated, "The correct measure of damages for loss of profits is net profits, which is defined as 'what remains in the conduct of a business after deducting from its total receipts all of the expenses incurred in carrying on the business.' " *See St. Paul Surplus Lines Ins. Co. v. Dal–Worth Tank Co.,* 917 S.W.2d 29, 60 (Tex.App.-Amarillo 1995), *aff'd in part, reversed in part on other grounds,* 974 S.W.2d

51 (Tex.1998). "In the calculation of net profits, allowance should be made for expenditures which the plaintiff would have been compelled to make...." *Id.*

Wilkins testified as to the method he used to arrive at the damage calculation. For example, he relied upon measurements by a government agency in order to determine

> acreages to come up with deficits.... I took the yield per farm from the [government **\*759** agency] and multiplied it times the number of acres of grain that was planted per farm to come up with the number I have under yield.... I took the actual yield based on the sales records of what we produced and subtracted that from what yield should have been ... [t]o come up with a deficit, and then I multiplied the deficit times the number of acres, and then I multiplied that times the price.

Wilkins admitted that he did not include expenses in computing his estimated losses, such as additional lease payments, grain elevator costs, and transportation charges. These expenses would have been higher if the Wilkins enjoyed a greater yield during the years in question. Yet, the record reflects (both in the form of testimony as well as exhibits) what the lease payments would have been. Wilkins testified also that "check-off that the grain elevator deducts" could have been refunded, which explains why he did not add that potential cost to the damages sought. He testified that he believed the costs for drying the grain "were reflected as a shrinking in yield" rather than as an actual charge. A copy of the statement in which Helena canceled the Wilkins' debt for seed in 1994 was admitted as an exhibit as well. Finally, Wilkins testified to the amount of acreage devoted to seed *other than* Cherokee. With this evidence, the jury could have reduced the yield attributable to non-Cherokee seed in arriving at their damage award, recalculated the lease payments, and regarded the various elevator costs as either reflected in the yield or refundable (and not part of the net cost calculation).

The Wilkins' estimated damages (which they submitted to the jury) was $490,855.58. The jury's award of $360,000 is $130,855.58 lower than what the Wilkins sought. The Wilkins *did not fail* to provide the necessary factual data to support their claim of lost net profits with *reasonable*

*certainty.* Calculating the lost profits in consideration of all of the relevant factors is not impossible, particularly in light of the $130,855.58 deduction that the jury made to the Wilkins' requested damages.

We find that the award is within the range of evidence offered by the Wilkins. We conclude that the damages awarded are supported with reasonable certainty.

### 4. Pre–Judgment Interest (Wilkins' Issue on Cross–Appeal)

On cross-appeal, the Wilkins argue that the trial court erred when it computed prejudgment interest from the date the court lifted the abatement (October 23, 1996). The Wilkins claim that the trial court's judgment should order pre-judgment interest to accrue from November 17, 1994 (which reflects six months after the date of the alleged "occurrence," May 20, 1994).

### a. Preservation of Error

Helena maintains that because the Wilkins argue a theory of recovery regarding prejudgment interest on appeal that is different from that argued below, they have not preserved error regarding this issue. In their proposed judgment, attached to their Motion for Entry of Judgment, "[p]re-judgment interest is calculated to commence 180 days [after the Wilkins notified Helena of the Wilkins' problem with the seed]." In their Motion to Modify, Correct or Reform Judgment, the Wilkins ask for an award of pre-judgment interest "pursuant to the terms of Article 5069–1.05(6)," which the Texas Legislature repealed in 1997 and replaced with Section 304.108 of the Finance Code. *See* TEX. FIN.CODE ANN. § 304.108 (Vernon 1998 & Supp.2000). On appeal, the Wilkins argue for an award of pre-judgment interest under *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex.1985). In their brief, the Wilkins appear to concede that their reliance on the predecessor to Chapter 34 of the Finance Code, Article 5069–1.05(6), "was inappropriate."

The Wilkins may have waived their right to complain on appeal regarding prejudgment interest because they state a different ground for the relief sought. *See* TEX.R.APP. P. 33.1(a)(1)(A). Assuming, without **\*760** deciding, that the issue is preserved for our review, we conclude that the trial court's decision to award prejudgment interest beginning on October 23, 1996 is not an abuse of discretion.

### b. Standard of Review

**[24]  [25]**  The award of prejudgment interest during periods of delay is generally left to the discretion of the trial court. *See Lege v. Jones,* 919 S.W.2d 870, 875–76 (Tex.App.-Houston [14th Dist.] 1996, no writ). The trial court's decision in refusing to offset from its interest calculations periods of delay caused by a litigant are reviewed under the abuse of discretion standard. A trial court abuses its discretion if its action "is arbitrary, unreasonable, and without reference to [any] guiding [rules and] principles." *Goode v. Shoukfeh,* 943 S.W.2d 441, 446 (Tex.1997); W. Wendell Hall, *Standards of Review in Texas,* 29 ST. MARY'S L.J. 351, 362 (1998). Because the offset is discretionary rather than mandatory, we do not substitute our opinion for that of the trial court. *See City of Alamo v. Casas,* 960 S.W.2d 240, 260 (Tex.App.-Corpus Christi 1997, pet. denied).

### c. Discussion

In *Cavnar,* the Texas Supreme Court held that, "as a matter of law, a prevailing plaintiff may recover prejudgment interest compounded daily (based on a 365–day year) on damages that have accrued by the time of judgment." *Cavnar v. Quality Control Parking,* 696 S.W.2d 549, 554 (Tex.1985). The court later abrogated the *Cavnar* holding and explained that the "[w]hen the Court decided *Cavnar,* there was no statute governing prejudgment interest." *Johnson & Higgins of Tex., Inc. v. Kenneco Energy,* 962 S.W.2d 507, 530 (Tex.1998). In *Johnson,* the court adopted the statutory predecessor to the Texas Finance Code and held that "prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed." *Id.* at 531; *see* TEX. FIN.CODE ANN. § 304.104 (Vernon Supp.2000) (providing similar provisions). The court recognized that the statutory approach to prejudgment interest " 'works as a system of rewards and penalties' intended to encourage settlements." *Johnson,* 962 S.W.2d at 530–31 (citation omitted).

Accrual of prejudgment interest is not automatic. For example, "a court may order that prejudgment interest does not accrue during periods of delay in the trial." *Id.* § 304.108(a). "A court shall consider: (1) periods of delay caused by a defendant; and (2) periods of delay caused by a claimant." TEX. FIN.CODE ANN. § 304.108(b) (Vernon Supp.2000). *Johnson* recognizes that this provision, among others, helps encourage settlements. *See Johnson,* 962 S.W.2d at 529 (discussing the predecessor to § 304.108). Yet, "[t]he statute does not mandate such offsetting, which is

entirely within the discretion of the trial court." *Casas,* 960 S.W.2d at 260.

 **[26]**    The record reflects the Wilkins' understanding of Texas law regarding the necessity of arbitrating seed claims. The Wilkins waited sixteen months after the trial court abated the matter before submitting their claim to arbitration. Conversely, the Wilkins argue that they did not cause any delay. They argue that any delay stems from Helena's desire to continue negotiations.

Given the parties' actions, the trial court could have reasonably commenced prejudgment interest after it lifted the abatement. It could have considered the role that each party played in giving rise to the pretrial delay and concluded that the Wilkins had the most discretion in determining when to submit the claim for arbitration.

### CONCLUSION

We affirm the trial court's judgment.

Dissenting opinion by: SARAH B. DUNCAN, Justice.

 **\*761**  SARAH B. DUNCAN, Justice, dissenting.
I respectfully dissent.

### FAILURE TO PERFORM AS REPRESENTED
### ON WARRANTY OR LABEL

The majority holds the Wilkins' claims are not barred because they "submitted their claim to arbitration," and "[t]he trial court was empowered to take such delay into account under Section 64.004 of the Agriculture Code." *Helena Chem. Co. v. Wilkins,* 18 S.W.3d 744, 751-52 (Tex.App.—San Antonio 2000, no pet. h.). However, it is undisputed the Wilkins did not request arbitration until approximately sixteen months after the suit was abated for that purpose and, as a result, their claims that they were "damaged by the failure of the seed to produce or perform as represented by warranty or by the label required to be attached to the seed"[1] were not arbitrated; rather, the arbitration board determined the Wilkins' "request did not qualify for arbitration." Accordingly, section 64.004 does not apply. *See* TEX. AGRIG. CODE ANN.. § 64.004 (Vernon 1995) ("In any litigation involving a complaint *that*

*has been the subject of arbitration under this chapter*, ... [t]he court may also take into account ... any finding as to the effect of delay in filing the arbitration claim ....") (emphasis added). Therefore, even if we view "must" in section 64.002 of the Texas Agriculture Code as directory rather than mandatory, and even if the Wilkins' failure to timely institute arbitration was not jurisdictional, their failure to timely submit their claim to arbitration during the abatement ordered for that purpose should have resulted in the dismissal of their claims arising out of the label on the seed package. *Cf. Hines v. Hash,* 843 S.W.2d 464, 469 (Tex.1992) (A trial court should dismiss a plaintiff's DTPA suit if it fails to give the notice required by the DTPA "while the action is abated for that purpose…. *See Miller v. Kossey,* 802 S.W.2d 873, 876–77 (Tex.App.—Amarillo 1991, writ denied) (no notice for more than six months after abatement granted until date set for trial).").

### DTPA—MISREPRESENTATION
### APART FROM LABEL OR WARRANTY

Apart from the information printed on the labels on the seed packages, the Wilkins allege only one misrepresentation. According to the Wilkins, Helena representative Elmore told them that Cherokee was a "good" seed. However, this alleged misrepresentation amounts to no more than non-actionable puffing. *Prudential Ins. Co. of America v. Jefferson Assocs., Ltd.,* 896 S.W.2d 156, 163 (Tex.1995) (holding statements that a "building was 'superb', 'super fine', and 'one of the finest little properties in the City of Austin' " "were not misrepresentation of material fact but merely 'puffing' or opinion"). Nor will this statement support the jury's finding that Helena and Hyperformer committed an unconscionable act or course of action. *See Latham v. Castillo,* 972 S.W.2d 66, 68 (Tex.1998) ("To be actionable under subsection (A), the resulting unfairness must be 'glaringly noticeable, flagrant, complete and unmitigated.' " (quoting *Chastain v. Koonce,* 700 S.W.2d 579, 584 (Tex.1985))).

Because the Wilkins' claims arising out of alleged misrepresentations apart from the label on the seed package are not actionable, and their claims arising out of the label are barred by their failure to timely institute arbitration, I would reverse the trial court's judgment and render judgment in favor of Helena and Hyperformer. Because the majority fails to do so and instead affirms the trial court's judgment, I must respectfully dissent.

**All Citations**

18 S.W.3d 744

Footnotes

1    Sorghum: "any of an economically important genus (*Sorghum* ) of Old World tropical grasses similar to Indian corn in habit ... with ... spikelets in pairs on a hairy rachis [ (axial structure) ]; *esp:* a cultivated plant (as a grain sorghum or sorgo). ...." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1126 (1991).

2    The Cherokee seed is also purported to have "good field tolerance" to charcoal rot. When grain sorghum develops charcoal rot, the stem becomes weak. It "lodges," or literally "falls down," which reduces yield. The best height for harvesting sorghum with a combine is chest-high, because the harvesting equipment cannot pick it as effectively if it is shorter. Also, if the sorghum is shorter, the combine will pull in other undesirable parts of the plant (called "trash"), as well as dirt and rocks.

3    Our resolution of Helena's issue regarding the Wilkins' failure to arbitrate in a timely fashion is consistent with a Texas case discussed during oral argument. In *Hines v. Hash,* the Supreme Court of Texas affirmed the judgment of the trial court in a DTPA case Hines failed to give Hash the statutory notice of an impending DTPA claim prior to commencing suit. *See Hines v. Hash,* 843 S.W.2d 464, 469 (Tex.1992) (concluding "that if a plaintiff files an action for damages under the DTPA without first giving the required notice, and a defendant timely requests an abatement, the trial court must abate the proceedings"). The court explained that the court of appeals erred in reversing and remanding the case because Hash "waived notice under the DTPA by failing to request abatement." *Id.* Our result today is not at odds with *Hines* because we recognize that filing a claim for arbitration is necessary in order to maintain a legal action. When an untimely claim for arbitration is filed, the Agriculture Code provides the trial court with ample room to fashion a remedy.

4    "Dry land" refers to non-irrigated land that relies upon natural precipitation for moisture. The viability of a dry land parcel is relative to the amount of rainfall it receives. Whether a seed is suitable for dry land farming depends upon various factors; *for example,* its ability to tolerate diseases such as charcoal rot determines whether a seed is suitable for dry land farming. A drought-stressed crop is more likely to develop charcoal rot. So, if a dry land crop does not tolerate charcoal rot well, and if below-average rainfall occurs (assuming no irrigation), such a crop is at an increased risk of developing charcoal rot. As discussed earlier, a crop of grain that has a greater chance of developing charcoal rot could result in decreased yields.

5    The court defined "producing cause" as an "efficient, exciting, or contributing cause that, in a natural sequence, produced the damages, if any."

6    Because Helena's complaint regarding liability and causation stem from the same jury questions, we combine our discussion on these issues.

7    The Wilkins had a profit of approximately $111,000 in 1992.

1    TEX. AGRIC. CODE ANN.. § 64.002(a) (Vernon 1995).

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# M

736 S.W.2d 617
Supreme Court of Texas.

Celeste Eugenia HOPKINS, a/n/f of
Celeste Adeline Hopkins, Petitioner,
v.
SPRING INDEPENDENT SCHOOL
DISTRICT et al., Respondents.

No. C–5209.  |  Feb. 25, 1987.
|  Rehearing Denied Oct. 7, 1987.

Mother, as next friend of injured student, brought action against school district, bus driver, principal, nurse, and teacher for personal injuries suffered by student. The 11th District Court, Harris County, William N. Blanton, Jr., J., granted defendants' motion for summary judgment, and mother appealed. The Court of Appeals, 706 S.W.2d 325, affirmed, and mother appealed. The Supreme Court, Campbell, J., held that: (1) failure of school employees to adequately supervise children or to provide prompt medical care for injured student was not "negligent discipline" for purposes of statute eliminating immunity for negligent discipline, and (2) even if student's injuries were aggravated when she had seizures on bus, and negligent failure to provide medical care continued while student was on bus, bus supervisor and school district were immune from liability, as injuries were not proximate result of use or operation of school bus.

Affirmed.

Kilgarlin, J., dissented and filed opinion in which Ray and Mauzy, JJ., joined.

West Headnotes (3)

**[1]**   **Statutes**
🔑 Undefined terms

In construing statute, ordinary meaning of terms will be applied if legislature does not define terms.

36 Cases that cite this headnote

**[2]**   **Education**
🔑 Injuries by other students

**Education**
🔑 Other particular injuries to students

Failure of school employees to supervise children or to obtain prompt medical care for student injured at school was not "negligent discipline" for purposes of statute eliminating immunity of school employees for injuries arising from their negligent discipline of students. V.T.C.A., Education Code § 21.912.

42 Cases that cite this headnote

**[3]**   **Education**
🔑 Duties and liabilities in general

**Education**
🔑 Other particular injuries to students

Even if student's injuries were aggravated when she had seizures on school bus, and school officials were negligent in failing to provide adequate medical care, school district and bus supervisor were immune from liability for injuries sustained when student struck her head during school, as injury was not proximate result of use or operation of school bus. V.T.C.A., Education Code § 21.912; V.T.C.A., Civil Practice and Remedies Code § 101.051.

30 Cases that cite this headnote

**Attorneys and Law Firms**

**\*617**  Victor R. Rodriguez, Hocker, Rodriguez & Morrow, George W. Wilhite, Wilhite, Gilbreath, Squier, Hamm & Caridi, Inc., Houston, for petitioner.

Daryl G. Dursum, Coats, Yale, Holm & Lee, James A. McDaniel, Houston, for respondents.

**Opinion**

CAMPBELL, Justice.

This is an appeal from a summary judgment rendered for Spring Independent School District and several of its employees. The court of appeals affirmed the trial court's judgment. 706 S.W.2d 325. We affirm the judgment of the court of appeals.

Celeste Adeline Hopkins, a student at an elementary school in the Spring Independent School District, suffers from cerebral palsy. Her mother, Celeste Eugenia Hopkins, alleges that while the students were left unsupervised Celeste Adeline was pushed into a stack of chairs and sustained a head injury. She had mild convulsions, developed cold sweats and became dazed and incoherent. The teacher did not call for help or send her to the school nurse. Later, an occupational therapist noticed her condition and took her to the nurse, who told Celeste Adeline to stay at school. The nurse did not contact her mother, an employee **\*618** of the school district, and did not contact her doctors, although the school knew the names of the doctors.

At the end of the school day, Celeste Adeline rode on the school bus to the day care center. She suffered severe convulsions while on the bus. The bus driver contacted a supervisor, requesting a school nurse be provided at the next stop, but none was provided. The driver was told to take her to the day care center, where she finally received medical treatment.

Two years later Celeste Adeline's mother sued Spring I.S.D., the bus supervisor, the school principal, the school nurse and the teacher. She claimed the school personnel's negligence and gross negligence in failing to provide adequate care dramatically decreased Celeste Adeline's life expectancy. Summary judgment was rendered for the school district and the employees based on the immunity granted the school district under the Tort Claims Act and the employees under the Education Code.

We are asked to abrogate the immunity enjoyed by school district employees under section 21.912 of the Texas Education Code. This would require us to overrule the recent Supreme Court case of *Barr v. Bernhard,* 562 S.W.2d 844 (Tex.1978).

Mrs. Hopkins contends that school personnel should be liable for their negligent acts which result in serious bodily injury to students. The Texas Education Code, section 21.912, provides tort immunity to professional school employees except:

> No professional employee of any school district within this state shall be personally liable for any act incident to or within the scope of the duties of his position of employment, and

which act involves the exercise of judgment or discretion on the part of the employee, except in circumstances where professional employees use excessive force in the discipline of students or negligence resulting in bodily injury to students.

Tex.Educ.Code Ann. § 21.912 (Vernon Supp.1986). This statute was construed in *Barr v. Bernhard.* This court held a professional school employee is not personally liable for acts done within the scope of employment and which involve the exercise of judgment or discretion, except when disciplining a student the employee uses excessive force or negligence which results in bodily injury to the student. *Barr,* 562 S.W.2d at 849.

The *Barr* court held the statute is ambiguous because "it is inaccurate to say that a person 'uses negligence'; negligence occurs as a result of an act or omission by an individual." Therefore, the court determined the legislative intent of the statute. *Id.* at 848. The court concluded that when subsection (b) is read in conjunction with subsection (c), an interpretation that the last clause of subsection (b) subjects employees to liability for any negligent act which results in bodily injury is untenable. Subsection (c) states, "This section is not applicable to the operation, use, or maintenance of any motor vehicle." The court reasoned that if subsection (b) were read to exclude from immunity all negligent acts of school employees, not merely those incident to discipline, there would be no need for subsection (c) to explicitly negate immunity in the operation, use, or maintenance of a motor vehicle.

*Barr* was decided eight years ago, and the legislature has had ample time to change the statute if that construction did not comport with legislative intent. It has not done so. Indeed, the legislature has broadened the immunity provided by section 21.912(b) by enacting section 13.906 of the Texas Education Code in 1981 and section 13.503 in 1984.

Section 13.906(a) applies to student teachers:

> A person assigned to perform student teaching in a student teacher center is entitled to the same protection of law accorded to the supervising teacher and the principal of the school in which the student teacher serves or acts in the course of employment.

This protection includes the limitation of liability accorded all professional employees as specified in Section 21.912 of this Code. While serving as a student teacher, a person shall comply with the rules of the school and of the board of trustees of the district **\*619** serving as the student teacher center.

Tex. Educ.Code Ann. §§ 13.503, 13.906(a) (Vernon Supp.1986). Subsection (c) of section 13.503 states: "A non-certified teacher is immune from personal liability for acts or omissions in the scope of employment to the same extent that a certified teacher is immune...." The *Barr* decision had been law for three years when the earliest of these statutes was passed. The legislature had time to consider *Barr's* effect and chose to add to, not abrogate, the immunity granted by section 21.912. This court stated in *Barr,* "We will adhere to our decisions in the past that the waiver of governmental immunity is a matter to be addressed by the legislature." *Lowe v. Texas Tech University,* 540 S.W.2d 297 (Tex.1976).

Hopkins also contends the school employees could be liable under section 21.912 because their actions constituted "negligent discipline." She claims the child was disciplined by submitting to the authority and control of her teacher, the school nurse and other employees. We do not accept such a broad interpretation of the term "discipline."

**[1]   [2]** In construing a statute, if the legislature does not define a term, its ordinary meaning will be applied. *Satterfield v. Satterfield,* 448 S.W.2d 456 (Tex.1969). "Discipline" in the school context ordinarily describes some form of punishment. The opinion in *Diggs v. Bales* describes "negligent discipline" as "punishment [which] involves no force, but rather requires some action on the part of the student as a result of which the student suffers bodily injury," as in ordering a student to run laps. 667 S.W.2d 916, 918 (Tex.App.—Dallas 1974, writ ref'd n.r.e.) We hold "negligent discipline" is not involved.

Hopkins also asserts the court of appeals erred in holding the school district and the bus supervisor immune from liability under the Texas Tort Claims Act. That Act grants immunity to school districts and their employees from liability for damages caused by negligence except in circumstances relating to the use, maintenance or operation of motor vehicles. Tex.Civ.Prac. & Rem. Code Ann. § 101.051 (Vernon 1986) (formerly article 6252–19 § 19A).

**[3]** Hopkins argues the school district and the bus supervisor cannot claim this immunity because 1) the child's injuries were aggravated when she had seizures on the bus and 2) the defendants were negligent in failing to provide adequate medical care. Therefore, she claims, the injuries arose from the "use or operation of a motor vehicle." Several Texas courts have held that when injuries are not the proximate result of the use or operation of the school bus, but the bus provides the setting for the injury, the actions do not fall within the section 101.051 exception to immunity. *See Jackson v. City of Corpus Christi,* 484 S.W.2d 806 (Tex.Civ.App.—Corpus Christi 1972, writ ref'd n.r.e.); *Brantley v. City of Dallas,* 545 S.W.2d 284 (Tex.Civ.App.—Amarillo 1976, writ ref'd n.r.e.); *Estate of Garza v. McAllen Independent School District,* 613 S.W.2d 526 (Tex.Civ.App.—Beaumont 1981, writ ref'd n.r.e.); *Pierson et al. v. Houston Independent School District et al.,* 698 S.W.2d 377 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.). Applying the common and ordinary meaning of the words "operation" and "use", Celeste Adeline's injury could not have arisen from the use of a motor vehicle as contemplated by the statute.

We remain committed to our original interpretation of section 21.912 of the Education Code. The judgment of the court of appeals is affirmed.

KILGARLIN, J., dissenting, joined by RAY and MAUZY, JJ.

KILGARLIN, Justice, dissenting.

I respectfully dissent. Even if the court were correct in its adherence to *Barr v. Bernhard,* 562 S.W.2d 844 (Tex.1978), this cause would have to be reversed and remanded as to the defendant Charles Bammel, Spring's Director of Transportation.

By its clear language, Tex.Educ.Code Ann. § 21.912(b) is applicable to *professional* school district employees. Bammel's summary judgment proof does not **\*620** place him in this category. While his affidavit states his job involves the exercise of judgment or discretion, it fails to state his employment requires certification, as mandated by section 21.912(d).

But, I would go further. I would overrule *Barr v. Bernhard.* The court's holding in that case was a product of faulty reasoning and conflicts with a majority of other jurisdictions which have followed the prevailing authority that the

tort immunity of the school does not preclude liability of professional school employees for their negligence.[1] Commentators have also recognized that teachers may be liable to pupils for their negligence.[2] It is noteworthy that the court in this cause does not attempt to justify such faulty reasoning. Rather, the court says that because *Bernhard* has not been overruled by the legislature, it must be correct. This obeisance to a misguided notion of what constitutes legislative intent is disheartening. When one considers all of the rules operative in the respective houses of the legislature that prevent proposed legislation from even coming to a vote, it cannot be contended that legislative inaction amounts to legislative intent. Nevertheless, such argument is repetitive of the contention made by the dissent in *Sanchez v. Schindler,* 651 S.W.2d 249, 256 (Tex.1983). However, this court disposed of that thesis by saying "[i]naction of the legislature cannot be interpreted as prohibiting judicial reappraisal of the judicially created pecuniary loss rule. *Bedgood v. Madalin,* 600 S.W.2d 773, 780 (Tex.1980) (Spears, J., concurring). '[A] legislature legislates by legislating, not by doing nothing, not by keeping silent.' *Wycko v. Gnodtke,* 361 Mich. 331, 105 N.W.2d 118, 121–22 (Mich.1960)."

Moreover, the court is extremely inconsistent in its application of its misguided concept of legislative intent. Almost contemporaneous with the handing down of this opinion is the rendition of the opinion in *Crawford v. Coleman,* 726 S.W.2d 9 (Tex.1987), wherein this court overruled *Deveroex v. Nelson,* 529 S.W.2d 510 (Tex.1975). Like this case, both of those cases involved interpretation of statutory language. This court was not deterred in *Crawford* from giving a new interpretation to Tex.Ins.Code Ann. art. 21.23, although the legislature had over eleven years in which to amend the statute if it were dissatisfied with *Deveroex.* Yet, the legislature has remained silent. Like Justice Spears in *Sanchez,* I do not consider legislative inactivity to be legislative intent. All that I ask of my colleagues who do, is that they apply that concept uniformly. If legislative **\*621** inaction could not save *Deveroex,* why should it be used to preserve *Bernhard?* While I dissented in *Crawford,* I at least did so by giving support to the logic expressed in *Deveroex,* which is more than can be said for this court's silence as to the reasoning of *Barr v. Bernhard.*

If the court was wrong in *Bernhard,* we should admit so, rather than reaffirming it simply because seven other jurists reached a different conclusion from what we think right. As Associate Justice Livington Lindsay, speaking for the court, said over a century ago:

Certainly, in all doubtful cases, precedent and former adjudication of what the law may be should have great weight with all courts. But all courts would but subserve the interest of society and fulfill the obligations of conscience, by the observance of that remarkable institute of Justinian, so replete with wisdom and so pre-eminently just, in which it is ordered: 'Let no judge or arbiter believe himself bound to follow official opinions which he holds not to be correct; nor even the judgment of the prefect or other magnates; nor those of the supreme court of prefecture and of other supreme courts; but we commend all our judges to follow truth, justice and law. It does not seem good to us, that if one judge decide wrong, his error should be extended to others. The decision of the judge should be founded on law, and not on precedents.'

*Myers v. State,* 33 Tex. 525, 542 (1870).

There can be little doubt that the court was wrong in its conclusions as to legislative intent in *Barr v. Bernhard.* Section 21.912 of the Texas Education Code became law in 1971. Its origin was S.B. 74 introduced by Senator Snelson of Midland. Section two of that bill provided that "no employee of any school district ... shall be personally liable for any act ... which act involves the exercise of judgment or discretion on the part of the employee." Section three of the bill defined "employee" as including "superintendents, principals, classroom teachers, counselors and other employees of a school district whose employment requires an exercise of discretion."

The bill was amended in the Senate Education Committee to change "employee" to "professional employee" and add after "judgment or discretion on the part of the employee" the language "except in circumstances where professional employees use excessive force in the discipline of students." The definition of "professional employee" was changed to read "whose employment requires certification and an exercise of discretion" and to add "supervisors" to the laundry list. After the bill, as amended by the Education Committee, was favorably reported to the Senate, Senator Snelson successfully tacked on two floor amendments, the first one reading "[a]mend committee amendment to S.B. 74, sec. 2, by striking the period at the end of the paragraph following the word 'students' and adding the following: 'or negligence resulting in bodily injury to students'." That left the bill in the form of the language ultimately adopted.

The general rule in respect to statutory interpretation is that "[c]ourts should carefully search out a statute's intent, giving full effect to all of its terms. 'But they must find its intent in its language and not elsewhere. They are not the lawmaking body. They are not responsible for omissions in legislation'." *Seay v. Hall,* 677 S.W.2d 19, 25 (Tex.1984). However, a different rule attains when the statute is ambiguous. Section 21.912(b) of the Education Code is clearly ambiguous, as was recognized by the court in *Bernhard,* 562 S.W.2d at 848. Whether it was inartful drafting, or what, it is erroneous to say that one "uses" negligence. If a statute is ambiguous, a court, in interpreting that statute, is justified in looking to legislative intent. *Huntsville Independent School District v. McAdams,* 148 Tex. 120, 221 S.W.2d 546 (1949).

Fortunately, we have a clear expression of legislative intent in regards to section 21.912(b) in the form of a bill analysis prepared by the House Committee on Judiciary when it considered S.B. 74 after the measure, incorporating the Snelson floor **\*622** amendments, passed the Senate. That bill analysis states that the exception to non-liability of an employee is "*where the employee uses excessive force or is negligent* " (emphasis added). The amended Senate version passed the House intact and became law. Yet, the court in *Bernhard* totally overlooked this important item of legislative history. Instead, it rewrote the statute to in effect read that a professional school employee was not personally liable for acts done *except in circumstances where disciplining a student, the employee uses excessive force or his negligence results in bodily injury to the student.*

To reach its conclusion, the *Bernhard* court put great emphasis on the conflict that would exist if liability were imposed upon professional employees for their negligence and the fact that the second Snelson floor amendment made the statute inapplicable to the operation, use, or maintenance of a motor vehicle. The court said "[i]f the interpretation of subdivision (b) urged by Bernhard were followed, then subdivision (c) would be meaningless since liability for the negligent operation of a motor vehicle would necessarily be covered by the broader provisions of subdivision (b)." 562 S.W.2d at 849. This judicial legerdemain, if unexamined, has initial appeal. However, it is plagued with one major inconsistency. Paragraph (b) of section 21.912 deals with liability of professional employees to students. Paragraph (c) is an imposition of liability for all school district employees, professional or otherwise, not just as to students, but to the world at large, for their acts of negligence when motor vehicles are involved. As was observed in a Comment, *Liability of Public Officials For Their Tortious Acts,* 16 Hous.L.Rev. 100, 115 (1978):

> This latter provision would be rendered meaningless only if the earlier provision encompassed all negligent activities involving motor vehicles that the latter language covered. That the earlier section does not purport to do, however. By its terms, it empowers only *students* suffering from negligently inflicted '*bodily injury* ' to recover from official malefactors; by its terms, it declines to regulate personal or *property* injuries to *non-students.* In contrast, the latter subsection permits *student* and *non-student* alike to recover from officials unreasonably operating, using, or maintaining motor vehicles, whether they sue for personal or property damages.

Thus, it can be readily seen that the motor vehicle exemption is not rendered meaningless by an interpretation that professional school employees are liable for their negligent acts towards students.

Justice Sam Johnson articulated in his dissent in *Bernhard* many of the arguments that I have presented here, and with the exception of Justice Pope, met with the same lack of success as I have in the convincing of colleagues. Nevertheless, I believe that the court has erred, and therefore I dissent.

RAY and MAUZY, JJ., join in this dissenting opinion.

**All Citations**

736 S.W.2d 617, 42 Ed. Law Rep. 448

Footnotes

1    *See Forgone v. Salvador Union School Dist.,* 41 Cal.App.2d 423, 106 P.2d 932 (1940): *Buzzard v. East Lake School Dist.,* 34 Cal.App.2d 316, 93 P.2d 233 (1939); *Adams v. Kline* 239 A.2d 230 (Del.Super.1968); *Miller v. Griesel,* 261 Ind. 604, 308 N.E.2d 701 (1974); *Anderson v. Calamus Com. School Dist.,* 174 N.W.2d 643 (Iowa 1970); *Rose v. Bd.*

*of Education,* 184 Kan. 486, 337 P.2d 652 (1959); *Cox v. Barnes,* 469 S.W.2d 61 (Ky.Civ.App.1971); *Prier v. Horace Mann Ins. Co.,* 351 So.2d 265 (La.App. 3d Cir.1977, writ ref'd); *Brooks v. Jacobs,* 139 Me. 371, 31 A.2d 414 (1943); *Duncan v. Koustenis,* 260 Md. 98, 271 A.2d 547 (1970); *Lovitt v. Concord School Dist.,* 58 Mich.App. 593, 228 N.W.2d 479 (1975), *rev'd on other grounds, Galli v. Kirkeby,* 398 Mich. 527, 248 N.W.2d 149 (1976); *Wire v. Williams,* 270 Minn. 390, 133 N.W.2d 840 (1965); *Clark v. Furch,* 567 S.W.2d 457 (Mo.App.1978); *Doktor v. Greenberg,* 58 N.J.Super. 155, 155 A.2d 793 (1959); *Ostrowski v. Board of Education of Coxsackie-Athens School Dist.,* 294 N.Y.S.2d 871, 31 A.D.2d 571 (1968); *Drum v. Miller,* 135 N.C. 204, 47 S.E. 421 (1904); *Wentz v. Deseth,* 221 N.W.2d 101 (N.D.1974); *Baird v. Hosmer,* 46 Ohio St.2d 273, 347 N.E.2d 533 (1976); *Hutchison v. Toews,* 4 Or.App. 19, 470 P.2d 811 (1970); *Guerrieri v. Tyson,* 147 Pa.Super.Ct. 239, 24 A.2d 468 (1942); *DeGooyer v. Harkness,* 70 S.D. 26, 13 N.W.3d 815 (1944); *Eastman v. Williams,* 124 Vt. 445, 207 A.2d 146 (1965); *Crabbe v. County School Bd. of Northumberland Co.,* 209 Va. 356, 164 S.E.2d 639 (1968).

2    Comment, *Broad Tort Immunity Provided Texas Public Schools and Public School Personnel: A Reappraisal,* 16 Tex.Tech L.Rev. 515 (1985); Comment, *Professional School Employees—The Privileged Class?,* 19 S.Tex.L.J. 664 (1978); Seitz, *Legal Responsibility Under Tort Law of School Personnel and School Districts as Regards Negligent Conduct Toward Pupils,* 15 Hastings L.J. 495 (1964); *Teacher's Liability for Pupils Injuries—Duty of Supervision,* 19 Main L.Rev. 111 (1967); Proehh, *Tort Liability of Teachers,* 12 Vand.L.Rev. 723 (1959); Ripps, *Tort Liability of the Classroom Teacher,* 9 Akron L.Rev. 19 (1975); Vacca, *Teacher Malpractice,* 8 U.Rich.L.Rev. 447 (1974); *Schools and Teachers—Tort Liability in Our Changing Society,* 8 U.Kan.L.Rev. 124 (1959).

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

N

41 Tex. Sup. Ct. J. 268

962 S.W.2d 507
Supreme Court of Texas.

JOHNSON & HIGGINS OF TEXAS, INC., Petitioner,
v.
KENNECO ENERGY, INC., f/k/a Armada Supply Inc.,
Respondent.
No. 96–0244. | Argued Oct. 22, 1996. | Decided Jan.
16, 1998. | Dissenting Opinion Dec. 7, 1997.

After defending against similar suit in federal court, insurance broker filed declaratory judgment action in state court to determine its liability for insured's marine cargo. The 133rd District Court, Harris County, Lamar McCorkle, J., entered judgment in favor of broker, notwithstanding jury verdict in favor of insured, and insured appealed. The Court of Appeals, Lee Duggan, Jr., J. (Retired), 921 S.W.2d 254, reversed. On application for writ of error, the Supreme Court, Abbott, J., held that: (1) insured sustained injury when coverage for loss of profits was denied and, therefore, limitations period on insured's negligence cause of action against insurer commenced on that date; (2) to the extent insured's fraud and breach of contract claims were based on lost profits coverage, they were barred by collateral estoppel; (3) insured's claim based on insurance broker's breach of alleged agreement to secure contingency coverage was not barred by collateral estoppel; (4) broker's misrepresentation as to insured's coverage did not amount to fraud; (5) under common law, prejudgment interest begins to accrue on earlier of 180 days after date defendant receives written notice of claim or date suit is filed; and (6) prejudgment interest must be calculated as simple interest.

Judgment of Court of Appeals modified and remanded with directions.

Hecht, J., filed dissenting opinion, in which Gonzalez and Owen, JJ., joined, and in part II of which Spector, J., joined.

West Headnotes (32)

**[1]** **Limitation of Actions**
👉 Causes of action in general

Cause of action generally accrues, and statute of limitations begins to run, when facts come into existence that authorize claimant to seek judicial remedy.

93 Cases that cite this headnote

**[2]** **Limitation of Actions**
👉 Negligence

Insured sustained injury when coverage for loss of profits on its oil shipment was denied, and, therefore, limitations period on insured's cause of action against broker for negligent breach of duty to obtain insurance commenced on that date; all facts required for cause of action existed at that time.

15 Cases that cite this headnote

**[3]** **Limitation of Actions**
👉 Estoppel to rely on limitation

Equitable estoppel did not bar insurance broker's assertion of its limitations defense to insured's negligence action, even though jury answered "yes" to question of whether insured's failure to take action earlier was caused by insurance broker knowingly engaging in conduct solely calculated to induce insured to refrain from or postpone filing suit, where jury question was submitted as part of deceptive practices act claim and was not submitted as independent, common-law issue.

3 Cases that cite this headnote

**[4]** **Estoppel**
👉 Essential elements

Doctrine of equitable estoppel requires: (1) false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with intention that it should be acted on; (4) to party without knowledge or means of obtaining knowledge of facts; (5) who detrimentally relies on representations.

98 Cases that cite this headnote

**[5]** **Insurance**
⚷ Duties and liabilities to insureds or other third persons

On issue of applicable statute of limitations, jury question whether insurance broker engaged in unfair or deceptive act or practice in dealings with insured was grounded in Insurance Code, rather than Deceptive Trade Practices-Consumer Protection Act (DTPA), where question's language mirrored language of Insurance Code provision, and question was taken from pattern jury charge that referred to insurance code provision, rather than DTPA. V.A.T.S. Insurance Code, art. 21.21; V.T.C.A., Bus. & C. § 17.50(a)(4).

4 Cases that cite this headnote

**[6]** **Antitrust and Trade Regulation**
⚷ Insurance
**Insurance**
⚷ Of Insurers

If violations of Insurance Code and Deceptive Trade Practices-Consumer Protection Act (DTPA) are alleged, but only one cause of action is submitted, that claim is not automatically DTPA claim. V.A.T.S. Insurance Code, art. 21.21; V.T.C.A., Bus. & C. § 17.50(a)(4).

3 Cases that cite this headnote

**[7]** **Antitrust and Trade Regulation**
⚷ Time to Sue; Limitations
**Insurance**
⚷ Duties and liabilities to insureds or other third persons

Two-year statute of limitations provision of Deceptive Trade Practices-Consumer Protection Act (DTPA) applied to insured's cause of action against broker under pre-1985 version of Insurance Code provision concerning unfair or deceptive practices, since close relationship exists between Insurance Code provision at issue and certain sections of DTPA. V.A.T.S. Insurance Code, art. 21.21, § 16(d); V.T.C.A., Bus. & C. § 17.50(a)(4).

11 Cases that cite this headnote

**[8]** **Limitation of Actions**
⚷ Limitation as affected by nature or form of remedy in general

When statute lacks express limitations period, courts look to analogous causes of action for which express limitations period is available either by statute or by case law.

4 Cases that cite this headnote

**[9]** **Judgment**
⚷ Persons not parties or privies

"Defensive collateral estoppel" is utilized by defendants to prevent relitigation by plaintiff of issues previously lost against another defendant.

27 Cases that cite this headnote

**[10]** **Judgment**
⚷ Matters actually litigated and determined

Collateral estoppel may preclude relitigation of issues previously litigated even though subsequent suit is based upon different cause of action.

16 Cases that cite this headnote

**[11]** **Judgment**
🔑 Identity of Issues, in General
**Judgment**
🔑 Matters actually litigated and determined
**Judgment**
🔑 Essentials of Adjudication

If cause of action in second lawsuit involves element already decided in first lawsuit, that cause of action is barred under doctrine of collateral estoppel; for this to be true, however, issue decided in first action must be actually litigated, essential to that lawsuit's judgment, and identical to issue in pending action.

3 Cases that cite this headnote

**[12]** **Judgment**
🔑 Operation and effect

To extent insured's fraud and breach of contract claims against broker were based on failure to secure lost profits coverage, they were barred by collateral estoppel in state court lawsuit against insurance broker, even though federal district court's findings of no coverage were based on alternative findings of no agreement and no authority; appellate court reviewed and affirmed those findings, and they were thus essential to judgment. Restatement (Second) of Judgments § 27 comment.

Cases that cite this headnote

**[13]** **Judgment**
🔑 Essentials of Adjudication

Exception exists to general rule of no issue preclusion based on alternative holdings if they are appealed and affirmed. Restatement (Second) of Judgments § 27 comment.

8 Cases that cite this headnote

**[14]** **Judgment**
🔑 Operation and effect

Insured's claim based on insurance broker's breach of alleged agreement to secure contingency coverage was not barred by collateral estoppel, even though parties had brought previous suit in federal district court, where federal courts never addressed whether agreement was made to secure contingency coverage.

Cases that cite this headnote

**[15]** **Fraud**
🔑 Elements of Actual Fraud

Elements of common-law fraud are that: (1) material representation was made; (2) representation was false; (3) when representation was made, speaker knew it was false or made it recklessly without any knowledge of truth and as positive assertion; (4) representation was made with intention that it be acted upon by other party; (5) party acted in reliance upon representation; and (6) party suffered injury.

128 Cases that cite this headnote

**[16]** **Judgment**
🔑 Operation and effect

To extent that insured's state court fraud claim was based on its allegation that insurance broker knowingly or recklessly represented that insured's lost profits on oil purchase contract were insured, it was barred by collateral estoppel in that federal court had already concluded in earlier lawsuit that no such representation was made; however, insured's allegation that broker knowingly or recklessly represented that insured was fully insured for any loss to which underwriters did not respond under contingency clause was not barred because that issue was not decided in federal suit.

Cases that cite this headnote

**[17]** **Judgment**
    Operation and effect

Insurance broker's involvement in prior federal action as witness on behalf of insured did not extinguish collateral estoppel effect of federal court's findings, with respect to insured's state court action against broker, despite insured's argument that it had no incentive to fully litigate against broker in federal action; proper inquiry was whether insured had incentive to litigate issue of broker's representations.

1 Cases that cite this headnote

**[18]** **Judgment**
    Operation and effect

Lack of opportunity for jury trial in federal court did not, in and of itself, preclude application of defensive collateral estoppel in state court.

Cases that cite this headnote

**[19]** **Damages**
    Construction and operation

When prevailing party does not elect measure of damages from among alternative measures, courts should render judgment based on finding affording greatest recovery.

2 Cases that cite this headnote

**[20]** **Insurance**
    Duties and liabilities to insureds or other third persons

Insurance broker's misrepresentation as to insured's contingency coverage with respect to shipment of oil and transfer of title did not amount to fraud where there was no evidence that broker recklessly misrepresented the coverage; although broker should have known that his representations may have been incorrect, such evidence was akin to negligent misrepresentation, not fraud.

2 Cases that cite this headnote

**[21]** **Fraud**
    Knowledge of defendant
**Fraud**
    Statements recklessly made; negligent misrepresentation

Statement is not fraudulent unless speaker knew it was false when made or speaker made it recklessly without knowledge of truth.

34 Cases that cite this headnote

**[22]** **Fraud**
    Falsity of representations and knowledge thereof

Proof that defendant made statement knowing of its falsity or without knowledge of its truth may be proved by direct or circumstantial evidence.

14 Cases that cite this headnote

**[23] Fraud**
☞ Statements recklessly made; negligent misrepresentation

Speaker acts recklessly if he makes representations without any knowledge of truth and as positive assertion.

43 Cases that cite this headnote

**[24] Insurance**
☞ Actions

Jury's finding that insurance broker breached contract with insured to secure contingency coverage for oil shipment was supported by evidence demonstrating that either broker sold insured insurance it did not need, or broker agreed to sell insured additional coverage, which broker ultimately did not do.

Cases that cite this headnote

**[25] Interest**
☞ Prejudgment Interest in General

"Prejudgment interest" is compensation allowed by law as additional damages for lost use of money due as damages during lapse of time between accrual of claim and date of judgment. Vernon's Ann.Texas Civ.St. art. 5069–1.01(a) (Repealed).

104 Cases that cite this headnote

**[26] Interest**
☞ Prejudgment Interest in General

There are two legal sources for award of prejudgment interest: (1) general principles of equity and (2) an enabling statute.

48 Cases that cite this headnote

**[27] Interest**
☞ Torts; wrongful death

Tort reform statute providing that judgments in wrongful death, personal injury, and property damage cases must include prejudgment interest applies only to wrongful death, personal injury, and property damage cases. Vernon's Ann.Texas Civ.St. art. 5069–1.05, § 6(a) (Repealed).

46 Cases that cite this headnote

**[28] Interest**
☞ Insurance matters

Although contract concerned insurance coverage for damages to insured's property by third party, statute providing for prejudgment interest in property damage cases did not apply where insured did not base its suit on that property damage, but instead brought claims for purely economic losses stemming from insurance broker's breach of contract to secure contingency coverage; thus, any recovery for prejudgment interest would be governed by common law. Vernon's Ann.Texas Civ.St. art. 5069–1.05, § 6(a) (Repealed).

56 Cases that cite this headnote

**[29] Interest**
☞ Prejudgment Interest in General

Under common-law, prejudgment interest begins to accrue on earlier of (1) 180 days after date defendant receives written notice of claim or (2) date suit is filed. Vernon's Ann.Texas Civ.St. art. 5069–1.05, § 6(a) (Repealed).

112 Cases that cite this headnote

**[30] Interest**
 Insurance matters

Insured's standstill agreement with broker delaying state court suit pending outcome of federal suit against insurers was "written notice of a claim" that triggered accrual of prejudgment interest 180 days from date of agreement; agreement preserved all of insured's rights, including right to prejudgment interest, and all of broker's liabilities.

78 Cases that cite this headnote

**[31] Interest**
 Stay of proceedings

In most circumstances, standstill agreement to maintain status quo and temporarily suspend or stop all aspects of suit operates to toll accrual of prejudgment interest while agreement is in effect; however, parties may contractually provide otherwise.

4 Cases that cite this headnote

**[32] Interest**
 Mode of computation in general

Equitable prejudgment interest should be computed as simple interest. Vernon's Ann.Texas Civ.St. art. 5069–1.05, § 6(g) (Repealed).

32 Cases that cite this headnote

**Attorneys and Law Firms**

**\*511** Joe R. Greenhill, Bob E. Shannon, Austin, Stephen G. Tipps, Jane A. Bland, Robert Harrison Pemberton, Amy Eikel, Houston, for Petitioner.

John L. Russell, David J. Mullican, Jr., Robert Eikel, George E. Pletcher, Kimberly Ann Warren Brown, Nina Cortell, Houston, for Respondent.

**Opinion**

ABBOTT, Justice delivered the opinion of the Court, in which PHILLIPS, Chief Justice, ENOCH, BAKER and HANKINSON, Justices, join. SPECTOR, Justice, joined Parts I, II, III, and IV of the Court's opinion.

We withdraw our opinion of December 11, 1997, and substitute the following in its place. The parties' motions for rehearing are overruled.

This insurance case involves statute of limitations and collateral estoppel issues, and reevaluates the common-law method of calculating prejudgment interest under *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex.1985). The court of appeals reversed the trial court's judgment in favor of Johnson & Higgins, and rendered judgment for Kenneco Energy. We modify the court of appeals' judgment and remand the cause to the trial court to render judgment in accordance with this opinion.

**I. BACKGROUND**

In 1982, Kenneco Energy, an oil trading company then known as Armada Supply, purchased a tanker cargo of fuel oil from Petrobas, a Brazilian oil company, to be shipped from Rio de Janeiro to New York. Under their contract, the purchase price of the oil was to be measured by the market price on the day

the tanker arrived in New York. The contract was on a "C.I.F." basis, meaning that Petrobas bore the cost of shipment, insurance, and freight.

Petrobas purchased insurance for the cargo from Banorte, a Brazilian underwriter, for the amount of the purchase price, plus ten percent. This amount was the "primary coverage." In addition to the insurance provided by Petrobas, Kenneco already had its own insurance from a group of London underwriters, which it obtained through an insurance broker, Johnson & Higgins of Texas, Inc. (J & H).

The oil tanker sailed November 16, 1982. While the tanker was en route, Kenneco contracted to sell the oil, upon delivery in New York Harbor, to Sun Oil Trading Company (Sun) for $30.55 per barrel. This contract was on a "delivered" basis (rather than a C.I.F. basis), meaning that Kenneco retained title to the oil and assumed the risk of loss until Sun accepted the cargo in New York. Kenneco's profit on the oil was to be the difference between the sale price of $30.55 per barrel and the purchase price to be determined by the market price upon delivery.

After the tanker set sail, the market price of the oil began to decline. Because Kenneco's purchase price was determined by the market price, as the market price decreased, Kenneco's potential profit on the sale increased. At the same time, the primary coverage amount under the Brazilian insurance policy, which was tied to the market price Kenneco would pay to Petrobas (plus ten percent), declined. Concerned about the adequacy of insurance coverage for its increasing potential profit, anticipated to be $1.5 million, Kenneco arranged a meeting with J & H to discuss coverage under the London policy. On November 30, 1982, while **512 the tanker of fuel sailed to New York, Kenneco sent Carolyn Brown to meet with Jim Anderson of J & H to discuss coverage.

According to Kenneco, Brown met with J & H to address two primary concerns. First, Kenneco was worried that it would be unable to collect on a claim under the Banorte policy because Kenneco had heard that the Brazilian insurers had a dubious reputation. To avoid that potential problem, Kenneco wanted to claim the primary coverage amount directly from the London underwriters. In essence, Kenneco wanted assurance from the London underwriters that it would be able to recover the amount insured by Banorte.

In response, Anderson prepared a certificate of insurance

under the contingency coverage Kenneco already had with the London underwriters. Anderson did not, however, offer the possibility of a "guarantee of collectibility," which would insure Kenneco against the risk that Banorte would not pay. This later proved problematic because the policy's cover sheet stated that contingency coverage required a back-to-back C.I.F. sale, meaning that both the sale from Petrobas to Kenneco and the sale from Kenneco to Sun needed to be C.I.F.

Anderson testified that he believed the sale was back-to-back C.I.F. In a back-to-back C.I.F. sale, Kenneco would not hold title to the cargo during the voyage; instead, Kenneco's buyer would take title and accordingly bear the risk of loss of the cargo during transport. In a back-to-back C.I.F. sale, Kenneco would prepare a certificate of insurance under its contingency coverage and deliver it to the purchaser of the cargo, who would then replace Kenneco as the party asserting a claim.

As it turned out, the sale from Kenneco to Sun was contracted on a delivered basis, not C.I.F.; therefore, Kenneco retained both the title and the risk. As a consequence, the contingency coverage procured by J & H did not protect Kenneco against the possibility that the Brazilian underwriters would not fulfill their insurance obligations.

The second concern Brown expressed to J & H was that the primary coverage through Banorte was insufficient to cover its profits on the deal because Banorte insured only the purchase price (*i.e.,* the market price) plus ten percent. Kenneco wanted to insure against the loss of the sizable profit it would make on the Sun contract. Anderson responded by preparing a certificate under Kenneco's preexisting increased value coverage, increasing the insured value of the cargo from the market price plus ten percent (the primary coverage amount) to the contract amount of $30.55 per barrel (thereby including the profit).

In preparing both certificates, Anderson apparently did not realize that Kenneco could not recover under both the increased value provision, under which Kenneco retained title and bore the risk of loss, and the contingency coverage provision, under which Kenneco's buyer held the title and the risk. Nevertheless, Brown discerned from her meeting with Anderson that Kenneco was protected by "contingency coverage" in the event the Brazilian underwriters failed to pay, and that the profits on the Sun contract were covered by the increased value provision. Kenneco paid premiums for both the contingency coverage and the increased value coverage.

When the tanker arrived in New York Harbor, Sun rejected the cargo and canceled the contract because the oil arrived both short and contaminated. Before leaving Brazil, the cargo was apparently deficient by 8,000 barrels. In addition, the tanker crew used some of the cargo as fuel during the voyage, pumping in seawater to replace the depleted amount.

Sun rescinded the contract. Had it not, Kenneco's profits would have been about $1,690,780.00. Kenneco was able to partially renegotiate the contract with Sun; however, the renegotiated contract was also lost when the tanker fled the harbor to avoid being sanctioned for its conduct. Eventually, Kenneco convinced the tanker captain to return, took control of the cargo, and began to recondition the oil. As the reconditioned oil became saleable, Kenneco sold it in several parcels at various prices below the $30.55 per barrel contract price.

Kenneco asserted insurance claims under both the Brazilian and London policies, **\*513** claiming the full amount of its lost profit under the canceled Sun contract. The London underwriters refused Kenneco's contingency coverage because the sale was not back-to-back C.I.F. as required under the insurance policy. The London underwriters did recognize coverage under the increased value provision; however, their position was that the increased value coverage insured only against physical loss or damage to the cargo up to the amount insured, not the loss of profits due to cancellation of a contract, as Kenneco urged. The London underwriters took a formal position on the claim in March 1983, denying contingency coverage and rejecting Kenneco's interpretation of the increased value provision.

Kenneco filed suit against Banorte and the London underwriters in April 1983 in New York federal district court. _Armada Supply, Inc. v. Wright,_ 665 F.Supp. 1047 (S.D.N.Y.1987), _aff'd in part, rev'd in part,_ 858 F.2d 842 (2d Cir.1988). With the contingency coverage in dispute, Kenneco could not look solely to the London underwriters for coverage, but had to bring suit against Banorte, which disputed Kenneco's primary coverage. Kenneco did not name J & H as a defendant, but did offer evidence about the events at the November 30, 1982 meeting between Brown and Anderson, and Kenneco's contention that Anderson's and J & H's representations resulted in lost profits coverage.

After a non-jury trial, the federal district court held that the

contingency coverage was inapplicable because the sale was not back-to-back C.I.F. The court also concluded that the increased value provision covered physical loss and damage, but not the loss of the Sun contract. In determining the scope of the lost profits and lost contract coverage, the court considered J & H's conduct during and after the November 30 meeting to decide what agreements had been made regarding coverage. On appeal, the Second Circuit affirmed most of the district court's judgment, but reversed in part on the issue of sue and labor expenses.[1] _Armada Supply, Inc. v. Wright,_ 858 F.2d 842, 851 (2d Cir.1988). The Second Circuit rendered its decision on September 22, 1988.

While the federal action was pending in New York, Kenneco indicated that it might file a separate suit against J & H for mishandling its insurance needs. J & H and Kenneco signed a standstill agreement on December 15, 1986, delaying any such action pending the outcome of the federal litigation. The standstill agreement contained a provision tolling the statute of limitations for "the period between December 15, 1986 and the date when thirty days ... elapsed following the final determination of the New York Action."

In June 1988, prior to the Second Circuit's decision, J & H filed a declaratory judgment action in Texas state court, seeking a ruling that res judicata and collateral estoppel barred Kenneco from filing suit against it. Kenneco counterclaimed and sought damages on a variety of claims. A jury found that Kenneco suffered damages in the amounts of: $1,500,000 for fraud; $1,500,000 for Insurance Code[2] violations; $1,560,000 for breach of the contract to secure lost profits coverage; $412,273.66 for breach of the contract to secure contingency coverage; and $1,700,000 for negligence. The jury also found that Kenneco discovered or should have discovered the basis for its Insurance Code claim by March 1983.

J & H moved for judgment based on the ground that the Insurance Code and negligence claims were barred by their respective statutes of limitations. J & H alternatively moved for judgment notwithstanding the verdict on the grounds that: (1) all of Kenneco's claims were barred by collateral estoppel and res judicata, and (2) no evidence supported the jury's findings of breach of contract and fraud. The trial court granted J & H's motion without stating the grounds.

**\*514** The court of appeals reversed the trial court's judgment, finding that: (1) res judicata and collateral estoppel did not bar any of Kenneco's claims; (2) Kenneco's Insurance Code claim was not barred by limitations; and (3) although Kenneco's

negligence claim accrued in March 1983 and would otherwise be barred by limitations, equitable estoppel prevented J & H from asserting a limitations defense. 921 S.W.2d 254, 261–63. Accordingly, the court of appeals rendered judgment in favor of Kenneco, awarding $1,972,273.66 in damages (based on the breach of contract claims[3]), $275,000 in attorney's fees, and $2,750,952.39 in prejudgment interest. To calculate the prejudgment interest, the court of appeals held that the case was controlled by *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex.1985), and not by Tex.Rev.Civ. Stat. article 5069–1.05, section 6. As a result, the court of appeals compounded the prejudgment interest on a daily basis beginning six months from the date Sun rejected the cargo. 921 S.W.2d at 267.

We granted this application for writ of error to determine: (1) whether limitations bars the negligence and Insurance Code claims; (2) the appropriate preclusive effect of the federal court judgment on the state court action under the doctrine of collateral estoppel; and (3) the proper method for calculating prejudgment interest on claims governed by *Cavnar.*

## II. LIMITATIONS

J & H asserts that limitations bars Kenneco's negligence and Insurance Code claims. We agree.

### A. Negligence

The court of appeals held that Kenneco's negligence claim against J & H accrued in March 1983, when the London underwriters denied coverage of Kenneco's claim. 921 S.W.2d at 262. However, it found that equitable estoppel barred J & H's limitations defense based upon the jury's finding that Kenneco's delay in filing suit was caused by J & H's conduct. *Id*. at 265–66. In its application for writ of error, J & H asserts that the court of appeals correctly held that Kenneco's negligence claim accrued in March 1983, but erred in holding that equitable estoppel prevents J & H from asserting its limitations defense. Kenneco responds that the court of appeals correctly found and applied equitable estoppel, or, in the alternative, the court of appeals erred in determining the date of accrual because Kenneco's negligence claim did not arise until August 1988, the date when the Second Circuit affirmed the district court's holding of no coverage and when Kenneco first suffered injury. We agree with J & H that the negligence cause of action accrued in March 1983, and that equitable estoppel does not bar J & H's assertion of its

limitations defense.

[1] [2] A cause of action generally accrues, and the statute of limitations begins to run, when facts come into existence that authorize a claimant to seek a judicial remedy. *Murray v. San Jacinto Agency, Inc.,* 800 S.W.2d 826, 828 (Tex.1990); *see also Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex.1990)* ("[A] cause of action can generally be said to accrue when the wrongful act effects an injury."). Today we are asked to decide whether, in a suit by an insured against its agent for negligent breach of the agent's duty to obtain insurance, the injury-producing event was the denial of coverage by the insurance company, or the final resolution of the coverage dispute by the courts. We hold that Kenneco sustained injury when coverage was denied and, therefore, limitations commenced on that date because all facts required for a cause of action existed at that time. *See Gilbreath v. White,* 903 S.W.2d 851, 856 (Tex.App.—Texarkana 1995, no writ) (holding that legal injury occurred for purposes of negligence action against insurance agent when insurance company rejected the claim); *see also Bush v. Ford Life Ins. Co.,* 682 So.2d 46, 47–48 (Ala.1996); *Plaza Bottle Shop v. Al Torstrick Ins. Agency,* 712 S.W.2d 349, 350 (Ky.Ct.App.1986).

**\*515** In *Murray v. San Jacinto Agency, Inc.,* 800 S.W.2d at 828, we held that when an insurer wrongfully denies coverage, the denial is the injury-producing event and, therefore, a cause of action for breach of the duty of good faith and fair dealing accrues when coverage is denied and not the date upon which the coverage suit is resolved. *See also Celtic Life Ins. Co. v. Coats,* 885 S.W.2d 96, 100 (Tex.1994) (holding that a cause of action under article 21.21 of the Insurance Code accrued on the date that insurer first denied coverage); *Long v. State Farm Fire & Cas. Co.,* 828 S.W.2d 125, 128 (Tex.App.—Houston [1st Dist.] 1992, writ denied) (holding that a cause of action under the DTPA accrues on the date that coverage is denied). We believe that the reasoning of *Murray* is equally applicable to Kenneco's negligence claim.

Although *Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d 165, 168 (Tex.1987), held that limitations on a bad faith claim does not begin to run until the underlying contract claims are finally resolved, that rule was expressly modified in *Murray* by our holding that limitations runs when coverage is denied because, at that time, the insured "ha[s] sufficient facts to seek a judicial remedy." *Murray,* 800 S.W.2d at 829. Kenneco's position that its negligence cause of action did not accrue until the underlying coverage dispute was resolved "is not consistent with the rule that limitations commences at the

time facts come into existence which authorize a claimant to seek a judicial remedy." *Id.* Regardless of whether a coverage suit was ever filed against the London underwriters, sufficient facts existed when coverage was denied in March 1983 for Kenneco to seek a judicial remedy against J & H for negligence.

Kenneco's reliance on *Atkins v. Crosland,* 417 S.W.2d 150 (Tex.1967), is misplaced. *Atkins* involved a suit by a taxpayer against his accountant for negligence. We held that the statute of limitations did not begin to run against the taxpayer in that case until his tax deficiency was assessed by the IRS because "[p]rior to assessment the plaintiff had not been injured." *Id.* at 153. Kenneco, in contrast, was not only harmed when the London underwriters denied coverage on its claim, but also knew or should have known at that time that J & H might have been negligent. Thus, Kenneco's negligence cause of action accrued in March 1983, and the two-year limitations period had run when Kenneco and J & H signed the standstill agreement in 1986.

[3] We also hold that equitable estoppel does not bar J & H's assertion of its limitations defense. The court of appeals, citing *Neeley v. Bankers Trust Co. of Texas,* 757 F.2d 621, 632 & n. 14 (5th Cir.1985), found the jury's affirmative answer to the following question to be equivalent to a finding of equitable estoppel:

> Was Kenneco's (Armada's) failure to take action before December 15, 1986 [the date of the standstill agreement], caused by J & H's knowingly engaging in conduct solely calculated to induce Kenneco (Armada) to refrain from or postpone filing suit?

921 S.W.2d at 263.

J & H argues that this question is an insufficient submission of equitable estoppel and that it was merely a submission of the 180–day limitations extension available under article 21.21, section 16(d) of the Insurance Code or section 17.565 of the DTPA. We agree. Section 16(d) provides:

> The period of limitation provided in this section may be extended for a period of 180 days if the person bringing the action proves

that the failure to timely commence the action was caused by the defendant's *engaging in conduct solely calculated to induce the plaintiff to refrain from or postpone the commencement of the action.*

Tex. Ins.Code art. 21.21, § 16(d) (emphasis added). Section 17.565 of the DTPA contains virtually identical language. Tex. Bus. & Com.Code § 17.565. Kenneco's question tracks the language of sections 16(d) and 17.565 almost verbatim and submits the exact question suggested by Pattern Jury Charge 102.23 for the 180–day extension under both statutes.

[4] In contrast to that statutory language, the doctrine of equitable estoppel requires: (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should **\*516** be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations. *Schroeder v. Texas Iron Works, Inc.,* 813 S.W.2d 483, 489 (Tex.1991). Kenneco's jury question clearly does not address most of the equitable estoppel elements.[4] Even if the question could be characterized as a partial submission of the equitable estoppel issue, the language submitted is not "necessarily referable" to equitable estoppel and therefore should not be characterized as such on appeal. Tex.R. Civ. P. 279; *see also Martin v. McKee Realtors, Inc.,* 663 S.W.2d 446, 446 (Tex.1984); *Gold Kist, Inc. v. Carr,* 886 S.W.2d 425, 431 (Tex.App.—Eastland 1994, writ denied) (holding that jury question relating to breach of contract and fraud did not necessarily refer to promissory estoppel to the extent that defendant would be put on notice of possibility of deemed or express findings on that theory).

Furthermore, Kenneco's question was clearly submitted as part of the DTPA/Insurance Code claim—the jury was instructed not to answer it unless it found that J & H had engaged in an "unfair or deceptive act or practice" that was a producing cause of damages to Kenneco. The question was not submitted as an independent common-law issue. Therefore, the wording of the question and its placement after other questions concerning statutory

claims reveal that it was an attempt to submit the 180–day extension issue, either under the Insurance Code or the DTPA. Because Kenneco's jury question *is* a correct submission of the statutory 180–day extension under the DTPA and Insurance Code, J & H could not have objected to the question as improperly submitted.

Further, holding that an affirmative answer to this jury question, which tracks the language of sections 16(d) and 17.565, is equivalent to a finding of equitable estoppel renders the 180–day extension language meaningless in actions under the DTPA and the new Insurance Code; anytime the question is submitted, a "yes" answer would arguably establish equitable estoppel and wholly preclude a defendant's limitations defense instead of just allowing the 180–day extension.

In sum, J & H is not estopped from asserting its limitations defense and Kenneco's negligence claim is barred by the statute of limitations.

### B. Insurance Code

#### 1. *Insurance Code vs. DTPA*

[5] Kenneco asserted causes of action under the DTPA and Insurance Code article 21.21. Under each cause of action, Kenneco argued incorporation of the other cause of action. On those issues, Kenneco submitted a single liability question to the jury:

> Did Johnson & Higgins engage in any unfair or deceptive act or practice in its dealings with Kenneco (Armada) on or about November 30, 1982?

The parties dispute whether this jury question is properly characterized as an Insurance Code claim or a DTPA claim. That determination must be made before considering the applicable statute of limitations.

J & H asserts that Kenneco abandoned its Insurance

Code claim and submitted only a DTPA claim to the jury, and therefore the DTPA's two-year statute of limitations applies. J & H's position is not supported by the record. There is no indication that Kenneco waived the Insurance Code claim and proceeded only with its DTPA claim.

To support its position, J & H relies on the parties' repeated references to the cause of action submitted to the jury as dealing with "unfair or deceptive practices." J & H argues that such language refers to a DTPA cause of action and, thus, indicates that Kenneco submitted the claim under the DTPA. However, article 21.21 also deals with unfair or deceptive practices.

Article 21.21 is entitled "Unfair Competition and Unfair Practices." **\*517** Tex. Ins.Code art. 21.21. Section 3 is captioned "Unfair methods of competition or unfair and deceptive acts or practices prohibited." *Id.* § 3. Section 16 provides a cause of action for persons injured by "unfair and deceptive acts or practices in the business of insurance." *Id.* § 16. Clearly, the reference to "any unfair or deceptive act or practice" in the jury question can refer to an Insurance Code claim as well as to a DTPA claim.

[6] J & H also argues that because violations of article 21.21 are incorporated as violations of the DTPA, Tex. Bus. & Com.Code § 17.50(a)(4), and because Texas courts have held that the DTPA limitations provision should be applied to all causes of action submitted under the DTPA, *see McAdams v. Capitol Prods. Corp.,* 810 S.W.2d 290, 292 (Tex.App.—Fort Worth 1991, writ denied), limitations bars this claim since Kenneco did not request that the trial court submit an Insurance Code claim as an alternative cause of action. J & H's argument fails to consider the fact that, while the DTPA does incorporate article 21.21, the converse is also true—article 21.21 incorporates certain practices delineated in the DTPA. *Aetna Cas. & Sur. Co. v. Marshall,* 724 S.W.2d 770, 772 (Tex.1987). Thus, if both DTPA and Insurance Code violations are alleged, but only one cause of action is submitted, that claim is not automatically a DTPA claim.

We agree with Kenneco that the jury question is

grounded in the Insurance Code because it mirrors the language of article 21.21. Pattern Jury Charge (PJC) 102.14 (1990 ed.), entitled "Question for Article 21.21 of the Insurance Code," was the form used for the jury question actually submitted. The jury question language "unfair or deceptive act or practice" tracks the language of article 21.21, section 16. Also, the definitions provided in the jury charge for "unfair or deceptive act or practice"[5] unmistakably resemble the Insurance Code. Definition (1) tracks the language of article 21.21, § 4(1) and submits PJC 102.16, entitled "Misrepresentation or False Advertising of Policy Contracts—Insurance." Definition (2) tracks the language of article 21.21, § 4(2) and submits PJC 102.17, entitled "False Information or Advertising—Insurance." Definition (3) tracks the language of Insurance Board Order No. 41060 and submits PJC 102.19, entitled "Misrepresentations—Insurance." Additionally, Question 12 ("What amount of the damages you found, if any, ... occurred before December 15, 1984 [two years before the date of the standstill agreement]?") is applicable only to causes of action under the pre–1985 Insurance Code, which excluded recovery for "damages incurred beyond a point two years prior to the institution of the action." Tex. Ins.Code art. 21.21, § 16(d) (Vernon 1981). This question would not have been submitted if the underlying liability claim concerned only the DTPA.

## 2. *Applicable Limitations Period*

[7] Having determined that the claim submitted is sufficiently grounded in the Insurance Code, we must determine what statute of limitations applies to an Insurance Code cause of action that accrued prior to April 4, 1985. Under the current version of article 21.21, a party has two years from the date on which it discovered or should have discovered its cause of action in which to file suit. Tex. Ins.Code art. 21.21, § 16(d). However, before April 4, 1985, article 21.21 contained no express statute of limitations.[6] **\*518** Tex. Ins.Code art. 21.21, § 16(d) (Vernon 1981); Act of June 7, 1951, 52d Leg., R.S., ch. 491, § 1, 1951 Tex. Gen. Laws 868, 1075, *amended by* Act of April 4, 1985, 69th Leg., R.S., ch. 22, §§ 3, 4, 1985 Tex. Gen. Laws 395, 395–96. The date of accrual of the article 21.21 cause of action determines which version of the Insurance Code applies. *See Long v. State Farm Fire & Cas. Co.,*

828 S.W.2d 125, 128 (Tex.App.—Houston [1st Dist.] 1992, writ denied). The jury found, and Kenneco concedes, that its insurance claim accrued when coverage was denied in March 1983. Therefore, the pre–1985 version of article 21.21, section 16(d) applies to Kenneco's claim.

[8] When a statute lacks an express limitations period, courts look to analogous causes of action for which an express limitations period is available either by statute or by case law. *See Tectonic Realty Inv. Co. v. CNA Lloyd's of Tex. Ins. Co.,* 812 S.W.2d 647, 655 (Tex.App.—Dallas 1991, writ denied); *Brooks Fashion Stores, Inc. v. Northpark Nat'l Bank,* 689 S.W.2d 937, 942 (Tex.App.—Dallas 1985, no writ). Texas courts of appeals have repeatedly analogized an article 21.21 cause of action to an action for breach of a written contract, thus applying the four-year statute of limitations applicable to actions for debt. *See, e.g., Long,* 828 S.W.2d at 128; *Tectonic,* 812 S.W.2d at 655; *Nash v. Carolina Cas. Ins. Co.,* 741 S.W.2d 598, 601 (Tex.App.—Dallas 1987, writ denied); *Gibbs v. Main Bank of Houston,* 666 S.W.2d 554, 558 (Tex.App.—Houston [1st Dist.] 1984, no writ). *See also* Kalis et al., Policyholder's Guide to the Law of Insurance Coverage § 26.02[B], at 26–4 (1997)("Lawsuits seeking to enforce a coverage obligation typically are governed by the general statute of limitations applicable to actions on written contracts.")(citing *Franco v. Allstate Ins. Co.,* 505 S.W.2d 789, 793 (Tex.1974)). The court of appeals in this case cited *Long* and *Tectonic* to reach the same conclusion. 921 S.W.2d at 262.

In deciding which limitations period applied to an article 21.21 claim that arose before April 4, 1985, the *Tectonic* court explained:

The key question is whether to analogize article 21.21 claims to general tort actions, for which a two-year limitations period applied, or to actions for breach of a written contract, for which a four-year limitations period applied. Texas appellate courts interpreting article 21.21 have repeatedly analogized it to an action for breach of a written contract. As a result, the cases have applied the four-year limitations period normally available for actions to enforce a written contract.

*Tectonic,* 812 S.W.2d at 655 (citations omitted).

This reasoning is flawed, however, because it fails to consider that an article 21.21 claim is more analogous to a DTPA claim than to an action for debt on a written contract. As discussed in the preceding section in this opinion, Kenneco's article 21.21 claim is virtually indistinguishable from its DTPA claim. The language of section 17.50(a)(4) of the DTPA, by its terms, incorporates article 21.21 of the Insurance Code in its entirety. *Vail v. Texas Farm Bureau Mut. Ins. Co.,* 754 S.W.2d 129, 132 (Tex.1988). Similarly, article 21.21, section 16 makes actionable any violation of section 17.46 of the DTPA. *Aetna Cas. & Sur. Co. v. Marshall,* 724 S.W.2d 770 (Tex.1987). "The DTPA and the Insurance Code each grant relief for unfair or deceptive acts or practices in the business of insurance." *Vail,* 754 S.W.2d at 132.

We conclude that the close relationship between article 21.21 and section 17.50(a)(4) of the DTPA requires us to apply the two-year statute of limitations provision of the DTPA to Kenneco's article 21.21 claim. We disapprove of *Long v. State Farm Fire & *519 Cas. Co.,* 828 S.W.2d 125, 128 (Tex.App.—Houston [1st Dist.] 1992, writ denied); *Tectonic Realty Inv. Co. v. CNA Lloyd's of Tex. Ins. Co.,* 812 S.W.2d 647, 655 (Tex.App.—Dallas 1991, writ denied); *Nash v. Carolina Cas. Ins. Co.,* 741 S.W.2d 598, 601 (Tex.App.—Dallas 1987, writ denied); and *Gibbs v. Main Bank of Houston,* 666 S.W.2d 554, 558 (Tex.App.—Houston [1st Dist.] 1984, no writ); to the extent they differ from this conclusion.

Kenneco's article 21.21 cause of action accrued in March 1983. Kenneco and J & H signed their standstill agreement more than two years later on December 15, 1986. As a result, Kenneco's Insurance Code claims are barred by limitations.

## III. COLLATERAL ESTOPPEL

[9] Kenneco's arguments indicate that it regards J & H's collateral estoppel plea as "offensive" collateral estoppel. However, J & H correctly argues that its

invocation of the plea is, in fact, "defensive." Defensive collateral estoppel is utilized by defendants to prevent relitigation *by a plaintiff* of issues previously lost against another defendant. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 329, 99 S.Ct. 645, 650–51, 58 L.Ed.2d 552 (1979); Black's Law Dictionary 261–62 (6th ed.1990). J & H's status as a "plaintiff" in the declaratory judgment action is purely nominal; J & H asserted its plea of collateral estoppel as a defense to Kenneco's claims for affirmative relief. *See Republic Ins. Co. v. Davis,* 856 S.W.2d 158, 164 (Tex.1993).

J & H asserts that all of Kenneco's claims in the state court action are barred by collateral estoppel.[7] The court of appeals concluded that collateral estoppel did not bar any of Kenneco's claims. Because Kenneco, then known as Armada, actually was a party in the first action, the critical collateral estoppel issues concern only whether: (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action, and (2) those facts were essential to the judgment in the first action. *Sysco Food Servs., Inc. v. Trapnell,* 890 S.W.2d 796, 801 (Tex.1994); *Eagle Properties, Ltd. v. Scharbauer,* 807 S.W.2d 714, 721 (Tex.1990).

### A. Federal Court Findings

We must first ascertain exactly what issues were decided in the federal action to determine whether those findings might preclude Kenneco's claims in its state court action. Although Kenneco's federal action was brought against both the London and the Brazilian underwriters, for our purposes we need address only the claims against the London underwriters. J & H was not a party in the federal action; but, several of its employees were called to testify in that case.

The federal district court concluded that the London underwriters were not liable for contingency coverage. Kenneco argued that the back-to-back C.I.F. requirement was waived by the London underwriters' retention of Kenneco's premium. The district court rejected this argument, finding that the London underwriters did not waive their reservation of coverage, despite the fact that they received and retained the premium from Kenneco. As to J & H's

conduct, the court stated, "[I]t appears that Johnson & Higgins did not clearly understand the situation and mistakenly billed Armada for a premium for contingency coverage." *Armada Supply,* 665 F.Supp. at 1062. The court further noted that "Johnson & Higgins billed Armada for the contingency coverage premium before the question of coverage was resolved." *Id.* at 1067. The court did not, however, determine whether J & H was or was not liable to Kenneco.

The federal district court also considered whether the London underwriters were liable for Kenneco's lost profits on the Sun contract under the increased value provision. The court reasoned that the increased value coverage included physical loss or damage to the cargo, but not the loss of a contract or its **\*520** profits. *Id.* at 1051. The court squarely addressed Kenneco's argument that "even if the normal interpretation of [the coverage provision] would not allow recovery for loss of profits [on a contract], nevertheless there was a separate agreement to provide such coverage for this cargo." *Id.* at 1050. The district court held that no such separate agreement was made, explicitly finding that J & H "did not make an agreement binding the London underwriters ... to coverage of the lost profits on the Sun contract," that "[J & H] did not purport to make such an agreement," and that "[J & H] had neither actual nor apparent authority to do so." *Id.* at 1051. It is significant to note that these findings relate to the loss of profits coverage under the increased value provision and not to contingency coverage.

In its conclusions of law regarding increased value coverage, the federal district court phrased the issue as follows: "[Kenneco] contends that Johnson & Higgins agreed that the London insurance would cover lost profits on the Sun contract." *Id.* at 1058. The court "found as a fact that Johnson & Higgins did not purport to make any agreement to insure the Sun contract or the profits on that contract," and found that J & H had no actual or apparent authority to do so. *Id.* at 1066–67. Finally, the court concluded that, "as a matter of fact and law, no agreement was made at the November 30 meeting binding the London underwriters to insurance against loss of the Sun contract or the profits thereon." *Id.* at 1067.

The district court also made other specific findings about what occurred at the November 30 meeting. The court drew the distinction "between the concept of increasing the *insured value* based on the amount of a contract and the concept of insuring against the loss of a contract as such," finding that only the former was discussed at the November 30 meeting. *Id.* at 1059. The court also found that "Brown said nothing which apprised Anderson that [Kenneco] wished to have coverage that would depart from the normal marine insurance and would cover possible loss of a contract. Brown did not testify in words or substance that Anderson ever agreed to such a thing." *Id.* at 1059–60. The court continued, "There is nothing in Anderson's testimony to indicate that he was agreeing to insure against the loss of the Sun contract or the profits on that contract. Certainly Anderson did not agree to something other than the normal particular average method of adjustment in the case of a contamination loss." *Id.* at 1061. Again, these conclusions by the court relate to lost profits under the increased value provisions rather than contingency coverage.

Kenneco appealed the district court's ruling to the Second Circuit. The Second Circuit generally affirmed the district court's findings regarding increased value coverage that: (1) Brown and Anderson did not discuss insurance against loss of profits for the Sun contract at the November 30 meeting; (2) Brown did not ask for, nor did Anderson agree to, coverage on lost profits; (3) Anderson's testimony was consistent with the London underwriters' position that the increased value coverage insured against cargo loss or damage rather than lost profits; (4) what was actually discussed was Kenneco's desire to "protect" its profits by utilizing the increased value coverage; and (5) Brown and Anderson did not discuss the difference between increasing the insured value based on the amount of the contract and insuring against the loss of a contract as such. *Armada Supply,* 858 F.2d at 851. The Second Circuit found that these findings were not clearly erroneous. *Id.* The court also reviewed and affirmed the finding that J & H lacked authority to bind the London underwriters. *Id.* Finally, the court explicitly upheld the district court's conclusion that "as a matter of fact and law, no agreement was made at the November 30 meeting binding the London underwriters to insurance against loss of the Sun contract or the profits thereon." *Id.*

The Second Circuit also upheld the district court's finding that the London underwriters were not liable for contingency coverage. *Id.* at 852. The court addressed Kenneco's claim "that the London underwriters' acceptance and retention of a premium for contingency coverage waived any objection they may have had to such coverage." *Id.* at 851. The court noted that the "evidence indicates that **\*521** J & H mistakenly billed Armada for [contingency] coverage before any question of coverage had been resolved and that the London underwriters denied coverage as soon as the facts of the transaction became fully known." *Id.* The court held that "the payment of a premium alone does not justify the rewriting of an insurance contract," reasoning that waiver cannot change coverage. *Id.* at 851–52. Thus, the court concluded that coverage could not be created "where none clearly existed." *Id.* at 852.

## B. Preclusion of Kenneco's Claims

[10] [11] Collateral estoppel may preclude relitigation of issues previously litigated even though the subsequent suit is based upon a different cause of action. *Wilhite v. Adams,* 640 S.W.2d 875 (Tex.1982). If a cause of action in the second lawsuit involves an element already decided in the first lawsuit, that cause of action is barred. For this to be true, however, the issue decided in the first action must be actually litigated, essential to that lawsuit's judgment, and identical to the issue in the pending action. *Getty Oil v. Insurance Co. of N. Am.,* 845 S.W.2d 794, 802 (Tex.1992); *Eagle Properties,* 807 S.W.2d at 721–22; *Tarter v. Metropolitan Sav. & Loan Ass'n,* 744 S.W.2d 926, 927 (Tex.1988); *Van Dyke v. Boswell, O'Toole, Davis & Pickering,* 697 S.W.2d 381, 384 (Tex.1985). The federal courts have applied the same test. *See Interoceanica Corp. v. Sound Pilots, Inc.,* 107 F.3d 86, 91 (2d Cir.1997); *Levy v. Kosher Overseers Ass'n of America, Inc.,* 104 F.3d 38, 41 (2d Cir.1997); *Hicks v. Quaker Oats Co.,* 662 F.2d 1158, 1166 (5th Cir.1981).

Kenneco's state court claims include: (1) breach of contract, (2) Insurance Code violations, (3) common-law fraud, and (4) negligence. Kenneco's negligence and Insurance Code claims are barred by limitations. We hold that, to the extent Kenneco's remaining claims are based on lost profits coverage, they are barred by collateral estoppel and to the extent they are based on contingency coverage, they are not barred.

### 1. *Breach of Contract Claims*

#### a. lost profits coverage

[12] Kenneco's claim for breach of the alleged agreement to secure lost profits coverage is barred by collateral estoppel. In its state court claim, Kenneco asserts that J & H "breached its agreement to provide the type of coverage it assured [Kenneco] it would secure." The jury question submitted asks, "Did Johnson & Higgins and Armada agree on November 30, 1982, that Johnson & Higgins would secure for Kenneco's (Armada's) benefit a policy of insurance protecting the profits on the sale of the cargo in question?" The instruction further clarifies that the jury was asked to "decid[e] whether the parties reached an agreement." That identical issue was previously decided against Kenneco in the federal action.

In the federal suit, Kenneco argued that J & H "specifically agreed" to lost profits coverage at the November 30 meeting. *Armada Supply,* 665 F.Supp. at 1057. Even a cursory reading of the federal district court's opinion demonstrates its finding that no such agreement to secure lost profits coverage was made. At least twice in its opinion, the court explicitly found that J & H neither made an agreement to insure the profits on the contract nor purported to make such an agreement. *Armada Supply,* 665 F.Supp. at 1051, 1066–67. The Second Circuit noted the district court's rejection of Kenneco's argument that the parties agreed to coverage of lost profits at the meeting, and affirmed the finding that "Brown did *not* ask for, nor did Anderson agree to, coverage on lost profits." *Armada Supply,* 858 F.2d at 847, 851. In order to succeed on its breach of contract claim in state court, Kenneco was required to establish that an agreement concerning lost profits coverage was made. That issue was already decided against Kenneco in the prior action. Thus, Kenneco's claim for breach of a contract to secure lost profits coverage is precluded

if the claim was actually litigated and essential to the judgment in the federal action.

The issue concerning whether J & H agreed to secure lost profits coverage was actually litigated in the federal action because the issue was properly raised, submitted for determination, and determined. Restatement (Second) of JudgmentsSSSSSSS § 27 cmt. **522** d (1982); *Van Dyke v. Boswell, O'Toole, Davis & Pickering,* 697 S.W.2d 381, 384 (Tex.1985). The real question concerns the extent to which the federal district court's finding that no such agreement was made was essential to its judgment.

Kenneco argues that, because the federal district court's holding of no lost profits coverage was based on the alternative findings of no agreement and no authority, neither finding was "essential to the prior judgment." Section 27 of the *Restatement (Second) of Judgments* provides in part: "If a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone." *Id.* § 27, cmt. i (1982). Thus, according to the *Restatement,* the general rule is that there cannot be estoppel by alternative holdings.[8]

[13] In response, J & H correctly asserts that both of the district court's findings can have a preclusive effect because both were reviewed and affirmed by the Second Circuit. An exception exists to the general rule of no preclusion when alternative holdings are appealed and affirmed. Comment o to the *Restatement* provides:

> If the judgment of the court of first instance was based on a determination of two issues, either of which standing independently would be sufficient to support the result, and the appellate court upholds both of these determinations as sufficient, and accordingly affirms the judgment, the judgment is conclusive as to both determinations. In contrast to the case discussed in Comment *i,* the losing party has here obtained an appellate decision on the issue, and thus the balance weighs in favor of preclusion.

Restatement (Second) of Judgments § 27, cmt. o

(1982). The district court's alternative findings of no agreement to insure the Sun contract and no authority to do so were both appealed and affirmed by the Second Circuit. The finding that no agreement was made to cover the Sun contract profits was rigorously considered—the district court discussed this issue extensively in its findings of fact and conclusions of law. This finding was affirmed by the Second Circuit and could, standing independently, support the result of no coverage; it thus serves as a valid estoppel in this action.

Because we conclude that alternative findings that are in fact reviewed and affirmed by an appellate court may have preclusive effect, we need not address J & H's additional argument under *Eagle Properties, Ltd. v. Scharbauer,* 807 S.W.2d 714, 721 (Tex.1990), that estoppel is allowed for alternative holdings that were "rigorously considered" and sufficient to sustain the judgment.

**b. contingency coverage**

[14] Kenneco's claim for breach of the alleged agreement to secure "contingency coverage" is not barred by collateral estoppel. The issue sought to be litigated in this action, as framed by the submitted jury question, is: "Did Johnson & Higgins and Kenneco (Armada) agree on November 30, 1982, that Johnson & Higgins would secure for Kenneco's (Armada's) benefit 'contingency coverage'?" The jury found that such an agreement was made and awarded Kenneco $412,273.66.

Kenneco's cause of action for breach of an agreement to secure contingency coverage is not collaterally estopped because, in contrast to their consideration of whether J & H agreed to secure lost profits coverage, the federal courts never addressed whether an agreement was made to secure contingency coverage.

It is undisputed that Brown went to J & H to obtain "back up" insurance in the event the Brazilian underwriters failed to pay on a claim. It is also undisputed that Anderson told Brown such coverage could be triggered by the policy's already existing

"contingency coverage." The federal district court found that the contingency coverage did not apply because: (1) the sale was not back-to-back **\*523** C.I.F., and (2) the London underwriters did not waive the coverage requirements. *Armada Supply,* 665 F.Supp. at 1051, 1067. Thus, the district court's finding that the policy's contingency coverage did not apply to the sale does not preclude a finding by the jury in the state action that Anderson agreed to secure contingency coverage.

Collateral estoppel is not proper because the issue decided in the federal action is not identical to the issue Kenneco litigated as a basis for the contingency coverage breach of contract claim in the state court. *See Getty Oil,* 845 S.W.2d at 802. Similarly, the ultimate issues in Kenneco's state action "were neither expressly nor necessarily adjudicated" in the federal action nor were the federal court findings inconsistent with the state court findings. *See Tarter v. Metropolitan Sav. & Loan Ass'n,* 744 S.W.2d 926, 928 (Tex.1988).

The federal courts never decided whether J & H agreed to secure contingency coverage. Kenneco's assertions in the federal courts regarding contingency coverage were mainly that events *after* the November 30 meeting (*e.g.,* the underwriters' receiving and retaining premiums for contingency coverage) resulted in a waiver of the back-to-back C.I.F. requirement. *Armada Supply,* 665 F.Supp. at 1061–63, 1067–68, 1061 ("[Kenneco] claims that during the course of later events the London underwriters waived the requirement of the cover note."). In contrast, the jury question in the state action focused only on whether J & H agreed *on November 30* to secure coverage. The issue of whether J & H mistakenly billed Kenneco for premiums after the London underwriters disputed coverage is not identical to whether Anderson agreed on November 30 to secure contingency coverage.

Further, the federal district court's statements regarding the state of knowledge of both parties as to the nature of the sale from Kenneco to Sun (*i.e.,* that it was not back-to-back C.I.F.) should not support collateral estoppel. These statements were not affirmed on appeal and were not essential to the district court's holdings that the sale was not covered and that the back-to-back C.I.F. requirement was not

waived. Not every fact finding in the district court's opinion may be afforded preclusive effect. To allow such broad preclusion would eviscerate the requirement that the finding be essential to the judgment in the prior suit. *Bonniwell v. Beech Aircraft Corp.,* 663 S.W.2d 816, at 818–19 (Tex.1984); *Eagle Properties,* 807 S.W.2d at 721–22.

In federal court, Kenneco argued that the C.I.F. back-to-back requirement was not a material term of the cover note and that the underwriters waived the requirement because they retained the contingency premium. The district court made three inquiries that were essential to its holding of no contingency coverage: (1) whether the back-to-back C.I.F. requirement of the cover note was a material term; (2) if so, whether it was satisfied; and (3) if not satisfied, whether the London underwriters waived that requirement by accepting and retaining the premium. The district court concluded that it was a material term, it was not satisfied, and that it was not waived. Although the district court stated that "Anderson understood Brown to say" that the sale was back-to-back C.I.F. and that Kenneco did not "affirmatively state" until December 1992 that the sale to Sun was delivered, what Brown said and what Anderson knew or understood regarding the sale to Sun were not essential to the district court's holding. *Armada Supply,* 665 F.Supp. at 1061–62.

Regarding Kenneco's "claim that the underwriters waived the requirement of the cover note because they received and retained the 'contingency' premium," the district court made two alternative holdings. *Id.* at 1067. First, it concluded that waiver could not rewrite the requirements of the policy. *Id.* Then, it stated, "In any event, the evidence does not support the conclusion that the London underwriters waived their objections to coverage through retention of a premium." *Id.* The district court's statement that "it appears that Johnson & Higgins did not clearly understand the situation and mistakenly billed Armada for a premium for contingency coverage,"*id.* at 1062, was not essential in its evaluation of whether the conduct of the underwriters resulted in waiver. The district court focused on the fact **\*524** that the London underwriters reserved decision on the contingency coverage, did not waive their position after J & H billed Kenneco for premiums, and plainly denied

coverage when the facts were fully known. _Id._ at 1067–68. Thus, J & H's billing actions did not affect the London underwriters' position. If J & H's act of billing Kenneco was irrelevant to the determination of no waiver, surely J & H's state of mind in so doing was also irrelevant.

Simply put, the facts relevant to the contingency claims in this case were not identical to the facts decided in the federal case and were not essential to the federal court's holding. Therefore, the contingency coverage breach of contract claim is not collaterally estopped.

### 2. _Common-law Fraud_

In the state action, the court submitted the following question to the jury:

> Did Johnson & Higgins misrepresent Kenneco's (Armada's) insurance coverage with the London underwriters at the November 30, 1982, meeting?

The question did not differentiate between the increased value coverage and the contingency coverage, although the pleadings alleged that Anderson misrepresented Kenneco's coverage under both provisions. The jury answered affirmatively and awarded Kenneco $1.5 million in damages.

[15] The elements of common-law fraud are that: (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the representation was made with the intention that it be acted upon by the other party; (5) the party acted in reliance upon the representation; and (6) the party suffered injury. _T.O. Stanley Boot Co. v. Bank of El Paso,_ 847 S.W.2d 218, 222 (Tex.1992); _Eagle Properties,_ 807 S.W.2d at 723.

[16] J & H argues that Kenneco's fraud claim is estopped because Kenneco contended in the federal action that Anderson misrepresented coverage under

the London policy, and the federal district court found against Kenneco on that issue. To support its position, J & H points to the federal district court's statement that "[Kenneco] contends that [J & H] agreed that the London insurance would cover lost profits on the Sun contract." 665 F.Supp. at 1058. J & H further argues that Kenneco relies on the same arguments and facts that it relied on in federal court to now support its fraud claim.

Kenneco responds that its fraud claim could not be estopped by the prior action because, in the federal action, it contended that Anderson did _not_ misrepresent coverage because J & H _correctly_ represented the coverage under the London policy, whereas here its position is that J & H _did_ misrepresent coverage. Further, Kenneco argues that the federal suit was nothing more than a contract construction suit, and therefore the federal court's determination of that suit should have no bearing on Kenneco's fraud claim.

We hold that, to the extent that Kenneco's fraud claim is based on its allegation that Anderson knowingly or recklessly represented that Kenneco's lost profits on the contract were insured by the increased value provision, it is barred by collateral estoppel. Kenneco's state court fraud claim necessarily involves proof that a representation was made, and that that representation was false. Although Kenneco never contended that Anderson or J & H _mis_-represented coverage in the federal courts, Kenneco did contend that Anderson made certain representations regarding lost profits coverage, and the federal courts rejected that contention. In fact, the Second Circuit specifically characterized the issue being decided as "whether the London underwriters were bound by the alleged _representations_ of J & H, a Houston broker, that the insurance would cover lost profits." _Armada Supply,_ 858 F.2d at 851 (emphasis added). Even Kenneco's own brief states that "Kenneco offered evidence concerning representations made by Anderson of [J & H] as to the extent of coverage" for lost profits. Thus, insofar as Kenneco's fraud claim is based on an alleged representation by Anderson that Kenneco's lost profits were covered, the claim is barred **\*525** by the federal courts' conclusion that no such representation was made.

However, Kenneco's allegation that Anderson knowingly or recklessly represented that Kenneco "was fully insured for any loss to which the Brazilian underwriters did not respond under the 'contingency' clause" is not barred because that issue was not decided in the federal suit. The federal courts made no findings that would preclude a verdict in favor of Kenneco on this claim, and the jury's findings are not inconsistent with the federal courts' findings.

### C. Full and Fair Litigation

[17] Kenneco argues that the federal court's findings should not be afforded preclusive effect because of the alignment of the parties in the federal action. Kenneco asserts that it had no real incentive in the federal action to develop testimony against J & H, because J & H was participating on Kenneco's behalf. Thus, according to Kenneco, there was no full and fair litigation of issues relating to J & H's conduct, and the alignment of the parties created a situation in which J & H's conduct was not rigorously considered.

J & H responds that the alignment of the parties should not negate the collateral estoppel effect of the federal court's findings. J & H admits that it assisted Kenneco in asserting its claim against the London underwriters, and even testified on Kenneco's behalf in federal court as to how the claim should be adjusted. However, J & H claims it did not align itself with Kenneco concerning the events of the November 30 meeting. J & H asserts that the issue of what occurred at the meeting and what Anderson said or did was "drawn" through the conflicting testimony of Anderson and Brown and through the dispute over that issue between Kenneco and the London underwriters.

We agree with J & H and hold that J & H's involvement in the prior action as a witness on behalf of Kenneco does not extinguish the collateral estoppel effect of the federal court's findings. There would be no question as to the preclusive effect of those findings had J & H not participated in the prior action. Kenneco's argument that it had no incentive to litigate against J & H fails because that is not the test: the proper inquiry is whether Kenneco had incentive to litigate the *issue* of Anderson's

representations regarding lost profits coverage at the November 30 meeting. *See Sysco Food Servs., Inc. v. Trapnell,* 890 S.W.2d 796, 802 (Tex.1994) ("When the issue is properly identified, it becomes clear that this issue was fully and fairly litigated in the federal action."). Kenneco had every incentive to prove that Anderson made the alleged representations concerning increased value coverage; Kenneco's recovery for lost profits in the federal coverage suit depended upon such a finding. What Anderson said regarding lost profits coverage was fully aired in the federal courts through the testimony of Brown and Anderson and through the conflicting positions of Kenneco and the London underwriters regarding those representations. *See Armada Supply,* 665 F.Supp. at 1050 ("London underwriters ... den[y] that Johnson & Higgins purported to make such an agreement."). Thus, the issue of what Anderson said at the November 30 meeting was fully and fairly litigated in the federal courts.

[18] Kenneco also argues that collateral estoppel should not apply because the "procedural opportunity" of a jury trial was unavailable in the New York action, citing Federal Rule of Civil Procedure 38(e). The mere fact that Kenneco could not avail itself of this opportunity does not, in and of itself, preclude an application of defensive collateral estoppel. Further, the United States Supreme Court has previously rejected the position that collateral estoppel violates a party's Seventh Amendment right to a trial by jury. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 333–37, 99 S.Ct. 645, 652–55, 58 L.Ed.2d 552 (1979). While the question remains open as a matter of Texas constitutional law, *see Sysco Food Servs.,* 890 S.W.2d at 801 n. 7, Kenneco has not raised any argument under the Texas Constitution in this Court, and therefore we will not consider the question. *See Tilton v. Marshall,* 925 S.W.2d 672, 677 n. 6 (Tex.1996).

### *526 IV. DISPOSITION

[19] After application of J & H's limitations and collateral estoppel defenses, Kenneco's remaining jury awards include fraud ($1,500,000.00) and breach of contract ($412,273.66), both of which relate to the contingency coverage issue. When a prevailing party does not elect a measure of damages

from among alternative measures, courts should render judgment based on the finding affording the greatest recovery. *Birchfield v. Texarkana Memorial Hosp.,* 747 S.W.2d 361, 367 (Tex.1987). Although the fraud claim provides the greatest recovery, Kenneco is not entitled to recover on the jury's fraud award because there is no evidence to support the jury's finding that J & H knowingly or recklessly misrepresented Kenneco's contingency coverage.

### A. Fraud

[20] The contingency coverage provisions in Kenneco's insurance policy provided that "where the Assured purchase goods on C.I.F. terms and sell on C.I.F. terms, but wish to give their buyer a certificate for their Sales Price ... they may issue certificates for the full value hereunder." Thus, the contingency coverage policy language required a C.I.F. purchase and a C.I.F. sale. Kenneco contends that Anderson, on behalf of J & H, committed fraud by representing on November 30 that the contingency coverage applied even though Brown had informed Anderson that the sale to Sun was on a delivered basis, not C.I.F. J & H responds that, even if Anderson misrepresented the contingency coverage, there is no evidence that he made the misrepresentation knowingly or recklessly. According to J & H, Anderson was, at worst, negligent.

[21] [22] A statement is not fraudulent unless the speaker knew it was false when made or the speaker made it recklessly without knowledge of the truth. *Prudential Ins. Co. v. Jefferson Assocs.,* 896 S.W.2d 156, 163 (Tex.1995). Proof that a defendant made a statement knowing of its falsity or without knowledge of its truth may be proved by direct or circumstantial evidence. *See Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435 (Tex.1986).

The evidence of the events surrounding the November 30 meeting is as follows: Brown visited J & H's offices to discuss insurance coverage for the tanker cargo, already en route from Rio de Janeiro to New York. Kenneco's normal account representative was on vacation, so Brown met with Anderson, a cargo claims adjuster. Anderson testified that, because he was not familiar with the language of the contingency coverage provision, he obtained a copy of Kenneco's policy and read the provision aloud at the meeting, including the language requiring back-to-back C.I.F. sales. Brown testified that she clearly informed Anderson that the sale to Sun was on a delivered basis, and that Anderson told her that the contingency coverage applied nonetheless. Anderson admitted telling Brown that Kenneco had contingency coverage, but testified that Brown had incorrectly informed him that Kenneco's deal was back-to-back C.I.F., which would trigger contingency coverage. Anderson's contemporaneous notes of the meeting reflected that Kenneco's purchase was C.I.F., but the notes were silent regarding the sale to Sun. Anderson testified that December 22, 1982, when Brown sent documentation reflecting that the Sun sale was delivered, was the first time he was informed that the sale to Sun was not C.I.F. Despite that knowledge, Anderson did not inform Kenneco or the London underwriters of the potential problem with contingency coverage. Instead, he calculated the premium and billed Kenneco even though he admittedly knew at that time that coverage was "highly improbable." Anderson testified that J & H billed Kenneco for the premium to avoid difficulty in processing a claim for lack of payment, and that J & H at all times advocated to the London underwriters that there was contingency coverage.

Construing the evidence in the light most favorable to Kenneco and disregarding all contrary evidence and inferences, *see Havner v. E–Z Mart Stores, Inc.,* 825 S.W.2d 456, 458 (Tex.1992), we conclude that although Anderson did in fact misrepresent Kenneco's coverage, there is no evidence that he made the misrepresentation knowingly or recklessly. Clearly Kenneco has provided no direct **\*527** evidence, such as Anderson's notes or a memorandum, indicating that Anderson intentionally or recklessly misled Brown and Kenneco. Thus, Kenneco's claim must be supported, if at all, by circumstantial evidence. But there is no circumstantial evidence that Anderson knowingly misrepresented the coverage. Brown herself discounted such a theory, testifying that "[i]n retrospect I believe that [Anderson] didn't appreciate the difference [between a C.I.F. sale and a delivered sale]." Further, there is no evidence to support a motive for Anderson to intentionally misrepresent the coverage. In contrast, Anderson testified that, had he obtained coverage other than the existing contingency coverage, J & H would have received a

better premium. Thus, there is no evidence that Anderson acted knowingly.

[23] Further, there is no evidence that Anderson recklessly misrepresented the coverage. A speaker acts recklessly if he makes representations "without any knowledge of the truth and as a positive assertion." *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 222 (Tex.1992). In other words, a representation is recklessly made if the speaker knows that he does not have sufficient information or basis to support it, *Trenholm v. Ratcliff,* 646 S.W.2d 927, 933 (Tex.1983), or if he realizes that he does not know whether or not the statement is true. *Custom Leasing, Inc. v. Texas Bank & Trust Co.,* 516 S.W.2d 138, 142 (Tex.1974) (citing Restatement of Restitution § 8 (1957)). This standard might apply if Anderson, with no familiarity of the policy language, had told Brown that the coverage applied without consulting the policy itself. It is undisputed that that is not the case. Anderson realized his ignorance of the policy language, and obtained a copy of the policy and read it over with Brown in an effort to answer her concerns. *See Jauregui v. Jones,* 695 S.W.2d 258, 263–64 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.) (finding no fraud when defendant made investigation before making assertion). Thus, the evidence does not indicate that Anderson made the representation "without any knowledge of the truth." At most, it establishes that Anderson should have known that his representations may have been incorrect; such evidence, however, is akin to negligent misrepresentation, not fraud. *See Federal Land Bank Ass'n v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991) (standard for negligent misrepresentation is that defendant "did not exercise reasonable care or competence in obtaining or communicating the information").

Lastly, we do not believe that Anderson's conduct weeks after the loss occurred constitutes evidence that he acted fraudulently at the November 30 meeting. Taking all reasonable inferences favorable to Kenneco, Anderson's conduct establishes, at most, that he was reluctant to admit his mistake. That is not evidence of fraud.

**B. Breach of Contract**

[24] J & H also challenges the legal sufficiency of the jury's award for breach of contract to secure contingency coverage. Specifically, J & H argues that there is no evidence that it agreed to secure contingency coverage. We hold that there is some evidence to support the jury's finding, and therefore Kenneco is entitled to judgment on this claim.

Both Anderson and Brown testified that Brown went to J & H on November 30, 1982 seeking, among other things, insurance against the possibility that the Brazilian underwriters would not pay on a claim by Kenneco. Brown testified several times that she told Anderson that the transaction for which the additional insurance was sought "was a C.I.F. purchase and a delivered sale."

Brown further testified that:

> [T]he end result was he [Anderson] agreed that it [the additional coverage] would cover exactly what we were looking for, the type of purchase we had and type of sale we had. He knew I told him that it was a delivered sale, so that he was well aware that it was not a C.I.F. back-to-back but was a purchase sale.

When asked whether she was "telling the Court and jury that when you left Johnson and Higgins you were convinced that you had the protection that you went there specifically to get," Brown succinctly and unequivocally testified: "Without a doubt." J & H **\*528** charged, and Kenneco paid, a premium for this insurance.

Anderson testified that he sold Brown contingency coverage and told her he would make the declarations. He further agreed that he would have expected her to believe that she had contingency coverage after the meeting, and that it was possible for him to convince the underwriters to grant coverage for the sale even were it not back-to-back C.I.F.

Although Anderson claims that Brown indicated to him that the transaction was C.I.F. back-to-back, Brown explained that "on a back-to-back transaction, Armada [Kenneco] would never have

any risk at all," and consequently no need for the contingency coverage which Anderson actually procured for Kenneco. Either Anderson sold Kenneco insurance that it did not need; or, contrary to his later position, he actually agreed to sell Kenneco the additional coverage that Brown claims she requested.

This is legally sufficient evidence to support the jury's verdict. Therefore, Kenneco is entitled to recover on its claim for breach of contract to secure contingency coverage, in the amount of $412,273.66.

## V. PREJUDGMENT INTEREST

[25] [26] We next consider the proper method of calculating prejudgment interest under *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 552 (Tex.1985). Prejudgment interest is "compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Id.* at 552 (citing McCormick, *Damages,* § 50 (1935)); *see also* Tex.Rev.Civ. Stat. art. 5069–1.01(a). There are two legal sources for an award of prejudgment interest: (1) general principles of equity and (2) an enabling statute. *Cavnar,* 696 S.W.2d at 552; *Phillips Petroleum Co. v. Stahl Petroleum Co.,* 569 S.W.2d 480, 483–85 (Tex.1978).

J & H argues that any award of prejudgment interest in this case is governed by Tex.Rev.Civ. Stat. article 5069–1.05, section 6, or, alternatively, that we should defer to the policy underlying section 6 even if it does not expressly apply. Kenneco argues that *Cavnar* controls this case and that general principles of equity govern the award of prejudgment interest. We hold that this case is governed by the common law rather than by statute; however, we conform *Cavnar*'s common-law rule with the legislative policy established by section 6.[9]

In *Cavnar,* this Court overruled eighty-eight years of judicial precedent and adopted a rule allowing recovery of prejudgment interest on personal injury, wrongful death, and survival actions. *See generally*

Cloud, Note, *Cavnar v. Quality Control Parking, Inc.*: *Prejudgment Interest is Now Recoverable in Personal Injury, Wrongful Death and Survival Action Cases,* 38 Baylor **529** L.Rev. 385 (1986). The decision to extend prejudgment interest recovery to such cases was driven primarily by the rationale that awarding prejudgment interest was necessary to fully compensate injured plaintiffs. *Cavnar,* 696 S.W.2d at 552.

*Cavnar* established that a prevailing plaintiff may recover prejudgment interest, compounded daily (based on a 365–day year), on damages that accrued by the time of judgment. *Id.* at 554. The starting date for accrual of prejudgment interest on claims governed by *Cavnar* was "six months after the occurrence of the incident giving rise to the cause of action,"[10] and the rate of interest was to be computed under Tex.Rev.Civ. Stat. article 5069–1.05, section 2[11] on the date of judgment. *Cavnar,* 696 S.W.2d at 554. *Cavnar* involved claims for personal injury, but its application has been expanded to non-personal injury scenarios. *See, e.g., Perry Roofing Co. v. Olcott,* 744 S.W.2d 929, 930 (Tex.1988) (breach of contract action for damages unascertainable from contract); *Rio Grande Land & Cattle Co. v. Light,* 758 S.W.2d 747, 748 (Tex.1988) (same); *City of Houston v. Wolfe,* 712 S.W.2d 228, 229 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd) (eminent domain).

In fashioning its prejudgment interest rule, the *Cavnar* Court was primarily concerned with advancing two ends: (1) encouraging settlements and (2) expediting both settlements and trials by removing incentives for defendants to delay without creating such incentives for plaintiffs. *Cavnar,* 696 S.W.2d at 554–55; *see also Perry Roofing,* 744 S.W.2d at 930.

In 1987, two years after *Cavnar* was issued, the Texas Legislature passed a comprehensive package of legislation known as "tort reform." *See generally* Sanders & Joyce, *"Off to the Races": The 1980s Tort Crisis and the Law Reform Process,* 27 Houston L.Rev. 207 (1990). Part of the tort reform legislation added section 6 to article 5069–1.05.

Section 6 somewhat codified and modified the

*Cavnar* rule by providing that "[j]udgments in wrongful death, personal injury, and property damage cases must include prejudgment interest." Tex.Rev.Civ. Stat. art. 5069–1.05, § 6(a). However, under this section, the time period during which prejudgment interest accrues is shorter than under *Cavnar.* Instead of beginning six months after the date of the incident, section 6 provides that prejudgment interest generally begins to accrue on the earlier of (1) 180 days after the date the defendant receives written notice of a claim or (2) the day the suit is filed. *Id.* Section 6(g) states that "[t]he rate of prejudgment interest shall be the same as the rate of postjudgment interest at the time of judgment." But, interest "shall be computed as simple interest." *Id.* § 6(g). Section 6 also provided other modifications to the *Cavnar* rule, such as tolling accrual of prejudgment interest as to the amount of a settlement offer during its pendency, allowing a trial court the discretion to order accrual or nonaccrual during periods of delay caused by a defendant or a plaintiff, and allowing prejudgment interest for future damages included in the judgment. *Id.* §§ 6(a)-(d).

[27] J & H takes the position that section 6 's calculation rules apply to all judgments, and therefore apply to any judgment awarded to Kenneco. Kenneco argues that the plain language of section 6 applies only to wrongful death, personal injury, and property damage cases. The courts of appeals have split on this question. *Compare e.g., Kuehnhoefer v. Welch,* 893 S.W.2d 689, 694 (Tex.App.—Texarkana 1995, writ denied) *and Texas Commerce Bank v. Lebco Constructors, *530 Inc.,* 865 S.W.2d 68, 84 n. 13 (Tex.App.—Corpus Christi 1993, writ denied)(holding that statute has application beyond those actions listed) *with Spangler v. Jones,* 861 S.W.2d 392, 397–98 (Tex.App.—Dallas 1993, writ denied); *and H.E. Butt Grocery Co. v. Bay, Inc.,* 808 S.W.2d 678, 680 (Tex.App.—Corpus Christi 1991, writ denied) (holding that statute only applies to actions specifically enumerated). We hold that section 6 means what it says: statutory prejudgment interest applies only to wrongful death, personal injury, and property damage cases.

The Legislature's codification and modification of *Cavnar* did not purport to provide a statutory framework for prejudgment interest in all cases. *See*

*Spangler,* 861 S.W.2d at 398. The limited application of section 6 is evident from the statute's plain language, especially when viewed in the context of other sections of article 5069–1.05. Whereas section 2 provides that interest shall accrue on "all judgments," section 6 provides only that statutory prejudgment interest must be awarded for "[j]udgments in wrongful death, personal injury, and property damage cases." Tex.Rev.Civ. Stat. art. 5069–1.05 §§ 2, 6(a). Further, the Legislature later added section 7, which specifically allows for prejudgment interest in condemnation cases. *Id.* § 7. Surely if section 6 were applicable to all judgments, the addition of section 7 would have been superfluous.

[28] Given that section 6 is expressly limited to wrongful death, personal injury, and property damage cases, we must next determine whether Kenneco's claims fall within any of those categories. Clearly the only potentially applicable category would be property damage. We have concluded that Kenneco is entitled to recover only on its breach of contract claim. Although the contract concerned insurance coverage for damages to Kenneco's property by a third party, Kenneco does not base its suit on that property damage. Instead, Kenneco's claims are for purely economic losses stemming from J & H's breach of contract to secure contingency coverage. Such claims do not fall within the scope of "property damage cases," which only include claims for damage to tangible property, not economic loss or loss of economic opportunity. *See Spangler,* 861 S.W.2d at 398; *Associated Telephone Directory Publishers, Inc. v. Five D's Publishing Co.,* 849 S.W.2d 894, 900 (Tex.App.—Austin 1993, no writ); *Ralston Purina Co. v. McKendrick,* 850 S.W.2d 629, 633 (Tex.App.—San Antonio 1993, writ denied). Thus, section 6 does not apply to this case, and any award of prejudgment interest is governed by the common law.

J & H argues that, even if section 6 does not expressly apply, this Court should adopt the Legislature's views, expressed in its enactment of section 6, concerning the appropriate balancing of interests. Specifically, J & H argues that this Court could follow the policy of section 6 and hold that, under the common law, prejudgment interest should begin to accrue on the earlier of 180 days after a defendant receives written notice of a claim or the

day suit is filed, and that it should be calculated as simple interest. Kenneco responds that *Cavnar* requires both daily compounding and accrual beginning six months after the occurrence giving rise to the cause of action. *Cavnar,* 696 S.W.2d at 554–55.

[29] When the Court decided *Cavnar,* there was no statute governing prejudgment interest. *See* Act of May 8, 1967, 60th Leg., R.S., ch. 274, § 2, 1967 Tex. Gen. Laws 608, 610; Tex.Rev.Civ. Stat. art. 5069–1.05 (Vernon 1987). Thus, the *Cavnar* Court fashioned its rule without the guidance of legislative policy. The enactment of section 6 involved many of the same policy concerns underlying the decision in *Cavnar.* Section 6 is a "trade-off provision," effectuating some of the goals of tort reform while preserving the availability of prejudgment interest under *Cavnar,* and even expanding the scope of recoverable interest to include future damages awarded as part of the judgment. *C & H Nationwide, Inc. v. Thompson,* 903 S.W.2d 315, 326–27 (Tex.1994) (citing Montford & Barber, *1987 Texas Tort Reform: The Quest for a Fairer and More Predictable Texas Civil Justice System,* 25 Houston L.Rev. 59, 102 (1988)). Section 6 works as a "system of rewards and penalties" intended to encourage settlements. **\*531** *C & H Nationwide,* 903 S.W.2d at 326. This Court has recognized the importance of such a goal, and today we adopt the Legislature's approach to effectuating that goal. *See Owens–Illinois, Inc. v. Estate of Burt,* 897 S.W.2d 765, 769 (Tex.1995) (adopting a prejudgment interest accrual rule for latent-injury cases "consistent with the prejudgment interest statute"); *cf. Smith v. Merritt,* 940 S.W.2d 602, 604–05 (Tex.1997) (fashioning a common-law social host liability rule in accordance with legislative policy of Dram Shop Act). We adopt the Legislature's approach to prejudgment interest and hold that, under the common law, prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed. *See* Tex.Rev.Civ. Stat. art. 5069–1.05, § 6(a).

[30] Applying these time frames, Kenneco argues that December 15, 1986, the date the tolling agreement was signed, is the equivalent of the date of suit, and therefore should be the date of accrual. We disagree. The tolling agreement is not a lawsuit,

nor did it provide that it would be considered the date of suit for any purpose.

Alternatively, Kenneco argues that prejudgment interest began to accrue on June 13, 1987, 180 days from the date the tolling agreement was signed. J & H counters that interest did not begin to accrue until April 15, 1988, 180 days after J & H received Kenneco's DTPA notice letter. Thus, we must determine whether the standstill agreement constitutes "written notice of a claim" that triggers accrual of prejudgment interest.

The standstill agreement plainly says that "Kenneco asserts that, to the extent underwriters are found not to be liable [in the federal action] ..., J & H is liable to Kenneco for the amounts which Kenneco has claimed under the Policy." We hold that the agreement constitutes "written notice of a claim." A "claim" is "a demand for compensation or an assertion of a right to be paid." *See Robinson v. Brice,* 894 S.W.2d 525, 528 (Tex.App.—Austin 1995, writ denied); *see also* Black's Law Dictionary 247 (6th ed.1991) (a "claim" is a "demand for money or property as of right"). Through the standstill agreement, J & H received written notice that Kenneco was claiming a right to compensation. *See Robinson,* 894 S.W.2d at 529 (claimant not required to demand exact amount or list every element of damage). Moreover, J & H had sufficient information at that time to obtain a settlement without incurring any prejudgment interest at all. *See Owens–Illinois, Inc. v. Estate of Burt,* 897 S.W.2d 765, 769 (Tex.1995) ("[A] defendant must have notice and an opportunity to settle a claim in order to advance *Cavnar*'s objective of expedited settlements.").

[31] The purpose of a standstill agreement is normally to maintain the status quo and temporarily suspend or stop all aspects of a suit. In most circumstances, this would operate to toll the accrual of prejudgment interest while the agreement is in effect. However, parties to a standstill agreement may contractually provide otherwise.

The standstill agreement in this case expressly preserves all of Kenneco's rights and all of J & H's liabilities. The terms of the agreement provide: "The

period between December 15, 1986 and the date when 30 days shall have elapsed following the final determination of the New York Action ... shall not be counted for purposes of the statute of limitations, laches or any other defense which may be asserted in any subsequent action." The agreement continues, "Except as expressly provided [in the previous sentence], nothing in this agreement, or the recitals set forth herein, shall prejudice, influence or in any way affect any rights, liabilities, defenses, counterclaims or setoffs which may be asserted by either party hereto in this or any other proceeding." Thus, the standstill's application is narrow—it applies only to limitations, laches, and other defenses. All of Kenneco's rights, which include prejudgment interest, were expressly reserved.[12] Thus, prejudgment interest accrued **\*532** beginning 180 days from the date the standstill agreement was signed.

[32] We further hold that prejudgment interest accrues at the rate for postjudgment interest and it shall be computed as simple interest. *See* Tex.Rev.Civ. Stat. art. 5069–1.05, § 6(g). There has been much confusion among Texas courts regarding how prejudgment interest should be calculated in cases following *Cavnar. Crum & Forster, Inc. v. Monsanto Co.,* 887 S.W.2d 103, 153 (Tex.App.—Texarkana 1994, writ dism'd by agrmt).* Although the majority of appellate court cases have held that equitable prejudgment interest awards should be compounded daily, even after the enactment of section 6, *see, e.g., Spangler,* 861 S.W.2d at 398–99; *Shell Pipeline Corp. v. Coastal States Trading, Inc.,* 788 S.W.2d 837, 848–49 (Tex.App.—Houston [1st Dist.] 1990, writ denied), we hold that equitable prejudgment interest should be computed in accordance with the legislative policy supporting section 6. The Legislature expressly provided that statutory prejudgment interest shall be computed as simple interest. Tex.Rev.Civ. Stat. art 5069–1.05, § 6(g). We will follow the Legislature's lead and hold that equitable prejudgment interest shall be computed as simple interest.

Adoption of the statutory approach to prejudgment interest continues to promote the policy goals underlying the *Cavnar* decision. For example, the accrual rule of section 6 effectively encourages settlements without creating incentives for plaintiffs

to delay. In contrast to section 6, where interest begins to accrue 180 days after a defendant receives notice of the claim or the claim is filed, *Cavnar* interest begins to accrue 180 days after the occurrence giving rise to the claim, regardless of whether a defendant knows of the claim. Allowing plaintiffs to accrue prejudgment interest even before the defendant becomes aware of the claim is at odds with the principle we recognized in *Owens–Illinois, Inc. v. Estate of Burt,* 897 S.W.2d 765, 769 (Tex.1995), that "[o]bviously, a defendant must have notice and an opportunity to settle a claim in order to advance *Cavnar*'s objective of expedited settlements and trials."

In *Estate of Burt,* the *Cavnar* accrual rule required an exception in cases of latent injury because the date of the occurrence of the incident giving rise to the cause of action was often difficult to determine. In adopting an accrual date beginning when a defendant receives notice or suit is filed, we reasoned that such an accrual rule provides sufficient compensation for plaintiffs, establishes a definite date for accrual to begin, encourages expedited settlements and trials, and removes incentives for defendants to delay without creating such incentives for plaintiffs. *Id.* at 769. Section 6—and, now, the new common law rule—effectively serve each of those policy goals even when the date of accrual of the cause of action can be readily determined.

Applying the computation rules of section 6 to the common law also serves the goal of compensating plaintiffs, without overcompensating them or simultaneously punishing defendants. Although the rate of prejudgment interest is the same under *Cavnar* and section 6, *Cavnar*'s daily compounding allows plaintiffs far greater recovery than under section 6. It is not uncommon for *Cavnar* prejudgment interest awards to greatly exceed the amount of the actual judgment, as is true in this case where the actual damages awarded were $1,972,273.66 and the prejudgment interest award was $2,750,952.39. Further, *Cavnar* often allows for a larger recovery of interest than the plaintiff could have received by investing the money himself, thereby overcompensating the plaintiff. The computation rules of section 6 serve to more **\*533** accurately reflect the damages incurred by the plaintiff for the lost use of money.

Finally, conforming the common law to legislative policy serves the important goal of restoring uniformity to the law of prejudgment interest. In *Cavnar,* we reasoned that "[t]he time has come to revise the prejudgment interest rule ... and restore equity and symmetry to this area of the law." *Cavnar,* 696 S.W.2d at 553–54. Given the Legislature's enactment of section 6, that time has come again. *Cavnar* was a wrongful death case and, by its express language, applied to personal injury, wrongful death, and survival action cases. *Id.* Thus, while *Cavnar*'s application has expanded beyond those specific causes of action, it is the context of those causes of action in which the rule was fashioned. The enactment of section 6, however, precludes the application of *Cavnar* to some of those very claims, if they accrue after September 2, 1987. The result is that section 6 applies one rule to personal injury, wrongful death, and property damage cases, while *Cavnar* applies a different rule, and only in cases *not* involving personal injury, wrongful death, and property damage. Such a result is as illogical as it is arbitrary, and is therefore no longer the law in Texas.

Our common law prejudgment interest holding applies to all cases in which judgment is rendered on or after December 11, 1997, and to all other cases currently in the judicial process in which the issue has been preserved.

\* \* \* \* \*

We conclude that limitations bars Kenneco's negligence and Insurance Code claims and that there is no legally sufficient evidence to support Kenneco's fraud claim concerning contingency coverage. We further hold that collateral estoppel bars all of Kenneco's claims concerning an alleged agreement to secure lost profits coverage and the related fraud claims. We sustain, in part, J & H's point of error regarding the calculation of prejudgment interest. We overrule J & H's other points of error.

Therefore, we conclude that Kenneco is entitled to recover $412,273.66 from J & H on its claim for breach of contract to secure contingency coverage, plus attorney's fees in the amount of $300,000 as

stipulated by the parties. Kenneco is also entitled to recover prejudgment interest on its $412,273.66 breach of contract award, calculated as simple interest, accruing beginning 180 days from December 15, 1986, as well as postjudgment interest and costs as allowed by law. We accordingly modify the judgment of the court of appeals and remand the cause to the trial court for the calculation of the amount of prejudgment interest and for rendition of judgment in accordance with this opinion.

HECHT, Justice, filed a dissenting opinion, in which GONZALEZ and OWEN, Justices, join, and in Part II of which SPECTOR, Justice, joins.

HECHT, Justice, dissenting.

I do not disagree with the Court that prejudgment interest awards on common law contract claims should be guided by legislated policies for prejudgment interest on wrongful death, personal injury, and property damage claims. No good reason is advanced for having different prejudgment interest rules for different kinds of claims. In deference to the Legislature's adoption of a rule for some cases, it is appropriate for the common law to apply the same rule in other cases. I do disagree with the Court's holding that prejudgment interest should accrue during a period when the parties have agreed to take no action. Neither of the two purposes of prejudgment interest—encouraging prompt settlements and discouraging delay by defendants—can be served when parties agree to allow *the plaintiff* to delay deciding whether to file suit. The Court's argument that the plaintiff in this case reserved by agreement a right to prejudgment interest that it would not have had otherwise—in other words, that the defendant contracted to pay prejudgment interest for plaintiff's delay in filing suit—can hardly be taken seriously.

But I would not reach the prejudgment interest issue because I conclude that Kenneco Energy, Inc. (formerly Armada Supply Inc.) is not entitled to judgment against Johnson & Higgins of Texas, Inc. on any **\*534** claim Kenneco asserts. I agree with the

Court that Kenneco's negligence claim is barred by limitations,[*] that there is no evidence to support Kenneco's fraud claim, and that Kenneco's claims for breach of contract based on Johnson & Higgins' failure to obtain lost profits coverage are precluded by findings in *Armada Supply Inc. v. Wright,* 665 F.Supp. 1047 (S.D.N.Y.1987), *aff'd in part and rev'd in part,* 858 F.2d 842 (2d Cir.1988). Contrary to the Court, however, I would hold that Kenneco's contract claims for Johnson & Higgins' failure to obtain contingency coverage are also precluded by the federal court's findings. Thus, I would render judgment for Johnson & Higgins.

Accordingly, I respectfully dissent.

**I**

Kenneco bought fuel oil from Petrobras in Rio de Janeiro for resale to Sun Oil Trading Corp. in New York. Kenneco's purchase price was the market value of the oil upon arrival in New York harbor. The resale to Sun was at a fixed contract price, which Kenneco hoped would be higher than the prevailing market price at the time of delivery. Kenneco's purchase was on a C.I.F. basis, meaning that although Kenneco took title to the oil in the Brazilian port, Petrobras was obliged to insure the oil during its voyage to New York. Kenneco's resale of the oil was not on a C.I.F. basis, so that it had no obligation to Sun Oil to insure the cargo during shipment. But while the oil was en route, a steep and steady decline in the fuel oil market moved Kenneco to obtain additional insurance to protect what appeared would very likely be a very substantial profit from the resale to Sun.

Kenneco's concerns were two. Petrobras had provided insurance from Brazilian underwriters for 110% of the purchase price, but because the purchase price was tied to the market, as the market fell, so did the amount of insurance, leaving a large part of the potential value of the oil at resale—and almost all of Kenneco's profits—uninsured. Kenneco sought to insure the oil at Sun's higher contract price. Kenneco was also concerned that the Brazilian underwriters might fail to pay a claim and so sought insurance against that contingency. Through its insurance broker, Johnson & Higgins, Kenneco

sought assurance that its marine insurance policies issued by London underwriters would provide both increased value coverage and contingency coverage.

When the ship arrived in New York, the cargo was found to be contaminated, and some of it had been lost. Sun canceled the contract, and eventually Kenneco sold some of the oil at a reduced price. The London and Brazilian underwriters disputed Kenneco's claims, so Kenneco sued them—but not Johnson & Higgins—in the United States District Court for the Southern District of New York. In essence, the London underwriters contended that the increased value coverage applied only to damages from the destruction of the oil and not to damages from Sun's cancellation of the contract, and that the contingency coverage applied only if Kenneco's purchase and resale were both on C.I.F. terms, and its sale to Sun was not. Kenneco argued that Johnson & Higgins had agreed to provide Kenneco with the coverage it claimed, and that because Johnson & Higgins was the London underwriters' agent, the underwriters were bound by that agreement.

The federal district court's finding that Johnson & Higgins was not the London underwriters' agent was sufficient reason to deny Kenneco's claims, but the court went further. It also found, in the words of the Second Circuit on appeal, that Kenneco "did *not* ask for, nor did [Johnson & Higgins] agree to, coverage on lost profits" as Kenneco contended. *Armada,* 858 F.2d at 851. This Court holds, and I agree, that because the federal district court's findings of no agency and no agreement regarding increased value coverage were both affirmed **\*535** on appeal, relitigation of either is barred by collateral estoppel. Restatement (Second) of Judgments § 27 cmt. o (1982). But contrary to the Court, I believe a fair reading of the federal district court's opinion shows that it also found that Johnson & Higgins did not agree to provide the contingency coverage Kenneco requested, and that finding, too, was affirmed on appeal.

The federal district court found that Johnson & Higgins' representative, Anderson, did not know because Kenneco's representative, Brown, did not tell him that Kenneco's sale to Sun was not on C.I.F. terms. Specifically, the federal district court found:

• "She [Brown] did not state what she told Anderson about whether the Sun contract was or was not C.I.F." *Armada,* 665 F.Supp. at 1059.

• "As to the question of coverage under the contingency clause, Anderson understood Brown to say that both the Petrobras–Armada sale and the Armada–Sun sale were C.I.F. sales. As already stated, this was contrary to the fact." *Id.* at 1061.

• "It is important to note that [it was not until after the meeting between Brown and Anderson and after the dispute arose], according to evidence in this case, that Armada had affirmatively stated that the sale to Sun was on a delivered, rather than a C.I.F. basis." *Id.* at 1062.

Anderson could not have agreed to provide contingency coverage despite the fact that the sale to Sun was not on C.I.F. terms when, as the federal court found, Anderson understood from what Brown told him that the sale to Sun *was* on C.I.F. terms. In other words, Anderson could not have agreed to provide coverage he did not even know was being requested. Thus, the federal district court found that "Johnson & Higgins did not clearly understand the situation and mistakenly billed Armada for a premium for contingency coverage." *Id.* at 1062. The Second Circuit approved this finding. *Armada,* 858 F.2d at 851 ("The evidence indicates that [Johnson & Higgins] mistakenly billed Armada for this coverage...."). If Johnson & Higgins did not understand that Kenneco was requesting coverage even though the sale to Sun was not on C.I.F. terms, it could hardly have agreed to provide such coverage.

A simpler example makes the point clearer. Suppose a person wants an automobile policy that applies throughout Mexico, but he does not tell the agent, and the agent understands from what the person says that the car will not be operated in Mexico. The agent procures a policy that clearly limits coverage to operations in the United States. When the insured is involved in an accident in Mexico City, how can he successfully claim that the agent agreed to provide coverage? Once it is established that the agent did not know the automobile would be operated in Mexico, that fact precludes an agreement to provide such coverage.

The federal district court expressly found that Kenneco did not tell Johnson & Higgins that it wanted contingency coverage for a transaction that did not involve back-to-back sales on C.I.F. terms, Johnson & Higgins understood from Kenneco that the transaction *did* involve back-to-back sales on C.I.F. terms, and Johnson & Higgins provided an insurance certificate that clearly conditioned coverage on back-to-back sales on C.I.F. terms. These facts having been determined, Johnson & Higgins cannot be said to have agreed to provide the contingency coverage Kenneco claims it wanted, or to have represented that it would provide such coverage. Had the federal district court concluded otherwise, it would not have been necessary to address, as it did, Kenneco's argument that the back-to-back C.I.F. requirement was waived.

Kenneco had full opportunity to litigate in its federal suit whether Johnson & Higgins agreed to provide contingency coverage applicable in Kenneco's circumstances. It could not prevail on its claim against the London underwriters without proving either a representation by Johnson & Higgins that it would obtain the coverage, or a waiver of the back-to-back C.I.F. sales requirement. Having lost on both grounds, it should not be allowed to relitigate the issue in Texas.

**II**

"The purpose of a standstill agreement," the Court explains, "is normally to maintain **\*536** the status quo and temporarily suspend or stop all aspects of a suit. In most circumstances, this would operate to toll the accrual of prejudgment interest while the agreement is in effect." *Ante* at 531. Prejudgment interest encourages early settlements and discourages delay by defendants. Obviously, a plaintiff who wishes to maintain the status quo can hardly complain of a defendant's delay or failure to settle. A plaintiff should not be entitled to prejudgment interest for a delay he has requested and agreed to.

The Court nevertheless holds that Kenneco should recover prejudgment interest while the standstill agreement was in effect because Johnson & Higgins contracted to pay interest during such period. One would naturally think that if anyone should pay for a delay in the running of limitations requested by the plaintiff, it should be the plaintiff. While it is certainly possible that a defendant might agree not only to delay the running of limitations but also to pay a plaintiff interest for that delay, no reason for such an agreement suggests itself, and the Court supplies none. The Court's position is simply that by the language of their agreement, Johnson & Higgins agreed to pay Kenneco prejudgment interest for the delay Kenneco requested, strange as that may seem. The only language to which the Court points is this:

> Except as expressly provided, nothing in this agreement, or the recitals set forth herein, shall prejudice, influence or in any way affect any rights, liabilities, defenses, counterclaims or setoffs which may be asserted by either party hereto in this or any other proceeding.

By this language both parties attempted to preserve their rights. Since as a general rule, according to the Court, a defendant would not owe prejudgment interest while a standstill agreement was in effect, Johnson & Higgins should have preserved its right not to pay interest for that period, and Kenneco had no right to interest to be preserved. The Court simply changes the phrase, "which may be asserted by *either party* ", to "which may be asserted by Kenneco". Misconstrued, the language does not preserve each party's rights but gives Kenneco more rights than it would otherwise have had and takes away a right of Johnson & Higgins'.

Had the quoted sentence been omitted, the Court would hold that Kenneco had no right to prejudgment interest during the period of the standstill agreement:

> That "right" [not to pay prejudgment interest during a standstill period], which may exist under a general stipulation, was eliminated because the stipulation protected the full scope of Kenneco's rights and J & H's liabilities.

*Ante* at 531 n. 12. That is, Johnson & Higgins'

preservation of the full scope of its rights under a standstill stipulation means that it preserved all but one, the right not to pay prejudgment interest during the period. The absurdity of this Orwellian doublespeak and consequent result is lost on the Court.

**Parallel Citations**

41 Tex. Sup. Ct. J. 268

Footnotes

1    Sue and labor expenses are the reasonable expenses incurred by an insured to mitigate its loss and thus reduce the amount to be paid by the underwriter. *Armada Supply,* 858 F.2d at 853.

2    The parties disagree as to whether the claim submitted to the jury is properly characterized as an Insurance Code claim or a DTPA claim. Because we conclude that the claim submitted can be characterized as an Insurance Code claim, *infra* at 517, we will refer to it as such.

3    When a prevailing party does not elect a measure of damages from among alternative measures, the court should render judgment based on the finding affording the greatest recovery. *Birchfield v. Texarkana Memorial Hosp.,* 747 S.W.2d 361, 367 (Tex.1987).

4    *Neeley v. Bankers Trust Co. of Texas,* 757 F.2d 621 (5th Cir.1985), relied on by the court of appeals, is distinguishable because the question submitted in that case at least included the necessary elements of false representation, materiality, and reliance, and did not appear to be submitted as part of some other theory of recovery, whereas Kenneco's question was submitted as part of its Insurance Code/DTPA claim.

5    "Unfair or deceptive act or practice" means any of the following:
(1) Making or causing to be made any statement misrepresenting the terms, benefits, or advantages of an insurance policy.
(2) Making, or directly or indirectly causing to be made, any assertion, representation, or statement with respect to insurance that was untrue, deceptive, or misleading.

(3) Making any misrepresentation relating to insurance. 'Misrepresentation' means any of the following:

(a) any untrue statement of a material fact; or

(b) any failure to state a material fact that is necessary to prevent the statements from being misleading, when these statements are considered in light of the circumstances under which they are made; or

(c) the making of any statement in such manner or order as to mislead a reasonably prudent person to a false conclusion of a material fact.

6    Prior to the 1985 amendment, § 16(d) read: "In an action under this section, damages may not include any damages incurred beyond a point two years prior to the institution of the action." Tex. Ins.Code art. 21.21, § 16(d) (Vernon 1981). This provision has been characterized as an exclusion on damages incurred more than two years before filing of the suit, rather than as a statute of limitations. *Tectonic Realty Inv. Co. v. CNA Lloyd's of Texas Ins. Co.,* 812 S.W.2d 647, 655 n. 4 (Tex.App.—Dallas 1991, writ denied). *But see Johnston v. Barnes,* 717 S.W.2d 164, 165 (Tex.App.—Houston [14th Dist.] 1986, no writ)(applying pre–1985 § 16(d) as a two-year limitations period). J & H admits that "[prior] to 1985, the Texas Insurance Code had no limitations provision, although it did have a provision that limited recoverable damages to those incurred within two years of the date the lawsuit is filed."

7    In *Eagle Properties, Ltd. v. Scharbauer,* 807 S.W.2d 714, 721 (Tex.1990), we declined to decide whether state or federal collateral estoppel law governed the preclusive effect of a prior federal court judgment on a subsequent state court action because the same result would have been reached under either state or federal law.*See also Sysco Food Servs., Inc. v. Trapnell,* 890 S.W.2d 796, 805 (Tex.1994). The same is true in this case. Accordingly, we do not decide the issue today.

8    The Second Restatement states a rule different from that of the First Restatement, which provided that each independently sufficient alternative basis for the prior judgment was a valid estoppel. Restatement (First) of Judgments § 68 cmt. n (1942).

9    Effective September 1, 1997, article 5069–1.05 was codified in Chapter 304 of the Texas Finance Code. *See* Act of May 24,1997, 75 th Leg., R.S., ch. 1008, § 1, 1997 Tex. Sess. Law Serv. 3435. No substantive change in law was intended by the codification. Tex. Fin. Code § 1.001(a); Act of May 24, 1997, 75 th Leg., R.S., ch. 1008, § 7 & preamble, 1997 Tex. Sess. Law Serv. 3091, 3603. It appears that the prejudgment language in the Texas Finance Code was then superseded by the subsequent enactment of similar prejudgment interest language in the Texas Credit Title, Act of June 2, 1997, 75 th Leg., R.S., ch. 1396, § 1, 1997 Tex. Sess. Law Serv. 5212–13. *See* Tex. Gov't Code § 311.031(c) ("The repeal of a statute by a code does not affect an amendment, revision, or reenactment of the statute by the same legislature that enacted the code. The amendment, revision, or reenactment is preserved and given effect as part of the code provision that revised the statute so amended, revised, or reenacted.") & § 311.031(d) ("If any provision of a code conflicts with a statute enacted by the same legislature that enacted the code, the statute controls."). *See also Miller v. State,* 708 S.W.2d 436, 446 (Tex.Crim.App.1984) (holding that amendment to statute controlled when same Legislature amended statute and also enacted a new code that omitted the amendment).

The codification and subsequent reenactment of what has been Tex.Rev.Civ. Stat. article 5069–1.05, section 6 does not modify the legislative policy established by section 6. We believe the legislative underpinnings of section 6 extend to that section's codification in the Texas Finance Code and its subsequent reenactment in the Texas Credit Title.

In any event, at the time the trial court's judgment was rendered in this case, section 6 was the operative provision. As a result, the opinion will refer to section 6 rather than to the Texas Finance Code or the Texas Credit Title.

10   For survival actions, interest accrual was to begin on either the date of death or six months after the injury-causing accident occurred, whichever yielded the larger interest award. *Cavnar,* 696 S.W.2d at 555.

11   Section 2 provided that the interest rate should be computed by "taking the auction rate quoted on a discount basis for 52–week treasury bills issued by the United States government as published by the Federal Reserve Board on the most recent date preceding the date of computation," except that "if the rate so computed is less than 10 percent, the judgment interest rate shall be 10 percent, and if it be more than 20 percent, the judgment interest rate shall be 20 percent." Tex.Rev.Civ. Stat. art. 5069–1.05, § 2 (Vernon 1987). The most recent version of section 2 is virtually identical. *Id.* (Supp.1997).

12   The standstill agreement was silent with regard to prejudgment interest. The parties easily could have included a provision that prejudgment interest would abate during the specified standstill time period. Absent such provision, this court cannot imply one. *Tenneco Inc. v. Enterprise Products Co.,* 925 S.W.2d 640, 646 (Tex.1996).

The dissent distorts our conclusion by stating that we are holding that J & H "*contracted to pay interest* during such period [the period of the standstill]" and that J & H "*agreed to pay Kenneco prejudgment interest* for the delay Kenneco requested." 962 S.W.2d at 534 (emphasis added). The stipulation does not reference interest, prejudgment or otherwise. The agreement does, however, expressly preserve the "rights and liabilities" of the parties. Kenneco has the legal right to prejudgment interest and J & H has the legal liability to pay prejudgment interest—unless otherwise stipulated. Contrary to the dissent, J & H does not have an inherent "right not to pay interest" during the stipulation period. That "right," which may exist under a general stipulation, was eliminated because the stipulation protected the full scope of Kenneco's rights and J & H's liabilities.

*    The Court holds that Kenneco's negligence action accrued when the insurer denied coverage, not when the lack of coverage was finally adjudicated years later. Johnson & Higgins does not argue for a different accrual date. I do not read the Court's opinion to foreclose the position, had it been argued, that Kenneco's negligence claim accrued even earlier, when Johnson & Higgins failed to provide the coverage Kenneco claims it requested, but that limitations was tolled until coverage was denied.

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.



932 S.W.2d 140
Court of Appeals of Texas,
Texarkana.

K MART CORPORATION, Appellant,
v.
Allie Louise RHYNE and Curtis Olin Rhyne, Sr.,
Appellees.
No. 06–95–00042–CV. | June 4, 1996.

Store patron brought negligence action against store in which she fell to floor after tripping over protruding metal plate, and patron's husband sought damages for loss of consortium. The 124th Judicial District Court, Gregg County, Alvin G. Khoury, J., entered judgment for patron and her husband, awarding $190,000 to patron, and $10,500 to husband. Store appealed. The Court of Appeals, Grant, J., held that: (1) sufficient evidence supported determination that store should have known of condition caused by protruding plate; (2) sufficient evidence supported damage award; (3) execution of release to store for medical records provided notice to begin accrual of prejudgment interest; and (4) improper admission of testimony of chiropractor, who was not qualified to testify as to costs of future surgeries, did not warrant reversal.

Affirmed.

West Headnotes (15)

**[1]** **Appeal and Error**
&#128273; Interrogatories and Special Verdicts
**Appeal and Error**
&#128273; Total Failure of Proof

In reviewing no evidence point, Court of Appeals considers only evidence and inferences that tend to support finding, disregarding all evidence and inferences to the contrary; if there is any probative evidence to support finding, Court of Appeals must uphold verdict.

Cases that cite this headnote

**[2]** **Negligence**
&#128273; Buildings and Other Structures

Determination that store had actual or constructive knowledge of condition created by metal plate protruding from floor, in patron's negligence action against store that arose from patron's trip on plate and fall to floor, was supported by evidence that there was observable physical evidence of pipe, broken from metal plate, that extended three inches from floor, and testimony that employee had been working in that area with fork truck, and that it was probable that employee knocked pipe down with fork truck.

1 Cases that cite this headnote

**[3]** **Appeal and Error**
&#128273; Clear or Palpable Weight or Preponderance

In reviewing factual sufficiency challenge, Court of Appeals must examine all of evidence presented at trial and may set aside finding only when it is so contrary to overwhelming weight of evidence as to be clearly wrong and unjust.

Cases that cite this headnote

**[4]** **Damages**
&#128273; Discretion as to Amount of Damages

Jury has broad discretion in assessing amount of damages in personal injury case.

1 Cases that cite this headnote

**[5]** **Damages**
&#128273; Expenses

Recovery for future medical expenses is primarily matter for jury to determine in its discretion.

1 Cases that cite this headnote

**[6]**    **Damages**
    Expenses

Recovery for future medical expenses requires showing that there is reasonable probability that such medical expenses will be incurred in future; expert testimony, however, is not required.

2 Cases that cite this headnote

**[7]**    **Damages**
    Injuries to the Person
    **Damages**
    Medical Treatment and Custodial Care
    **Damages**
    Particular Cases
    **Damages**
    Construction and Operation

Damage award of $190,000 to patron in negligence action against store in which patron tripped over protruding metal plate and fell to floor, was supported by evidence of both past and future physical pain and mental anguish, physical impairment, and medical care, and so jury could have awarded entire amount on basis of past and future pain and suffering, so as to preclude requirement of recovery for future medical expenses, of reasonable probability that such medical expenses would be incurred in future.

3 Cases that cite this headnote

**[8]**    **Damages**
    Physical Suffering and Inconvenience in General
    **Damages**
    Mental Suffering and Emotional Distress

Jury has great discretion in awarding damages in a personal injury case for pain and mental anguish.

Cases that cite this headnote

**[9]**    **Damages**
    Loss of Earnings, Services, or Consortium

Jury has discretion in awarding loss of consortium damages.

Cases that cite this headnote

**[10]**    **Damages**
    Husband and Wife

Damage award of $10,500 for loss of consortium to husband of store patron who brought negligence action against store for injuries she incurred in fall to store floor after trip over metal plate that protruded from floor, was supported by testimony that husband had been under stress from seeing patron in pain, that husband had not been able to sleep with patron since her injury, that husband was required to perform household duties such as cooking and gardening that had previously been performed by patron, and that husband and patron were no longer able to pursue their plans to travel.

1 Cases that cite this headnote

**[11]**    **Appeal and Error**
    Amount of Recovery
    **Appeal and Error**
    Remission of Part of Recovery

In reviewing request for remittitur, proper standard is factual sufficiency; appellate court will examine all of evidence in record to determine whether sufficient evidence supports damage award, remitting only if some portion is so factually insufficient as to be manifestly unjust.

1 Cases that cite this headnote

**[12]** **Interest**
 Form and Sufficiency of Demand

Patron's execution of release to store for her medical records, that indicated that information was to be used for purposes of evaluating and handling patron's claim for injury, was sufficient to give notice to store of patron's claim for compensation for her injuries, and so date of execution of release was date of accrual of prejudgment interest in patron's negligence action against store. Vernon's Ann.Texas Civ.St. art. 5069–1.05, § 6(a).

2 Cases that cite this headnote

**[13]** **Interest**
 Mode of Computation in General

Prejudgment interest awarded in patron's negligence action against store should have been computed as simple interest. Vernon's Ann.Texas Civ.St. art. 5069–1.05, § 6(g).

Cases that cite this headnote

**[14]** **Evidence**
 Damages

Chiropractor was not qualified to testify as to cost of surgeries, and so chiropractor's testimony was improperly admitted in store patron's negligence action against store, to recover damages for injuries patron suffered when she fell to floor after tripping over protruding metal plate. Rules of Civ.Evid., Rule 702.

4 Cases that cite this headnote

**[15]** **Appeal and Error**
 Opinions and Conclusions

Improper admission of testimony of chiropractor in slip and fall negligence action by patron against store, as to cost of future surgeries that patron might need in future, did not warrant reversal of judgment and award of $200,000 for patron, even though jury could have included future medical expenses as part of damage award, since jury could have awarded entire amount to cover pain and suffering, mental anguish, and physical impairment, for which patron had sought $215,000. Rules App.Proc., Rule 81(b)(1); Rules of Civ.Evid., Rule 702.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*141** J. Gene Bailey, Longview, for appellant.

John Graves, Sloan & Price, Longview, for appellees.
Before CORNELIUS, C.J., and GRANT, J.[1]

**OPINION**

GRANT, Justice.

This is a premises liability case in which the appellee, Allie Louise Rhyne, slipped and fell in the appellant's store (K Mart

Corporation) in Longview, Texas, on March 7, 1991. Allie Rhyne and her husband, Curtis Olin Rhyne, brought a negligence suit against K Mart, and the jury awarded damages in the amount of $200,000. Because the jury found K Mart ninety-five percent negligent and Allie Rhyne five percent negligent, her damages were reduced to $190,000. The jury also awarded $10,500 in damages to her husband. Both were also awarded prejudgment interest.[2]

**\*142** On March 7, 1991, Rhyne was shopping in the garden section of the Longview K Mart when she tripped and fell on a three-inch metal plate protruding from the concrete floor. The metal plate on which Rhyne fell was embedded in the middle of the concrete walkway and was used to hold a pipe that ran between the concrete and the fence to stabilize the fence. She blacked out after she fell. When she awoke, she could not move, and her foot was caught underneath the metal plate upon which she had stumbled. After she freed her foot, she crawled several feet and collapsed. Rhyne sustained injuries to her face, neck, and back.

Sharon Moore, the assistant manager on duty at the time of Rhyne's fall, was summoned by another employee. Moore filled out an accident report with Rhyne, listing the cause of Rhyne's fall as "inadequate guard of fence." Moore admitted that the metal plate was a dangerous and hazardous condition and that it was K Mart's responsibility to repair the condition.

Rhyne's husband testified that he has been under stress seeing his wife in pain every day and that the two of them have not slept together since Rhyne's accident. He also testified that he must now perform what were previously his wife's household duties, such as cooking and gardening. Finally, he testified that the two are not able to travel in his retirement years, as they had planned before his wife's injuries.

Dr. Roy Randall Northcutt, a chiropractor, testified that Rhyne has a very limited range of motion in her neck and that her condition is permanent. Dr. Frank R. Jackson, Rhyne's family doctor, testified via videotape that Rhyne will continue to have medical problems in the foreseeable future.

[1] By its first point of error, K Mart contends that the trial court erred in rendering judgment on the verdict because the evidence was legally insufficient to support the jury's answer to question one, which addressed K Mart's negligence. Because K Mart did not have the burden of proof on this issue,

it must demonstrate on appeal that there was no evidence to support this finding. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983). In reviewing a no evidence point, we consider only the evidence and inferences that tend to support the finding, disregarding all evidence and inferences to the contrary. *Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex.1992); *Havner v. E–Z Mart Stores, Inc.,* 825 S.W.2d 456, 458 (Tex.1992); *E–Z Mart Stores, Inc. v. Hale,* 883 S.W.2d 695, 699 (Tex.App.—Texarkana 1994, writ denied). If there is any probative evidence to support the finding, we must uphold the verdict. *Southern States Transportation, Inc. v. State,* 774 S.W.2d 639, 640 (Tex.1989); *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987) (stating that if there is "more than a scintilla of evidence" to support the finding, a no evidence point fails); *In re King's Estate,* 150 Tex. 662, 664, 244 S.W.2d 660, 661 (1951).

The Texas Supreme Court listed the elements in a premises liability negligence case as follows:

(1) Actual or constructive knowledge of some condition on the premises by the owner/operator;

(2) That the condition posed an unreasonable risk of harm;

(3) That the owner/operator did not exercise reasonable care to reduce or eliminate the risk; and

(4) That the owner/operator's failure to use such care proximately caused the plaintiff's injuries.

*Keetch v. Kroger Co.,* 845 S.W.2d 262, 264 (Tex.1992); *Corbin v. Safeway Stores, Inc.,* 648 S.W.2d 292, 296 (Tex.1983).

[2] K Mart argues that there was legally insufficient evidence for the jury to infer K Mart's actual or constructive knowledge of the condition which injured Rhyne. Moore, the assistant manager on duty the day of Rhyne's accident, testified that no one had previously been hurt on the metal plate and that K Mart had no previous notice of the condition. Moore also testified, however, that the most probable explanation for the condition was that a K Mart employee in a fork truck broke the pipe while setting tables **\*143** in the garden area.[3] Moore further testified that to dislodge the pipe, the employee would had to have hit it with great force and, therefore, should have assessed the situation after the impact.

K Mart argues that the evidence is legally insufficient because a jury had to have stacked inferences to come to this conclusion, citing *McClure v. Allied Stores of Texas,* 608 S.W.2d 901, 904 (Tex.1980). The Texas Supreme Court has also held, however, that a number of inferences may be drawn from a single fact situation. *McClure,* 608 S.W.2d at 904; *see also Farley v. M M Cattle Co.,* 529 S.W.2d 751, 757 (Tex.1975).

Whether inferences are stacked is often a matter of semantics, and thus depends upon the wording of the inference. The ultimate test on any inference should be its reasonable probability.

In the first place, these conclusions were not based solely on inferences made by the jury, but were founded upon direct opinion evidence by the K Mart assistant manager. The present case is analogous to the case of *Coffee v. F.W. Woolworth Co.,* 536 S.W.2d 539 (Tex.1976). In the *Coffee* case, the Supreme Court concluded that there was sufficient evidence to support the jury finding that the defendant store owner created the condition based upon the testimony of a supervisor in the defendant store. The supervisor testified that the only two possible causes of the condition both involved store personnel. (In the present case, the assistant manager on duty at the time of the accident testified that the probable cause of the condition was that a K Mart employee broke the pipe with a fork truck.) In the *Coffee* case, the court concluded that the evidence created a reasonable inference for the jury that the defendants had caused the condition and therefore had actual notice. (In the present case, there was evidence from which the jury could have concluded that the defendant caused the condition and therefore had actual notice of the condition.)

The jury did not have to make an inference that an employee was actually aware of the pipe being broken, but only that the K Mart employee working in that area should have known of the condition. The jury found that Allie Rhyne was five percent negligent based upon the pleadings and evidence presented by K Mart concerning her failure to keep a proper lookout. If the jury determined that there was some negligence on the part of Allie Rhyne, a customer coming down the aisle, then the jury also certainly had a basis to believe that K Mart employees, working in that area of the store, should have known of the condition, because the workers, by spending more time in the store, would have more opportunities to observe the situation and to recognize the change that had been created by the broken pipe.

In the present case, as in the *Farley* case, the inference that the

jury had to draw was based on direct evidence admitted at trial. *See Farley,* 529 S.W.2d at 757. There was observable physical evidence of the pipe, broken from the metal plate, which extended three inches from the floor. When the pipe was extended from the metal plate to the fence, it provided an obvious barrier that called attention to the obstacle. After the pipe was separated, it no longer extended into the air above the plate to the fence and left only the metal plate protruding from the floor, which was not an obvious obstacle. From the physical evidence, an inference could be made that the pipe had been broken off from the metal plate by something or someone requiring considerable force, which would have been obvious to anyone involved in the breaking.

The other contended inference came from the opinion evidence of the K Mart employee. It is drawn from the totality of the circumstances and the personal knowledge of the assistant manager. She gave direct testimony that a K Mart employee had been working in that area with a fork truck, and she concluded that it was probable that this K Mart employee knocked the pipe down with the fork truck. Furthermore, even if these were improper inferences, a jury could have concluded because of the physical condition of the plate extended up from the floor three inches in the middle of an aisle that the K **\*144** Mart employees either knew or should have known of the dangerous condition.

K Mart also contends that there was legally insufficient evidence for the jury to find the third element, i.e., that the owner/operator did not exercise reasonable care to reduce or eliminate the risk. It was undisputed, however, that the condition was hazardous when Rhyne fell and that K Mart did not repair the condition until after Rhyne fell. Therefore, the jury could have concluded that K Mart did not exercise reasonable care to reduce or eliminate the risk of harm to its customers after notice of the condition. This point of error is therefore overruled.

By its second and third points of error, K Mart contends that the trial court erred in rendering judgment on the verdict because the evidence was factually insufficient to support the jury's answer to question three (amount of damages to Ms. Rhyne), and question four (amount of damages to Mr. Rhyne). K Mart contends that the jury's award of $200,000 in damages was factually insufficient because the damage award included future damages, which K Mart argues were not proven by a reasonable probability.

[3] In reviewing a factual sufficiency challenge, we must examine all of the evidence presented at trial and may set aside

the finding only when it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *In re King's Estate,* 244 S.W.2d at 661; *Wal–Mart Stores, Inc. v. Berry,* 833 S.W.2d 587, 590 (Tex.App.—Texarkana 1992, writ denied).

[4] Because personal injury damages are unliquidated and are not capable of certain measurement, the jury has broad discretion in assessing the amount of damages in a personal injury case. *Transit Management Co. of Laredo v. Sanchez,* 886 S.W.2d 823, 826 (Tex.App.—San Antonio 1994, no writ); *Baylor Medical Plaza Services v. Kidd,* 834 S.W.2d 69, 78 (Tex.App.—Texarkana 1992, writ denied); *Pipgras v. Hart,* 832 S.W.2d 360, 366 (Tex.App.—Fort Worth 1992, writ denied); *Kansas City Southern Railway Co. v. Catanese,* 778 S.W.2d 114, 119 (Tex.App.—Texarkana 1989, writ denied).

[5] [6] Likewise, recovery for future medical expenses is primarily a matter for the jury to determine in its discretion. *Strahan v. Davis,* 872 S.W.2d 828, 832 (Tex.App.—Waco 1994, writ denied); *Berry Property Management v. Bliskey,* 850 S.W.2d 644, 664 (Tex.App.—Corpus Christi 1993, writ dism'd by agr.); *Hughett v. Dwyre,* 624 S.W.2d 401, 405 (Tex.App.—Amarillo 1981, writ ref'd n.r.e.). Recovery for future medical expenses requires a showing that there is a reasonable probability that such medical expenses will be incurred in the future. *Fisher v. Coastal Transport Co.,* 149 Tex. 224, 230 S.W.2d 522, 523 (1950); *Fibreboard Corp. v. Pool,* 813 S.W.2d 658, 681 (Tex.App.—Texarkana 1991, writ denied), *cert. denied,* 509 U.S. 923, 113 S.Ct. 3037, 125 L.Ed.2d 724 (1993). Expert testimony, however, is not required. *Strahan,* 872 S.W.2d at 832; *Hughett,* 624 S.W.2d at 405; *see also Bliskey,* 850 S.W.2d at 664 (stating that the jury may estimate both the necessity of future medical treatment and the cost of such treatment).

[7] [8] In the present case, the jury was given a broad-form damage submission consisting of both past and future medical damages for the following:

· physical pain and mental anguish;

· physical impairment; and

· medical care.

The jury was not asked to specify the amount of damages for each damage element. The jury has great discretion in awarding damages in a personal injury case for pain and

mental anguish. *Kidd,* 834 S.W.2d at 78; *Exxon Corp. v. Roberts,* 724 S.W.2d 863, 868 (Tex.App.—Texarkana 1986, writ ref'd n.r.e.); *George C. Vaughan & Sons v. Dyess,* 323 S.W.2d 261, 264–65 (Tex.Civ.App.—Texarkana 1959, writ dism'd). Thus, the jury could have awarded the entire amount on the basis of past and future pain and suffering. *See Kidd,* 834 S.W.2d at 79 (on motion for rehearing). There was evidence to support the jury's damage award to Rhyne. The jury's verdict is therefore not so contrary to the overwhelming weight of **\*145** the evidence as to be clearly wrong and unjust. This point of error is overruled.

[9] By its third point of error, K Mart contends that the evidence was factually insufficient to support the jury's award of $10,500 in loss of consortium damages to the husband. The jury has discretion in awarding loss of consortium damages. *See Whittlesey v. Miller,* 572 S.W.2d 665, 667 (Tex.1978) (stating that the duty to compensate for loss of consortium must be resolved by the "impartial conscience and judgment of jurors who may be expected to act reasonably, intelligently and in harmony with the evidence").

[10] K Mart does not, however, argue this point in its brief. The only reference regarding Rhyne's husband in this portion of K Mart's brief details his testimony as it related to his wife's injuries. Based on Tex.R.App. P. 74, an appellant waives any issue not supported by argument and authority in his or her brief. *Trenholm v. Ratcliff,* 646 S.W.2d 927, 934 (Tex.1983); *Gulf Coast State Bank v. Emenhiser,* 562 S.W.2d 449, 452–53 (Tex.1978). Furthermore, there was sufficient evidence in the record to support this award. Rhyne's husband testified that he has been under stress seeing his wife in pain everyday and has not been able to sleep with his wife since her injury. He also testified that he must now perform what were previously his wife's household duties, such as cooking and gardening. Finally, he testified that the two are not able to travel in his retirement years as they had planned before his wife's injuries. Therefore, the jury's award of $10,500 in damages to the husband is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

[11] K Mart alternatively contends that the trial court erred in refusing to order a remittitur. In reviewing a request for a remittitur, the proper standard is factual sufficiency. *Kansas City Southern Railway Co. v. Carter,* 778 S.W.2d 911, 915 (Tex.App.—Texarkana 1989, writ denied). The appellate court will examine all of the evidence in the record to determine whether sufficient evidence supports the damage award, remitting only if some portion is so factually insufficient as to be manifestly unjust. *Pope v. Moore,* 711

S.W.2d 622, 623–24 (Tex.1986); *Carter,* 778 S.W.2d at 915.

The jury's determination was not so factually insufficient as to be manifestly unjust. Therefore, the trial court did not err in refusing to order a remittitur. This point of error is overruled.

[12] By its fourth point of error, K Mart contends that the trial court erred in failing to modify, correct, or reform the judgment as it relates to prejudgment interest. First, K Mart argues that the trial court used the incorrect date of accrual of prejudgment interest.

The Texas statute dealing with prejudgment interest in a personal injury case states that interest shall begin 180 days after the defendant receives written notice of the plaintiff's claim. Tex.Rev.Civ. Ann. art. 5069–1.05 § 6(a) (Vernon Supp.1996). The court ordered that the prejudgment interest would begin 180 days after Rhyne executed a release to K Mart for her medical records on March 27, 1991. K Mart contends that this is not sufficient to constitute notice of a claim as required by the statute. K Mart argues that the appropriate date for prejudgment interest to begin is 180 days after Rhyne provided written notice to a K Mart claims agent on April 22, 1992.

A recent Austin appellate court opinion states that written notice of an accident and injuries is not sufficient to constitute notice of a claim under the prejudgment interest statute. *Robinson v. Brice,* 894 S.W.2d 525, 528 (Tex.App.—Austin 1995, writ denied). *Robinson* requires written notice of a claim, i.e., a legal demand for payment or compensation. *Robinson,* 894 S.W.2d at 528. The court in *Robinson,* however, recognized that it was deciding an issue of first impression. *Robinson,* 894 S.W.2d at 528.

The Fort Worth appellate court also recently addressed this issue in *Bevers v. Soule,* 909 S.W.2d 599, 603–604 (Tex.App.—Fort Worth 1995, n.w.h.), where it concluded that a signed medical authorization form, coupled with a letter asking the company to "properly consider [plaintiff's] claim," was **\*146** sufficient to constitute notice under this statute. *Bevers,* 909 S.W.2d at 603. K Mart distinguishes this case on the basis that Rhyne made no similar request with her medical release form. Rhyne's release, prepared by K Mart, indicates, however, that "[t]his information is to be used for purposes of evaluating and handling *my claim for injury* as a result of an accident occurring on or about 3–7–91." (Emphasis added.) This notice is comparable to that given in *Bevers* and was sufficient to give notice to K Mart of Rhyne's claim for compensation for her injuries.

[13] Secondly, K Mart argues that the trial court erred in compounding the prejudgment interest because the statute authorizing prejudgment interest specifically requires simple interest.[4] Article 5069–1.05 provides that "[t]he rate of prejudgment interest shall be the same as the rate of postjudgment interest at the time of judgment and *shall be computed as simple interest.*" Tex.Rev.Civ. Stat. Ann. art. 5069–1.05, § 6(g) (Vernon Supp.1996) (emphasis added); *see also Bevers,* 909 S.W.2d at 603–04.[5]

Rhyne argues that this section was modified by section 2 of the same statute which states that all judgments earn interest "compounded annually." Tex.Rev.Civ. Stat. Ann. art. 5069–1.05, § 2 (Vernon Supp.1996). Section 2, however, deals with postjudgment interest, not prejudgment interest. *Id.* Because the plain language of Section 6(g) requires prejudgment interest to be computed as simple interest, this point of error is sustained.

[14] By its final point of error, K Mart argues the trial court erred in admitting evidence from Dr. Roy Randall Northcutt, which he was incompetent to render. K Mart complains that Dr. Northcutt, a chiropractor, estimated the cost of future surgeries Rhyne might need. K Mart asserts that a chiropractor is not competent to testify as to the costs of surgeries.

In support of this contention, K Mart cites a recent Texas Supreme Court case holding that courts should more closely scrutinize expert witness testimony before allowing it into evidence. *E.I. du Pont de Nemours and Co. v. Robinson,* 923 S.W.2d 549, 38 Tex. S.Ct. J. 852 (June 15, 1995) (stating that an expert's opinion must be based upon a reliable foundation). K Mart argues that because there was no showing that a chiropractor was qualified to opine about cost of surgical treatment, this evidence was improperly admitted. *See* Tex.R. Civ. Evid. 702. We agree.

[15] We can only reverse based on this error, however, if this error amounted to such a denial of K Mart's rights as was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *See* Tex.R.App. P. 81(b)(1). As stated in point of error two, this Court cannot ascertain the amount of future medical damages awarded by the jury in this case because the damages were submitted by a broad-form question and also included pain and suffering, physical impairment, and past medical care. The other damages could have amounted to this total without the cost of

surgical treatment.

On rehearing, K–Mart contends that the record reflects that the chiropractor's testimony as to future medical expenses probably had an effect on the jury's verdict. K–Mart states that the opposing counsel had emphasized the cost of future surgeries in the final argument and that he had asked for $395,000 in damages of which the cost of the future medical expenses amounted to more than forty percent. It must be pointed out, however, that the jury did not award the $395,000 argued for by counsel, but instead **\*147** awarded $200,000. It should further be pointed out that in addition to the argument for the cost of future medical expenses, counsel for Rhyne placed a great deal of emphasis and spent considerable time in discussing pain and suffering, mental anguish, and physical impairment that had resulted from the injury. In argument, counsel asked the jury to award $215,000 for pain and suffering, mental anguish, and physical impairment. Therefore, the $200,000 awarded by the jury may have been to cover pain and suffering, mental anguish, and physical impairment and not the cost of future medical expenses. The finding of harm is not to be based upon speculation, but on whether the error probably did cause the rendition of an improper judgment. We can only say that it was possible. We do not find that it was probable that the jury included the future medical expenses as a part of the damages. Because the jury could have awarded the entire amount on the basis of elements other than the cost of future medical expenses,[6] no harmful error has been presented to this Court.

While there is much virtue in the simplicity of the broad-form submission, the courts are deprived in many situations of determining with exactitude what the jury found. This is especially true in lumping of all damages together because it renders the trial court and the reviewing court helpless in knowing which damages were actually awarded. This point of error is overruled.

Based on our disposition of K Mart's fourth point of error, the prejudgment interest awards are reformed to $70,211[7] for Allie Rhyne and $3,905[8] for Curtis Rhyne. The judgment of the trial court is otherwise affirmed.

Footnotes

[1]    Justice Charles Bleil was a member of the Court when this case was argued and submitted, and participated fully in the consideration of this case, but resigned from the Court before the opinion was issued.

2    Prejudgment interest was included in the trial court's judgment pursuant to Tex.Rev.Civ. Stat. Ann. art. 5069–1.05 (Vernon Supp.1996). Rhyne's prejudgment interest amounted to $65,812.33. Her husband's prejudgment interest amounted to $3,872.80.

3    Moore testified that "[t]he only—it probably got broken setting the tables with the fork truck."

4    In a previous opinion, this Court held that prejudgment interest under this statute should be compounded annually pursuant to Section 3 of this Article 5069–1.05. *See Sadler v. Duvall,* 815 S.W.2d 285, 294 (Tex.App.—Texarkana 1991, writ denied). This opinion, however, dealt with a case occurring before the Legislature amended Section 6(g) to require simple interest. *See Sadler,* 815 S.W.2d at 294.

5    In *Bevers,* the Fort Worth Court asserted that this Court wrongly decided *Sadler. Bevers v. Soule,* 909 S.W.2d 599 (Tex.App.—Fort Worth 1995, n.w.h.). The Fort Worth Court failed to recognize, however, that *Sadler* dealt with a case that occurred before the Legislature amended Section 6(g) of Article 5069–1.05 to require simple interest. *See Sadler,* 815 S.W.2d at 294.

6    *See Baylor Medical Plaza Services v. Kidd,* 834 S.W.2d 69, 79 (Tex.App.—Texarkana 1992, writ denied)(on motion for rehearing); *see also Transit Management Co. of Laredo v. Sanchez,* 886 S.W.2d 823, 826 (Tex.App.—San Antonio 1994, no writ) (stating that the valuation of mental anguish damages are generally left to the trier of fact); *Pipgras v. Hart,* 832 S.W.2d 360, 366 (Tex.App.—Fort Worth 1992, writ denied) (noting that future physical pain and mental anguish damages are left to the jury's discretion).

7    This amount was calculated as follows:
     First three years (3/27/91—3/27/94), 10% of $190,000 per year x 3 = $57,000.

     For partial year (3/27/94—2/24/95), 10% of $190,000 for 334 days = $17,386.

     Total interest is $57,000 + $17,386 = $74,386.

     The parties agreed to reduce this amount based upon settlement offers K Mart made to Rhyne. Accordingly, $4,175 was subtracted from the above amount of $74,386 to reach a final figure of $70,211.

8    This amount was calculated in the same manner as above, except on a principal amount of $9,975, resulting in the amount of $3,905 in interest to be paid. Because K Mart made no settlement offers to Curtis Rhyne, no deductions apply.

---

**End of Document**                                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**P**

98 S.W.3d 766
Court of Appeals of Texas,
Fort Worth.

MCN ENERGY ENTERPRISES, INC.,
formerly named MCN Investment
Corporation, Appellant and Appellee,
v.
OMAGRO DE COLOMBIA,
L.D.C., Appellee and Appellant.

No. 2–02–015–CV.   |   Feb. 6, 2003.

Manufacturing company brought action against prospective investor for breach of contract, promissory estoppel, breach of good faith and fair dealing, fraud, and negligent misrepresentation. The 67th District Court, Tarrant County, Don J. Cosby, J., entered judgment on jury verdict for company. Prospective investor appealed, and company cross-appealed. The Court of Appeals, Dixon W. Holman, J., held that: (1) evidence supported finding of negligent misrepresentation; (2) damages of $2.2 million were not excessive; and (3) company could not maintain claim for promissory estoppel.

Affirmed.

West Headnotes (15)

**[1]**      **Appeal and Error**
         Verdict

When no objection was made to a jury instruction, evidence to support a finding based on the instruction should be assessed on appeal in light of the instruction the trial court gave the jury.

Cases that cite this headnote

**[2]**      **Fraud**
         Statements recklessly made;  negligent misrepresentation

Evidence legally supported finding that prospective investor made negligent misrepresentation to manufacturing company;

evidence showed that representatives of investor repeatedly urged company to expend more money by making it believe that investor would be joining company in operation of plant.

Cases that cite this headnote

**[3]**      **Fraud**
         Duty to disclose facts

When one makes a representation to another that later becomes misleading or false, he has a duty to correct the false information to the misled party and not continue to conceal the truth.

1 Cases that cite this headnote

**[4]**      **Fraud**
         Weight and Sufficiency

Both negligence and causation in a case of negligent misrepresentation may be established by either circumstantial or direct evidence.

1 Cases that cite this headnote

**[5]**      **Fraud**
         Amount awarded

Damages of $2.2 million were not excessive for potential investor's negligent misrepresentation that it would join manufacturing company in operating plant; company spent $3.6 million of development costs in reliance on misrepresentation.

1 Cases that cite this headnote

**[6]**      **Evidence**
         Tendency to mislead or confuse

Prejudicial effect of evidence that potential investor withdrew from involvement with manufacturing company because company paid a bribe to the wife of a foreign government official substantially outweighed probative value; investor's letter to company did not mention bribe as grounds for withdrawal, and investor was not aware of bribe until three years after it withdrew from project. Rules of Evid., Rule 403.

Cases that cite this headnote

**[7] Trial**

Admission of evidence in general

A trial court has the sound discretion to admit and exclude evidence.

Cases that cite this headnote

**[8] Appeal and Error**

Rulings as to Evidence in General

A party desiring to reverse a judgment on evidentiary error must show that the error probably resulted in an improper judgment.

Cases that cite this headnote

**[9] Interest**

Demand for Payment of Principal

Prejudgment interest on claim of negligent misrepresentation by potential investor in manufacturing company was to be calculated beginning the day company sent letter to potential investor, demanding to be paid. V.T.C.A., Finance Code § 304.104.

1 Cases that cite this headnote

**[10] Appeal and Error**

Cases Triable in Appellate Court

The date from which statutory prejudgment interest should begin is a question of law that an appellate court must review de novo. V.T.C.A., Finance Code § 304.104.

1 Cases that cite this headnote

**[11] Interest**

Demand for Payment of Principal

A "claim," for purposes of calculating prejudgment interest, is a demand for compensation or an assertion of a right to be paid. V.T.C.A., Finance Code § 304.104.

1 Cases that cite this headnote

**[12] Estoppel**

Pleading as element of cause of action

Manufacturing company could not maintain claim for promissory estoppel against potential investor, based on investor's withdrawal from proposed project; company did not identify or make clear the specific nature of the promise or promises it alleged.

1 Cases that cite this headnote

**[13] Estoppel**

Future events; promissory estoppel

If a promisee has reasonably and detrimentally relied on an otherwise unenforceable promise, he may have a cause of action for promissory estoppel.

4 Cases that cite this headnote

**[14] Estoppel**

Future events; promissory estoppel

Although normally a defensive theory, promissory estoppel may become available as a cause of action to a promisee who has acted to his detriment in reasonable reliance on an otherwise unenforceable promise.

6 Cases that cite this headnote

**[15] Estoppel**

Future events; promissory estoppel

The elements of a cause of action for promissory estoppel include: (1) a promise, (2) the promisor foreseeing that the promisee will rely on it, and (3) detrimental reliance by the promisee.

7 Cases that cite this headnote

**Attorneys and Law Firms**

**\*768** Godwin Gruber, P.C., Julia F. Pendery, Dallas, for Appellant/Cross Appellee.

Shannon, Gracey, Ratliff, et al., Joseph W. Spence, Fort Worth, for Appellee/Cross Appellant.

Panel B: HOLMAN, GARDNER, and WALKER, JJ.

**OPINION**

DIXON W. HOLMAN, Justice.

Appellant MCN Energy Enterprises, Inc. (MCN) asks that we reverse the jury's verdict and trial court judgment awarding Appellee Omagro De Colombia, L.D.C. (Omagro) $2,781,041.36 for a claim of negligent misrepresentation and that we render judgment that Omagro take nothing. We will affirm.

**The Agreement**

Omagro is a company controlled by petroleum engineer Naresh Vashisht. Omagro produces urea, a nitrogen fertilizer used for plants and crops. In 1996, Vashisht decided to operate a urea plant that he bought in Peru. He soon moved the plant to Colombia. Unable to find adequate bank financing, he approached MCN's president, Rai Bhargava, and asked him to buy an interest in Omagro as an international investment. Eventually, MCN and Omagro signed a memorandum of understanding in which the two companies agreed they would associate for the purpose of owning and operating the urea plant.

Each party agreed to deal with the other in good faith. The memorandum stated the companies' agreement that as long as MCN was negotiating in good faith, Omagro would share with MCN information to use in making joint decisions about the project and would not solicit or encourage proposals from others. The parties further agreed that within thirty days the companies would sign "definitive documents," consisting of a stock purchase agreement and documents concerning financing, plant construction and operation, and the distribution of the plant's profits. **\*769** The memorandum also stated that within thirty days after the definitive documents were signed, MCN would reimburse Omagro for a percentage of the verifiable development costs Omagro incurred before those documents were signed. Finally, the memorandum provided that MCN would conduct a due diligence review within the first thirty days after signing the memorandum and would have no obligation to consummate the deal unless satisfied with that review. The memorandum was signed July 14, 1997, and eventually it was amended and extended six times. The final extension

of the memorandum was dated March 16, 1998, extending the date for signing the definitive documents until April 15, 1998. In the summer of 1998, MCN's president, Bhargava, was replaced by Joe Williams.

**Due Diligence Efforts**

In 1997, after the memorandum was signed, George Robles, MCN's "point man" for the transaction, and Purna Pai, an MCN chemical engineer, visited Colombia to conduct due diligence for the urea project. When they returned after inspecting the plant, they gave Omagro no indication that MCN would not be interested in it. To the contrary, when they came home from Colombia, Robles, Pai, and Shanti Sharma (the man in charge of MCN's international investments) told Omagro the plant looked fine to them. In August 1997, MCN asked for a thirty-day extension within which to sign the definitive documents. The request was granted by a sixty-day extension letter the two companies signed, that also extended the thirty-day period for MCN to conduct its due diligence.

Omagro continued to pursue the project, obtaining a "mandate agreement" signed by International Finance Corporation, MCN, and Omagro to proceed with the financing of the project. Omagro then spent money to conduct soil studies, design electrical systems, do engineering work, and to continue repairing and cleaning the plant's equipment. Because MCN and Omagro decided to transform the plant into a "granular" operation, costs again increased, and Omagro bought more equipment in the United States, storing it in Houston. That equipment was inspected by MCN's Robles and Pai, who once again indicated that MCN was committed to the project. Meanwhile, Omagro sent a memo to MCN containing Omagro's analysis of the bids received for constructing and operating the plant and identifying the party Omagro wished to hire for that purpose. Robles reacted by calling Omagro to agree with the hiring recommendation. Also, Omagro sent MCN a copy of a proposed gas contract with Ecopetrol, to which MCN made no objection.

**MCN Withdraws**

Without warning, fourteen months into the transaction, Robles and Sharma telephoned Vashisht in September 1998 to tell him that MCN would not invest in the project with Omagro. Vashisht then wrote a letter to MCN's new president, Williams, to protest MCN's sudden withdrawal.

MCN responded to Omagro with a letter dated November 10, 1998, stating that MCN would not invest in the operation of Omagro's urea plant because MCN believed the memorandum of understanding had "expired." The September telephone call and November letter were the first times MCN expressed any concerns or reservations to Omagro about the Colombia urea plant.

### Omagro Sues MCN

In September 1999, Omagro sued MCN alleging causes of action for breach of contract, promissory estoppel, breach of good **\*770** faith and fair dealing, fraud, and negligent misrepresentation. At trial, the jury heard evidence that from April 1997 until September 1998, MCN personnel negligently misrepresented to Omagro, through words and conduct, that MCN was committed to making an investment in the construction and operation of the urea plant, and that Omagro relied to its detriment on the negligent misrepresentations of MCN's words and conduct.

From the evidence, the jury answered "yes" to question 3 of the charge, which asked whether MCN made a negligent misrepresentation on which Omagro justifiably relied. Question 3 defined "misrepresentation" as "any manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts." The question instructed jurors that a "negligent misrepresentation" occurs when a party, acting either in the course of his business, or in a transaction in which he has a pecuniary interest, makes a representation that supplies false information to guide others in their business, and without exercising reasonable care or competence in obtaining or communicating the represented information.

On direct examination, Robles conceded that, despite his favorable comments to Omagro, he had determined in 1998 that the urea project would not get done. On cross-examination, Robles agreed that "from the very beginning," he did not believe it would fit MCN. Moreover, Robles conceded that he felt he could not be honest with Omagro because it might hurt his own employment at MCN. Pai testified that soon after his first visit to the plant in Colombia, he concluded that the project was not technically feasible. Pai did not tell that to Omagro. Pai also admitted that when he went to Houston in January 1998 to inspect equipment Omagro had bought to transform the plant to a "granular"

plant, he concluded the equipment was substandard, but he did not report that to Omagro. Pai conceded that he knew Omagro was continuing to spend a lot of money on the project. Pai also admitted that the MCN people with whom Omagro was talking should have been informed that Pai had made two negative reports to MCN about the project. In answer to question 4, the jury found that for the damages proximately caused by MCN's negligent misrepresentations, Omagro is entitled to recover $2.2 million, as fair and reasonable compensation to reimburse it for expenses it incurred in connection with the urea plant project. The trial court signed a final judgment for Omagro for $2.2 million, plus $581,041.36 in prejudgment interest.

### MCN's Appeal

MCN presents five issues on appeal. The first complains that Omagro relied on the same evidence to prove its three theories of liability against MCN: breach of contract; fraud; and negligent misrepresentation. MCN asserts that because the jury found MCN neither breached the contract, nor committed fraud related to it, the jury had no reasonable basis for finding that Omagro independently proved a compensable injury for negligent misrepresentation in the transaction. MCN's second issue contends Omagro presented both legally and factually insufficient evidence of the essential elements of negligent misrepresentation. Omagro counters the second issue by arguing that MCN has failed to preserve a factual sufficiency complaint because MCN failed to file a motion for new trial after the jury verdict. Because MCN concedes in its reply brief that its claim of factual insufficiency is waived, that portion of the second issue is moot. We will address the first and the remainder of the second issues together.

**\*771** **[1]** With regard to MCN's legal sufficiency challenge, we are required to consider all of the evidence in the light most favorable to Omagro, the party for whom the verdict has been rendered, and to indulge every reasonable inference from that evidence in Omagro's favor. *See Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). Our review must be based on the actual wording of the question and instructions submitted to the jury. *Wal–Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 715 n. 5 (Tex.2001). MCN complains about jury question 3, arguing MCN cannot be considered liable for negligent misrepresentation without evidence of an "affirmative" misrepresentation it made to Omagro. However, MCN's complaint is contrary to the wording of the jury charge. The

jury's instruction in question 3 does not mention the word "affirmative." Instead, it defines only a "misrepresentation" as "any manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts." MCN's appeal does not complain of the word "misrepresentation," and the jury charge does not limit the definition to only "affirmative" misrepresentations. When, as here, no objection was made to a jury instruction, evidence to support a finding based on the instruction should be assessed in light of the instruction the trial court gave the jury. *City of Fort Worth v. Zimlich,* 29 S.W.3d 62, 71 (Tex.2000).

 **[2]**   **[3]**   **[4]**   Legally sufficient evidence exists to show that the words and conduct of MCN's point man, Robles, and its petroleum engineer, Pai, were misrepresentations of the type defined in jury question 3. Their words and conduct, along with that of Sharma, repeatedly spurred Omagro to expend more money by making Omagro believe MCN would be joining Omagro in the operation of the urea plant. The specific words and conduct of the negligent misrepresentations have been stated above and will not be repeated. Suffice it to say that evidence of the negligent misrepresentations made by Robles, Pai, and Sharma establishes conclusively that they were made on behalf of MCN in the course of its business and in connection with the transaction in which MCN had a pecuniary interest—but were not in accord with the true facts and were false when made to Omagro. MCN never attempted to correct the false or misleading statements. When one makes a representation to another that later becomes misleading or false, he has a duty to correct the false information to the misled party and not continue to conceal the truth. *Anderson, Greenwood & Co. v. Martin,* 44 S.W.3d 200, 212–13 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). Both negligence and causation may be established by either circumstantial or direct evidence. *Birmingham v. Gulf Oil Corp.,* 516 S.W.2d 914, 917 (Tex.1974) (op. on reh'g).

The evidence of the words and conduct of MCN's personnel, done over a period of fourteen months while Omagro was expending millions of dollars for the joint benefit of MCN and Omagro, is legally sufficient to have proven to a reasonable jury that MCN did not exercise reasonable care or competence and, indeed, that MCN worked to hide the truth from Omagro, until after September 1998. A reasonable jury was able to conclude that no reasonably prudent person would have acted as MCN acted. The evidence also is legally sufficient to demonstrate to a reasonable jury that Omagro relied on MCN's negligent representations. Vashisht testified that if

he had been told the truth as soon as it became apparent to MCN's personnel, Omagro could and would have found another investor partner. Pai testified that he knew Omagro was spending more money on the project and, for that reason, **\*772** conceded MCN should have told Omagro the truth early in the transaction. We overrule MCN's first and second issues.

MCN's third issue asserts that because the jury awarded Omagro damages that equal the benefit of the bargain, Omagro erroneously is placed in the same position it would have enjoyed if MCN had signed the definitive documents. MCN insists that in this case, Omagro is controlled by a contract/tort principle that prevents any plaintiff from recovering breach of contract damages for liability under a tort theory. *See D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.,* 973 S.W.2d 662 (Tex.1998).

To apply the contract/tort principle here, the parties first must have an agreement, the breach of which will create identifiable "benefit of the bargain" damages. *Id.* at 663. Nevertheless, MCN also relies on the jury's answer to question 1, that there never was a binding and enforceable agreement obligating it to execute definitive documents, or otherwise continue with the project, or to reimburse forty percent of Omagro's development costs. Yet, when jury question 1 asked whether MCN failed to comply with the terms of the memorandum of understanding, the jury answered "no." And by answering "no" to question 1, the jury accepted MCN's theory, that no agreement legally obligated MCN to execute definitive documents or reimburse forty percent of Omagro's development costs. Thus, the jury found that the so-called "benefit of the bargain," an alleged obligation to pay Omagro forty percent of its costs, was not available to Omagro in its action for breach of contract.

For a long time, the Texas Supreme Court has held that obligations and duties separately imposed by contract and by tort may co-exist. *See Formosa Plastics Corp. USA v. Presidio Eng'rs. & Contractors, Inc.,* 960 S.W.2d 41, 44 (Tex.1998); *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 618 (Tex.1986); *Int'l Printing Pressmen & Assistants' Union v. Smith,* 145 Tex. 399, 198 S.W.2d 729, 735–36 (1946). And these cases are not altered by *D.S.A., Inc.,* 973 S.W.2d at 663 (stating that the court was not deciding whether a party breached a legal duty independent of its contractual duty). We hold here MCN had a tort duty not to make negligent misrepresentations, and we decline to apply contract/tort principles in this case. Even without the

memorandum of understanding, MCN had a duty not to negligently misrepresent that it was committed to a business deal when it was not. *Shell Oil Prods. Co. v. Main St. Ventures, L.L.C.,* 90 S.W.3d 375, 382 (Tex.App.-Dallas 2002, pet. denied).

**[5]** The damages of $2.2 million found by the jury's answer to question 4 are not limited to reimbursing forty percent of Omagro's development costs. Instead, question 4 allowed the jury to award *any* damages proximately caused by MCN's negligent misrepresentation, *including* reimbursement of Omagro's expenses incurred in connection with the project. That includes the sixty percent of Omagro's costs MCN had no obligation, except from breaching its tort duty, to reimburse. MCN failed to object to the wording of the instruction about the measure of damages or submit its own instruction specifically limiting the jury to consideration of only MCN's contractual share of development costs. The evidence in the record clearly supports the conclusion that the jury's award of damages from MCN's misrepresentations is for an independent tort injury. Here, the undisputed evidence shows that Omagro spent $3.6 million of development costs in reliance on MCN's negligent misrepresentations. A jury may award damages anywhere within the trial court's range of the presented evidence. **\*773** *Clary Corp. v. Smith,* 949 S.W.2d 452, 467 (Tex.App.-Fort Worth 1997, pet. denied). The jury therefore had before it sufficient evidence to support its $2.2 million verdict. We overrule the third issue.

**[6]** The fourth issue contends that the trial court denied MCN the right to provide the jury with evidence of one of its "most important reasons" for withdrawing from the transaction. MCN suspected from evidence it gained outside the jury's presence that Omagro had paid a bribe to the wife of a Colombian government official, not disclosing it in violation of the Foreign Corrupt Practices Act. 15 U.S.C.A. §§ 78dd–1—78dd–2 (West 1998). In connection with its fourth issue, MCN argues that if the jury had only known about the alleged bribe, Omagro's negligent misrepresentation claim would have been defeated. Initially, we note that the evidence shows that MCN's November 10, 1998 letter to Omagro does not mention the alleged "bribe" as a reason for cancelling its participation in the transaction. Next, Daniel Schiffer, former MCN senior vice president and general counsel, testified to the trial court outside the jury's presence that MCN was not aware of any such bribe until three years after it withdrew from the urea plant project. Finally, Vashisht denied to the court that he had paid a bribe.

Omagro objected to allowing the jury to hear the bribery evidence by filing a motion in limine.

**[7]** **[8]** A trial court has the sound discretion to admit and exclude evidence. *Pack v. Crossroads, Inc.,* 53 S.W.3d 492, 499 (Tex.App.-Fort Worth 2001, pet. denied). A party desiring to reverse a judgment on evidentiary error must show that the error probably resulted in an improper judgment. *Id.* The trial court granted the motion because the alleged relevance and/or probative value of the evidence was significantly outweighed by its prejudicial effect. TEX.R. EVID. 403. The record reveals no abuse of discretion in the court's ruling. We overrule the fourth issue.

**[9]** **[10]** **[11]** In the fifth issue, MCN asserts that the trial court used an incorrect date for accrual of prejudgment interest. The date from which statutory prejudgment interest should begin is a question of law that an appellate court must review *de novo. See generally Johnson v. City of Fort Worth,* 774 S.W.2d 653, 655–56 (Tex.1989). Prejudgment interest accrues on the amount of a judgment during a period that begins on the earlier of the 180th day after the date a defendant like MCN receives written notice of a claim against it, or the date the suit is filed. TEX. FIN.CODE ANN. § 304.104 (Vernon Supp.2003); *Johnson & Higgins, Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 531 (Tex.1998). A "claim" is a demand for compensation or an assertion of a right to be paid. *Johnson,* 962 S.W.2d at 531.

On October 29, 1998, Vashisht sent a letter to MCN, demanding Omagro's right to be paid by MCN. The letter was Omagro's claim. *Id.* The trial court used this date to calculate prejudgment interest. We overrule MCN's fifth issue.

### Omagro's Cross–Point

**[12]** Once the evidence in the trial closed, the trial court granted a directed verdict against Omagro on its cause of action for promissory estoppel. In a sole cross-point, Omagro complains that it is entitled to a new trial of its claim for promissory estoppel.

In reviewing a directed verdict, we must consider all of the evidence in the light most favorable to Omagro, the party against whom the verdict was granted, disregarding all evidence and inferences to the contrary. *See Smith v. Elliott,* 68 S.W.3d 844, 846 (Tex.App.-El Paso 2002, pet. denied). If conflicting evidence of **\*774** probative value on any theory

of recovery exists, an instructed verdict is improper, and we must remand the case for jury determination of the issue. *Id.*

 **[13]** **[14]** **[15]** If a promisee has reasonably and detrimentally relied on an otherwise unenforceable promise, he may have a cause of action for promissory estoppel. *Wheeler v. White,* 398 S.W.2d 93, 96–97 (Tex.1965). Although normally a defensive theory, it may become available as a cause of action to a promisee who has acted to his detriment in reasonable reliance on an otherwise unenforceable promise. *Id.* at 97. The elements of that cause of action include a promise, the promisor foreseeing that the promisee will rely on it, and detrimental reliance by the promisee. *English v. Fischer,* 660 S.W.2d 521, 524 (Tex.1983).

We have already held that the record contains legally sufficient evidence for a reasonable jury, as charged in this case, to find that negligent misrepresentations were made by MCN representatives. We will not revisit that evidence here. In connection with its sole cross-point, Omagro now argues generally that the evidence showing negligent misrepresentations via words and conduct of MCN representatives (Robles, Sharma, and Pai), equals more than a scintilla of evidence to support Omagro's promissory estoppel claim. We disagree because Omagro does not identify or make clear the specific nature of the promise or promises it alleges the MCN representatives made. We overrule Omagro's sole cross-point.

### Conclusion

We have carefully considered and overruled MCN's five issues for the reasons stated. We hold that on the issue of negligent misrepresentation, the evidence is legally sufficient to support the jury's finding for Omagro. The issue presented by Omagro's sole cross-point is overruled. We affirm the trial court's judgment.

### All Citations

98 S.W.3d 766

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Q

158 S.W.3d 607
Court of Appeals of Texas,
Fort Worth.

Helen PRINGLE, Independent Executrix of the
Estate of Brantley Pringle, Deceased, Appellant,

v.

Toby MOON, Appellee.

No. 2–04–012–CV.    |    Feb. 10, 2005.

**Synopsis**

**Background:** Motorist brought action against tree remover, and tree remover counterclaimed to recover for personal injuries that allegedly were sustained when motorist's car struck piece of equipment, which pushed tree remover into another piece of equipment. Due to settlements involving tree remover's workers' compensation carrier and motorist's liability insurer, motorist was assigned subrogation recovery interest concerning workers' compensation benefits paid to tree remover. Independent executrix of motorist's estate was substituted as a party following motorist's death. Following a jury trial, the 43rd District Court, Parker County, Don Chrestman, J., rendered final judgment. Independent executrix appealed.

**Holdings:** The Court of Appeals, John Cayce, C.J., held that:

[1] final judgment did not relate back to earlier judgment, and thus applicable rate of prejudgment interest was rate in effect at time that final judgment was signed, and

[2] amount of workers' compensation credit was required to be deducted from amount of damages found by jury before prejudgment interest could be calculated.

Reversed and remanded.

West Headnotes (8)

**[1]** **Interest**
 Effect on Judgments
**Judgment**
 Operation and Effect

Trial court's final judgment in personal injury action arising from automobile accident did not relate back to earlier judgment, and thus applicable rate of prejudgment interest was rate in effect at time that final judgment was signed, although trial court intended that final judgment would relate back to earlier judgment; earlier judgment no longer existed once trial court expressly vacated earlier judgment in granting motion to modify judgment. V.T.C.A., Finance Code §§ 304.003, 304.102, 304.103.

3 Cases that cite this headnote

**[2]** **Judgment**
 Operation and Effect

Judgment that has been vacated has no legal effect.

3 Cases that cite this headnote

**[3]** **Judgment**
 Operation and Effect

When a judgment has been rendered and later set aside or vacated, the matter stands precisely as if there had been no judgment.

4 Cases that cite this headnote

**[4]** **Interest**
 Mode of Computation in General

In tree remover's personal injury action that arose from automobile accident involving motorist, who was assigned as result of settlements with insurers subrogation recovery interest concerning workers' compensation benefits paid to tree remover, amount of workers' compensation credit had to be deducted from amount of damages found by jury before prejudgment interest could be calculated. V.T.C.A., Finance Code §§ 304.003, 304.102, 304.103.

Cases that cite this headnote

**[5]** **Appeal and Error**
 Cases Triable in Appellate Court

Calculation of prejudgment interest is a question of law and thus is reviewed de novo. V.T.C.A., Finance Code §§ 304.003, 304.102, 304.103.

1 Cases that cite this headnote

**[6]** **Interest**

    Prejudgment Interest in General

"Prejudgment interest" is compensation allowed by law as additional damages for lost use of money due as damages during the lapse of time between the accrual of the claim and the date of judgment. V.T.C.A., Finance Code §§ 304.003, 304.102, 304.103.

1 Cases that cite this headnote

**[7]** **Interest**

    Mode of Computation in General

Prejudgment interest is calculated on the judgment amount, not the amount of damages awarded by the jury. V.T.C.A., Finance Code §§ 304.003, 304.102, 304.103.

2 Cases that cite this headnote

**[8]** **Interest**

    Mode of Computation in General

Any credits or offsets due a defendant should be deducted from the total damages awarded before, not after, prejudgment interest is calculated. V.T.C.A., Finance Code §§ 304.003, 304.102, 304.103.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*608** Wright & Greenhill, P.C., Brantley Ross Pringle Jr., Austin, for Appellant.

Dan Stroup, P.C., Dan Stroup, Longview, for Appellee.

Panel A: CAYCE, C.J.; DAUPHINOT and GARDNER, JJ.

**OPINION**

JOHN CAYCE, Chief Justice.

In this personal injury case, Helen Pringle, as independent executrix of the estate of Brantley Pringle, appeals from a judgment for Toby Moon. In two issues, Helen contends that the trial court erred in applying the wrong prejudgment interest rate and in calculating prejudgment interest on the damages found by the jury rather than on the judgment amount. We **\*609** will reverse the part of the judgment relating to prejudgment interest and remand to the trial court to recalculate prejudgment interest in accordance with this opinion.

On July 18, 2000, Brantley was driving in Parker County when he came upon a construction zone where Moon was working with tree removal equipment. Brantley's car struck a piece of equipment, which pushed Moon into another piece of equipment and caused him to sustain injuries. Because Moon sustained his injuries in the course and scope of his employment, he sought and received workers' compensation insurance benefits totaling $39,430.69 from Texas Mutual Insurance Company (Texas Mutual). Brantley filed suit against Moon, and Moon counterclaimed.

Before trial, Texas Mutual asserted a right to recovery of benefits paid to Moon. Brantley's liability insurance carrier, GEICO, then entered into an agreement with Texas Mutual whereby, in exchange for GEICO's cash payment, Texas Mutual assigned to GEICO Texas Mutual's right to recovery of the statutory workers' compensation lien in the amount of $39,430.69. GEICO then assigned to Brantley the subrogation recovery interest Texas Mutual had previously assigned to GEICO.

The case was tried to a jury in Parker County in June 2003. At the conclusion of the evidence, the jury returned a verdict finding Brantley negligent and liable to Moon for $44,243.06. The trial court rendered judgment on the verdict on July 7, 2003. Thereafter, Brantley filed a motion to modify the judgment because it did not reflect the amount of his workers' compensation lien. On August 20, 2003, the trial court granted Brantley's motion and vacated the July 7 judgment.

Brantley died suddenly on September 2, 2003. Helen, as independent executrix of Brantley's estate, was substituted as a party on October 24, 2003.

The trial court rendered a final judgment on October 30, 2003, allowing the credit for Brantley's workers' compensation lien and calculating prejudgment interest at the rate of ten percent per annum on the entire amount of damages found by the jury. Helen filed a motion to modify both the interest rate and the interest calculation in the judgment, which was overruled by operation of law. This appeal followed.

**[1]** In her first issue, Helen contends that the trial court erred in applying the wrong prejudgment interest rate to the damages award. Helen argues that the correct prejudgment interest rate was the greater of five percent or the prime interest rate in effect when the final judgment was signed. Moon contends that the final judgment was signed July 7, 2003, that the October 30 judgment was merely a judgment nunc pro tunc, and that the trial court properly determined that the applicable interest rate is ten percent.

The prejudgment interest rate is controlled by statute. *See* TEX. FIN.CODE ANN. §§ 304.003, 304.103 (Vernon Supp.2004–05). Because statutory construction is a question of law, we review the trial court's decision de novo. *Tex. Dep't of Transp. v. Needham,* 82 S.W.3d 314, 318 (Tex.2002); *Town of Flower Mound v. Stafford Estates, L.P.,* 71 S.W.3d 18, 26 (Tex.App.-Fort Worth 2002, no pet.). Under a de novo standard of review, the reviewing court exercises its own judgment and redetermines each legal issue. *Subaru of Am., Inc. v. David McDavid Nissan Inc.,* 84 S.W.3d 212, 222 (Tex.2002); *Quick v. City of Austin,* 7 S.W.3d 109, 116 (Tex.1998).

A judgment in a personal injury case earns prejudgment interest. TEX. FIN.CODE ANN. § 304.102 (Vernon Supp.2004–05). The prejudgment interest rate is **\*610** equal to the postjudgment rate applicable at the time of judgment. *Id.* § 304.103. During the regular 2003 legislative session, the legislature passed House Bills 4 and 2415, both of which contained nearly identical amendments to the finance code that effectively reduced the postjudgment interest rate from ten to five percent.[1] Both bills provided that the new interest rate would apply in a case in which a final judgment was "signed or subject to appeal on or after the effective date of this Act." Tex. H.B. 2415, § 2(a), 78th Leg., R.S., 2003 Tex. Gen. Laws 2096, 2097; Tex. H.B. 4, § 6.04, 78th Leg., R.S., 2003 Tex. Gen. Laws 847, 862. Because House Bill 4 went into effect on September 1, 2003, H.B. 4, § 23.02, 2003 Tex. Gen. Laws 847, 898, its prejudgment interest rate applies in any case in which a final judgment was signed or subject to

appeal on or after September 1, 2003.[2] *Burke v. Union Pac. Res. Co.,* 138 S.W.3d 46, 74 (Tex.App.-Texarkana 2004, no pet.); *see also Columbia Med. Ctr. of Las Colinas v. Bush,* 122 S.W.3d 835, 865 (Tex.App.-Fort Worth 2003, no pet.) (holding that judgment is "subject to appeal" when it fully and finally disposes of all parties and is therefore capable of being appealed).

The final judgment in this case was signed October 30, 2003. Moon's argument that the October 30 judgment was nunc pro tunc and therefore related back to the July 7 judgment is not supported by the record. The trial court expressly vacated the July 7 judgment in its order granting Pringle's motion to modify and at a later hearing twice acknowledged setting aside that judgment.[3]

**[2]** **[3]** A judgment that has been vacated has no legal effect. *Shelby Operating Co. v. City of Waskom,* 964 S.W.2d 75, 80 (Tex.App.-Texarkana 1997, pet. denied). When a judgment has been rendered and later set aside or vacated, the matter stands precisely as if there had been no judgment. *Ferguson v. Naylor,* 860 S.W.2d 123, 127 (Tex.App.-Amarillo 1993, writ denied); **\*611** *Sawyer v. Donley County Hosp. Dist.,* 513 S.W.2d 106, 109 (Tex.Civ.App.-Amarillo 1974, no writ). Therefore, despite the trial court's statement of its intention that the October 30 judgment would relate back to the July 7 judgment, the October 30 judgment could not relate back because the July 7 judgment no longer existed.

Because the final judgment in this case was signed and became subject to appeal after September 1, 2003, the trial court erred in applying a prejudgment interest rate of ten percent instead of five percent. We sustain Helen's first issue.

**[4]** In her second issue, Helen contends that the trial court improperly calculated prejudgment interest on the entire amount of damages found by the jury rather than the amount awarded to Moon after the credit for Brantley's workers' compensation lien. Helen argues that the trial court should have deducted the amount of Brantley's workers' compensation lien from the total damages before calculating prejudgment interest. Moon contends that the trial court correctly calculated prejudgment interest on the full amount of damages found by the jury.[4]

**[5]** Because the calculation of prejudgment interest is a question of law, *Travelers Ins. Co. v. Wilson,* 28 S.W.3d 42, 47 (Tex.App.-Texarkana 2000, no pet.); *Morgan v. Ebby Halliday Real Estate, Inc.,* 873 S.W.2d 385, 391 (Tex.App.-

Fort Worth 1993, no writ); *Strickland v. Coleman,* 824 S.W.2d 188, 192–93 (Tex.App.-Houston [1 Dist.] 1991, no writ), we will review the issue de novo, *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 928 (Tex.1998), *cert. denied,* 526 U.S. 1144, 119 S.Ct. 2018, 143 L.Ed.2d 1030 (1999); *Town of Flower Mound,* 71 S.W.3d at 26.

 **[6]**  **[7]**  **[8]** Prejudgment interest is compensation allowed by law as "additional damages for lost use of money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 528 (Tex.1998). Prejudgment interest is calculated on the judgment amount, not the amount of damages awarded by the jury. *C & H Nationwide, Inc. v. Thompson,* 810 S.W.2d 259, 275 (Tex.App.-Houston [1st Dist.] 1991), *aff'd in part and rev'd in part on other grounds,* 903 S.W.2d 315 (Tex.1994); *Owens–Corning Fiberglas Corp. v. Schmidt,* 935 S.W.2d 520, 524 (Tex.App.-Beaumont 1996, writ denied). Any credits or offsets due a defendant should be deducted from the total damages awarded before—not after—prejudgment interest is calculated. *Roberts v. Grande,* 868 S.W.2d 956,

960 (Tex.App.-Houston [14th Dist.] 1994, no writ); *Berry Prop. Mgt., Inc. v. Bliskey,* 850 S.W.2d 644, 671 (Tex.App.-Corpus Christi 1993, writ dism'd by agr.); *Sisters of Charity of Incarnate Word v. Dunsmoor,* 832 S.W.2d 112, 118 (Tex.App.-Austin 1992, writ denied).

The trial court erred in failing to deduct the amount of Brantley's workers' compensation credit before it calculated prejudgment interest. Prejudgment interest should have been calculated on the sum of $4,812.37, which is the amount of the damages award less the offsetting credit for the workers' compensation lien. We sustain Helen's second issue.

 **\*612** Having sustained both of Helen's issues, we reverse the part of the judgment awarding prejudgment interest and remand to the trial court to recalculate prejudgment interest in accordance with this opinion.

## All Citations

158 S.W.3d 607

## Footnotes

1   The legislation provided, in pertinent part:
    "The postjudgment interest rate is: (1) the prime rate as published by the Federal Reserve Bank of New York on the date of computation; (2) five percent a year if the prime rate as published by the Federal Reserve Bank of New York as described by Subdivision (1) is less that five percent; or (3) 15 percent a year if the prime rate as published by the Federal Reserve Bank of New York described by Subdivision (1) is more than 15 percent." Act of June 20, 2003, 78th Leg., R.S., ch. 676, § 1, 2003 Tex. Gen. Laws 2096, 2097; Act of June 2, 2003, 78th Leg., R.S., art. 6, § 6.01, 2003 Tex. Gen. Laws 847, 862 (both codified at TEX. FIN.CODE ANN. § 304.003(c)).

2   We note that the five percent prejudgment interest rate actually went into effect on June 20, 2003 by virtue of House Bill 2415. *See* Tex. H.B. 2415, § 2(b), 78th Leg., R.S., Tex. Gen. Laws 2096, 2097 (providing that House Bill 2415 took effect immediately if it received a two-thirds vote of all the members elected to each house, which it did on June 20, 2003); *Tesfa v. Stewart,* 135 S.W.3d 272, 279 (Tex.App.-Fort Worth 2004, pet. denied) (noting that amendments to finance code interest rate were effective on both June 20 and September 1, 2003). Because Pringle did not raise this argument below, however, we cannot reverse the trial court on this ground. *See Banda v. Garcia,* 955 S.W.2d 270, 272 (Tex.1997); *Rogers v. Stell,* 835 S.W.2d 100, 101 (Tex.1992).

3   At a hearing on October 6, 2003 the court made the following statements:
    [THE COURT]: The parties are incorrect, in that Mr. Pringle is deceased, was killed in a car wreck following the actual date of the jury verdict, and following the date ***I set aside the original final judgment.*** [Emphasis supplied.]
    ....
    [THE COURT]: The Court's response to that is I signed a judgment in this case before the death of Mr. Pringle even though ***I did set it aside.*** [Emphasis supplied.]

4   The case Moon cites to support his position, *Brandon v. American Sterilizer Co.,* 880 S.W.2d 488 (Tex.App.-Austin 1994, no writ), is inapposite because it does not address the issue before us. The prejudgment issues in *American Sterilizer* involved the award of prejudgment interest for the time between the return of the verdict and the rendering of the judgment and the right of a workers' compensation lien assignee to receive credit for the full amount of the lien. *See id.* at 494–95.

# R

7 S.W.3d 109
Supreme Court of Texas.

Jerry J. QUICK, Kaira G. Quick, John M. Bryant,
Ruth E. Bryant, Joe Cox, Dolores Cox, Florence
Turck and Circle C Land Corp., Petitioners,
v.
CITY OF AUSTIN, Save Our Springs Legal
Defense Fund, Inc. and Al St. Louis, Respondents.

No. 96–1154.　|　Argued Nov. 3,
1997.　|　Decided May 8, 1998.　|
Opinion Granting Rehearing Sept. 30, 1999.

Owners of land within city's extraterritorial jurisdiction brought declaratory judgment action challenging water pollution control ordinance. The 22nd Judicial District Court, Hays County, John Forbis, J., entered judgment declaring ordinance to be null and void. City appealed. The Austin Court of Appeals reversed in part and modified in part, 930 S.W.2d 678. On writ of error, the Supreme Court, Abbott, J., held that: (1) review did not violate separation of powers doctrine; (2) ordinance was rationally related to city's interest in protecting water quality; (3) ordinance was not subject to statutory procedures for adopting zoning ordinances; (4) city was not required to obtain approval from the Natural Resource Conservation Commission before ordinance became effective; and (5) ordinance was proper subject of the initiative and referendum process under city charter. On rehearing, the Court further held (6) repealed statute locking in development regulations in existence at time of original permit application continued to apply to applications filed or approved before repeal.

Affirmed in part, reversed and modified in part.

Enoch, J., filed a concurring opinion on original submission.

Hankinson, J., filed dissenting opinion on rehearing, which Enoch, Baker, and O'Neill, JJ., joined.

West Headnotes (30)

**[1]** **Constitutional Law**
　 Nature and scope in general

Legislative function cannot, under the separation of powers doctrine, be reviewed de novo by any other branch of government. Vernon's Ann.Texas Const. Art. 2, § 1.

Cases that cite this headnote

**[2]** **Constitutional Law**
　 To Judiciary
**Environmental Law**
　 Validity

Water Code provision that permitted persons located outside city limits, but affected by water pollution control ordinance, to bring suit challenging such ordinance as "invalid, arbitrary, unreasonable, inefficient, or ineffective," and permitted reviewing court to "overturn or modify" city's action, did not allow de novo review of legislative action, as would violate separation of powers doctrine. Vernon's Ann.Texas Const. Art. 2, § 1; V.T.C.A., Water Code § 26.177(d).

4 Cases that cite this headnote

**[3]** **Constitutional Law**
　 Avoidance of constitutional questions

In analyzing the constitutionality of a statute, court should, if possible, interpret the statute in a manner that avoids constitutional infirmity.

10 Cases that cite this headnote

**[4]** **Statutes**
　 Effect of Partial Invalidity; Severability

If any provision of statute is held to be invalid, the invalidity does not affect other provisions that can properly be given effect in the absence of the invalid provisions.

5 Cases that cite this headnote

**[5]** **Constitutional Law**
　 Policy
**Municipal Corporations**
　 Conformity to constitutional and statutory provisions in general

Judiciary has no power to allow a jury to redecide the policy behind legislative issues by a preponderance of the evidence; instead, in reviewing an ordinance, the court is to consider all the circumstances and determine as a matter of law whether the legislation is invalidated by a relevant statute or constitutional provision. Vernon's Ann.Texas Const. Art. 2, § 1.

6 Cases that cite this headnote

[6] **Administrative Law and Procedure**
 Scope of Review in General

Standard of review is more than just words; rather, it embodies principles regarding the amount of deference a reviewing tribunal accords the original tribunal's decision.

4 Cases that cite this headnote

[7] **Administrative Law and Procedure**
 Trial De Novo

Key to determining whether statute authorizes a de novo review is the amount of deference the statute requires the reviewing tribunal to give to the original tribunal's decision.

28 Cases that cite this headnote

[8] **Administrative Law and Procedure**
 Trial De Novo

When conducting a de novo review, the reviewing tribunal exercises its own judgment and redetermines each issue of fact and law.

95 Cases that cite this headnote

[9] **Administrative Law and Procedure**
 Trial De Novo

In conducting de novo review, the reviewing tribunal accords the original tribunal's decision absolutely no deference.

42 Cases that cite this headnote

[10] **Municipal Corporations**
 Presumptions and burden of proof

Party attacking municipal ordinance bears the extraordinary burden to establish that no conclusive or even controversial or issuable fact or condition existed that would authorize the passage of the ordinance.

3 Cases that cite this headnote

[11] **Municipal Corporations**
 Public safety and welfare

Court reviewing municipal ordinance considers all the circumstances and determines, as a substantive matter, if reasonable minds could differ as to whether the ordinance has a substantial relationship to the protection of the general health, safety, or welfare of the public; if the evidence reveals a fact issue in this respect, the ordinance must be upheld.

6 Cases that cite this headnote

[12] **Environmental Law**
 Validity

Water pollution control ordinance that restricted new development in watershed area, including areas within city's extraterritorial jurisdiction, was rationally related to city's governmental interest in protecting water quality, and was not invalid, arbitrary, unreasonable, inefficient, or ineffective, even insofar as it established strict runoff standards, provided only limited opportunity for variance, and severely affected some property values. V.T.C.A., Water Code § 26.177(d).

3 Cases that cite this headnote

[13] **Eminent Domain**
 What Constitutes a Taking;  Police and Other Powers Distinguished

Governmental regulation can restrict, or even take, property for public benefit, but if the regulation of property rights goes too far, compensation must be provided.

Cases that cite this headnote

[14] **Environmental Law**

 Effluent Limitations and Guidelines

Statutory procedures for adopting municipal rules governing plats and subdivisions of land, which required public hearing, did not apply to adoption of municipal water pollution control ordinance. V.T.C.A., Local Government Code §§ 212.002, 212.003.

2 Cases that cite this headnote

**[15] Zoning and Planning**
 Procedural Requirements

Municipal water pollution control ordinance was not in effect a zoning ordinance that would be subject to statutory procedures for adopting municipal rules governing plats and subdivisions of land, though ordinance included impervious cover limitations that clearly had effect on land use. V.T.C.A., Local Government Code §§ 212.002, 212.003.

2 Cases that cite this headnote

**[16] Municipal Corporations**
 Local legislation

Home rule city was not required to obtain approval from the Natural Resource Conservation Commission before its water control ordinance became effective; Water Code provision requiring that water pollution or abatement program be submitted to the Commission for "review and approval" did not, with unmistakable clarity, limit effectiveness of home rule city's program pending appeal. Vernon's Ann.Texas Const. Art. 11, § 5; V.T.C.A., Water Code § 26.177(a, c).

1 Cases that cite this headnote

**[17] Municipal Corporations**
 Local legislation

Home-rule city is not dependent on the Legislature for a grant of authority; rather, the Legislature may provide limits on the power of home-rule cities, but only if the limitation appears with unmistakable clarity. Vernon's Ann.Texas Const. Art. 11, § 5.

7 Cases that cite this headnote

**[18] Municipal Corporations**
 Matters subject to initiative

Water pollution control ordinance was proper subject of the initiative and referendum process under city charter, and was not impliedly withdrawn by charter provision requiring comprehensive plan to regulate development and planning commission to review development proposals.

2 Cases that cite this headnote

**[19] Municipal Corporations**
 Initiative

City charter provisions are to be liberally construed in favor of the power of initiative and referendum.

3 Cases that cite this headnote

**[20] Municipal Corporations**
 Initiative

While the initiative power may be either expressly or impliedly limited by the city charter, such a limitation will not be implied unless the provisions of the charter are clear and compelling.

2 Cases that cite this headnote

**[21] Appeal and Error**
 Intervention

Any error in failing to grant citizens group's plea in intervention was harmless, in suit challenging city's water pollution control ordinance, where group sought to intervene because it believed city could not adequately protect its interest, but city prevailed on appeal in upholding ordinance against all the challenges. Rules App.Proc., Rule 61.1.

1 Cases that cite this headnote

**[22] Statutes**

Repealing Statutes

Generally, when a statute is repealed without a savings clause limiting the effect of the repeal, the repeal of that statute is usually given immediate effect.

3 Cases that cite this headnote

**[23]** **Statutes**
Repealing Statutes

When a right or remedy is dependent on a statute, the unqualified repeal of that statute operates to deprive the party of all such rights that have not become vested or reduced to final judgment.

7 Cases that cite this headnote

**[24]** **Appeal and Error**
Effect of change in law
**Statutes**
Pending Actions and Proceedings

Ordinarily all suits filed in reliance on statute must cease when the repeal of statute becomes effective, and if final relief has not been granted before the repeal goes into effect, final relief cannot be granted thereafter, even if the cause is pending on appeal; repeal of the statute deprives the court of subject matter jurisdiction.

9 Cases that cite this headnote

**[25]** **Statutes**
Saving clauses

Existence of the specific savings clause in repeal of legislation does not preclude application of the general savings provision of the Code Construction Act to the repeal. V.T.C.A., Government Code § 311.031(a, b).

1 Cases that cite this headnote

**[26]** **Statutes**
Saving clauses

General savings clause of Code Construction Act is presumed to apply to repeal of legislation unless a contrary legislative intent is shown

by clear expression or necessary implication. V.T.C.A., Government Code § 311.031(a, b).

29 Cases that cite this headnote

**[27]** **Zoning and Planning**
Constitutional and Statutory Provisions

Repeal of statute locking in development regulations in existence at time of original permit application was subject to general savings clause of Code Construction Act, though repeal included specific savings clause, where repeal did not expressly make general savings clause inapplicable, and specific savings clause was not redundant of and did not conflict with general clause. V.T.C.A., Government Code § 311.031(a, b); V.T.C.A., Government Code § 481.143 (Repealed).

1 Cases that cite this headnote

**[28]** **Zoning and Planning**
Retroactive operation

Subsequent applications were covered by statute locking in development regulations in existence at time of original permit application even if original application was filed before effective date of statute. V.T.C.A., Government Code § 481.143 (Repealed).

2 Cases that cite this headnote

**[29]** **Statutes**
Property
**Zoning and Planning**
Retroactive operation

Statute locking in development regulations in existence at time of original permit application was not improperly given retroactive effect to extent it was determined to apply even when original application was filed before effective date of statute, with result that subsequent applications, filed after effective date, were governed by regulations in effect before effective date. V.T.C.A., Government Code § 481.143 (Repealed).

4 Cases that cite this headnote

**[30]    Zoning and Planning**
　　👉 Constitutional and Statutory Provisions

By application of general savings clause of Code Construction Act, repealed statute locking in development regulations in existence at time of original permit application precluded application of current water pollution control ordinance, restricting new development in watershed area, to permit applications first filed or approved before repeal, but not those first filed after repeal. V.T.C.A., Government Code § 311.031(a, b).

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*112**  Roy Q. Minton, John L. Foster, Bob E. Shannon, Joseph R. Knight, Robert I. Howell, Scott K. Field, Joe R. Greenhill, Austin, for Petitioners.

William G. Bunch, Thomas H. Watkins, Andrew F. Martin, Elizabeth G. Bloch, James K. McClendon, Frank C. Cooksey, Pamela Stanton Baron, Austin, Michael A. Hatchell, Tyler, Dick DeGuerin, Houston, Teresa L. Todd, Marfa, for Respondents.

**Opinion**

Justice ABBOTT delivered the opinion of the Court.

We are confronted with a challenge to the City of Austin's Save Our Springs Ordinance, a water pollution control measure enacted in 1992. Petitioners, who own land within the City of Austin's extraterritorial jurisdiction, brought this action contesting the Ordinance. Petitioners claim that the Ordinance is arbitrary, unreasonable, and inefficient. Petitioners also assert that the Ordinance is void because it was enacted without a public hearing, it impermissibly regulates the number, use, and size of buildings in the City's extraterritorial jurisdiction, and it has not been approved by the Texas Natural Resource Conservation Commission. The trial court rendered judgment in favor of Petitioners, holding that the Ordinance was null and void. The court of appeals reversed in part and modified in part, rendering judgment that the Ordinance was valid. 930 S.W.2d 678. Although we do

not agree with all of the court of appeals' analysis, we affirm its judgment upholding the Ordinance's validity.

**I**

Frustrated by their perception that the Austin City Council was failing to safeguard Barton Springs adequately, a group of Austin citizens interested in protecting the environment initiated the Save Our Springs Ordinance and placed it on the Austin municipal ballot for a local referendum election. In August 1992, the Austin citizens participating in the referendum election overwhelmingly approved the Ordinance. Two days after the voters approved the Ordinance, the Austin City Council enacted the Ordinance and incorporated it into the City Code.

The purpose of the Ordinance, according to its Declaration of Intent, is to insure water quality control in Barton Creek, Barton Springs, and the Barton Springs Edwards Aquifer. [1] The provisions of the **\*113** Ordinance apply to those areas within Austin and Austin's extraterritorial jurisdiction that contain watersheds contributing to Barton Springs. The Ordinance limits impervious or non-porous cover on land in the regulated areas to between 15% and 25% of the net site area. The Ordinance also requires that new developments be set back from streams and not contribute to an increase in the amount of pollution constituents commonly found in urban rainfall runoff water. Construction in the "critical water quality zone" of the Barton Creek watershed is prohibited by the Ordinance. The Ordinance provides for no waivers or exceptions unless necessary to avoid conflict with state and federal laws.

Petitioners Jerry J. Quick, Kaira G. Quick, John M. Bryant, Ruth E. Bryant, Joe Cox, Dolores Cox, Florence Turck, and Circle C Land Corporation all own land outside the city limits of Austin but within its extraterritorial jurisdiction. Because their land is within Austin's extraterritorial jurisdiction, any development of their property must comply with the Ordinance. The Petitioners sued the City in Hays County, seeking a declaratory judgment that the Ordinance was void because it was illegally enacted. Additionally, Petitioners challenged the Ordinance under section 26.177(d) of the Texas Water Code, which authorizes a party aggrieved by a water pollution control ordinance to appeal to district court to review whether the ordinance is invalid, arbitrary, unreasonable, inefficient, or ineffective.

Save Our Springs Alliance, Inc., an incorporated association of individuals led by the citizen initiators of the Ordinance, moved to intervene in the suit. The Alliance urged that the City was incapable of adequately advocating the Alliance's interest due to previous hostilities over the Ordinance. *See, e.g., City Council of Austin v. Save Our Springs Coalition,* 828 S.W.2d 340 (Tex.App.—Austin 1992, no writ)(citizens sued City to force election on the Ordinance). The trial court, however, struck the plea in intervention, leaving the City to defend the Ordinance.

The Petitioners and the City proceeded to try the case to a jury. The jury answered "yes" to all the questions in the charge inquiring whether the Ordinance and its impervious cover limitations, its prohibition against increases in pollution constituents, and its failure to contain variances were an unreasonable, arbitrary, and inefficient attempt to control water quality. The jury also found that the Ordinance was not a proper subject for the initiative and referendum process and that the Ordinance regulated the number, use, and size of buildings in the City's extraterritorial jurisdiction (a violation of section 212.003 of the Texas Local Government Code).

Based on the jury's answers, the trial court rendered judgment for the Petitioners declaring the Ordinance null and void. The trial court's final judgment also contained conclusions of law, including that the Ordinance was ineffective because the Texas Natural Resource Conservation Commission had not approved it and that the Ordinance was void because it was enacted without a public hearing in violation of section 212.002 of the Local Government Code. The trial court further decreed that any permit required by Petitioner Circle C Land Corporation to develop its property would be subject only to the law in effect when the original application for preliminary subdivision approval was filed, which, in some cases, pre-dated the enactment of the Ordinance.

The court of appeals reversed and rendered in part and modified in part the trial court's judgment. 930 S.W.2d 678. The appellate court first determined that the trial court did not abuse its discretion in striking the Alliance's plea in intervention. 930 S.W.2d at 683. The court of appeals then concluded that the trial court erred in rendering judgment that the Ordinance **\*114** was unreasonable, arbitrary, and inefficient pursuant to section 26.177(d) of the Texas Water Code because section 26.177(d) was unconstitutional under article II, section 1 of the Texas Constitution, the separation of powers provision. *Id.* at 685. The court of appeals further held that the Ordinance was not illegally enacted because (1)

it did not require approval by the Texas Natural Resource Conservation Commission before it could become effective, (2) it was not subject to sections 212.002 and 212 .003 of the Local Government Code, and (3) it was a proper subject of the initiative and referendum process. *Id.* at 686–91. The appellate court accordingly reversed the trial court's judgment in part and rendered judgment that the Ordinance was a valid legislative act. The court of appeals also modified the trial court's judgment in part, holding that any permit required by Circle C would be considered only under the regulations and ordinances in effect when the original application for preliminary subdivision approval was filed, *as long as the permit application was filed after September 1, 1987. Id.* at 693–94.

Petitioners challenged the court of appeals' judgment by filing an application for writ of error with this Court. Petitioners allege that the court of appeals erred by holding (1) that section 26.177(d) of the Water Code is unconstitutional as a violation of separation of powers, (2) that the Ordinance is not subject to sections 212.002 and 212.003 of the Local Government Code, (3) that the Ordinance is effective without the City first obtaining the Texas Natural Resource Conservation Commission's approval, (4) that the Ordinance was a proper subject of the initiative and referendum process, and (5) that only Circle C's permit applications filed after September 1, 1987 would be considered on the basis of the regulations and ordinances in effect at that time. The Alliance also filed its own application for writ of error, contending that the court of appeals erred in upholding the trial court's striking of its plea in intervention.

**II**

We first consider the constitutionality of section 26.177(d) of the Texas Water Code. Section 26.177(d) provides in pertinent part:

> Any person affected by any ... ordinance ... relating to water pollution control and abatement outside the corporate limits of such city adopted pursuant to this section or any other statutory authorization may appeal such action to the [Texas Natural Resource Conservation Commission] or district court.... The issue on appeal is whether the action or program

is invalid, arbitrary, unreasonable, inefficient, or ineffective in its attempt to control water quality. The commission or district court may overturn or modify the action of the city.

TEX. WATER CODE § 26.177(d).

The trial court submitted several questions to the jury inquiring whether various provisions of the Ordinance were "unreasonable," "arbitrary," or "inefficient." Based on the jury's affirmative answers to these questions, the court then rendered judgment that the Ordinance was invalid under section 26.177(d).

The court of appeals, however, concluded that section 26.177(d) violates the separation of powers doctrine of the Texas Constitution because it requires a de novo review of a legislative act. The court of appeals reasoned that the trial court conducted a de novo review of the statute as evidenced by the court's charge asking the jury to determine, by a preponderance of the evidence, whether the jury thought the Ordinance was unreasonable, arbitrary, or inefficient. The court of appeals further ruled that section 26.177(d) authorized such an unconstitutional de novo review by permitting the reviewing court to "modify" a legislative act and to determine whether a legislative act was "inefficient" or "ineffective."

**A**

 **[1]**   A legislative function cannot, under the separation of powers doctrine, be reviewed **\*115** de novo [2] by any other branch of government. Article II, section 1 of the Texas Constitution divides the functions of government as follows:

[T]hree distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others.

TEX. CONST. art. II, § 1. Consistent with this division of power, we have recognized that, when the Legislature delegates a legislative function to a municipality or an administrative agency, a de novo review by the judiciary of the delegated function violates the Constitution. *Chemical Bank & Trust Co. v. Falkner,* 369 S.W.2d 427, 432–33 (Tex.1963); *Davis v. City of Lubbock,* 160 Tex. 38, 326 S.W.2d 699, 712–14 (1959); *Southern Canal Co. v. State Bd. of Water Eng'rs,* 159 Tex. 227, 318 S.W.2d 619, 621– 22 (1958).

 **[2]**   The Petitioners concede that, if section 26.177(d) in fact confers the power on the courts to review a legislative function de novo, the statute is unconstitutional as a violation of the separation of powers provision of our state constitution. Petitioners also concede that the Ordinance represents the exercise of a legislative function the Legislature has delegated to the City. Accordingly, the only issue we must determine is whether section 26.177(d) necessitates a de novo review by the judiciary. If it does, it is unconstitutional; if it does not, it is constitutional.

 **[3]**    **[4]**   In analyzing the constitutionality of a statute, we should, if possible, interpret the statute in a manner that avoids constitutional infirmity. *Barshop v. Medina County Underground Water Conservation Dist.,* 925 S.W.2d 618, 629 (Tex.1996). Moreover, if any provision of the statute is held to be invalid, the invalidity does not affect other provisions that can properly be given effect in the absence of the invalid provisions. *Rose v. Doctors Hosp.,* 801 S.W.2d 841, 844 (Tex.1990); *see also* TEX. GOV'T CODE § 311.032(c).

The Petitioners argue that, under these standards, section 26.177(d) does not unconstitutionally authorize de novo review of a legislative act. The Petitioners maintain that the Legislature did not expressly mandate de novo review, but rather used neutral terms consistent with the constitutionally appropriate standard for judicial review of legislative acts. Petitioners observe that section 26.177(d) employs terms such as "unreasonable" and "arbitrary," which are consistent with the standard of review traditionally employed in reviewing city ordinances. *See City of Brookside Village v. Comeau,* 633 S.W.2d 790, 792 (Tex.), *cert. denied,* 459 U.S. 1087, 103 S.Ct. 570, 74 L.Ed.2d 932 (1982)(city ordinance is presumed valid unless the ordinance is unreasonable and arbitrary); *Hunt v. City of San Antonio,* 462 S.W.2d 536, 539 (Tex.1971)(same). Petitioners also rely on this Court's holding in *Edgewood Indep. Sch. Dist. v. Kirby,* 777 S.W.2d 391, 394 (Tex.1989), that legislative acts can be reviewed for "efficiency." Petitioners alternatively urge that, even assuming that certain words in the statute impermissibly

connote a de novo review, this Court should excise those words and uphold the remaining portions of the statute.

The City responds that section 26.177(d)'s effect is to require a court to reweigh the City's legislative decisions regarding the reasonableness, effectiveness, and efficiency of the Ordinance, which is an unconstitutional judicial review of public policy determinations. The intrusiveness of section 26.177(d) is demonstrated, according to the City, by the fact that the jury was asked to decide in this case, by a **\*116** preponderance of the evidence, whether the Ordinance was "inefficient," "unreasonable," or "arbitrary." Section 26.177(d) is not, the City continues, similar to a permitted review of whether a legislative act is unreasonable or arbitrary. Moreover, the City argues that *Edgewood,* 777 S.W.2d at 394, does not apply because our decision in that case was premised on a unique state constitutional provision, article VII, section 1, which charged the Legislature with the duty to provide for "an efficient system of public free schools." Because there is no constitutional mandate that a water quality ordinance be "efficient," the City avers that *Edgewood* does not mean that courts may routinely review the efficiency of legislation. Finally, the City asserts that severing any offending terms in section 26.177(d) would contravene legislative intent and would render the statute devoid of meaning.

 **[5]** The City correctly argues that the trial court erred in submitting a question for the jury to determine, based on a preponderance of the evidence, whether the Ordinance was arbitrary, unreasonable, or inefficient. The judiciary has no power to allow a jury to redecide the policy behind legislative issues by a preponderance of the evidence. *See Southern Canal,* 318 S.W.2d at 623–24. Instead, in reviewing an ordinance, the court is to consider all the circumstances and determine as a matter of law whether the legislation is invalidated by a relevant statute or constitutional provision. *Cf. Comeau,* 633 S.W.2d at 793. Nevertheless, the fact that the trial court in this case impermissibly submitted these questions to the jury does not mandate that the *statute* is unconstitutional. The submitted jury questions, being questions of law, are immaterial and will not be considered. *Spencer v. Eagle Star Ins. Co.,* 876 S.W.2d 154, 157 (Tex.1994)(court may disregard as immaterial a jury's finding on a question of law). We will instead rely on the provisions of the statute itself to determine its constitutionality.

 **[6]** **[7]** The court of appeals focused on certain words in the statute, such as "inefficient," "ineffective," and "modify," as

the basis for its conclusion that the statute unconstitutionally authorizes a de novo review for legislative acts. However, a standard of review is more than just words; rather, it embodies principles regarding the amount of deference a reviewing tribunal accords the original tribunal's decision. The key to determining whether section 26.177(d) authorizes a de novo review is therefore the amount of deference the statute requires the reviewing tribunal to give to the original tribunal's decision.

 **[8]** **[9]** When conducting a de novo review, the reviewing tribunal exercises its own judgment and redetermines each issue of fact and law. *Key Western Life Ins. Co. v. State Bd. of Ins.,* 163 Tex. 11, 350 S.W.2d 839, 846 (1961); *Lone Star Gas Co. v. State,* 137 Tex. 279, 153 S.W.2d 681, 692 (1941); *Ysleta Ind. Sch. Dist. v. Meno,* 933 S.W.2d 748, 751 n. 5 (Tex.App.—Austin 1996, writ denied). In such a review, the reviewing tribunal accords the original tribunal's decision absolutely no deference. *See, e.g., State v. Heal,* 917 S.W.2d 6, 9 (Tex.1996); *Ysleta,* 933 S.W.2d at 751 n. 5. Accordingly, then, the controlling issue is whether section 26.177(d) requires that the Ordinance be given practically no deference by the reviewing court.

We hold that section 26.177(d) does not mandate such a result. In reaching this conclusion, we abide by the maxim that courts should, if possible, interpret statutes in a manner that avoids constitutional infirmities. *Barshop,* 925 S.W.2d at 629. We note that section 26.177(d) utilizes two words, "unreasonable" and "arbitrary," that this Court has repeatedly stated connote the proper deferential standard of reviewing a city ordinance. *Comeau,* 633 S.W.2d at 792 (city ordinance is presumed to be valid unless the ordinance is unreasonable and arbitrary); *Thompson v. City of Palestine,* 510 S.W.2d 579, 581–82 (Tex.1974)(describing extraordinary burden **\*117** on party attacking ordinance to show that reasonable minds could not differ on whether the ordinance has a substantial relationship to the general welfare and that the city acted arbitrarily); *Hunt,* 462 S.W.2d at 539 (city ordinance is presumed to be valid unless the ordinance is unreasonable and arbitrary).

In the context of the deferential standard predicated by the words "unreasonable" and "arbitrary," we cannot agree with the court of appeals that the inclusion of "inefficient" and "ineffective" somehow requires a transformation of the standard of review from the proper deferential standard to a standard in which the City's decision is afforded no deference. In fact, on prior occasions, albeit under

different circumstances, this Court has interpreted the word "efficient" in a more deferential manner than would have been required under a de novo review. *See, e.g., Edgewood,* 777 S.W.2d at 398–99 (utilizing the term "efficient" in article VII, section 1 of the Texas Constitution to provide a standard to measure the constitutionality of the Texas system for financing public education in Texas, but recognizing that the Legislature, rather than the courts, had "the primary responsibility to decide how best to achieve an efficient system"); *Central Educ. Agency of State of Texas v. Upshur County Com'rs Court,* 731 S.W.2d 559, 561 (Tex.1987)(holding that Commissioner of Education's responsibility to "promote efficiency and improvement" did not mean that Commissioner could conduct a de novo review of county commissioners' detachment and annexation decisions). We accordingly perceive no constitutional impediment to judicial review of an ordinance to determine whether it is "inefficient" or "ineffective" under the appropriate deferential standard of review.

 **[10]**     **[11]**     The principles that underlie this deferential standard of review for municipal legislation are summarized in our decision in *Comeau,* 633 S.W.2d at 792–93. The party attacking the ordinance bears the "extraordinary burden" to establish " 'that no conclusive or even controversial or issuable fact or condition existed' " that would authorize the passage of the ordinance. *Id.* (quoting *Thompson,* 510 S.W.2d at 581). We consider all the circumstances and determine, as a substantive matter, if reasonable minds could differ as to whether the ordinance has a substantial relationship to the protection of the general health, safety, or welfare of the public. *Id.* at 793. If the evidence reveals a fact issue in this respect, the ordinance must be upheld. *Id.* Accordingly, we hold that, under this deferential standard of review, the Texas Constitution is not violated by the judiciary considering, according to the mandates of section 26.177(d) of the Water Code, whether a water control ordinance is invalid, arbitrary, unreasonable, inefficient, or ineffective in its attempt to control water quality.

We further do not believe that the provision in section 26.177(d) allowing the reviewing court to "modify" the city's action connotes an impermissible de novo review. Courts ordinarily cannot strike down an entire ordinance as invalid based on the invalidity of only a part of the ordinance, unless all the provisions of the ordinance are so dependent or connected that it cannot be presumed that one provision would have been passed without the others. *Rose v. Doctors*

*Hosp.,* 801 S.W.2d 841, 844 (Tex.1990). If a reviewing court were to determine that one portion of a water control ordinance was invalid, the court would therefore be required to "modify" the ordinance to delete the invalid portion if the remainder of the ordinance was complete in itself and capable of being executed in accordance with the apparent legislative intent. *See id.* The Legislature's use of the word "modify" thus does not render section 26.177(d) unconstitutional. We disagree with the court of appeals' holding that section 26.177(d) violates the separation of powers doctrine and is unconstitutional. Rather, we will interpret and apply section 26.177(d) consistent with the deferential **\*118** standard of review this Court articulated in *Comeau.*

### B

 **[12]**     Petitioners urge that the Ordinance's invalidity under the *Comeau* standard is manifest. Petitioners rely upon evidence in the record that, before the passage of the Ordinance, the City already had the most stringent water quality standards in Texas. Moreover, a city engineer and the head of Austin's Environmental Services admitted during trial that no discernible trend of pollution existed in Barton Springs prior to the Ordinance's enactment. Accordingly, Petitioners maintain that the Ordinance was unnecessary and based on flawed data.

Petitioners also complain that it is impossible to comply with the Ordinance. The Ordinance requires that a development not increase annual pollution loadings of thirteen identified constituents. Petitioners contend that the rules implemented by the City of Austin to execute the Ordinance require runoff surface water from a development to have lower average concentrations of some of these constituents than was found in certain rain samples taken in Austin.[3] In fact, Petitioners point out that the Ordinance requires that runoff surface water have less average nitrogen than contained in some name-brand bottled drinking water.[4] Petitioners allege that the Ordinance's practical effect is therefore a preclusion of all development in the watershed areas.

Petitioners also attack the lack of variances in the Ordinance. For instance, even if a landowner could establish that no increase in pollution would result from constructing a greater percentage of impervious cover than allowed under the Ordinance, no variance is permitted.

Finally, Petitioners impugn the Ordinance's financial impact. The City's own expert economist concluded that the Ordinance would, over a fifteen-year period, decrease property values in the watershed areas in the range of $229 million to $379 million. The Petitioners introduced evidence at trial that some land lost ninety percent of its value because of the Ordinance.

The City presented evidence at trial that sharply contradicted the Petitioners' arguments. In response to the Petitioners' evidence regarding the effectiveness of the water control ordinances in place before the Save Our Springs Ordinance, the City provided testimony that the Ordinance was cheaper and easier to administer than earlier measures. Further, the evidence also established that eighty-six percent of all development applications received a variance under the water quality ordinance in effect immediately prior to the Save Our Springs Ordinance. This excessive grant of variances under the prior ordinance, according to the City, obviously undercut its effectiveness.

To rebut the Petitioners' claim that it is impossible to comply with the Ordinance because its rules require that runoff be purer than rain, the City elicited testimony from Stephen Stecher, the project director of the Barton Creek watershed study. He testified that soil and plants on the ground **\*119** typically capture much of the nitrogen and some other constituents in urban rainfall before the constituents reach a creek or tributary. Accordingly, even assuming that the Petitioners' evidence regarding the rainfall samples was reliable, *see* ante at n. 3, the City contends that compliance with the technical rules is still possible because runoff is naturally less contaminated with certain pollutants than rainfall. In further support of its argument that it is not impossible to comply with the Ordinance, the City presented testimony from two developers that it is not only possible, but actually profitable to develop land in the watershed areas in compliance with the Ordinance. These developers both testified that they were anticipating sizable profits from their developments complying with the strictures of the Ordinance.

Finally, the City offered evidence that the impervious cover limitations in the Ordinance reduce polluting runoff and are a nationally-recognized method of protecting water quality. According to the City, the provisions restricting the pollutant constituents are only a small percentage of the 138 pollutants that the City is required to monitor under federal law. The restrictions on impervious cover and pollutant constituents, the City therefore urges, are clearly related to its goal of protecting the watershed from pollution in order to preserve water quality.

In light of the conflicting evidence presented at trial regarding the Ordinance, we cannot conclude that the Petitioners met their "extraordinary burden" of establishing that reasonable minds could not differ regarding whether the Ordinance was invalid, arbitrary, unreasonable, inefficient, or ineffective in its attempt to control water quality. While Petitioners presented evidence tending to establish that prior water control ordinances were sufficient such that the Ordinance was not necessary, the City's evidence regarding the excessive grant of variances under the prior measure precludes a determination that reasonable minds could not differ on the need for the Ordinance.

The trial testimony conflicts regarding a landowner's ability to comply with the Ordinance. The Petitioners offered scientific testimony attempting to establish that it was virtually impossible to comply with the Ordinance, but this testimony was refuted by the City. Moreover, the City also presented the testimony of two developers that, not only did the City approve their developments under the Ordinance, they actually anticipate profitable returns on their investments. The conflict in this evidence demonstrates that reasonable minds could indeed differ on whether compliance with the Ordinance is possible.

While the Petitioners decry the lack of a variance procedure in the Ordinance, the Ordinance does actually provide a limited variance to keep the Ordinance from running afoul of federal and state laws. Moreover, the Petitioners' complaint regarding the lack of a variance procedure ignores the evidence that the excessive grant of variances under prior water control measures had undercut their effectiveness.

We perceive that the real crux of the Petitioners' complaint is that the Ordinance unreasonably reduces property values and requires excessive expenditures in order to comply with its provisions. The Petitioners established that the Ordinance will result in at least a $225 million decrease in property values in regulated areas, and that the Ordinance has caused some parcels of land to lose ninety percent of their value. The City has not refuted this evidence.

However, in this case, the fact that the Ordinance severely impacts some property values does not make it invalid, arbitrary, unreasonable, inefficient, or ineffective in its attempt to control water quality. While the Ordinance's

impervious cover limitations undoubtedly substantially affect the value of some property parcels, such limitations are a nationally-recognized method of preserving water quality. Further, **\*120** it is indisputable that limiting pollutants in runoff water will aid in preserving water quality. We therefore conclude that the Ordinance's provisions are rationally related to its goal of protecting water quality.

 **[13]** Because we have concluded that the Ordinance is rationally related to the governmental interest in protecting water quality, the City has the right to significantly limit development in watershed areas in furtherance of this interest. *See Day–Brite Lighting, Inc. v. Missouri,* 342 U.S. 421, 424, 72 S.Ct. 405, 96 L.Ed. 469 (1952). A governmental regulation can restrict, or even take, property for such a public benefit; however, if the regulation of property rights goes too far, compensation must be provided. *See Barshop,* 925 S.W.2d at 628. To the extent that the City's limitations on development deny all economically viable use of property or unreasonably interfere with the right to use and enjoy property, affected property owners may have a remedy in takings law. *See Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 935 (Tex.1998)(recognizing that a compensable taking can occur if a governmental regulation totally destroys a property's value or if the regulation has a severe enough economic impact and the regulation interferes with distinct investment-backed expectations). Such a challenge is not part of this lawsuit. Our holding today that the Ordinance is not invalid, arbitrary, unreasonable, inefficient, or ineffective in its attempt to control water quality accordingly has no impact on any potential claim that the Ordinance unconstitutionally interferes with a landowner's property rights.

### III

 **[14]** The Petitioners next attack the court of appeals' conclusion that the Ordinance is not void under sections 212.002 and 212.003 of the Local Government Code. Local Government Code section 212.002 provides:

> After a public hearing on the matter, the governing body of a municipality may adopt rules governing plats and subdivisions of land within the municipality's jurisdiction to promote the health, safety, morals, or general welfare of the municipality and

the safe, orderly, and healthful development of the municipality.

TEX. LOC. GOV'T CODE § 212.002. Local Government Code section 212.003 provides in pertinent part:

> (a) The governing body of a municipality by ordinance may extend to the extraterritorial jurisdiction of the municipality the application of municipal ordinances adopted under Section 212.002 and other municipal ordinances relating to access to public roads. However, unless otherwise authorized by state law, in its extraterritorial jurisdiction a municipality shall not regulate:

> (1) the use of any building or property for business, industrial, residential, or other purposes;

> (2) the bulk, height, or number of buildings constructed on a particular tract of land;

> (3) the size of a building that can be constructed on a particular tract of land, including without limitation any restriction on the ratio of building floor space to the land square footage; or

> (4) the number of residential units that can be built per acre of land.

*Id.* § 212.003.

Petitioners argue that (1) sections 212.002 and 212.003 govern the Ordinance, (2) the Ordinance was enacted without a public hearing in violation of section 212.002, and (3) the Ordinance effectively violates the prohibitions in section 212.003 by regulating the use, bulk, height, number, or size of buildings. Petitioners accordingly advocate that the trial court correctly held that the Ordinance was void. The City responds that sections 212.002 **\*121** and 212.003 do not apply because these sections are zoning statutes and the Ordinance is a water pollution control measure. We agree with the City.

By their express terms, sections 212.002 and 212.003 apply to ordinances that "govern plats and subdivisions of land." Further, the statutes' legislative history indicates that they govern a city's zoning authority, not a city's authority to apply water quality requirements. For instance, House Bill 3187, which amended section 212.003, "prohibits the application of zoning regulations in ETJ areas." COMMITTEE ON URBAN AFFAIRS, BILL ANALYSIS, Tex. H.B. 3187, 71st Leg., R.S. (1989). In fact, the Legislature made it clear that

section 212.003 was not intended "to affect the ability of a municipality to apply water control requirements" in its extraterritorial jurisdiction. CONFERENCE COMMITTEE REPORT, Tex. H.B. No. 3187, 71st Leg., R.S. (1989). We therefore conclude that sections 212.002 and 212.003 apply only to zoning statutes, not water control measures such as the Ordinance.

 **[15]**    Petitioners nevertheless assert that the Ordinance is, in effect, a zoning ordinance, not a water control ordinance. Petitioners argue that the Ordinance's impervious cover limitations effectively constitute a regulation on the use, bulk, height, number, and size of buildings in the City's extraterritorial jurisdiction in violation of section 212.003. Petitioners contend that we should consider the actual effect of the Ordinance, not its stated purpose, in determining whether the Ordinance must comply with these statutes.

However, we disagree with Petitioners' assertion that the Ordinance effectively constitutes a zoning regulation. The Ordinance's stated goal is to protect and preserve a "clean and safe drinking water supply" and "to prevent further degradation of the water quality in Barton Creek, Barton Springs, and the Barton Springs Edwards Aquifer." While the Ordinance clearly has effects on land use through its imposition of impervious cover limitations, these cover limitations are typical features in ordinances protecting water quality. Indeed, as discussed previously, such cover limitations are a nationally-recognized method of preserving water quality, and therefore we conclude that the cover limitations further the Ordinance's stated goal. On balance, the Ordinance is not a zoning regulation seeking to shape urban development, but rather is a measure designed to protect water quality. We accordingly hold that the requirements of sections 212.002 and 212.003 are not applicable to the Ordinance, and the Ordinance cannot be invalidated by these statutes.

### IV

 **[16]**    Petitioners also complain that the court of appeals erred in holding that the Ordinance is effective without the City first obtaining approval from the Texas Natural Resource Conservation Commission. Section 26.177(a) of the Water Code allows municipalities with populations in excess of five thousand to establish water pollution control and abatement programs. Section 26 .177(c) provides in pertinent part:

The water pollution and abatement program ... must be submitted to the [Texas Natural Resource Conservation] commission for review and approval. The commission may adopt rules providing the criteria for the establishment of those programs and the review and approval of those programs.

TEX. WATER CODE § 26.177(c).

Petitioners argue that the Legislature clearly contemplated by the phrase "review and approval" that the Texas Natural Resource Conservation Commission would actually approve a city's water pollution and abatement control program before the program could become effective. Otherwise, Petitioners maintain that a city ordinance would remain effective even if the Commission later expressly disapproved the ordinance. Additionally, Petitioners **\*122** rely on the statute's bill analysis, which stated that:

Current law requires the preparation of pollution abatement plans by cities ... but does not require submittal, review and approval of the plans. There is currently no requirement for cities to notify anyone when a pollution abatement plan is established. Water pollution abatement plans, when properly prepared, can be beneficial in reducing water pollution. However, if a city fails to submit a plan, or submits an inadequate plan, there is no procedure for carrying out the intent of the law. This bill would provide for direct Texas Water Commission oversight of pollution abatement plans.

SENATE NATURAL RESOURCES COMM., BILL ANALYSIS, Tex. H.B. 1546, 71st Leg., R.S. (1989). Petitioners assert that the Commission cannot "provide oversight" of the pollution abatement plans if the plans can become effective before approval is obtained. Because the Ordinance undisputedly has not yet been approved by the Commission, Petitioners urge that it is not effective.

The City responds that its own charter prescribes when ordinances become effective. Any legislative limits on the City's authority to control the effective date of its ordinances cannot be implied, but must be set forth with unmistakable clarity. *Lower Colorado River Auth. v. City of San Marcos,* 523 S.W.2d 641, 643–45 (Tex.1975). According to the City, section 26.177(c) does not state with unmistakable clarity that a water pollution control ordinance is not effective until the Commission approves it. Moreover, the City maintains that the statute's legislative history supports its position. The City also points out that the Commission itself considers any ordinance submitted for review to be effective prior to Commission approval. Indeed, the Commission has filed an amicus curiae brief in this Court requesting that we affirm the court of appeals' holding on this issue.

**[17]** The City of Austin is a home-rule city deriving its power from article XI, section 5 of the Texas Constitution. A home-rule city is not dependent on the Legislature for a grant of authority. *Lower Colorado River Auth.,* 523 S.W.2d at 643. Rather, the Legislature may provide limits on the power of home-rule cities, but only if the limitation appears with "unmistakable clarity." *Id.* at 645; *City of Sweetwater v. Geron,* 380 S.W.2d 550, 552 (Tex.1964).

Under Austin's city charter, the Ordinance is effective. Accordingly, unless the Legislature limited the City's authority to set the Ordinance's effective date with unmistakable clarity in section 26.177(c), the Ordinance does not require Commission approval before it becomes effective. We conclude that the Legislature has not so limited the City's authority.

While section 26.177(c) states that a water pollution or abatement program must be submitted to the Commission for "review and approval," the statute is silent as to whether the program is effective pending approval. We find this silence significant because, in other Water Code sections, the Legislature has specifically stated that an act was not effective until the Commission approved it. For instance, section 11.121 of the Water Code provides that any project for "the storage, taking, or diversion of water" shall not begin "*without first obtaining a permit from the commission.* " TEX. WATER CODE § 11.121 (emphasis added). Similarly, section 26.032, which has since been repealed, stated that "*[b]efore* the order, resolution, or other rule *becomes effective,* the county shall submit it to the commission and obtain the commission's written approval." Act of May 26, 1985, 69th Leg., R.S., ch. 795, § 1.079(c), 1985 Tex. Gen.

Laws 2760 (emphasis added), *repealed by* Act of June 17, 1987, 70th Leg., R .S., ch. 406, § 2, 1987 Tex. Gen. Laws 1938. Thus, while the Legislature clearly was well-versed in drafting statutes that explicitly provided that a local act was not **\*123** effective until approved by the Commission, the Legislature chose not to include such an express provision in section 26.177(c). We presume that this omission has a purpose. *See Cameron v. Terrell & Garrett,* 618 S.W.2d 535, 540 (Tex.1981). The only purpose that we can ascribe for such an omission is that the Legislature did not intend that water pollution programs such as the Ordinance require Commission approval before becoming effective.

Section 26.177(c)'s legislative history also supports our holding. The author of the bill that added the review and approval provision stated that the provision was not intended to take away local control, but was designed to gather information and to assist cities in developing their programs. Debate on Tex. H.B. 1546 on the Floor of the House, 71st Leg., R.S., Floor Tape 72, Side 2 (May 2, 1989)(remarks of Representative Terral Smith). *See also* Hearing on Tex. H.B. No. 1546 before the House Resources Committee, 71st Leg., R.S., House Tape Excerpts, Tape 2–B (March 22, 1989)(Executive Director of the Commission testified that the Commission viewed the legislation as establishing an information-gathering process). Nothing in the bill analysis relied upon by the Petitioners compels a contrary conclusion.

Finally, we note that our holding is consistent with the Commission's interpretation of the statute. While not controlling, the contemporaneous construction of a statute by the administrative agency charged with its enforcement is entitled to great weight. *State v. Public Util. Comm'n,* 883 S.W.2d 190, 196 (Tex.1994); *Dodd v. Meno,* 870 S.W.2d 4, 7 (Tex.1994). According to the Commission's amicus brief, the Commission has refrained from acting on submitted water pollution control and abatement programs until it can analyze and adopt rules and standards to guide its consideration. Therefore, a holding that a water pollution control and abatement program requires pre-approval by the Commission would essentially render ineffective every municipality's program passed since 1989. This is a result that we cannot presume the Legislature intended by enacting section 26.177(c).

**V**

**[18]** Petitioners next urge that the Ordinance is invalid because it is not a proper subject of the initiative and referendum process under Austin's city charter. Article IV, section 1 of the City's charter contains the following provision regarding legislation by public initiative:

> The people of the city reserve the power of direct legislation by initiative, and in the exercise of such power may propose any ordinance, not in conflict with this Charter, the state constitution, or the state laws except an ordinance appropriating money or authorizing the levy of taxes.

Austin City Charter art. IV, § 1.

Petitioners assert that the Ordinance conflicts with article X of the City's charter. Article X mandates the implementation of a comprehensive plan to guide, regulate, and manage development to assure the most beneficial use of land, water, and other natural resources. Article X also establishes a planning commission which "shall" review and make recommendations on proposals to "adopt or amend land development regulations," including "zoning, subdivision, building and construction, environmental and other police power regulations controlling, regulating, or affecting the use or development of land." Austin City Charter art. X, § 4. Finally, the charter provides that the city council may adopt amendments to the comprehensive plan only after at least one public hearing. *Id.* § 5. Petitioners claim that these provisions of the charter remove water pollution regulations, such as the Ordinance, from the domain of citizen initiators. The City responds that such a withdrawal of the power of initiative must be clearly stated, and no such clear statement exists in this case.

**\*124** **[19]** **[20]** Charter provisions are to be liberally construed in favor of the power of initiative and referendum. *Glass v. Smith,* 150 Tex. 632, 244 S.W.2d 645, 649 (1951); *Taxpayers' Ass'n of Harris County v. City of Houston,* 129 Tex. 627, 105 S.W.2d 655, 657 (1937). While the initiative power may be either expressly or impliedly limited by the city charter, such a limitation will not be implied unless the provisions of the charter are clear and compelling. *Glass,* 244 S.W.2d at 649.

Petitioners make no contention that the Austin city charter expressly provides that a water control regulation, such as the Save Our Springs Ordinance, may not be adopted by the people at an initiative election. Rather, Petitioners claim that, because the charter requires a comprehensive plan to regulate development and a planning commission to review development proposals, the subject matter of the Ordinance has been implicitly withdrawn from the people. However, such an implicit withdrawal must be "clear and compelling." The provisions of article X do not clearly compel the conclusion that the Ordinance cannot be passed through the initiative and referendum process. The planning commission's review and recommendation powers over development can reasonably coexist with the adoption of a water quality regulation through public initiative. Indeed, article X does not grant the planning commission the power to establish a water pollution and abatement program under section 26.177(d) of the Water Code. Accordingly, we hold that the SOS Ordinance was a proper subject of the initiative and referendum process.

## VI

Petitioners finally contend that the court of appeals erred by holding that only projects where the original permit applications were filed after September 1, 1987 were required to be considered on the basis of the City's regulations and ordinances in effect at that time. Circle C made applications for preliminary subdivision approval for five different sections of the Circle C development, four of which were filed in 1985 and the fifth of which was filed in 1992. In furtherance of its ongoing development from these permit applications, Circle C applied for site development permits after the enactment of the Ordinance.

The trial court concluded that, under former section 481.143 of the Government Code, the ordinances in effect when Circle C filed its original permit applications in 1985 and 1992 governed the City's consideration of Circle C's subsequent permit applications for the same development. The court of appeals, however, modified the trial court's judgment, holding that because section 481.143 became effective September 1, 1987, only initial permits filed between September 1, 1987 and the effective date of the Ordinance (August 10, 1992) were not subject to the strictures of the Ordinance. Circle C contends that the court of appeals erred in modifying the trial court's judgment.

Generally, the right to develop property is subject to intervening regulations or regulatory changes. *Connor v. City of University Park,* 142 S.W.2d 706, 709 (Tex.Civ.App.—

Dallas 1940, writ ref'd). In adopting sections 481.141–.143 of the Texas Government Code on September 1, 1987, the Texas Legislature significantly altered this rule by locking in for the life of a project the regulations in effect at the time of the application for the project's first permit. The version of section 481.143 in effect at the time of the dispute provided:

> The approval, disapproval, or conditional approval of an application for a permit shall be considered by each regulatory agency solely on the basis of any orders, regulations, ordinances, or other duly adopted requirements in effect at the time the original application for the permit is filed. If a series of permits is required for a project, the orders, regulations, ordinances, or other requirements in effect at the time the original **\*125** application for the first permit in that series is filed shall be the sole basis for consideration of all subsequent permits required for the completion of the project.

Act of June 16, 1987, 70th Leg., R.S., ch. 374, § 1, 1987 Tex. Gen. Laws 1838–39, *amended by* Act of May 24, 1995, 74th Leg., R.S., ch. 794, § 1, 1995 Tex. Gen. Laws 4147, *repealed by* Act of June 1, 1997, 75th Leg., R.S., ch. 1041, § 51(b), 1997 Tex. Gen. Laws 3966.

However, the Legislature repealed section 481.143 while this case was pending before this Court. Act of June 1, 1997, 75th Leg., R.S., ch. 1041, § 51(b), 1997 Tex. Gen. Laws 3966. Because of this repeal, we conclude that we cannot address Circle C's argument that the court of appeals erred in its modification of the trial court's judgment.

When a cause of action is based on a statute, the repeal of that statute without a savings clause for pending suits is usually given immediate effect. *Knight v. International Harvester Credit Corp.,* 627 S.W.2d 382, 384 (Tex.1982). Ordinarily, all suits filed in reliance on the statute must cease when the repeal becomes effective; if final relief has not been granted before the repeal goes into effect, final relief cannot be granted thereafter, even if the cause is pending on appeal. *Knight,* 627 S.W.2d at 384; *National Carloading Corp. v. Phoenix–El Paso Express, Inc.,* 142 Tex. 141, 176 S.W.2d 564, 568 (1943); *Dickson v. Navarro County Levee Improvement Dist. No. 3,* 135 Tex. 95, 139 S.W.2d 257, 259

(1940). The repeal of the statute in such instances deprives a court of subject matter jurisdiction over the cause. *See Knight,* 627 S.W.2d at 384; *Dickson,* 139 S.W.2d at 259.

The Legislature, in its repeal of section 481.143, did not include a savings clause providing that section 481.143 remained in effect for pending litigation. Accordingly, we must give its repeal immediate effect, and we cannot review Circle C's argument that the court of appeals erred in concluding that its original permit applications filed before September 1, 1987 were not covered by section 481.143.

We were confronted with a similar situation in *Dickson v. Navarro County Levee Improvement Dist. No. 3,* 135 Tex. 95, 139 S.W.2d 257 (1940). In *Dickson,* a bondholder instituted suit to collect delinquent taxes owed by the defendants to a levee improvement district under a statute allowing holders of bonds issued by such districts to commence suit if the district failed to do so within sixty days after the taxes became delinquent. The trial court rendered judgment in favor of the bondholder, and defendants appealed. While the case was pending in the court of appeals, the Legislature repealed the statute allowing bondholders to bring such actions. *Id.* at 259. The court of appeals nevertheless affirmed the trial court's judgment for the bondholder, but this Court vacated the appellate court's judgment and dismissed the cause. *Id* . at 260. We reasoned that the Legislature's repeal of the statute precluded the bondholder from maintaining the suit because the Legislature had not incorporated a savings clause in the repealing statute. *Id.* at 259.

We similarly cannot review Circle C's claim that the court of appeals erred by holding that section 481.143 did not apply to subsequent permit applications when the original permit application was filed before September 1, 1987. Because the Legislature did not include a savings provision in its repeal of section 481.143, we must give the repeal immediate effect since Circle C had not obtained "final relief" prior to the repeal.

However, no party challenged the court of appeals' holding that section 481.143 applied to Circle C's original permit applications filed after September 1, 1987. The court of appeals' holding on this issue therefore constituted "final relief" in Circle C's favor. When "final relief" has been granted before the repeal of a statute, the relief is not usually affected by the statute's **\*126** subsequent repeal, unless the Legislature has provided to the contrary. *Cf. Knight,* 627 S.W.2d at 384.

In sum, we dismiss Circle C's point of error challenging the court of appeals' modification to the trial court's judgment. However, that portion of the court of appeals' judgment holding that any permit Circle C required be considered on the basis of the ordinances in effect when the original application for preliminary subdivision approval was filed, as long as the original application was filed after September 1, 1987, remains intact as it was not challenged in this Court.

## VII

 [21]   As a final matter, we must consider Save Our Springs Alliance's argument that the trial court erred in striking its plea in intervention and the court of appeals erred in affirming the trial court's striking of its intervention. The Alliance, comprised of the citizen initiators of the Save Our Springs Ordinance, maintains that the City could not adequately defend the Ordinance in court because the City had consistently opposed the Ordinance and had vigorously defended the previous water control ordinances that had been in place. Further, the Alliance points out that the City had opposed the legality of the Ordinance in open court and attempted to preclude a vote on the Ordinance. *See City Council of Austin v. Save Our Springs Coalition,* 828 S.W.2d 340 (Tex.App.—Austin 1992, no writ)(citizens sued City to force election on the Ordinance). Under these circumstances, the Alliance urges that its intervention was essential to protect its interests. *See Guaranty Fed. Savings Bank v. Horseshoe Operating Co.,* 793 S.W.2d 652, 657 (Tex.1990)(trial court abuses its discretion in striking intervention when (1) the intervenor, in its own name, could have either brought, or defended and defeated the same action; (2) the intervention will not complicate the case by an excessive multiplication of the issues; and (3) the intervention is almost essential to effectively protect the intervenor's interest). The Alliance contends that the court of appeals erred in concluding that the City could adequately protect its interests. The Alliance further asserts that citizen initiative sponsors have an absolute right to intervene in litigation involving the initiated legislation.

However, we do not believe it is necessary to reach the merits of the Alliance's argument. Even assuming the trial court erred in striking the Alliance's intervention and the court of appeals erred by affirming the trial court's action, the error was harmless. Under the Texas Rules of Appellate Procedure, no judgment may be reversed on appeal unless we conclude that the error complained of probably caused the rendition of an improper judgment. TEX. R. APP. P. 61.1. The Alliance admits that the only remedy for the alleged improper striking of its intervention is a new trial. Because the City has prevailed in upholding the Ordinance against all the challenges raised by Petitioners, a new trial would do nothing to further the Alliance's interests. We accordingly conclude that any alleged error in striking the Alliance's intervention was harmless.

\* \* \* \* \* \*

For the foregoing reasons, we affirm the court of appeals' judgment holding that the Ordinance is a valid legislative act that need not be approved by the Texas Natural Resource Conservation Commission to become effective and enforceable. We dismiss Circle C's point of error regarding the court of appeals' modification of the trial court's judgment with regard to section 481.143 of the Government Code because Circle C did not obtain final relief prior to the repeal of section 481.143.

Justice ENOCH filed a concurring opinion.

Justice ENOCH, concurring.
I join in the Court's opinion and in the judgment. I write separately only to mention one facet of this case that troubles me: **\*127** by conferring on Austin the authority to control land use outside its boundaries, the Legislature has partially disenfranchised a class of citizens. This disenfranchisement is at its most obvious in this case, in which the citizens of one community by their vote have placed land use restrictions on citizens of neighboring communities who had no vote. It is also a disenfranchisement that may very well violate the "one man, one vote" principle inherent in the right to participate in the political process and guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *See Holt Civic Club v. City of Tuscaloosa,* 439 U.S. 60, 68, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978).

In *Holt,* the United States Supreme Court decided that the City of Tuscaloosa's extraterritorial jurisdiction, which extended police jurisdiction and sanitary regulations over several unincorporated areas, did not violate the voting rights of those areas' residents. *Id.* at 70, 99 S.Ct. at 389-90. The Court declined to invalidate the extraterritorial jurisdiction because of "the extraordinarily wide latitude that States

have in creating various types of political subdivisions and conferring authority upon them." *Id.* at 71, 99 S.Ct. at 390. But however wide the states' latitude is, it is not without boundaries, and two aspects of the *Holt* opinion indicate that this case might be distinguishable.

First, the jurisdictional extension in *Holt* provided substantial benefits to the residents in the form of municipal services such as police, fire, and health protection. *See id.* at 74, 99 S.Ct. at 392. Second, the Court stated that an extraterritorial-jurisdiction statute conferring broader powers than those at issue in *Holt* could run afoul of the "one man, one vote" principle. *See id.* at 72 n. 8, 99 S.Ct. at 391; *id.* at 79, 99 S.Ct. at 394-95 (Stevens, J., concurring) (noting the Court's "limited" holding and stating that extraterritorial jurisdiction "might sometimes operate to deny the franchise to individuals who share the interests of their voting neighbors").

In this case, by contrast, the Petitioners appear to bear most of the burdens and the City appears to enjoy most of the benefits. Perhaps the extraterritorial jurisdiction at issue here is onerous enough to violate the Petitioners' constitutional rights. However, though they hint at it, the Petitioners do not brief this issue, and the Court properly omits considering it. *See* TEX. R. APP. P. 38.1(h). On the other hand, I think that this is a serious question that should be kept in mind.

Justice ABBOTT delivered the opinion of the Court on Motion for Rehearing as to Section VI, in which Chief Justice PHILLIPS, Justice HECHT, Justice OWEN, and Justice GONZALES join.

We granted Petitioners' Motion for Rehearing. We now withdraw Part VI of our opinion and substitute the following.

## VI

Petitioners finally contend that the court of appeals erred by holding that only projects in which the original permit applications were filed after September 1, 1987 are required to be considered on the basis of the City's regulations and ordinances in effect at the time the original permit applications were filed. Circle C made applications for preliminary subdivision approval for five different sections of the Circle C development, four of which were filed in 1985 and the fifth of which was filed in 1992. In furtherance of its ongoing development from these permit applications, Circle C applied for site development permits after the enactment

of the Ordinance. These subsequent permit applications are at issue.

The trial court concluded that, under former section 481.143 of the Government Code, the ordinances in effect when Circle C filed its original permit applications in 1985 and 1992 governed the City's consideration of Circle C's subsequent permit applications for the same development. The court of appeals, however, modified **\*128** the trial court's judgment, holding that because section 481.143 became effective September 1, 1987, only projects in which the initial permits were filed between September 1, 1987 and the effective date of the Ordinance (August 10, 1992) were not subject to the strictures of the Ordinance. Petitioners contend that the court of appeals erred in modifying the trial court's judgment in this manner.

Generally, the right to develop property is subject to intervening regulations or regulatory changes. *See Connor v. City of University Park,* 142 S.W.2d 706, 709 (Tex.Civ.App.—Dallas 1940, writ ref'd). In adopting sections 481.141–.143 of the Texas Government Code on September 1, 1987, the Texas Legislature significantly altered this rule by requiring that each permit in a series required for a development project be subject to only the regulations in effect at the time of the application for the project's first permit, and not any intervening regulations. The stated purpose of the statute was to establish requirements relating to the processing and issuance of permits and approvals by governmental regulatory agencies in order to alleviate bureaucratic obstacles to economic development. *See* Act of May 30, 1987, 70th Leg., R.S., ch. 374, § 1, sec. 7.001(2), 1987 Tex. Gen. Laws 1823, 1838, *amended by* Act of May 24, 1997, 74th Leg., R.S., ch. 794, § 1, sec. 481.141(b), 1995 Tex. Gen. Laws 4147, 4147, *repealed by* Act of June 1, 75th Leg., R.S., ch. 1041, § 51(b), 1997 Tex. Gen. Laws 3943, 3966. The version of section 481.143 in effect at the time of the dispute provided:

> The approval, disapproval, or conditional approval of an application for a permit shall be considered by each regulatory agency solely on the basis of any orders, regulations, ordinances, or other duly adopted requirements in effect at the time the original application for the permit is filed. If a series of permits is required for a project, the orders, regulations, ordinances, or other requirements

in effect at the time the original application for the first permit in that series is filed shall be the sole basis for consideration of all subsequent permits required for the completion of the project.

Act of May 30, 1987, 70th Leg., R.S., ch. 374, § 1, sec. 7.003(a), 1987 Tex. Gen. Laws 1823, 1839, *amended by* Act of May 24, 1995, 74th Leg., R.S., ch. 794, § 1, sec. 481.143, 1995 Tex. Gen. Laws 4147, 4147, *repealed by* Act of June 1, 1997, 75th Leg., R.S., ch. 1041, § 51(b), 1997 Tex. Gen. Laws 3943, 3966.

 **[22]** **[23]** **[24]** The Legislature repealed section 481.143 while this case was pending before this Court. *See* Act of June 1, 1997, 75th Leg., R . S., ch. 1041, § 51(b), 1997 Tex. Gen. Laws 3943, 3966. The general rule is that when a statute is repealed without a savings clause limiting the effect of the repeal, the repeal of that statute is usually given immediate effect. *See Knight v. International Harvester Credit Corp.,* 627 S.W.2d 382, 384 (Tex.1982). When a right or remedy is dependent on a statute, the unqualified repeal of that statute operates to deprive the party of all such rights that have not become vested or reduced to final judgment. Ordinarily, all suits filed in reliance on the statute must cease when the repeal becomes effective; if final relief has not been granted before the repeal goes into effect, final relief cannot be granted thereafter, even if the cause is pending on appeal. *See id.; National Carloading Corp. v. Phoenix–El Paso Express, Inc.,* 142 Tex. 141, 176 S.W.2d 564, 568 (1943); *Dickson v. Navarro County Levee Improvement Dist. No. 3,* 135 Tex. 95, 139 S.W.2d 257, 259 (1940). The repeal of the statute in such instances deprives a court of subject matter jurisdiction over the cause. *See Knight,* 627 S.W.2d at 384; *Dickson,* 139 S.W.2d at 259.

 **[25]** This common-law rule of abatement may be modified by a specific savings clause in the repealing legislation or by a general savings statute limiting the effect of repeals. Most states, including Texas, **\*129** have adopted some form of general savings statute. *See* Ruud, *The Savings Clause— Some Problems in Construction and Drafting,* 33 TEX. L. REV. 285, 296–97 (1955). Texas's general savings clause is codified in section 311.031 of the Government Code, which states:

> (a) Except as provided by Subsection (b), the reenactment, revision, amendment, or repeal of a statute does not affect:

> (1) the prior operation of the statute or any prior action taken under it;

> (2) any validation, cure, right, privilege, obligation, or liability previously acquired, accrued, accorded, or incurred under it;

> (3) any violation of the statute or any penalty, forfeiture, or punishment incurred under the statute before its amendment or repeal; or

> (4) any investigation, proceeding, or remedy concerning any privilege, obligation, liability, penalty, forfeiture, or punishment; and the investigation, proceeding, or remedy may be instituted, continued, or enforced, and the penalty, forfeiture, or punishment imposed, as if the statute had not been repealed or amended.

(b) If the penalty, forfeiture, or punishment for any offense is reduced by a reenactment, revision, or amendment of a statute, the penalty, forfeiture, or punishment, if not already imposed, shall be imposed according to the statute as amended.

TEX. GOV'T CODE § 311.031(a), (b).

Petitioners assert that the general savings provision of the Code Construction Act applies to the repeal of section 481.143. *See* TEX. GOV'T CODE § 311.002 (application of the Code Construction Act); *Knight,* 627 S.W.2d at 385. The City argues that the general savings clause does not apply because a much narrower specific savings clause is included in section 52 of the repealing legislation, which provides:

> The rules, policies, procedures, and decisions of the Texas Department of Commerce are continued in effect as rules, policies, procedures, and decisions of the Texas Department of Economic Development until superseded by a rule or other appropriate action of the Texas Department of Economic Development.

> The validity of a rule, form, or procedure adopted, contract or acquisition made, proceeding begun, obligation incurred, right accrued, or other action taken by or in connection with the authority of the Texas Department of Commerce before it is abolished under ... this section is not affected by this Act. To the extent those actions continue to have any effect on or after September 1, 1997, they are considered to be the actions of the Texas Department of Economic Development.

Act of June 1, 1997, 75th Leg., R.S., ch. 1041, §§ 52(g), 52(h), 1997 Tex. Gen. Laws 3943, 3967. The City argues that because the repealing legislation contains a specific savings clause, application of the general savings provision is preempted. *See Ex parte Mangrum,* 564 S.W.2d 751, 755 (Tex.Crim.App.1978) ("The general savings clause of the Code Construction Act, however, is inapplicable to the new Penal Code because a specific savings clause was provided by the Legislature."); *Scott v. State,* 916 S.W.2d 40, 41 (Tex.App.—Houston [1st Dist.] 1995, no pet.); *Wilson v. State,* 899 S.W.2d 36, 38 (Tex.App.—Amarillo 1995, pet. ref'd); *see also* TEX. GOV'T CODE § 311.026.

We conclude that section 52 contains a specific savings clause. But the existence of the specific savings clause does not preclude application of the general savings provision of the Code Construction Act to the repeal of section 481.143.

 **[26]**    The Legislature's adoption of the general savings clause in the Code Construction Act indicates a general legislative policy that the repeal of any statute shall not affect the prior operation of that statute nor extinguish any liability incurred or **\*130**  affect any right accrued or claim arising before the repeal takes effect. Given this general policy and the broad applicability of the Code Construction Act, we will presume that the general savings clause applies unless a contrary legislative intent is shown by clear expression or necessary implication. *See Great N. Ry. Co. v. United States,* 208 U.S. 452, 465, 28 S.Ct. 313, 52 L.Ed. 567 (1908) ("[T]he provisions of [the general savings clause] are to be treated as incorporated in and as a part of subsequent enactments, and therefore under the general principles of construction requiring, if possible, that effect be given to all parts of a law the section must be enforced unless either by express declaration or necessary implication, arising from the terms of the law, as a whole, it results that the legislative mind will be set at naught by giving effect to the provisions of [the general savings clause]."). Here, no contrary legislative intent is expressed or implied by section 52.

 **[27]**    Section 52 does not expressly state that only the enumerated items are saved, nor does it expressly negate application of the general savings statute. *See State v. Fenter,* 89 Wash.2d 57, 569 P.2d 67, 70 (1977) (en banc) ("Although [the specific savings clause] exempts three categories from repeal and thus acts as a mini-savings statute, it does not expressly state that these three categories are the only three categories exempt from repeal. Therefore, we find no express legislative intent that the general savings

statute ... does not apply [to the repealed statute]."). Nor is application of the general savings clause negated by necessary implication. Although in many cases it could be argued that the Legislature's inclusion of a specific savings clause despite its awareness of the existence of the general savings clause renders the specific savings clause redundant, *see State v. Showers,* 34 Kan. 269, 8 P. 474, 477 (1885), that is not the case here. The specific savings clause in section 52 is not redundant of the general savings provision. The purpose of Senate Bill 932, which repealed section 481.143, was to "abolish[ ] the Texas Department of Commerce and transfer [ ] its powers and duties to the newly created Texas Department of Economic Development and to certain other economic development programs." Act of June 1, 1997, 75th Leg., ch. 1041, 1997 Tex. Gen. Laws 3943, 3943. Sections 52(g) and (h) ensured that proceedings begun, rights accrued, and other actions taken by or in connection with the authority of the Texas Department of Commerce before it was abolished were not affected by the Act, and, as of the September 1, 1997 effective date of the Act, would be continued in effect as the actions of the newly created Texas Department of Economic Development. This result may not have been achieved by the general savings clause. Thus, both the general and specific clauses were needed to effectuate legislative intent.

Additionally, in contrast to the cases that have held that a specific savings clause "trumps" application of the general savings clause, the specific savings clause in section 52 does not irreconcilably conflict with the general savings clause. *See* TEX. GOV'T CODE § 311.026(a) (providing that a special provision prevails over a general provision only if the conflict between the provisions is irreconcilable). Accordingly, we conclude that the general savings clause applies to the repeal of section 481.143. Applying the clause, the prior operation of section 481.143 is not affected by the repeal, and we may address Petitioners' point of error.

**A**

 **[28]**    The parties do not dispute whether section 481.143 applies to subsequent permit applications when the original permit application was filed after September 1, 1987, such as the one application for preliminary subdivision approval filed in 1992. The issue we must decide is whether the statute is applicable to Circle C's subsequent permit applications filed after September 1, 1987, when the original application **\*131** in the series was filed *before* September 1, 1987, such as

the four applications for preliminary subdivision approval filed in 1985. The City argues that, in order to apply the statute to original permit applications filed before September 1, 1987, the statute must be applied retroactively, and that the law disfavors such retroactive application. *See Houston Indep. Sch. Dist. v. Houston Chronicle,* 798 S.W.2d 580, 585 (Tex.App.—Houston [1st Dist.] 1990, writ denied); *see also* TEX. GOV'T CODE § 311.022 ("A statute is presumed to be prospective in its operation unless expressly made retroactive."). Because section 481.143 does not expressly or impliedly indicate that it has a retroactive effect, the City asserts that the court of appeals correctly concluded that the statute does not apply to original permit applications filed before September 1, 1987. 930 S.W.2d at 693. Petitioners respond that they are not requesting a retroactive application of section 481.143, but rather a prospective application of the law to Circle C's subsequent permits filed after September 1, 1987.

Our first task is to determine whether the Legislature has expressly prescribed the statute's proper reach. *See Landgraf v. USI Film Prods.,* 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). The statute provides that if a series of permits is required for a project, the ordinances in effect at the time the original application for the first permit is filed shall be the sole basis for consideration of all subsequent permits required for the completion of the project. Nowhere does the statute require that the original application for the first permit in the series be filed after September 1, 1987. But neither does the statute expressly state that it will apply to projects in progress before that date. Thus, the plain language of the statute does not expressly delineate its reach.

Petitioners contend that the statute applies to the treatment of any subsequent permit application filed after September 1, 1987, regardless of when the first permit was filed. This construction is consistent with the plain language of section 481.143, which states that "the ... ordinances ... in effect at the time the original application for the first permit in that series is filed [the ordinances in effect in 1985 in this case] shall be the sole basis for consideration of all subsequent permits required for completion of the project [the subsequent permits filed by Circle C in 1992]."[1] Moreover, this construction complies with the Legislature's mandate to construe statutes liberally to achieve their purposes. *See* TEX. GOV'T CODE § 312.006. If we were to apply the construction urged by the City and the dissent, the statute would at least partially fail of its intended purpose to "alleviat[e] bureaucratic obstacles" that "inhibit the economic development of the state." Obviously, "current

administrative practices" can present bureaucratic obstacles to both ongoing and future projects. If the statute only applies to projects in **\*132** which initial permit applications are filed after the statute's effective date, the benefit of the statute would be denied to existing projects even though they too play a role in the State's economic development. Accordingly, we agree with Petitioners' construction of the statute.

**[29]** Our next step is to determine whether this construction renders the statute retroactive, thereby invoking the presumption against retroactivity. *See Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483. As the Supreme Court observed in *Landgraf v. USI Film Products,* "[w]hile statutory retroactivity has long been disfavored, deciding when a statute operates 'retroactively' is not always a simple or mechanical task." *Id.* at 268, 114 S.Ct. 1483. The Court in *Landgraf* did not attempt to precisely define what constitutes a retroactive law, instead preferring a "functional" approach. The Court instructed:

> A statute does not operate "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event. Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity. However, retroactivity is a matter on which judges tend to have "sound ... instinct[s]," and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance.

*Id.* at 269–70, 114 S.Ct. 1483 (citations and footnote omitted).

Applying these principles, we conclude that our construction does not operate retroactively. Contrary to the court of appeals' conclusion, section 481.143 does not affect any applications for permits filed before September 1, 1987. That would be retroactive. But applying section 481.143 to subsequent permit applications filed after September 1, 1987, when the original permit application was filed before September 1, 1987, is not a retroactive application of the law. The statute operates prospectively on new permits for existing projects. It affects only new permits to be issued in the future. It does not annul or affect prior permits, or require the City to issue a permit retroactively.

When Circle C filed its original permit applications in 1985, the City's ordinances in effect at that time governed the City's evaluation of those applications. Although subsequent applications in the series required for a project would normally be subject to any new ordinances and regulations in effect at the time of their filing, the Legislature provided that these subsequent applications, if filed after September 1, 1987, would be governed by only the ordinances and regulations in effect at the time the original permit application was filed. Thus, when Circle C filed subsequent permit applications after September 1, 1987, the City was required to apply only the ordinances in effect in 1985 to those applications. The statute is not retroactive merely because it requires the City to evaluate future permits based on past law.

The dissent argues that application to existing projects is retroactive because it reaches back in time and attaches new legal consequences to past acts. But the only new legal consequences it attaches to prior acts is in determining which "orders, regulations, ordinances, and other requirements" may be applied in the future to new permits. The Legislature could have passed a law comprehensively setting out criteria for new permits. Instead, section 481.143 adopts by reference to original **\*133** permits the appropriate orders, regulations, ordinances, and other requirements to apply to new permits —those in effect at the time the original application for the first permit in the series was filed. As the *Landgraf* opinion states, "a statute 'is not made retroactive merely because it draws upon antecedent facts for its operation.' " *Id.* at 270 n. 24, 114 S.Ct. 1483 (quoting *Cox v. Hart,* 260 U.S. 427, 435, 43 S.Ct. 154, 67 L.Ed. 332 (1922)); *accord Regions Hosp. v. Shalala,* 522 U.S. 448, 456, 118 S.Ct. 909, 139 L.Ed.2d 895 (1998); *General Dynamics Corp. v. Sharp,* 919 S.W.2d 861, 866 (Tex.App.—Austin 1996, writ denied); *American Home Assurance v. Texas Dep't of Ins.,* 907 S.W.2d 90, 94 (Tex.App.—Austin 1995, writ denied); *see also Walls v. First*

*State Bank of Miami,* 900 S.W.2d 117, 121 (Tex.App.—Amarillo 1995, writ denied) (discussing *Landgraf* ). Here, the statute merely draws upon an antecedent fact—the date of the first permit application—to determine what law will apply to subsequent permit applications.

Accordingly, we hold that the court of appeals erred in holding that only the subsequent permit applications from original permit applications filed after September 1, 1987 were governed by the ordinances in effect at the time of the original application.

**B**

 **[30]**    That does not end our inquiry, however, for we must also consider the effect of the repeal on Circle C's rights. The general savings clause of the Code Construction Act saves both the prior operation of the statute and "any validation, cure, right, privilege, obligation, or liability previously acquired, accrued, accorded, or incurred under it." TEX. GOV'T CODE § 311.031(a)(2).

We begin by identifying Circle C's rights under section 481.143. As we have concluded, by its terms, section 481.143 gives Circle C the right to have the City consider an application for a permit "solely on the basis of any orders, regulations, ordinances, or other duly adopted requirements in effect at the time the original application for the permit is filed," which in this case would be the regulations and ordinances in effect in 1985 when the original applications for preliminary subdivision approval were filed and approved.

The general savings clause saves this right only if it was acquired, accrued, or accorded under section 481.143 before the September 1, 1997 effective date of the repeal. [2] *See Iowa Dep't of Transp. v. Iowa Dist. Ct. for Buchanan County,* 587 N.W.2d 774, 776 (Iowa 1998) ("[O]ne relying on [the general savings clause] must demonstrate that the privilege he seeks to save is one that he possessed, or that had vested, or that had been granted prior to the date the statute providing such a privilege was repealed."). This right would not accrue until Circle C filed an application for a permit; it is only when an application is filed that the right granted by section 481.143 is due and attaches to the review of the application. As each subsequent application for a permit is filed, Circle C's right accrues with respect to that application. With respect to applications filed after the repeal of section 481.143, Circle C's right would not have accrued before the effective date

of the repeal, and nothing is saved by the general savings clause. Thus, the City may not apply current regulations and ordinances to its evaluation of permit applications filed or approved during **\*134** the prior operation of section 481.143, but it may do so with respect to any applications filed after its repeal, subject, of course, to the effects, if any, of the statute as reenacted in 1999. *See* Act of April 29, 1999, 76th Leg., R.S., ch. 73, 1999 Tex. Gen. Laws 431 to be codified at TEX. LOC. GOV'T CODEE § 245.001 et. seq.).

In sum, we hold that the general savings clause applies to the repeal of section 481.143. Considering Petitioners' point of error, we conclude that, under the 1987 version of section 481.143, any subsequent permit applications filed or approved between September 1, 1987 and September 1, 1997 are governed by only the rules, regulations, and ordinances in effect in 1985 when the original applications for preliminary subdivision approval were filed. Because we hold that this is not a retroactive application of the statute, we reverse the court of appeals' judgment in that regard, and we modify the judgment accordingly.BAKER and Justice O'NEILL join.

Justice HANKINSON filed a dissenting opinion on rehearing as to Section VI, in which Justice ENOCH, Justice BAKER, and Justice O'NEILL join.

Justice HANKINSON, dissenting.
While I agree with the Court's resolution of the first issue we address on rehearing, I dissent from what I perceive to be its impermissible and unnecessary retroactive application of Texas Government Code § 481.143. For the reasons expressed by the court of appeals, 930 S.W.2d 678, 693, I would hold that for section 481.143 to apply to a particular series of permits, the first permit in the series must have been filed after the effective date of section 481.143.

> The presumption is very strong that a statute was not meant to act retrospectively, and it ought never to receive such a construction if it is susceptible of any other. It ought not to receive such a construction unless the words used are so clear, strong, and imperative that no other meaning can be annexed to them or unless the intention of the legislature cannot be otherwise satisfied.

*United States Fidelity & Guar. Co. v. United States ex rel. Struthers Wells Co.,* 209 U.S. 306, 314, 28 S.Ct. 537, 52 L.Ed. 804 (1908).

Texas has its own "well-entrenched legal hostility to retroactive laws." *Houston Indep. Sch. Dist. v. Houston Chronicle Publ'g Co.,* 798 S.W.2d 580, 585 (Tex.App.—Houston [1st Dist.] 1990, writ denied). "Texas law militates strongly against the retroactive application of laws," *id.,* and any doubts must be resolved against retroactive operation of a statute. *See Government Personnel Mut. Life Ins. Co. v. Wear,* 151 Tex. 454, 251 S.W.2d 525, 529 (1952). The Legislature has codified the presumption that statutes apply prospectively: "A statute is presumed to be prospective in its operation unless *expressly* made retroactive." Tex. Gov't Code § 311.022 (emphasis added).

The Court misconstrues the proper temporal reach of the statute before us. It seems reasonably clear to me that while section 481.143 is not retroactive on its face, the Court's application of it creates a retroactive effect that can easily be avoided. The Court creates this retroactive effect by applying a statute not effective until September 1, 1987, to permit applications originally filed in 1985. Section 481.143 has retroactive effect if applied in this manner—it reaches back before its effective date and attaches new legal consequences to past acts by changing what the law was before section 481.143 was enacted.

Before the Legislature enacted section 481.143, under well-established law cities could pass or amend ordinances in the proper exercise of their police power, and citizens were bound by those intervening ordinances even if they were passed while an application for a permit was pending. *See* **\*135** *Connor v. City of Univ. Park,* 142 S.W.2d 706, 709 (Tex.Civ.App.—Dallas 1940, writ ref'd). Thus, permit applications were subject to any intervening ordinances and amendments. Section 481.143 essentially eliminated any intervening ordinances and amendments passed by any city, including changes to fire, electrical, plumbing, and mechanical codes designed to further public safety. For example, if someone filed an application for a building permit in 1970, under the Court's reading of section 481.143, that person would only have to meet the safety standards of 1970 when applying in 1987 for the next permit in the series, and any ordinances passed in the intervening seventeen years would have no effect. In this manner, the Court's reading attaches new legal consequences to the 1985 permit applications and retroactively changes the law

governing those 1985 applications, which were filed before the Legislature enacted section 481.143 in 1987. This is not "merely draw[ing] upon an antecedent fact," as the Court proposes. And I must emphasize that the Court's reading is what creates the retroactive effect, not the language of the Legislature as expressed in the statute itself; the Court agrees that the statute "does not expressly delineate its reach." Precisely because section 481.143 contains no clear expression that it operates retroactively, and because the Code Construction Act mandates that statutes operate prospectively in the absence of such clear expression, we are bound to read the statute in a way that does not create a retroactive effect.

Moreover, the Legislature knows precisely how to make the statute retroactive—it did so by amending section 481.143 in 1995 so that the section then expressly applied to projects "in progress on or commenced after" September 1, 1987. Act of May 24, 1995, 74th Leg., R.S., ch. 794, § 1, 1995 Tex. Gen. Laws 4147. That amendment bolsters the conclusion that we should not apply the 1987 version, which was not expressly retroactive, to have a retroactive effect. Thus, the Court's reading of the 1987 statute has the effect of making the 1995 amendments mere surplusage. The 1995 amendments also included an exemption for adopting the kind of codes affecting public safety mentioned above, highlighting that the Legislature is the proper body to decide what the best policy is and how best to redress particular problems.

The practical danger of ignoring the Legislature's policy choice, as expressed in the Code Construction Act, and applying section 481.143 retroactively, is that we have no idea what rules, regulations, ordinances, or orders will be affected. Section 481.143 applies not just to the city of Austin, or to all cities in Texas, but to every "agency, bureau, department, division, or commission of the state or any department or other agency of a political subdivision that processes and issues permits." TEX. GOV'T CODE § 481.142(4). The statute applies not just to land development projects, but to every "endeavor over which a regulatory agency exerts its jurisdiction and for which a permit is required before initiation of the endeavor." TEX. GOV'T CODE § 481.142(3). The definition of permit is equally broad: " 'Permit' means a license, certificate, approval, registration, consent, permit, or other form of authorization required by law, rule, regulation, or ordinance...." *Id.* § 481.142(2). In striving to reach its result in this particular case, the Court ignores the fact that the implications of its decision are unknown. I would argue that is precisely why the Legislature has codified its decision that statutes

not be applied retroactively without the Legislature itself saying so, without it's having weighed the consequences after considering the potential effects of retroactivity and expressed its decision that those consequences are desirable. Courts simply are not empowered or endowed with the jurisdiction or the resources to make those kinds of open-ended policy decisions.

The Court struggles to find legislative intent on retroactivity where none is apparent and uses that phantom intent to **\*136** circumvent the express language of the Code Construction Act. Nothing in the language of the statute or its history supports the Court's assertion that the usual prospective reading would cause the statute to "at least partially fail of its intended purpose." Without some expression by the Legislature that it intended section 481.143 to apply to existing projects, how do we know whether it intended precisely the opposite, perhaps as part of a legislative compromise, or perhaps as a result of the Legislature's understanding that statutes operate prospectively in the absence of clear expression to the contrary. Moreover, how can we liberally construe a statute on a point on which the statute is admittedly silent, without any proof of legislative intent, and when the Code Construction Act unequivocally mandates the opposite of the Court's reading. Whether to apply a statute retroactively is, for very good reasons, a legislative policy choice:

> Because [prospectivity] accords with widely held intuitions about how statutes ordinarily operate, a presumption against retroactivity will generally coincide with legislative and public expectations. Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits. Such a requirement allocates to Congress responsibility for fundamental policy judgments concerning the proper temporal reach of statutes, and has the additional virtue of giving legislators a predictable background rule against which to legislate.

*Landgraf v. USI Film Prods.,* 511 U.S. 244, 272–73, 114 S.Ct. 1483 (1994). Through the Code Construction Act,

the Legislature has clearly expressed its policy choice that its laws will not operate retroactively without its own deliberation and manifest expression of the value of retroactivity in the statute at issue. Ignoring the Code Construction Act, especially in the absence of any statutory language or legislative history to the contrary, is, in my view, tantamount to legislating.

The Court points out that "[n]owhere does [the 1987] statute require that the original application for the first permit be filed after September 1, 1987." In the face of that legislative silence, and in light of the statutory presumption against retroactive application, I conclude we must apply the statute prospectively. Applying section 481.143 prospectively, I would hold that because section 481.143 was not effective until 1987, it did not apply to Circle C's 1985 applications for preliminary subdivision approval. I would further hold that section 481.143 governs Circle C's one application filed after the effective date of section 481.143 and before the SOS ordinance became effective, but that any other applications in that series must have been filed before section 481.143 was repealed for section 481.143 to govern those applications. Any other reading flouts our longstanding principles disfavoring retroactive lawmaking. Accordingly, I dissent.

**All Citations**

7 S.W.3d 109

Footnotes

1     The Barton Springs Edwards Aquifer is that portion of an underground system of water-bearing formations in Central Texas that recharges Barton Springs. Barton Springs is a spring surfacing in Austin that is fed by and feeds Barton Creek. Barton Springs and Barton Creek provide a significant source of Austin's water supply. Barton Springs also contributes to a unique recreational attraction in Austin, Barton Springs Pool, a spring-fed outdoor swimming pool open throughout the year.

2     In a de novo review, the reviewing tribunal determines each issue of fact and law without according deference to the original tribunal's decision. *See Post* at 116.

3     As support for this contention, Petitioners rely on a water quality analysis of sixteen rainfall samples taken at three locations. The City, however, elicited testimony that the water quality analysis of the samples was unreliable because not enough rain was collected and several of the samples were contaminated.

4     Petitioners introduced into evidence a label from a bottle of Evian natural spring water showing a nitrate concentration exceeding the runoff requirements under the Ordinance's technical rules. Because the purpose of the Ordinance's rules is to ensure that no *increases* occur in the average annual loadings of constituents such as nitrogen, Petitioners' comparison to Evian merely establishes that natural runoff in the Barton Creek watershed has a lower concentration of nitrates than the spring waters producing Evian bottled water. Accordingly, this evidence is actually not probative of whether compliance with the technical requirements of the Ordinance is possible.

1     Chapter 481 was amended in 1995. *See* Act of May 24, 1995, 74th Leg., R.S., ch. 794, § 1, 1995 Tex. Gen. Laws 4147, *repealed by* Act of June 1, 1997, 75th Leg., R.S., ch. 1041, § 51(b), 1997 Tex. Gen. Laws 3943, 3966. The 1995 amendments provided that section 481.143 applied "to all projects in progress on or commenced after the effective date of this subchapter as originally enacted." Act of May 24, 1995, 74th Leg., R.S. ch. 794, § 1, sec. 481.143(b), 1995 Tex. Gen. Laws 4147, 4147 (repealed). Although the 1995 amendments were expressly made retroactive to September 1, 1987, Circle C concedes that the amendments do not apply to its claims. *See* Act of May 24, 1995, 74th Leg., R.S., ch. 794, § 3, 1995 Tex. Gen. Laws 4147, 4148 ("Nothing in this Act shall be construed to diminish or impair the rights or remedies of any person or entity under a final judgment rendered by, or in any pending litigation brought in, any court concerning an interpretation of the provisions of Subchapter I, Chapter 481, Government Code."). Subchapter I was reenacted in 1999 as Local Government Code, Subtitle C, Title 7, Chapter 245, but the reenacted version contains a similar provision and is thus also inapplicable to this litigation. *See* Act of April 29, 1999, 76th Leg., R.S., ch. 73, § 4, 1999 Tex. Gen. Laws ___, ___ (to be codified at TEX. LOC. GOV'T CODE E § ___). Moreover, given the Legislature's mandate, we do not consider the 1995 amendments in construing section 481.143 as enacted.

2     It is unclear whether the terms "accorded" and "acquired" relate to rights. Certainly, not all terms in the general savings clause relate to rights—for example, incur, which generally means "become liable or subject to" would not refer to a party's rights. In addition, if we apply the general definition of "accord," which is "grant" or "allow," then any right of action granted or allowed by a statute would be saved despite a repeal, regardless of whether it had accrued before repeal. This cannot have been the Legislature's intent in enacting the general savings clause, for repeals of statutory causes of

action would have no effect. Accordingly, we will apply these terms, but in the more limited sense of affording the right when due, rather than when granted.

**End of Document**                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

S

**894 S.W.2d 525**
Court of Appeals of Texas,
Austin.

Bryan D. ROBINSON, Appellant,
v.
Kevin R. BRICE, Appellee.
No. 03–93–00123–CV. | March 8, 1995. | Rehearing
Overruled April 12, 1995.

Passenger injured in accident while riding in automobile which belonged to driver's employer brought action against driver. The 368th Judicial District Court, Williamson County, Burt Carnes, J., entered judgment for passenger and awarded prejudgment interest accruing on date action was filed. After driver appealed portion of judgment awarding prejudgment interest on future damages, passenger cross-appealed regarding determination of accrual date, and the Court of Appeals, Powers, J., held that: (1) passenger was not required to perfect independent appeal; (2) accident report submitted by passenger to employer's insurer shortly after accident did not constitute written notice of claim as would accrue claim for prejudgment interest; but (3) letter sent two months after accident in which passenger requested that insurer pay certain medical bills and inquired as to when next lost wages check was due did not constitute written notice of claim.

Reversed and rendered.

West Headnotes (12)

**[1]** **Appeal and Error**
　👉 Cross-appeals or writs of error

Plaintiff was not required to perfect independent appeal in order to bring cross-appeal concerning date on which prejudgment interest accrued following defendant's appeal regarding award of prejudgment interest on judgment in favor of plaintiff where defendant's appeal included that portion of judgment which awarded prejudgment interest on future damages.

Cases that cite this headnote

**[2]** **Statutes**
　👉 Purpose

In interpreting statute, court must consider its object and purpose.

Cases that cite this headnote

**[3]** **Interest**
　👉 Unreasonable or vexatious delay in payment

In addition to ensuring that plaintiffs are fully compensated, prejudgment interest statute provides series of incentives designed to encourage expeditious settlement of claims. Vernon's Ann.Texas Civ.St. art. 5069–1.05, § 6(a).

2 Cases that cite this headnote

**[4]** **Interest**
　👉 Prejudgment Interest in General

Prejudgment interest statute plainly requires not merely written notice of accident and resulting injuries, but also written notice of claim, in order for award of prejudgment interest to accrue. Vernon's Ann.Texas Civ.St. art. 5069–1.05, § 6(a).

Cases that cite this headnote

**[5] Statutes**
- Undefined terms

Where statute does not define term, term must be construed according to its ordinary meaning. V.T.C.A, Government Code § 312.002(a).

Cases that cite this headnote

**[6] Interest**
- Prejudgment Interest in General

Term "claim," as used in provision of prejudgment interest statute which requires plaintiff to provide written notice of claim in order for claim for prejudgment interest to accrue, means demand for compensation or assertion of right to be paid. Vernon's Ann.Texas Civ.St. art. 5069–1.05, § 6(a).

10 Cases that cite this headnote

**[7] Interest**
- Prejudgment Interest in General

Accident report submitted by passenger, who was injured in automobile accident which occurred while passenger was riding in automobile belonging to driver's employer, to insurer of driver's employer did not constitute "written notice of claim" as would accrue claim for prejudgment interest under statute in action against driver where report was not notice of demand for payment or compensation by passenger on passenger's behalf, even though report notified insurer that accident had occurred. Vernon's Ann.Texas Civ.St. art. 5069–1.05, § 6(a).

7 Cases that cite this headnote

**[8] Costs**
- Attorney Fees

Provision of statute governing recovery of attorney fees which requires claimant to present claim to opposing party is similar to prejudgment interest statute in that there is no indication what information must be included in claim. V.T.C.A., Civil Practice & Remedies Code § 38.002(2); Vernon's Ann.Texas Civ.St. art. 5069–1.05, § 6(a).

Cases that cite this headnote

**[9] Costs**
- Attorney Fees
**Interest**
- Prejudgment Interest in General

Fact that presentment of claim required under statute to accrue claim for prejudgment interest or for attorney fees may be informal does not obviate necessity for assertion of claim. V.T.C.A., Civil Practice & Remedies Code § 38.002(2); Vernon's Ann.Texas Civ.St. art. 5069–1.05, § 6(a).

2 Cases that cite this headnote

**[10] Interest**

👉 Torts; wrongful death

Letter sent by passenger injured in automobile accident, which occurred while passenger was riding in automobile belonging to driver's employer, to insurer of driver's employer in which passenger requested that insurer pay certain medical bills and inquired as to when next lost wages check was due constituted "written notice of claim" so as to satisfy requirements of prejudgment interest and accrue claim for prejudgment interest in action against driver where letter was sufficient to notify insurer that passenger was claiming compensation for his injuries, even though letter was phrased as request. Vernon's Ann.Texas Civ.St. art. 5069–1.05, § 6(a).

7 Cases that cite this headnote

**[11] Interest**

👉 Prejudgment Interest in General

Prejudgment interest statute does not require claimant to demand exact amount or list every element of damage claimed in order to provide written notice of claim as will accrue claim for prejudgment interest. Vernon's Ann.Texas Civ.St. art. 5069–1.05, § 6(a).

6 Cases that cite this headnote

**[12] Interest**

👉 Prejudgment Interest in General

Prejudgment interest statute is construed liberally to achieve its purposes of fully compensating plaintiff and encouraging settlements. V.T.C.A., Government Code § 312.006(a); Vernon's Ann.Texas Civ.St. art. 5069–1.05, § 6(a).

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*526** Ranelle M. Meroney, Wright & Greenhill, Austin, David C. Kent, Hughes & Luce, L.L.P., Dallas, for appellant.

Danny S. Ashby, Hughes & Luce, L.L.P., Dallas, for appellee. Before POWERS, JONES and KIDD, JJ.

**Opinion**

POWERS, Justice.

[1] Kevin Brice appeals the portion of a trial-court judgment fixing the date from which prejudgment interest began to accrue.[1] We will reverse that part of the judgment **\*527** and render judgment consistent with this opinion.

**THE CONTROVERSY**

On February 2, 1989, Bryan Robinson and Brice were involved in a one-car accident in which Robinson was the driver and Brice was the passenger. Brice sustained severe personal injuries. The car belonged to Robinson's employer, Temple–Inland Forest Products Corporation ("Temple–Inland"). Temple–Inland's insurance carrier was Highlands Insurance Company ("Highlands").

On February 14, approximately two weeks after the accident, Temple–Inland sent Highlands a "Motor Vehicle Accident Report" with Robinson's handwritten account of the accident attached. These documents described the accident and Brice's injuries. Subsequently, a claims adjustor at Highlands, Marthilyn Collins, began an investigation and on February 15 obtained tape-recorded statements from Brice and Robinson. The next day, Collins filled out a report, noting that liability was present and that Brice had told her he only wanted payment of lost wages and medical bills that were not covered by his own health insurance policy. Highlands began to pay these items periodically.

On April 1, Brice sent a note to Highlands, attaching certain medical bills not covered under his own insurance policy. He requested that Highlands pay the bills and asked when he would receive his next lost wages check. Highlands continued to pay Brice's medical bills and lost wages over the next few months, eventually paying a total of $23,091.94. Collins testified at the hearing on prejudgment interest that Brice requested payment solely for lost wages and unpaid medical

bills until shortly before the statute of limitations ran. At that point, Brice requested a substantial amount for future damages. Shortly thereafter, on January 31, 1991, he filed suit against Robinson and Temple–Inland.[2]

At trial, the jury found Robinson's negligence had proximately caused the accident and fixed damages in the amount of $676,248.97. Brice filed a motion for judgment on the jury's verdict[3] and requested prejudgment interest. *See* Tex.Rev.Civ.Stat.Ann. art. 5069–1.05 § 6(a) (West Supp.1995) (the "Statute").[4] According to the Statute, prejudgment interest accrues beginning on the 180th day after the date the defendant receives written notice of a claim, or on the date suit is filed, whichever occurs first. *Id.* Brice asserted that prejudgment interest should be calculated beginning August 14, 1989, 180 days after Highlands received the accident report from Temple–Inland. Robinson contended that prejudgment interest should accrue from the day Brice filed suit (January 31, 1991).

After a hearing, the trial court found that Highlands had not received written notice of Brice's claim more than 180 days before the filing of suit. The court therefore calculated prejudgment interest from the date Brice filed suit (January 31, 1991) through the day before the date judgment was rendered. The sole issue on appeal is whether the trial court correctly determined that Highlands had not received written notice of Brice's claim before Brice filed suit.

## DISCUSSION AND HOLDING

Brice asserts the trial court erred in finding Highlands did not receive written notice of a claim before Brice filed suit so as to **\*528** trigger the 180–day provision in the statute. Brice argues that the statute does not require written notice to come from the claimant, and therefore, the accident report that Highlands received on February 14 from its insured, Temple–Inland, constituted written notice of his claim. Robinson asserts that notice of an accident from an insured who is a potential defendant is not notice of a third party's claim.

[2] [3] The prejudgment interest statute does not set forth requirements for what constitutes adequate "written notice of a claim."[5] Apparently, no court has addressed the question. In interpreting the statute, we must consider its object and purpose. *De Leon v. Harlingen Consol. Indep. Sch. Dist.,* 552 S.W.2d 922, 925 (Tex.Civ.App.—Corpus Christi 1977, no writ). In addition to ensuring plaintiffs are fully compensated,

the prejudgment interest statute provides a series of incentives designed to encourage the expeditious settlement of claims. *C & H Nationwide, Inc. v. Thompson,* 37 Tex.Sup.Ct.J. 1059, 903 S.W.2d 315, 1994 WL 278167 (June 22, 1994). Brice contends the evident purpose of the 180–day provision is to provide a time period within which the defendant may, without penalty, conduct an investigation and settle claims with merit. He argues that the accident report was sufficient to fulfill this purpose because it apprised Highland that he was injured, the time, place and manner of the accident, and its probable cause.

[4] [5] [6] [7] The statute, however, plainly requires not merely written notice of an accident and resulting injuries, but also written notice of a *claim*. The statute does not define the term "claim," and therefore, we must construe it according to its ordinary meaning. Tex.Gov't Code Ann. § 312.002(a) (West 1988); *Hopkins v. Spring Indep. Sch. Dist.,* 736 S.W.2d 617, 619 (Tex.1987). The word "claim" ordinarily means a demand for compensation or an assertion of a right to be paid. Although the accident report notified Highlands that an accident had occurred, and that Brice had been injured, it was not notice of a demand for payment or compensation by Brice or on Brice's behalf, and thus was not notice of a *claim*.

[8] [9] Brice refers us to cases construing "notice of claim" provisions in other statutes to support his contention that Highland's receipt of the accident report was sufficient "written notice of a claim" under the prejudgment interest statute. Section 38.002 of the Civil Practice and Remedies Code provides that in order to recover attorney's fees "the claimant must present the claim to the opposing party." Tex.Civ.Prac. & Rem.Code Ann. § 38.002(2) (West 1986). This provision is similar to the prejudgment interest statute in that it does not indicate what information must be included in the claim. Brice cites cases holding that presentment may be informal and in no particular form. *Jones v. Kelley,* 614 S.W.2d 95, 100 (Tex.1981). The fact that presentment may be informal does not obviate the necessity for assertion of a claim. *See, e.g., Adams v. Petrade Int'l, Inc.,* 754 S.W.2d 696, 719 (Tex.App.—Houston [1st Dist.] 1988, writ denied) (noting section 38.002 merely requires some type of assertion of debt or claim to opposing party and request for compliance); *King Optical v. Automatic Data Processing of Dallas, Inc.,* 542 S.W.2d 213, 217 (Tex.Civ.App.—Waco 1976, writ ref'd n.r.e.) (holding claimant must merely assert right to be paid and request payment in order to recover attorney fees). Additionally, Brice argues that courts have construed section 101.101 of the Texas Tort Claims Act as requiring merely a description of the injury, and the time, place and manner of the incident. Tex.Civ.Prac. & Rem.Code Ann. § 101.101 (West 1986). He contends that the accident report in the present case includes all of the above

information. The accident report fails as written notice of a claim not because of insufficient form or detail, but because it is not notice of a demand for compensation or an assertion of a right to be paid.

**\*529** [10] [11] [12] Alternatively, Brice contends that his letter of April 1, stamped "Received" by Highlands on April 10, in which he requested that Highlands pay certain medical bills and inquired as to when the next lost wages check was due, constituted written notice of a claim so as to satisfy the statutory requirement.[6] We agree. Although phrased as a request, Brice plainly asserted in the letter a right to payment of his medical bills and lost wages. *See Huff v. Fidelity Union Life Ins. Co.,* 158 Tex. 433, 312 S.W.2d 493, 500 (1958) (noting demand need not be evidenced by firm and commanding language, but may be phrased in customarily used polite language). The statute does not require the claimant to demand an exact amount or list every element of damage claimed, and we decline to read such requirements into it. We must construe the statute liberally to achieve its purposes of fully compensating the plaintiff and encouraging settlements.*See* Tex.Gov't Code Ann. § 312.006(a) (West 1988). Brice's letter was sufficient to notify Highlands that he was claiming compensation for his injuries and afforded it the opportunity to settle the claim without incurring liability for prejudgment interest. Therefore, Brice is entitled to prejudgment interest calculated from 180 days after April 10, 1989, the date Highland received Brice's letter of April 1, until the day before rendition of judgment. We sustain Brice's cross-point of error.

We reverse that portion of the trial-court judgment awarding Brice prejudgment interest calculated from the date this lawsuit was filed. We render judgment that prejudgment interest accrue from 180 days after April 10, 1989, the date Highlands received Brice's letter of April 1, through the day preceding the date judgment was rendered.

Footnotes

1   Initially, Bryan Robinson appealed that portion of the judgment awarding Brice prejudgment interest on future damages. Brice cross-appealed regarding the trial court's determination of the date from which prejudgment interest accrued. Robinson moved to dismiss the entire appeal in light of the supreme court's decision in *C & H Nationwide, Inc. v. Thompson,* 37 Tex.Sup.Ct.J. 1059, 903 S.W.2d 315, 1994 WL 278167 (June 22, 1994). In his motion to dismiss, Robinson contends Brice is not entitled to the relief sought by his cross-point because Brice did not perfect an independent appeal. However, it was unnecessary for Brice to do so because Robinson's appeal included "[t]hat portion of the judgment which awards pre-judgment interest on future damages."

2   Although Temple–Inland was a defendant at trial, the trial court granted its motion for directed verdict before the case was submitted to the jury. It is not a party to this appeal.

Brice credited Robinson for Highland's previous payment of medical bills and lost wages in the amount of $23,091.94, requesting judgment for the difference between $23,091.94 and the award of $676,248.97 in the amount of $653,157.03. The court rendered judgment for Brice and calculated prejudgment interest on the adjusted amount.

The statute provides:
Judgments in wrongful death, personal injury, and property damage cases must include prejudgment interest.... [P]rejudgment interest accrues on the amount of the judgment during the period beginning on the 180th day after the date the defendant receives written notice of a claim or on the day the suit is filed, whichever occurs first, and ending on the day preceding the date judgment is rendered. Tex.Rev.Civ.Stat.Ann. art. 5069–1.05 § 6(a) (West Supp.1995).

Many "notice of claim" provisions do provide detailed requirements for what the notice must contain. *See, e.g.,* Texas Tort Claims Act, Tex.Civ.Prac. & Rem.Code Ann. § 101.101(a)(1)–(3) (West 1986) (stating notice of claim must reasonably describe damage or injury claimed, the incident and its time and place); Deceptive Trade Practices—Consumer Protection Act, Tex.Bus. & Com.Code Ann. § 17.505(a) (West Supp.1995) (stating written notice must advise in reasonable detail of the consumer's specific complaint, actual damages, and expenses reasonably incurred in asserting claim).

The day after Highlands received the accident report, Brice informed Highlands that he wanted compensation for lost wages and medical bills, thus effectively giving notice of a claim, but this communication was not in writing as required by the statute. The April 1st letter read as follows:
Marthilyn—These are the bills that Prudential won't pay because they are applying to my deductible. Also included are other bills I have submitted to you previously but have no resolution on. Please process these as quickly as you can, as I have had to pay out of my pocket on these. Also, when is next lost wages check due? I'll call this week. Thank you, Kevin Brice.

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

# T

82 S.W.3d 314
Supreme Court of Texas.

TEXAS DEPARTMENT OF
TRANSPORTATION, Petitioner,
v.
Eddie William NEEDHAM, Respondent.

No. 01–0383. | Argued April 10, 2002. | Delivered May 9, 2002. | Rehearing Denied Sept. 12, 2002.

Former employee sued Department of Transportation (DOT), alleging DOT violated Whistleblower Act when it retaliated against employee for reporting a co-worker's alleged unlawful conduct to DOT supervisors. The District Court, Travis County, 353rd Judicial District, W. Jeanne Muerer, J., entered judgment on jury verdict in favor of employee. DOT appealed. The Austin Court of Appeals affirmed. DOT filed petition for review. The Supreme Court, Baker, J., held, as matter of first impression, that: (1) as a matter of law, DOT was not an appropriate law enforcement authority under Act for employee to report co-worker's alleged violation of driving while intoxicated laws, and (2) evidence did not support finding that employee had good faith belief that DOT was an appropriate law enforcement authority under Act to report co-worker's alleged drunk driving.

Reversed.

West Headnotes (11)

**[1]** **Statutes**
 Intent

In construing a statute, a court's objective is to determine and give effect to the Legislature's intent.

38 Cases that cite this headnote

**[2]** **Statutes**
 Defined terms; definitional provisions

Ordinarily, a court first looks at the statute's plain and common meaning, but if a statute defines a term, a court is bound to construe that term by its statutory definition only. V.T.C.A., Government Code § 311.011(b).

30 Cases that cite this headnote

**[3]** **Statutes**
 Construing together; harmony

Courts should not give an undefined statutory term a meaning out of harmony or inconsistent with other provisions, although it might be susceptible of such a construction if standing alone.

35 Cases that cite this headnote

**[4]** **Statutes**
 Similarity or difference

In ascertaining a term's meaning, courts look primarily to how that term is used throughout the statute as a whole.

7 Cases that cite this headnote

**[5]** **Statutes**
 Similarity or difference

Statutory terms should be interpreted consistently in every part of an act.

6 Cases that cite this headnote

**[6]** **Statutes**
 Questions of law or fact

Statutory construction is a question of law for the court to decide.

9 Cases that cite this headnote

**[7]** **Appeal and Error**
 Cases Triable in Appellate Court

Supreme Court reviews legal questions de novo.

53 Cases that cite this headnote

**[8]** **Officers and Public Employees**
 Grounds for removal or discipline

Department of Transportation (DOT) was not an entity charged with regulating under, enforcing,

investigating, or prosecuting driving while intoxicated (DWI) laws and, thus, as a matter of law, was not an "appropriate law enforcement authority" to whom former employee could have reported co-worker's alleged violation of DWI laws, within meaning of Whistleblower Act. V.T.C.A., Government Code § 554.002(b).

39 Cases that cite this headnote

**[9]  Officers and Public Employees**
        Grounds for removal or discipline

Under the Whistleblower Act's statutory definition of an "appropriate law enforcement agency," it is clearly not enough that a government entity has general authority to regulate, enforce, investigate, or prosecute; rather, the particular law the public employee reported violated is critical to the determination. V.T.C.A., Government Code § 554.002(b).

65 Cases that cite this headnote

**[10]  Officers and Public Employees**
         Grounds for removal or discipline

In the context of provision of Whistleblower Act requiring public employee to have a good faith belief that report of misconduct is made to an appropriate law enforcement agency, "good faith" means: (1) the employee believed the governmental entity was authorized to (a) regulate under or enforce the law alleged to be violated in the report, or (b) investigate or prosecute a violation of criminal law; and (2) the employee's belief was reasonable in light of the employee's training and experience. V.T.C.A., Government Code § 554.002(b).

79 Cases that cite this headnote

**[11]  Officers and Public Employees**
         Grounds for removal or discipline

Evidence regarding Department of Transportation's (DOT) disciplinary process, former employee's participation therein, and his belief that DOT could forward information to another entity to prosecute a drunk driving allegation against a coworker did not support

finding that employee had a good faith belief that DOT was an appropriate law enforcement authority under the Whistleblower Act to report co-worker's alleged drunk driving. V.T.C.A., Government Code § 554.002(b).

51 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*315**  Julie Caruthers Parsley, Office of Solicitor Gen. of Texas, John Cornyn, Jeffrey S. Boyd, Philip A. Lionberger, Katherine E. Kasten, Cavitt Wendlandt, Danica Lynn Milios, Office of Attys Gen. of Texas, Howard G. Baldwin, First Asst. Atty. Gen., Austin, for petitioner.

John Judge, Judge & Brim, Mark W. Robinett, Jefferson K. Brim, III, Brim Arnette & Robinett, Austin, for respondent.

**Opinion**

Justice BAKER delivered the opinion of the Court.

In this Texas Whistleblower Act suit we determine whether the Texas Department of Transportation is an appropriate law enforcement authority to which a public employee may report an alleged driving while intoxicated incident. If TxDOT is not, we must determine whether the public employee had a good faith belief that it was an appropriate law enforcement authority. The trial court rendered judgment based on the jury's verdict for Eddie Needham, TxDOT's former employee who TxDOT allegedly retaliated against because he reported a co-worker's alleged unlawful conduct to TxDOT supervisors. The court of appeals affirmed the trial court's judgment. 76 S.W.3d 15.

We conclude, under the circumstances in this case, that TxDOT was not an appropriate law enforcement authority as the Whistleblower Act defines that term. We also conclude that there is no evidence to support a finding that Needham had a good faith belief that TxDOT was an appropriate law enforcement authority. Accordingly, we reverse the court of appeals' judgment and render judgment that Needham take nothing.

**I. BACKGROUND**

By 1996, Eddie Needham had worked for TxDOT's information systems division **\*316** for twenty-three years. Needham was a crew chief in TxDOT's Geodetic Control Section. He traveled around the state with other TxDOT employees to perform global positioning surveys. On January 10, 1996, Needham and a crew member were returning from Orange to Austin. The two stopped for the night at College Station. When they arrived at the motel, Needham encountered another TxDOT crew chief, Sam Garnett, and his two crew members. The two crews decided to eat dinner together. One of Garnett's crew members, who drove a separate vehicle to the restaurant, called Needham on the radio for directions. Needham testified at trial that the co-worker's voice was slurred and that he was weaving as he walked into the restaurant. Needham also said that during dinner the co-worker's breath smelled of alcohol. Because he concluded that the co-worker was too intoxicated to drive, Needham instructed another employee to drive the intoxicated employee's car back to the motel after dinner.

Needham testified that he did not immediately report the co-worker's conduct to TxDOT because he believed that the worker's crew chief, Garnett, should do so, and because Needham feared retaliation. Accordingly, Needham waited until February 23 to report the co-worker's conduct to Lewis Keller, a supervisor at the same level as Needham's immediate supervisor, Frank Howard. Needham met with Keller to discuss whether Needham could transfer to Keller's section. During the meeting, Needham also discussed the co-worker's conduct in College Station and sought Keller's advice about what to do. Keller told Needham that TxDOT's Human Resources Manual required Needham to report the incident to Needham's immediate superior. That same day, Needham met with Howard and discussed the possible transfer to Keller's department as well as the drunk driving incident involving the co-worker.

On March 1, Needham talked to Leah Coffman, Howard's supervisor, about various work matters. Needham did not mention the co-worker's conduct in College Station to Coffman, because he had already told Keller and Howard about the incident. In fact, Needham saw Keller on that day to again bring up the drunk driving incident, because Needham thought nothing was being done about the situation. On this occasion, Keller told Needham to talk to Barry Six, a TxDOT employee who dealt with human resources issues.

Needham thus met with Six later that afternoon. When Needham started to tell Six about the drunk driving incident,

Six said that he already knew about the incident, management was deciding what to do, and Needham had already done everything he needed to do.

From March 4 through March 6, Needham was out with flu. When he returned to work, he again spoke to Six about the co-worker's conduct. Then, Needham suffered a relapse from the flu and stayed home until March 11.

When Needham returned to work, Coffman escorted him into Six's office to discuss concerns about Needham's travel and work assignment practices. A week later, Howard and Needham met with the division head, Coffman, Six, and another TxDOT supervisor. At that time, Howard gave Needham a progressive disciplinary action document charging Needham with thirteen violations of TxDOT policies and procedures. The violations included a charge that Needham unnecessarily traveled to College Station with no TxDOT business to conduct, secured lodging in College Station rather than return to Austin headquarters, and encouraged other employees to do the same. Based on **\*317** these allegations, Howard demoted Needham and placed him on probation for twelve months. Needham testified that he was shocked and devastated about these charges, because he had never received a reprimand during his twenty-three years with TxDOT.

In early April 1996, Needham initiated an administrative appeal of the adverse employment decision. Needham also left work on sick leave and eventually took early retirement on December 31, 1996. After abandoning his administrative appeal, Needham sued TxDOT and alleged, among other things, a Whistleblower Act claim. *See* TEX. GOV'T CODE §§ 554.001–010.

TxDOT moved for summary judgment on the Whistleblower Act claim. TxDOT asserted that Needham had not reported a violation of law to an appropriate law enforcement authority as the Whistleblower Act requires. However, the trial court denied TxDOT's motion. After a trial, the jury found in Needham's favor. Needham moved for judgment on the verdict, and TxDOT moved for judgment notwithstanding the verdict. The trial court entered judgment on the jury's verdict, and, in response to TxDOT's request, filed findings of fact and conclusions of law. The trial court found and concluded that Needham reported a violation of law to an appropriate law enforcement authority, and that TxDOT took adverse personnel action against Needham in retaliation for the report.

TxDOT appealed and asserted that there was no evidence or insufficient evidence to show that TxDOT violated the Whistleblower Act. The court of appeals concluded that TxDOT's disciplinary action policy gives it the power to discipline an employee "on account of an alleged violation being reported." 76 S.W.3d at 23. Thus, the court of appeals held, TxDOT qualified as an appropriate law enforcement authority. 76 S.W.3d at 21. The court of appeals also held that there was sufficient evidence for a jury to find that "Needham's report of [the co-worker's] conduct constituted a good faith report of a violation of law to an appropriate law enforcement authority." 76 S.W.3d at 21. Finally, the court of appeals held that the evidence was sufficient to support a finding that TxDOT retaliated against Needham because of his report. 76 S.W.3d at 21. We granted TxDOT's petition for review to determine if the court of appeals correctly applied the Whistleblower Act to conclude that Needham reported a violation of law to a government entity that he in good faith believed was an "appropriate law enforcement authority."

## II. APPLICABLE LAW

### A. THE WHISTLEBLOWER ACT

Texas's Whistleblower Act prohibits a state or local governmental entity from taking adverse personnel action against "a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority." TEX. GOV'T CODE § 554.002(a). Before 1995, the Whistleblower Act did not define the term "appropriate law enforcement authority." However, the Legislature's 1995 amendments to the statute added a provision to do so. *See* Act of May 25, 1995, 74th Leg., R.S. ch. 721, §§ 1–12, 1995 Tex. Gen. Laws 3812 (current version at TEX. GOV'T CODE § 554.002(b)). Thus, section 554.002 of the Whistleblower Act provides:

  (b) In this section, a report is made to an appropriate law enforcement authority if the authority is part of a state or local governmental entity or the federal government that the employee **\*318** in good faith believes is authorized to:

   (1) regulate under or enforce the law alleged to be violated in the report; or

   (2) investigate or prosecute a violation of criminal law.

TEX. GOV'T CODE § 554.002(b).

### B. STATUTORY CONSTRUCTION

 **[1]**   **[2]**   In construing a statute, "our objective is to determine and give effect to the Legislature's intent." *Nat'l Liab. & Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527 (Tex.2000); *see Albertson's, Inc. v. Sinclair,* 984 S.W.2d 958, 960 (Tex.1999). Ordinarily, we first look at the statute's plain and common meaning. *Allen,* 15 S.W.3d at 527; *Fitzgerald v. Advanced Spine Fixation Systems, Inc.,* 996 S.W.2d 864, 865 (Tex.1999). But if a statute defines a term, a court is bound to construe that term by its statutory definition only. TEX. GOV'T CODE § 311.011(b); *Transp. Ins. Co. v. Faircloth,* 898 S.W.2d 269, 274 (Tex.1995); *Tijerina v. City of Tyler,* 846 S.W.2d 825, 827 (Tex.1992).

 **[3]**   **[4]**   **[5]**   Further, courts should not give an undefined statutory term a meaning out of harmony or inconsistent with other provisions, although it might be susceptible of such a construction if standing alone. *See Barr v. Bernhard,* 562 S.W.2d 844, 849 (Tex.1978); *Dallas Indep. Sch. Dist. v. Finlan,* 27 S.W.3d 220, 228 (Tex. App.-Dallas 2000, pet. denied). In ascertaining a term's meaning, courts look primarily to how that term is used throughout the statute as a whole. *See Barr,* 562 S.W.2d at 849; *Finlan,* 27 S.W.3d at 228. Statutory terms should be interpreted consistently in every part of an act. *See Finlan,* 27 S.W.3d at 228.

 **[6]**   **[7]**   Statutory construction is a question of law for the court to decide. *Havlen v. McDougall,* 22 S.W.3d 343, 345 (Tex.2000); *Johnson v. City of Fort Worth,* 774 S.W.2d 653, 656 (Tex.1989). We review legal questions *de novo. See Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 928 (Tex.1998).

### III. ANALYSIS

 **[8]**   In this case, we interpret for the first time the term "appropriate law enforcement authority" under the post–1995 Whistleblower Act. TxDOT argues that the statutory definition's plain meaning does not support the court of appeals' conclusion that TxDOT was an appropriate law enforcement authority. TxDOT further asserts that the court of appeals misconstrued and interpreted the statute too broadly by reading a power-to-discipline qualification

into the statutory definition. TxDOT contends that it is not an entity charged with regulating under, enforcing, investigating, or prosecuting the state's criminal laws, including those that penalize driving while intoxicated.

On the other hand, Needham contends that the governmental entity's function, and the authority the state grants it, do not solely determine whether it is an "appropriate law enforcement authority." Rather, Needham contends that the perception of the employee who makes the report also determines what constitutes an appropriate law enforcement authority. Here, Needham argues, he reported the co-worker's conduct to his superiors believing in good faith that TxDOT had authority to investigate allegations that an employee drove a TxDOT vehicle while intoxicated in order to regulate its employees by prohibiting their driving TxDOT vehicles while intoxicated. Further, Needham contends that any long-time TxDOT employee would believe that TxDOT had the authority to investigate a report that an employee violated a criminal law not **\*319** only for TxDOT's own internal disciplinary process but also to forward the report to another entity to prosecute.

In analyzing whether TxDOT was an appropriate law enforcement authority, the court of appeals recognized that the pre–1995 Whistleblower Act did not define the term. The court of appeals also recognized that the post–1995 version now defines "appropriate law enforcement authority" as a governmental entity that the public employee in good faith believes is authorized to: (1) regulate under or enforce the law alleged to be violated in the report; or (2) investigate or prosecute a violation of criminal law. *See* 76 S.W.3d at 23 (citing TEX. GOV'T CODE § 554.002(b)).

But then the court of appeals considered a pre–1995 amendment case that discussed the undefined term "appropriate law enforcement authority." 76 S.W.3d at 21 (citing *City of Dallas v. Moreau,* 697 S.W.2d 472 (Tex.App.-Dallas 1985, no writ)). In *Moreau,* the court of appeals held that an appropriate law enforcement authority must have: (1) the power and duty under the law to decide disputes concerning the lawfulness of the matter being reported; (2) the power and duty to order a halt or a change in the matter reported; (3) the power to legislate or regulate with respect thereto; or (4) the power to arrest, prosecute, or otherwise discipline on account of the alleged violation being reported. *Moreau,* 697 S.W.2d at 474.

Relying on *Moreau's* fourth category, the court of appeals determined that TxDOT was an appropriate law enforcement authority, because TxDOT could "otherwise discipline" employees under its progressive disciplinary action policy. 76 S.W.3d at 24. The court of appeals explained that TxDOT's policy identifies conduct warranting disciplinary action, including illegal activity committed while carrying out official duties and behavioral problems occurring during work hours that relate to alcohol and substance abuse. 76 S.W.3d at 24. Then, the court of appeals noted that the policy requires supervisors to take certain progressive disciplinary action when an employee fails to meet behavior or performance standards. 76 S.W.3d at 24. Because TxDOT's policy gave it the power to discipline an employee based on a reported violation, the court of appeals held that TxDOT qualified as an appropriate law enforcement authority under *Moreau.* 76 S.W.3d at 23.

We disagree with the court of appeals' conclusion, because it relies on a pre–1995 amendment case. The court of appeals' analysis ignores the limiting nature of the Legislature's 1995 amendment to the Whistleblower Act that defines "appropriate law enforcement authority." And, in doing so, the court of appeals' analysis expands the statutory definition to include an employer's general obligation to internally discipline its own employees.

**[9]** When Needham made his drunk driving "report" to TxDOT, the Legislature had already amended the Whistleblower Act to define the term "appropriate law enforcement authority." Thus, the Whistleblower Act provided, as it does today, that an appropriate law enforcement authority is a governmental entity authorized to "regulate under or enforce the law alleged to be violated in the report." TEX. GOV'T CODE § 554.002(b)(1). Alternatively, an appropriate law enforcement authority is a governmental entity authorized to "investigate or prosecute a violation of a criminal law." TEX. GOV'T CODE § 554.002(b)(2). Under the statutory definition, it is clearly not enough that a government entity has *general* authority to regulate, enforce, investigate, or prosecute. Rather, to determine if a governmental entity qualifies as an "appropriate law enforcement authority," we are bound to construe **\*320** that term as the statute defines it. *See* TEX. GOV'T CODE § 311.011(b); *Faircloth,* 898 S.W.2d at 274; *Tijerina,* 846 S.W.2d at 827. And the statute defines that term as a governmental entity authorized to regulate under or enforce "*the law alleged to be violated in the report,*" or to investigate or prosecute "*a violation of criminal law.*"

*See* TEX. GOV'T CODE § 554.002(b). In other words, the particular law the public employee reported violated is critical to the determination. Thus, here, we must determine whether TxDOT has the authority to regulate under, enforce, investigate, or prosecute a violation of Texas's driving while intoxicated laws. *See* TEX. GOV'T CODE § 554.002(b).

Here, after analyzing the reported violation of law—driving while intoxicated—under the statutory definition, we conclude that TxDOT was not an appropriate law enforcement authority. TxDOT has no authority to regulate under or enforce the Texas's driving while intoxicated laws. *See* TEX. GOV'T CODE § 554.002(b)(1). Nor does it have authority to investigate or prosecute these criminal laws. *See* TEX. GOV'T CODE § 554.002(b)(2). At most, TxDOT has authority to regulate and investigate its employees' conduct only to carry out its internal disciplinary process procedures. But construing the statutory terms to include a public employer's internal disciplinary power would mean all public employers with a disciplinary policy for handling employees' alleged illegal conduct are "appropriate law enforcement authorities" for purposes of reporting any alleged violation. We reject such an interpretation. *See* TEX. GOV'T CODE § 311.023(5). Accordingly, we hold that, as a matter of law, TxDOT is not an appropriate law enforcement authority under section 554.002(b) for a public employee to report another employee's violation of Texas's driving while intoxicated laws.

However, our conclusion that TxDOT is not a governmental entity authorized to regulate under, enforce, investigate, or prosecute Texas's driving while intoxicated laws does not end our inquiry. Needham may still obtain Whistleblower Act protection if he in good faith believed that TxDOT was an appropriate law enforcement authority as the statute defines the term. *See* TEX. GOV'T CODE § 554.002(b). Because we have not defined what "good faith" means in this context, this issue is also one of first impression.

Though we have not defined "good faith" under subsection (b), we have defined the term in the context of subsection (a)'s requirement that the reporting employee have a good faith belief that another employee violated the law. *See* TEX. GOV'T CODE § 554.002(a). Specifically, in *Wichita County v. Hart,* this Court held:

> "Good faith" means that (1) the employee believed that the conduct reported was a violation of law and (2) the employee's belief was reasonable

in light of the employee's training and experience.

917 S.W.2d 779, 784 (Tex.1996).

The test's first element—the "honesty in fact" element—ensures that an employee seeking a Whistleblower Act remedy believed he was reporting an actual violation of law. *Hart,* 917 S.W.2d at 784–85. The test's second element ensures that, even if the reporting employee honestly believed that the reported act was a violation of law, the reporting employee only receives Whistleblower Act protection if a reasonably prudent employee in similar circumstances would have believed that the facts as reported were a violation of law. *Hart,* 917 S.W.2d at 785. Thus, the *Hart* test includes both a subjective and objective element.

 **[10]**     We conclude the same test applies to determine if a public employee in good **\*321** faith believed the governmental entity to which he reported a violation of law was an appropriate law enforcement authority. Applying this test upholds the statutory construction principle that, when feasible, we should consistently interpret terms used throughout a statute. *See Barr,* 562 S.W.2d at 849; *Finlan,* 27 S.W.3d at 228. And it allays the same concerns expressed in *Hart* that public employees receive Whistleblower Act protection when they attempt to report illegal activity while, at the same time, public employers retain the right to discipline employees who, in reporting the alleged violation, act unreasonably or only with ill motive. *See Hart,* 917 S.W.2d at 784–85. Thus, in the context of section 554.002(b), "good faith" means:

> (1) the employee believed the governmental entity was authorized to (a) regulate under or enforce the law alleged to be violated in the report, or (b) investigate or prosecute a violation of criminal law; and

> (2) the employee's belief was reasonable in light of the employee's training and experience.

Accordingly, we must determine if, under the test we adopt today, there is any evidence to support the conclusion that Needham had a good faith belief that he reported the alleged drunk driving incident to the appropriate law enforcement authority.

 **[11]**     Here, the court of appeals applied the *Hart* test to determine that Needham had a good faith belief that he was reporting the violation to an appropriate law enforcement

authority. *See* 76 S.W.3d at 21. The court of appeals relied on the same evidence as Needham does here to argue he had a good faith belief under the *Hart* test. First, the court of appeals decided that Needham's persistence in reporting the drunk driving incident to various TxDOT supervisors demonstrates that he subjectively believed TxDOT was the appropriate law enforcement authority. Second, the court of appeals concluded that TxDOT supervisors' telling Needham to whom he should report the co-worker's conduct "reinforces the reasonableness of Needham's belief that the individuals to whom he was reporting were appropriate law enforcement authorities." 76 S.W.3d at 24.

But the court of appeals' analysis, and Needham's contention that the evidence supports his good faith belief under the *Hart* test, are both based on the erroneous assumption that section 554.002(b)'s "appropriate law enforcement authority" definition includes an employer's power to discipline an employee for allegedly violating a law. 76 S.W.3d 24. As we have already held, the statutory definition's limiting language —regulate under, enforce, investigate, and prosecute—does not include an employer's power to internally discipline its own employees for an alleged violation. Here, the only evidence Needham relies on to support that he could have subjectively or objectively believed he was reporting to the appropriate law enforcement authority is TxDOT's disciplinary process, his participation therein, and his belief

that TxDOT could forward information to another entity to prosecute a drunk driving allegation. Therefore, we hold that there is no evidence to support a finding that Needham had a good faith belief that TxDOT was an appropriate law enforcement authority under the Whistleblower Act to report a co-worker's drunk driving. *See Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001); *Faircloth,* 898 S.W.2d at 275–76.

### IV. CONCLUSION

We hold that, as a matter of law, TxDOT is not an appropriate law enforcement authority under section 554.002(b) to which a public employee may report an alleged **\*322** drunk driving incident. We further hold that there is no evidence to support a finding that Needham had a good faith belief that he reported the alleged drunk driving to an appropriate law enforcement authority. Because these conclusions dispose of this appeal, we need not reach TxDOT's second argument that Needham's causation evidence is legally sufficient. Accordingly, we reverse the court of appeals' judgment and render judgment that Needham take nothing.

**All Citations**

82 S.W.3d 314, 45 Tex. Sup. Ct. J. 631

---

	© 2015 Thomson Reuters. No claim to original U.S. Government Works.



180 S.W.3d 761
Court of Appeals of Texas,
Fort Worth.

TOSHIBA MACHINE CO., AMERICA, Appellant,
v.
SPM FLOW CONTROL, INC., Appellee.
No. 2–03–156–CV. | Nov. 10, 2005.

**Synopsis**
**Background:** Manufacturer of heavy-duty oilfield pumps brought breach of contract action against maker of machine tools. The 236th District Court, Tarrant County, Thomas Wilson Lowe III, J., entered judgment on a jury verdict for manufacturer and awarded manufacturer attorney fees. Both parties appealed.

**Holdings:** On rehearing, the Court of Appeals, Anne Gardner, J., held that:

[1] there was some evidence to establish that manufacturer's use of nonconforming machine tools was reasonable and did not constitute acceptance nor preclude revocation of acceptance;

[2] there was some evidence to establish that addendum to purchase order was part of the parties' contract;

[3] there was some evidence to establish that maker breached its contracts;

[4] there was some evidence to establish that manufacturer was damaged in amount of $6,007,226;

[5] there was some evidence to establish that manufacturer made reasonable efforts to cover and mitigate its damages;

[6] trial court did not abuse its discretion by exceeding the lodestar amount and awarding manufacturer attorney fees in amount of $1.5 million through the date of judgment; and

[7] letter from manufacturer to maker did not constitute a written notice of a claim and, thus, did not trigger accrual of prejudgment interest.

Affirmed.

West Headnotes (43)

**[1]** **Sales**
 🔑 Effect of Acceptance
 **Sales**
 🔑 Protest, objection, notice, or conditional acceptance, and effect thereof

A buyer's rejection or acceptance of nonconforming goods determines the remedies available to him. V.T.C.A., Bus. & C. §§ 2.601, 2.711, 2.714.

4 Cases that cite this headnote

**[2]** **Sales**
 🔑 Use or other disposition by buyer

There was some evidence to establish, in breach of contract action, that heavy-duty oilfield pump manufacturer's 17,000 hours of use of nonconforming machine tools over four years was reasonable and, thus, did not constitute acceptance of machine tools nor preclude manufacturer's revocation of acceptance; there was evidence that maker of machine tools agreed to provide a specific boring function with both machines, that machine tools were delivered without the software necessary for boring function, that maker repeatedly promised it would deliver the boring software, that maker did not announce that it would not deliver the software until 17 months after delivery of first machine tool, that manufacturer's use of machine tools mitigated its damages, and that replacement machine tools having the required boring function had a long lead time. V.T.C.A., Bus. & C. §§ 1.205, 2.602, 2.606, 2.608.

2 Cases that cite this headnote

[3]     Sales
        Use or other disposition by buyer
        Sales
        Acceptance of goods

What constitutes reasonable use, such that a buyer's use of nonconforming goods does not undo a rejection or revocation of acceptance, is a question of fact to be decided under the circumstances of each case, though generally using goods during the time when the seller is promising or trying unsuccessfully to cure the nonconformity will not adversely affect the buyer's rights. V.T.C.A., Bus. & C. §§ 2.602, 2.606, 2.607(b), 2.608.

4 Cases that cite this headnote

[4]     Courts
        Decisions of Courts of Other State

In determining and applying the Texas version of the Uniform Commercial Code (UCC), Texas courts may consider and apply pertinent decisions from other jurisdictions. V.T.C.A., Government Code § 311.028; V.T.C.A., Bus. & C. § 1.103.

1 Cases that cite this headnote

[5]     Sales
        Use or other disposition by buyer

Factors relevant to a buyer's reasonable use of nonconforming goods, such that the use does not undo a rejection or revocation of acceptance, include the degree of economic hardship the buyer would suffer if it discontinued using the defective goods and the reasonableness of the buyer's use after revocation as a method of mitigating damages. V.T.C.A., Bus. & C. §§ 1.205, 2.602, 2.606, 2.608.

5 Cases that cite this headnote

[6]     Sales
        Use or other disposition by buyer

Use of nonconforming goods may be the most appropriate means of achieving mitigation until the buyer can obtain suitable replacements.

Cases that cite this headnote

[7]     Sales
        Acceptance of offer

There was some evidence to establish that addendum that heavy-duty oilfield pump manufacturer attached to its purchase order for machine tool was part of contract between manufacturer and maker of machine tool, in manufacturer's breach of contract action; manufacturer's purchase order was an offer to buy the machine tool, terms and conditions of purchase recited on back of order stated that maker's shipment of the machine tool was acceptance of the purchase order, maker shipped the machine tool, terms and conditions also stated that acceptance of order was acceptance of all terms on front and back of purchase order, merger clause on order stated that the order and all documents referred to on its face constituted parties' entire agreement, and front of order specifically referred to addendum. V.T.C.A., Bus. & C. § 2.207.

Cases that cite this headnote

**[8]      Sales**
   Quality, Fitness, and Condition of Goods

There was some evidence to establish that maker of machine tools breached contracts to sell machine tools to heavy-duty oilfield pump manufacturer, in manufacturer's breach of contract action; there was evidence that maker of machine tools failed to deliver boring function software, tool lists and part programs, process cycle study times and a test run-off of a fluid end for one of manufacturer's pumps, all of which the contracts required maker of machine tools to deliver.

Cases that cite this headnote

**[9]      Sales**
   Effect of delivery

Under the Uniform Commercial Code (UCC), delivery of goods is a necessary predicate to acceptance or rejection, but delivery by itself does not determine the buyer's remedies. V.T.C.A., Bus. & C. §§ 2.711, 2.713, 2.714.

1 Cases that cite this headnote

**[10]     Sales**
   Effect of Acceptance
**Sales**
   Protest, objection, notice, or conditional acceptance, and effect thereof

Assuming the seller delivers something, the buyer's acceptance or rejection determines the buyer's remedies under the Uniform Commercial Code (UCC). V.T.C.A., Bus. & C. §§ 2.711, 2.713, 2.714.

2 Cases that cite this headnote

**[11]     Sales**
   Acts Constituting Delivery

"Conformity" does not mean substantial performance, for purposes of determining whether a seller breached a contract under the Uniform Commercial Code (UCC); it means complete performance. V.T.C.A., Bus. & C. § 2.601.

1 Cases that cite this headnote

**[12]     Damages**
   Particular cases

There was some evidence to establish with reasonable certainty that heavy-duty oilfield pump manufacturer was damaged in the amount of $6,007,226 as a result of breach of contracts by maker of machine tools, in manufacturer's breach of contract action; manufacturer's vice president of finance testified, to a reasonable certainty, that manufacturer lost profits in the amount of $6,038,292, and there was evidence that manufacturer incurred incidental damages for things such as pouring foundations and designing tools for the machines.

[Cases that cite this headnote](#)

**[13]** **Damages**
     Loss of profits

A party seeking to recover lost profits must prove the loss through competent evidence with reasonable certainty.

[Cases that cite this headnote](#)

**[14]** **Damages**
     Loss of profits
**Evidence**
     Damages

While the requirement, that a party seeking to recover lost profits must prove the loss through competent evidence with reasonable certainty, is a flexible one in order to accommodate the myriad circumstances in which claims for lost profits arise, at a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained.

[Cases that cite this headnote](#)

**[15]** **Damages**
     Loss of profits

"Reasonable certainty" necessary to recover on a claim for lost profits is not demonstrated when the profits claimed to be lost are largely speculative or a mere hope for success, as from an activity dependent on uncertain or changing market conditions, on chancy business opportunities, or on promotion of untested products or entry into unknown or unproven enterprises.

[Cases that cite this headnote](#)

**[16]** **Damages**
     Loss of profits

The mere assertion that contracts were lost does not demonstrate a reasonably certain objective determination of lost profits.

[Cases that cite this headnote](#)

**[17]** **Damages**
     Questions for Jury

Whether evidence is speculative or reasonably certain, such that a claim for lost profits is established, is a factual issue within the exclusive province of the jury to determine.

[Cases that cite this headnote](#)

**[18]** **Damages**
     Loss of profits

Reasonably certain lost profits may be proved by relying on such factors as: (1) the experience of the business principals, (2) the nature of the business, (3) the nature of the market, (4) the nature of the client base, (5) the sales force, (6) the marketing plan, and (7) the company's track record of sales.

Cases that cite this headnote

**[19]**  **Damages**
 🔑  Loss of profits

When a business is already established and making a profit at the time the contract was breached or the tort committed, pre-existing profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost.

Cases that cite this headnote

**[20]**  **Evidence**
 🔑  Damages

Vice president of finance for oilfield pump manufacturer was qualified to testify as an expert on issue of manufacturer's lost profits, in manufacturer's breach of contract action against the maker of machine tools purchased by manufacturer, where vice president had a BBA in accounting, and he had more than 30 years' experience managing the financial and accounting functions of companies engaged in the manufacture and distribution of various products. Rules of Evid., Rule 702.

1 Cases that cite this headnote

**[21]**  **Evidence**
 🔑  Knowledge, experience, and skill in general

A witness is qualified to testify as an expert if he has the appropriate knowledge, skill, experience, training, or education. Rules of Evid., Rule 702.

2 Cases that cite this headnote

**[22]**  **Appeal and Error**
 🔑  Competency of witness
**Evidence**
 🔑  Determination of question of competency

The decision to admit expert testimony is within the trial court's discretion and will be disturbed on appeal only if there has been an abuse of that discretion. Rules of Evid., Rule 702.

1 Cases that cite this headnote

**[23]**  **Evidence**
 🔑  Damages

Trial court did not abuse its discretion, in breach of contract action brought by heavy-duty oilfield pump manufacturer against maker of machine tools, by admitting manufacturer's vice president's expert testimony on lost profits, though it was based on contacts vice president made with manufacturer's customers, and vice president's testimony regarding customer's responses was hearsay; expert could rely on inadmissible facts or data to form an opinion if the facts or data were of type reasonably relied upon by experts in the particular field, and asking customers was an appropriate way to determine why sales were lost. Rules of Evid., Rule 703.

Cases that cite this headnote

**[24]**  **Damages**
 🔑  Loss of profits

Testimony by vice president of finance of heavy-duty oilfield pump manufacturer regarding manufacturer's lost profits was not so speculative as to be legally insufficient, in breach of contract action against maker of machine tools, though vice president failed to determine what price or delivery time would have induced customers to buy pumps from manufacturer, where the lost sales to which vice president testified concerned the loss of sales of proven products to existing customers.

Cases that cite this headnote

**[25]** **Damages**
👉 Nature and theory of compensation

Damages awarded to heavy-duty oilfield pump manufacturer, in breach of contract action against maker of machine tools, for lost profits due to increased production costs and for lost profits due to lost sales did not overlap and did not result in an impermissible double recovery for manufacturer; though calculation of both elements hinged on the slow speed of maker's machines, if machines had performed as expected, manufacturer would have saved time and made more profit on the pumps actually produced, and with the time saved manufacturer could have also made more pumps and thus additional profits.

Cases that cite this headnote

**[26]** **Damages**
👉 Preparation and Form of Interrogatories or Findings

Trial court did not err by failing to submit damages questions that provided separate blanks for each element of damages claimed by heavy-duty oilfield pump manufacturer, in its breach of contract action against maker of machine tools, as there was legally sufficient evidence to support all of the elements in manufacturer's damage model.

Cases that cite this headnote

**[27]** **Appeal and Error**
👉 Submission of Issues or Questions to Jury

A trial court commits reversible error when it submits a broad-form damage issue that incorporates an element of damages on which there is no evidence, as such a submission prevents the appellate court from determining whether the jury based its verdict on the improperly submitted element of damage.

Cases that cite this headnote

**[28]** **Sales**
👉 Purchase of similar property elsewhere and prevention of damages

It is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective, when determining whether a buyer mitigated its damages and thus was not barred from recovering consequential damages. V.T.C.A., Bus. & C. §§ 2.712, 2.715(b)(1).

2 Cases that cite this headnote

**[29]** **Sales**
👉 Presumptions and burden of proof

The burden of establishing that damages could not have been reasonably prevented by cover is on the buyer seeking consequential damages in a breach of contract action. V.T.C.A., Bus. & C. §§ 2.712, 2.715(b)(1).

1 Cases that cite this headnote

**[30]  Damages**
 Duty of Person Injured to Prevent or Reduce Damage

Mitigation of damages is a rule requiring the injured party to use reasonable diligence to minimize his damages.

1 Cases that cite this headnote

**[31]  Damages**
 Mitigation of damages and reduction of loss

Though mitigation is similar to cover and a plaintiff in a breach of contract action has the burden of establishing that damages could not have been reasonably prevented by cover, the burden of disproving mitigation lies with the defendant.

Cases that cite this headnote

**[32]  Sales**
 Purchase of similar property elsewhere and prevention of damages

There was some evidence to establish, in breach of contract action against maker of machine tools, that heavy-duty oilfield pump manufacturer made reasonable efforts to limit its consequential damages by making a proper attempt at cover; there was evidence that manufacturer purchased two machines from another maker when it became clear that machine tools in question would not perform as represented, and that once new machines became operational manufacturer stopped using machines in question. V.T.C.A., Bus. & C. §§ 2.712, 2.715(b)(1).

1 Cases that cite this headnote

**[33]  Damages**
 Weight and Sufficiency

There was some evidence to establish, in breach of contract action against maker of machine tools, that heavy-duty oilfield pump manufacturer mitigated its damages; though machines did not perform as represented, there was evidence that manufacturer used machine tools to the extent possible and reduced its damages in the amount of $2,250 per fluid end, which was one of the components of manufacturer's pumps.

Cases that cite this headnote

**[34]  Costs**
 Contracts

Eight factors are weighed in determining reasonableness and necessity of attorney fees for breach of contract claim: (1) time and labor required, novelty and difficulty of the questions involved, and skill required to perform the legal services properly, (2) likelihood that acceptance of the particular employment will preclude other employment by lawyer, (3) fee customarily charged in the locality for similar legal services, (4) the amount involved and results obtained, (5) time limitations imposed by client or by circumstances, (6) nature and length of the professional relationship with client, (7) experience, reputation, and ability of the lawyer or lawyers performing services, and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. V.T.C.A., Civil Practice & Remedies Code § 38.001; State Bar Rules, V.T.C.A., Government Code Title 2, Subtitle G App. A, Art. 10, § 9, Rules of Prof.Conduct, Rule 1.04(b).

1 Cases that cite this headnote

**[35]**  **Costs**
🔑  Contracts

One method of computing reasonable attorney fees that can be awarded for a valid breach of contract claim is the "lodestar method," or the product of reasonable hours times a reasonable rate. V.T.C.A., Civil Practice & Remedies Code § 38.001; State Bar Rules, V.T.C.A., Government Code Title 2, Subtitle G App. A, Art. 10, § 9, Rules of Prof.Conduct, Rule 1.04(b).

20 Cases that cite this headnote

**[36]**  **Appeal and Error**
🔑  Attorney fees

Court of Appeals reviews a court-ordered award of attorney fees under the abuse of discretion standard.

1 Cases that cite this headnote

**[37]**  **Costs**
🔑  Contracts
**Costs**
🔑  Attorney fees on appeal or error

Trial court did not abuse its discretion, in heavy-duty oilfield pump manufacturer's breach of contract action against maker of machine tools, by exceeding the lodestar amount and awarding manufacturer attorney fees in amount of $1.5 million through date of judgment, plus $200,000 if maker was unsuccessful in appeal, plus $35,000 if maker filed a petition for review with Supreme Court of Texas and petition was denied, or $65,000 if the Supreme Court granted the petition but ruled against maker on the merits, as there was some evidence that award of fees was reasonable; manufacturer's attorney testified that his firm's services had a lodestar value of $667,114, that his firm took risk of losing case and receiving nothing over its $150,000 base fee, that $1.5 million were reasonable fees, and that such fees represented about 25% of jury verdict, which was less than the 30% to 50% typically charged in contingent fee cases. V.T.C.A., Civil Practice & Remedies Code § 38.001; State Bar Rules, V.T.C.A., Government Code Title 2, Subtitle G App. A, Art. 10, § 9, Rules of Prof.Conduct, Rule 1.04(b).

4 Cases that cite this headnote

**[38]**  **Costs**
🔑  Effect of fee agreement with attorney

The use of a multiplier based upon the contingent nature of a fee is allowed when awarding attorney fees under Texas statutes allowing recovery of attorney fees.

4 Cases that cite this headnote

**[39] Sales**
⚷ Acceptance of goods

Evidence that machine tool never was able to perform specific boring function that maker of machine tool agreed to provide and that maker repeatedly promised it would deliver software for the boring function before announcing that it would not deliver software raised fact issue for jury as to whether heavy-duty oilfield pump manufacturer never accepted machine tool, and thus whether manufacturer did not owe maker contract price for machine, in manufacturer's breach of contract action against maker. V.T.C.A., Bus. & C. § 2.607(a).

Cases that cite this headnote

**[40] Interest**
⚷ Form and sufficiency of demand

A written notice of a "claim," which triggers accrual of prejudgment interest 180 days after the claim is made, is a demand for compensation or an assertion of a right to be paid. V.T.C.A., Finance Code § 304.104.

3 Cases that cite this headnote

**[41] Interest**
⚷ Form and sufficiency of demand

A written notice of "claim," which triggers accrual of prejudgment interest 180 days after the claim is made, need not demand an exact amount or list every element of damage. V.T.C.A., Finance Code § 304.104.

2 Cases that cite this headnote

**[42] Appeal and Error**
⚷ Cases Triable in Appellate Court
**Appeal and Error**
⚷ Costs and Allowances

In a review of a trial court award of prejudgment interest, the abuse of discretion standard applies to the trial court's factual findings as they relate to prejudgment interest, but the de novo standard applies to the trial court's application of the law to the facts.

4 Cases that cite this headnote

**[43] Interest**
⚷ Form and sufficiency of demand

Letter from heavy-duty oilfield pump manufacturer to maker of machine tools, complaining that machines did not perform to the specifications represented by maker, did not constitute a written notice of a "claim," and thus letter did not trigger accrual of prejudgment interest on judgment for manufacturer in breach of contract action against maker, where letter urged maker to avoid a future claim by curing the defects rather than to accept an accrued, existing liability, and letter did not demand payment or assert a right to be paid. V.T.C.A., Finance Code § 304.104.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*767** Munsch, Hardt, Kopf & Harr, PC and Michael G. Foster, Dallas, Jackson Walker, LLP and Albon O. Head, and William R. Jenkins, Jr., Fort Worth, and Dorsey & Whitney, LLP and Creighton R. Magid, and Kevin B. Bedell, Washington, D.C., for Appellant.

Kelly Hart & Hallman, PC and Marshall M. Searcy, Jr., Hugh G. O'Connor, II and Brian S. Stagner, Fort Worth, for Appellee.
Panel A: CAYCE, C.J.; GARDNER and McCOY, JJ.

**OPINION ON REHEARING**

ANNE GARDNER, Justice.

After reviewing Appellant, Toshiba Machine Co., America's motion for rehearing, we deny the motion. We withdraw our June 2, 2005 opinion and judgment and substitute the following. Our ultimate conclusions remain unchanged.

**I. Introduction**

This case arises from the sale of two large machine tools. Toshiba Machine Company of America ("Toshiba") appeals a $9.25 million judgment on a jury verdict in favor of S.P.M. Flow Control, Inc. ("SPM"). In twelve issues, Toshiba complains of legally insufficient evidence to support jury findings on various aspects of SPM's breach of contract claims, mutually exclusive and inconsistent theories of recovery, overlapping damage awards, and excessive attorney's fees. In a single issue, SPM complains that the trial court used the wrong date to compute prejudgment interest. We affirm the judgment in all respects.

**II. Factual and Procedural Background**

SPM manufactures heavy-duty oilfield pumps. The pumps consist of two components: **\*768** a "power end" and a "fluid end." SPM makes the fluid ends from blocks of solid steel weighing 3,000–4,000 pounds. The fluid ends have a complex internal shape machined through a process called "internal contouring."

In 1996, SPM began to shop for new machine tools to make fluid ends. The machines SPM used at the time dated from the 1960s and required 115 hours to make a single fluid end. SPM's primary goal in replacing the old machines was to reduce the time required to make a fluid end. SPM enlisted the help of Maruka, U.S.A., Inc., a machine tool distributor, to find suitable replacements. Maruka presented SPM with literature and quotes for several machine tools, including Toshiba's BMC 1000 Horizontal Machining Center ("BMC–1000").

SPM initially rejected Toshiba's quote because the BMC–1000 lacked the ability to perform internal contouring. Soon thereafter, however, Toshiba informed SPM that it had developed new software for the BMC–1000 that made internal contouring possible. Toshiba called the software, and the process it controlled, "orbit boring." Toshiba told SPM that Toshiba customers in Japan were already using the orbit-boring software on BMC–1000 machines.

Toshiba represented that orbit boring on the BMC–1000 could make fluid ends in much less time than SPM's existing tools. According to Toshiba, orbit boring allowed one cutting tool to do the work of many. The time saved by not having to change cutting tools would, said Toshiba, reduce the time needed to a make a fluid end, even though the cutting speed of the BMC–1000 was slower than that of SPM's existing equipment. SPM employees testified that Toshiba employees said, at various times before and after the sale, that orbit boring would allow SPM to make a fluid end in anywhere from fifteen to fifty hours.

A key issue at trial was what the term "orbit boring" meant. According to SPM's president, Dan Lowrance, Toshiba promoted orbit boring, also called "shake turning," as a new process that would bring new functionality to the BMC–1000. According to Toshiba's regional sales manager, Steve Oliphant, orbit boring on the BMC–1000 was simply a combination of older techniques called "Hale Interpolation" and "Archimedes Interpolation." Complicating the issue, Toshiba's parent company in Japan developed a new "concept" machine tool, the NX–76, to showcase what it touted as a "revolutionary" new process—a process also called "orbit boring." The parties hotly disputed whether shake turning on the BMC–1000 was the same process as orbit boring on the NX–76. SPM argued that Toshiba sold SPM orbit boring but delivered Hale and Archimedes Interpolation. Toshiba argued that orbit boring and shake turning were two names for the same process, regardless of which machine was involved.

In December 1997, SPM issued a purchase order for a BMC–1000 that Toshiba had available for immediate delivery. SPM's purchase order incorporated a proposal from Maruka

in which Maruka listed "orbit machining" as a $20,000 option, and stipulated that Toshiba would provide a five-year warranty on "[o]rbit machining software, including support, updates and revisions as they become available." SPM also attached to the purchase order a list of terms captioned "Addendum 'A'." Those terms included the following:

• Toshiba would machine a fluid end on a BMC–1000 from a raw forging that SPM had already shipped to Japan, and provide to SPM the data gathered during the machining process;

**\*769** • Toshiba would provide a process cycle time, i.e., the time it should take to machine a fluid end on the BMC–1000;

• Toshiba would provide the technical support and training needed to make a fluid end on the BMC–1000; and

• SPM's acceptance of the BMC–1000 was conditioned on the successful production of a fluid end on the machine at SPM's factory.

Toshiba accepted SPM's purchase order and down payment without commenting on Addendum A. Toshiba delivered the BMC–1000 to SPM's factory in March 1998. Significantly, Toshiba delivered the machine without the software needed to perform orbit boring.

In late April 1998, Toshiba sent a programmer, Takeshi Ohki, to install orbit boring software on the BMC–1000 at SPM's factory. Ohki testified that this was the first time he had attempted to combine Hale Interpolation and Archimedes Interpolation to create the orbit boring function on a BMC–1000. He was unable to make the software perform to SPM's requirements and returned to Japan.

Soon after Ohki left SPM, Toshiba's Steve Oliphant sent a memorandum to Tony Tani, Toshiba's assistant general manager, raising several issues related to the BMC–1000. Oliphant wrote:

SPM is a Beta site for this very unique [orbit boring] software.

Orbit Boring vs Hale Interpolation: There seems to be some confusion as to the definition and capabilities of these two programs. In the beginning we were told that the Orbit Boring option was available and process descriptions were supplied

to the field. This was sold to SPM.... What further complicates this definition issue is that Mr. Oki [sic] told [Maruka] that Orbit and Hale were two different things and that the BMC1000 was not capable of Orbit.

On May 8, 1998, SPM complained that the BMC–1000 did not perform as expected and requested written confirmation that the machine could produce fluid ends. Toshiba replied that Ohki would return to Fort Worth later in May and again attempt to install the orbit boring software. Ohki returned to SPM on May 18, but still the BMC–1000 could not perform internal contouring. Around the same time, SPM offered to return the machine to Toshiba in exchange for a refund of its down payment if Toshiba had any concern about the BMC–1000's ability to perform. Toshiba promised that a software solution was imminent.

Meanwhile, SPM ordered a second machine tool from Toshiba in late July. This second tool, the BMC–800, was slightly smaller than the BMC–1000 but had the same purported functionality—including orbit boring. Toshiba advised SPM that it would not ship the BMC–800 until SPM paid the $742,500 balance due on the BMC–1000. On August 10, SPM paid the BMC–1000 balance.

Five days later, Toshiba sent SPM an "acceptance" of the BMC–800 purchase order. The acceptance stated that "there is no orbit boring software" and "there will never be any revisions or updates" to the software provided with the BMC–800. When SPM confronted Toshiba about these statements, Toshiba dismissed them as a miscommunication. Toshiba said it planned to showcase the orbit boring software along with the new NX–76 at a Chicago tool show in September. SPM would receive the software immediately after the show, promised Toshiba.

SPM sent a representative to the Chicago tool show. Toshiba did exhibit orbit boring on the new NX–76, but told SPM's **\*770** representative that the NX–76 software would not be available for the BMC–1000 until January.

SPM and Toshiba continued to wrangle over the BMC performance issues, and especially the orbit boring software, for another year. As late as May 13, 1999, Toshiba's Oliphant sent a memorandum to SPM promising delivery of the orbit boring software within two months. SPM, Maruka, and Toshiba scheduled a meeting at SPM's factory for August 1999. At the meeting, Toshiba definitively announced that

SPM would not receive the orbit boring software.

From June 1998, when the BMC–1000 became operational at SPM, until November 2001, SPM used the Toshiba machines extensively to help make fluid ends. Although the lack of orbit boring software made the Toshibas useless for internal contouring, they could be used for rough machining. Using the Toshiba machines for 15,000 hours in conjunction with 18,600 hours on other machines, SPM produced 344 fluid ends at the average rate of 100 hours per fluid end—down from 115 hours per fluid end before the Toshibas went online, but far longer than the fifteen to fifty hours predicted by Toshiba.

When Toshiba announced that SPM would not receive the orbit boring software, SPM began to shop for machines to replace the Toshibas. In May 2000, SPM purchased the first of two machine tools from Toshiba rival Goss Trevisan. The first Goss went online in July 2000. A second Goss went online in May 2001. In November 2001, SPM stopped using the Toshiba machines altogether. SPM offered testimony at trial that the Goss machines could produce a complete fluid end in thirty-four hours.

In February 2000, SPM sued Toshiba for fraud, negligent misrepresentation, breach of contract and breach of warranty.[1] Toshiba counterclaimed for the unpaid balance of the BMC–800.

The case was tried to a jury. SPM claimed three broad categories of damages: refund of the $898,200 SPM paid for the two Toshiba machines; $969,945 in incidental expenses for items such as pouring foundations for the Toshiba machines and time spent designing tools for the Toshiba machines; and $6,038,492 in lost profits.

The jury returned a verdict in favor of SPM on every cause of action. SPM elected to recover on the basis of its breach of contract claim, for which the jury awarded SPM $3,003,613 for each machine, for a total of $6,007,226. The issue of attorney's fees was submitted to the trial court by agreement of the parties. The trial court found that SPM was entitled to $1.5 million in attorney's fees through the date of judgment, plus additional fees if Toshiba unsuccessfully appealed the trial court's judgment. The trial court also found that SPM was entitled to prejudgment interest beginning on the day SPM filed suit through the date of judgment. Both parties appealed.

## III. Discussion

### A. Toshiba's Issues

**1. Did SPM accept the machines as a matter of law?**
A threshold question in this case, and key to several of Toshiba's issues, is whether SPM accepted or rejected the Toshiba machines. The jury found that SPM accepted but later revoked its acceptance of the BMC–1000 and failed to find that SPM accepted the BMC–800. In its second **\*771** issue, Toshiba argues that there is no evidence to support the jury's finding that SPM revoked its acceptance of the BMC–1000, and there is conclusive evidence that SPM accepted the BMC–800. The gist of Toshiba's argument is that SPM's extensive use of the BMC machines—17,000 hours of use over four years—constitutes acceptance and precludes revocation of acceptance as a matter of law. We disagree.

#### a. Standards of review

##### (1) No evidence
We review the jury's finding that SPM revoked its acceptance of the BMC–1000 under the "no evidence" standard. In determining a "no evidence" issue, we are to consider only the evidence and inferences that tend to support the finding of the disputed fact and disregard all evidence and inferences to the contrary. *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001); *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee,* 937 S.W.2d at 450; *Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex.1996). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.,* 77 S.W.3d 253, 262 (Tex.2002). A "no evidence" issue may only be sustained when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998), *cert. denied,* 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999).

##### (2) Matter of law
We review the jury's failure to find that SPM accepted the BMC–800 under the "as a matter of law" standard. When an appellant attacks the legal sufficiency of an adverse answer to an issue on which he had the burden of proof, the appellant must overcome two hurdles. *Victoria Bank & Trust Co. v.*

*Brady,* 811 S.W.2d 931, 940 (Tex.1991). First, the record must be examined for evidence that supports the finding, while ignoring all evidence to the contrary. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001). Second, if there is no evidence to support the finding, then the entire record must be examined to see if the contrary proposition is established as a matter of law. *Id.; Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989). The issue should be sustained only if the contrary proposition is conclusively established. *Dow Chem.,* 46 S.W.3d at 241–42.

### b. Analysis

[1] Where goods fail to conform to the contract, the buyer may reject or accept the goods. Tex. Bus. & Com.Code Ann. § 2.601 (Vernon 1994). A buyer's rejection or acceptance of nonconforming goods determines the remedies available to him. *Id.* §§ 2.711, 2.714 (Vernon 1994); *Southwestern Bell Tel. Co. v. FDP Corp.,* 811 S.W.2d 572, 576 (Tex.1991) (op. on reh'g); *Paul Mueller Co. v. Alcon Labs., Inc.* 993 S.W.2d 851, 855 (Tex.App.-Fort Worth 1999, no pet.).

A buyer accepts goods if he agrees to accept them despite their nonconformity, fails to make an effective rejection, or does any act inconsistent with the seller's ownership. Tex. Bus. & Com.Code Ann. § 2.606 (Vernon 1994). Where a buyer accepts goods with knowledge of a non-conformity, **\*772** the buyer may not revoke acceptance unless the acceptance was made on the reasonable assumption that the non-conformity would be seasonably cured. *Id.* §§ 2.607(b), 2.608(a)(1) (Vernon 1994). Where a buyer accepts goods without knowledge of a non-conformity, the buyer may revoke its acceptance if acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances. *Id.* § 2.608(a)(2).

Rejection of goods must occur within a reasonable time after their delivery. *Id.* § 2.602(a) (Vernon 1994). Likewise, revocation of acceptance must occur a reasonable time after the buyer discovers the grounds for revocation. *Id.* § 2.608(b). Whether rejection or revocation occurred within a reasonable time depends on the facts of a particular case. *Id.* § 1.205(a) (Vernon Supp.2004–05) (providing that "[w]hether a time for taking an action required by this title is reasonable depends on the nature, purpose, and circumstances of the action."); *Purnell v. Guar. Bank,* 624 S.W.2d 357, 359 (Tex.App.-Dallas 1981, writ ref'd n.r.e.) (holding that whether thirty-month delay precluded revocation of acceptance of defective pleasure boat was a fact question); *Don's Marine, Inc. v. Haldeman,* 557 S.W.2d 826, 829 (Tex.App.-Corpus Christi 1977, writ ref'd n.r.e.).

After rejection or revocation of acceptance, any exercise of ownership by the buyer with respect to the goods is wrongful as against the seller. Tex. Bus. & Com.Code Ann. § 2.602(b)(1).

[2] As noted above, the gist of Toshiba's argument is that SPM's extensive use of the BMC machines—17,000 hours of use over four years—constitutes acceptance and precludes revocation of acceptance as a matter of law. According to Toshiba, use equals irrevocable acceptance because it is an act inconsistent with Toshiba's ownership under § 2.606(a)(3) and a wrongful exercise of ownership under § 2.602(b)(1). Toshiba cites several Texas and foreign cases to support its argument. Generally, these cases stand for the proposition that a buyer who exercises dominion and control over nonconforming goods accepts those goods. *See, e.g., Bacchus Indus., Inc. v. Frontier Mech. Contractors,* 36 S.W.3d 579, 585 (Tex.App.-El Paso 2000, no pet.) (holding that buyer who made substantial repairs and modifications to air conditioning units accepted them as a matter of law); *Danjee, Inc. v. Addressograph Multigraph Corp.,* 44 N.C.App. 626, 262 S.E.2d 665, 669–70 (1980) (stating in dicta that revocation not available to buyer who, with full knowledge of defects, used printing presses for a "long period of time" and never attempted to reject them or revoke acceptance); *Explorers Motor Home Corp. v. Aldridge,* 541 S.W.2d 851, 853–54 (Tex.App.-Beaumont 1976, writ ref'd n.r.e.) (holding that buyers who traveled 14,000 miles in motor home over two years did not effectively reject the motor home); *Bowen v. Young,* 507 S.W.2d 600, 603–04 (Tex.App.-El Paso 1974, no writ) (holding that buyer who moved into nonconforming mobile home and converted its heater from electric to gas accepted the home as a matter of law).

[3] [4] But the cases cited by Toshiba do not give a complete answer to the question of whether "use equals acceptance" under the UCC. Most courts have indicated that whether the buyer's continued use of goods undoes a purported rejection or revocation of acceptance depends upon whether the use was reasonable. Anderson on the Uniform Commercial Code, § 2–608:281 (2004); Williston on Contracts, §§ 40:19, 40:30 (4th ed.). What constitutes reasonable use is a question of fact to be decided under the circumstances of each case, but courts generally hold that **\*773** using goods during the time when the seller is promising or trying unsuccessfully to cure the nonconformity will not adversely affect the buyer's rights. Williston on Contracts, § 40:30; *see Aluminum Line Prods. Co. v. Rolls–Royce Motors, Inc.,* 98 Ohio App.3d 759, 649 N.E.2d 887, 894 (1994) (holding that buyer was not precluded from revoking acceptance of automobile after three years and 15,000 miles of use when seller made repeated attempts to repair the vehicle, and buyer's continued use after revocation

did not undo revocation);[2] *North Am. Lighting, Inc. v. Hopkins Mfg., Inc.,* 37 F.3d 1253, 1258–59 (7th Cir.1994) (holding seller's repeated promises to update software for headlight testing apparatus justified buyer's use of apparatus during two-year delay in revoking acceptance); *Wilk Paving, Inc. v. Southworth Milton, Inc.,* 162 Vt. 552, 649 A.2d 778, 782 (1994) (holding buyer's continued use of asphalt paving machine after revocation of acceptance was reasonable where the seller continued to assure buyer that seller could repair machine); *Four Sons Bakery, Inc. v. Dulman,* 542 F.2d 829, 832 (10th Cir.1976) (holding seller's repeated assurances that it would fix commercial oven justified continued use of oven after revocation of acceptance). As the Seventh Circuit held in *North American Lighting,* a "use equals acceptance" argument comes dangerously close to suggesting a rule that would allow sellers to 'lock in' purchasers of goods by promising them the moon—only to bring them back to earth when they attempted to revoke the acceptance that they were persuaded to give because of their failure to fully understand a substantial defect. *North Am. Lighting,* 37 F.3d at 1258–59.

[5] [6] Other factors relevant to a buyer's reasonable use of nonconforming goods include the degree of economic hardship the buyer would suffer if it discontinued using the defective goods and the reasonableness of the buyer's use after revocation as a method of mitigating damages. *Liarikos v. Mello,* 418 Mass. 669, 639 N.E.2d 716, 719 (1994) (holding that continued use of automobile after revocation of acceptance was reasonable where buyer relied on car to run her business). Use of nonconforming goods may be the most appropriate means of achieving mitigation until the buyer can obtain suitable replacements. *Fablok Mills, Inc. v. Cocker Mach. & Foundry Co.,* 125 N.J.Super. 251, 310 A.2d 491, 494 (1973) (holding two-year delay in revocation of acceptance and extensive use by buyer of defective knitting machines was reasonable, during which seller attempted to fix the machines on many occasions); *see Deere & Co. v. Johnson,* 271 F.3d 613, 619–20 (5th Cir.2001) (applying Mississippi law and holding that farmer's continued use of defective tractor after revoking acceptance was reasonable because tractor was essential to farmer's work, replacement was difficult to obtain, and farmer mitigated his damages by using the tractor).

In our case, Toshiba agreed to provide the orbit boring function with both BMC machines. SPM's president, Dan Lowrance, **\*774** testified that Toshiba delivered the BMC–1000 in March 1998 without the software needed to perform orbit boring. Lowrance testified that SPM asked Toshiba about the missing orbit boring software soon after the machine arrived. According to Lowrance, Toshiba assured SPM that its programmer would travel to SPM's factory "very quickly" and install the software. Toshiba's programmer attempted but failed to install the software in April 1998 and again in May. Lowrance testified that after the programmer's first attempt, Lowrance told Toshiba's assistant general manager, Tony Tani, that SPM would return the BMC–1000 for a refund if Toshiba had any doubt about its ability to make fluid ends. Chris Wall, SPM's director of manufacturing, admitted that SPM accepted the BMC–1000 when it paid the $742,500 balance due, but Lowrance testified that SPM paid the balance only because Toshiba assured SPM that resolution of the orbit boring problem was "right around the corner" and refused to ship the BMC–800 otherwise.

Toshiba delivered the BMC–800 in September 1998. Lowrance testified that Toshiba's Steve Oliphant told him that SPM would receive the orbit boring software immediately following the debut of the NX–76 in Chicago that same month. Chris Wall testified that Oliphant told him on September 18, 1998 that Toshiba was working on the orbit boring software and would deliver it in January of the following year. On May 13, 1999, Oliphant sent a memo to SPM's George Reeve in which he stated that Toshiba would deliver orbit boring software within two months. Gene Burkes, general manager of Maruka U.S.A., testified that he called Oliphant on SPM's behalf at least a dozen times between January and May 1999. According to Burkes, Oliphant "kept saying the software is coming." In August 1999, Toshiba announced that it would not deliver orbit boring software to SPM.

Ray Gilbert, SPM's vice president of finance, testified that the BMC machines were worthless to SPM without the orbit boring function. Nevertheless, as detailed later in this opinion under the issues of damages and mitigation, SPM cut the time needed to make a fluid end from 115 hours to 100 hours by making what use it could of the BMC machines, though the production time was far longer than the fifteen to fifty hours SPM expected to achieve. It is undisputed that SPM used the BMC machines for 17,000 hours.

We note that it is unclear from the record when and how SPM notified Toshiba that it was revoking its acceptance of the BMC–1000 and rejecting the BMC–800. But Toshiba does not complain of lack of notice, so we will not dwell on this point.

We turn to the question of SPM's revocation of acceptance of the BMC–1000 under section 2.608. The non-conformity

identified by SPM was the lack of the orbit boring function. Gilbert testified that the lack of orbit boring substantially impaired the BMC–1000's value to SPM. The jury could reasonably conclude that SPM did not discover the non-conformity until Toshiba announced in August 1999 that it would not deliver the orbit boring software, and that SPM's failure to discover the non-conformity was induced by Toshiba's many assurances that it would deliver the orbit boring software. Both Toshiba's assurances and SPM's use of the BMC–1000 to mitigate its damages until it could obtain replacements tend to support the conclusion that SPM's extensive use of the BMC–1000 was reasonable, before and after SPM revoked its acceptance. Moreover, Chris Wall testified that replacement machines suitable to SPM's needs were not easy to obtain, and the replacement machines **\*775** SPM ultimately bought had a long lead time. Whether SPM's use of the BMC–1000 was reasonable was a fact question for the jury to decide. The evidence supports the conclusion that SPM's use was reasonable. We hold that there was more than a scintilla of evidence to support the jury's finding that SPM revoked its acceptance of the BMC–1000.

With regard to the BMC–800, the same factors—Toshiba's repeated assurances of an imminent fix, SPM's use of the BMC–800 to mitigate its damages, and the difficulty of obtaining replacement machines—tend to justify SPM's use of, and delay in rejecting, the BMC–800. We hold that there is more than a scintilla of evidence to support the jury's failure to find that SPM accepted the BMC–800.

We overrule the part of Toshiba's second issue that concerns acceptance of the BMC machines (the same issue raises other complaints, which we address in the next section of this opinion). This conclusion is the starting point for our analysis of Toshiba's other issues.

**2. Did Toshiba breach the contracts?**
Also in its second issue, Toshiba contends that even if SPM rejected the machines, there is no evidence that Toshiba breached sales contracts. Toshiba argues that its failure to deliver orbit boring software cannot give rise to a breach of contract claim and that there is no evidence to support the jury's finding that Toshiba breached the contracts. As a subissue, Toshiba argues that Addendum A to the BMC–1000 contract was not a part of the agreement between Toshiba and SPM and therefore could not give rise to a breach of contract claim.

**a. Was Addendum A part of the contract?**
[7] The jury found that Toshiba and SPM intended to "bind

themselves to an agreement regarding the BMC–1000 that included all provisions contained in Addendum A" to SPM's purchase order. Toshiba argues that there is no evidence to support the jury's finding.

Toshiba relies on section 2.207 of the Texas Business and Commerce Code. Tex. Bus. & Com.Code Ann. § 2.207 (Vernon 1994). Section 2.207, captioned "Additional Terms in Acceptance or Confirmation" and often referred to as the "battle of the forms" section of the UCC, provides in part as follows:

(a) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(b) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(1) the offer expressly limits acceptance to the terms of the offer;

(2) they materially alter it; or

(3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(c) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated **\*776** under any other provisions of this title.

Significantly, Toshiba does not argue that Maruka's December 16, 1997 proposal to SPM was an offer. Nor does Toshiba point to any other writing that it claims was an offer accepted by SPM's purchase order. Rather, Toshiba contends that this case is governed by section 2.207(c); according to Toshiba, the writings of the parties do not establish a contract.

Toshiba's argument fails because SPM's purchase order was an offer to buy the BMC–1000. The "Terms and Conditions of Purchase" recited on the back of the purchase order state that Toshiba's shipment of the BMC–1000 constitutes acceptance of the purchase order. Therefore, Toshiba accepted the purchase order when it shipped the BMC–1000 to SPM. The "Terms and Conditions of Purchase" also state that acceptance of the purchase order is acceptance of all terms on the front and back of the purchase order. And the merger clause on the back of the purchase order recites that "[t]his purchase order, *and any documents referred to on the face hereof,* constitute the entire agreement between the parties." (Emphasis added.) The front of the purchase order specifically refers to Addendum A. George Reeve, the SPM employee who generated the purchase order and Addendum A, testified that he discussed the specific terms of the addendum with Toshiba's Oliphant and Maruka's Davenport during a three-hour phone conference on December 9, 1998 and that Toshiba never objected to the Addendum A terms after it received the purchase order. We hold that SPM adduced more than a scintilla of evidence to support the jury's finding that Addendum A was part of the contract.

**b. Is there any evidence of breach?**

[8] Next, Toshiba argues that there is no evidence to support the jury's finding that it breached the contracts. In the same subissue, Toshiba claims that its delivery of the BMC machines to SPM precludes a breach of contract claim, even if the machines were missing critical features. We disagree.

[9] [10] The remedies available to a buyer under the UCC depend on whether the buyer accepts or rejects the goods in question. *See* Tex. Bus. & Com.Code Ann. §§ 2.711, 2.714. If a buyer rejects goods (or revokes acceptance), the buyer is entitled to the remedies set forth in sections 2.711 and 2.713. *Id.* § 2.713 (Vernon 1994). If, on the other hand, a buyer accepts goods, the buyer's remedy is determined by section 2.714. Because a buyer cannot accept what a seller does not deliver, delivery of goods is a necessary predicate to acceptance or rejection; but delivery by itself does not determine the buyer's remedies. Assuming the seller delivers *something,* the buyer's acceptance or rejection determines the buyer's remedies.

It is undisputed that Toshiba delivered the BMC machines to SPM. The jury found that SPM rejected the BMC–800 and revoked its acceptance of the BMC–1000. The question, then, is whether SPM produced any evidence to support the jury's finding that Toshiba breached the contracts.

[11] A seller breaches a contract if its delivery fails in any respect to conform to the contract. *Id.* § 2.601. This is sometimes referred to as the "perfect tender" rule. *Tex. Imps. v. Allday,* 649 S.W.2d 730, 737 (Tex.App.-Tyler 1983, writ ref'd n.r.e.). Conformity does not mean substantial performance; it means complete performance. *Printing Ctr., Inc. v. Supermind Publ'g Co.,* 669 S.W.2d 779, 783 (Tex.App.-Houston [14th Dist.] 1984, no writ).

**\*777** SPM identifies four specific contract items that Toshiba failed to deliver: the orbit boring software, tool lists and part programs, process cycle time studies, and a test run-off of a fluid end. SPM offered evidence that Toshiba failed to deliver these items. Except for the orbit boring software, Toshiba does not dispute its failure to deliver these items. Therefore, SPM produced at least some evidence to show that Toshiba's delivery did not conform to the contract in all respects.

We hold that Toshiba's delivery of the BMC machines does not preclude SPM's beach of contract claims and that there is some evidence to support the jury's findings that Toshiba breached the contracts. We overrule Toshiba's second issue.

**3. Damages**

Toshiba's first, fourth, sixth, seventh, and eleventh issues complain about various aspects of SPM's damages.

**a. Is there any evidence to support SPM's lost profits?**

[12] In issue 7a,[3] Toshiba complains that there is no evidence to support SPM's claim of lost profits. In its closely-related issue 4, Toshiba complains that the trial court erred by admitting the testimony of SPM's damage witness, Ray Gilbert, on the question of lost profit. We disagree.

[13] [14] [15] [16] [17] [18] [19] A party seeking to recover lost profits must prove the loss through competent evidence with reasonable certainty. *Szczepanik v. First Southern Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994); *VingCard A.S. v. Merrimac Hospitality Sys., Inc.,* 59 S.W.3d 847, 863 (Tex.App.-Fort Worth 2001, pet. denied). While this test is a flexible one in order to accommodate the myriad circumstances in which claims for lost profits arise, at a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.,* 877 S.W.2d 276, 279 (Tex.1994); *Szczepanik,* 883 S.W.2d at 649; *VingCard A.S.,* 59 S.W.3d at 863. In other words, "reasonable certainty" is not demonstrated when the profits claimed to be lost are largely

speculative or a mere hope for success, as from an activity dependent on uncertain or changing market conditions, on chancy business opportunities, or on promotion of untested products or entry into unknown or unproven enterprises. *Teletron Energy Mgmt., Inc.,* 877 S.W.2d at 279–80; *VingCard A.S.,* 59 S.W.3d at 863. The mere assertion that contracts were lost does not demonstrate a reasonably certain objective determination of lost profits. *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 85 (Tex.1992). Whether evidence is speculative or reasonably certain is a factual issue within the exclusive province of the jury to determine. *VingCard A.S.,* 59 S.W.3d at 863. Reasonably certain lost profits may be proved by relying on such factors as (1) the experience of the business principals, (2) the nature of the business, (3) the nature of the market, (4) the nature of the client base, (5) the sales force, (6) the marketing plan, and (7) the company's track record of sales. *Id.* at 864. For example, when a business is already established and making a profit at the time the contract was breached or the tort committed, pre-existing profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost. *Teletron Energy Mgmt., Inc.,* 877 S.W.2d at 279; **\*778** *Anthony Equip. Corp. v. Irwin Steel Erectors, Inc.,* 115 S.W.3d 191, 204 (Tex.App.-Dallas 2003, pet. dism'd).

Ray Gilbert, SPM's vice president of finance, was SPM's sole witness on damages. To begin our analysis, we will summarize Gilbert's testimony on the question of SPM's lost profits.

Gilbert broke SPM's lost profits into three components. First was the increased cost of producing the 344 fluid ends SPM made in part on the Toshiba machines. Gilbert testified that it took SPM 34,025 hours to produce the 344 fluid ends. From that he subtracted 12,040 hours, the time it would have taken to produce 344 fluid ends if the Toshiba machines could produce a fluid end in thirty-five hours. Gilbert then multiplied the remainder, 21,985 hours, by SPM's "shop rate" of $150 per hour, for a total of $3,297,750. Gilbert testified that $150 per hour was the industry standard shop rate; he also produced calculations to show that the shop rate was reasonably accurate for SPM.

Gilbert's second category of lost profits stemmed from the sales of 296 fluid ends SPM lost because it quoted prices too high or delivery times too long to suit its customers. Gilbert testified that SPM lost these sales "because the Toshibas didn't perform as represented and we had to quote longer deliveries and our prices were not competitive because instead of doing it in 35 hours, we were up closer to 100 hours." He personally contacted customers who cancelled orders or rejected SPM

quotes to ascertain whether the cancellation or rejection was due to SPM's price or delivery time. Gilbert then multiplied the gross sales lost because of price or delivery time by SPM's 28.68% profit margin to compute SPM's net lost profits. Gilbert derived the profit margin from SPM's consolidated financial statements for the years 1994 through 2001. While Gilbert admitted that he did not know precisely what price or delivery time SPM would have had to quote to make the sales in question, he opined that SPM would have made the sales if the Toshiba machines could make a fluid end in thirty-five hours. He attributed a total of $2,362,821 in lost profits to lost fluid end sales.

Gilbert's third category of lost profit arose from lost sales of flow control products—valves, piping, and connections—that SPM would have sold as part of its lost fluid end sales. Gilbert examined SPM's sales history to determine which customers typically purchased flow control products along with pumps and fluid ends. He testified that the fluid end sales SPM lost to those customers would have generated additional sales of $1,317,022 in flow control products. Gilbert multiplied the lost flow control sales by SPM's 28.68 percent profit margin for a lost net profit of $377,721.

Finally, Gilbert testified that SPM had the same customer base for decades. SPM sold the same product lines "for some time," and those product lines had always been profitable. He testified that SPM has turned a profit since at least 1991, the year Gilbert joined the company.

[20] [21] [22] Toshiba challenges Gilbert's testimony on three grounds. First, Toshiba argues that Gilbert did not qualify as an expert. A witness is qualified to testify as an expert if he has the appropriate knowledge, skill, experience, training, or education. *Roberts v. Williamson,* 111 S.W.3d 113, 121 (Tex.2003); Tex.R. Evid. 702. The decision to admit expert testimony is within the trial court's discretion and will be disturbed on appeal only if there has been an abuse of that discretion. *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 718–19 (Tex.1998). In this case, the specific subject matter of Gilbert's **\*779** testimony is SPM's damages arising from its purchase of the Toshiba machines. The question we consider is whether Gilbert has specialized knowledge that would assist the jury in understanding that issue. *See Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 500 (Tex.2001).

Gilbert earned a BBA in accounting in 1968. From 1968 to 1991 he worked as an accountant, controller, and vice president of sales and finance for several companies. In 1991,

Gilbert went to work for SPM, first as vice-president and general manager with full responsibility for SPM's manufacturing, sales, marketing, and accounting, then gradually narrowing his focus to sales and accounting as SPM's vice president of finance. He testified that he had more than thirty years' experience managing the financial and accounting functions of companies engaged in the manufacture and distribution of various products. After reviewing Gilbert's testimony about his education, work history, experience, and familiarity with SPM's business, we cannot say that the trial court abused its discretion by allowing Gilbert to testify as an expert about SPM's damages.

[23] Second, Toshiba argues that the trial court erred by admitting Gilbert's testimony about lost sales because it was rife with inadmissible hearsay. Gilbert testified that he personally contacted SPM customers to ascertain why certain sales were lost or certain orders cancelled. Toshiba made timely hearsay objections to Gilbert's testimony.

We review a trial court's rulings in admitting or excluding evidence under an abuse of discretion standard. *Nat'l Liab. & Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527 (Tex.2000). We must uphold the trial court's evidentiary ruling if there is any legitimate basis in the record for the ruling. *Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex.1998).

An expert may rely on inadmissible facts or data to form an opinion or inference if the facts or data are of a type reasonably relied upon by experts in the particular field. Tex.R. Evid. 703; *In re A.J.L.,* 136 S.W.3d 293, 301 (Tex.App.-Fort Worth 2004, no pet.). We cannot think of a more appropriate method to determine why sales were lost than to ask the customer. We hold that the trial court did not abuse its discretion by admitting this testimony.

[24] Finally, Toshiba argues that Gilbert's testimony about lost sales was purely speculative because Gilbert failed to determine what price or delivery time would have induced SPM's customers to buy fluid ends from SPM. We find no case law to support Toshiba's argument. Measuring lost profits is an inherently speculative undertaking. *Pena v. Ludwig,* 766 S.W.2d 298, 301 (Tex.App.-Waco1989, no writ). In *Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.,* the Supreme Court of Texas held that a hypothetical bid for a construction project was "entirely speculative" and legally insufficient to support an award of lost profits because there was no evidence that the bid would have been accepted. 960 S.W.2d 41, 50 (Tex.1997). But our case is readily distinguishable from *Formosa Plastics.* In that case, there was

evidence that two of the three other bids on the same project were lower than the claimant's hypothetical bid; thus, the alleged lost profits "were based on an entirely hypothetical, speculative bargain that was never struck and would not have been consummated." *Id.* There is no such evidence in our case. Moreover, the lost sales to which Gilbert testified concerned the loss of sales of proven products to existing customers. We hold that Gilbert's testimony regarding lost sales was not so speculative as to be legally insufficient.

**\*780** In sum, Gilbert testified that SPM lost profits of $6,038,292. As noted above, SPM also claimed $970,000 in incidental damages. The jury awarded SPM a total of $6,007,226 on its breach of contract claims. Even if we assume that the jury based its award solely on SPM's lost profits, we hold that Gilbert's testimony presented more than a scintilla of evidence to support the jury's verdict. Gilbert's testimony established SPM's lost profits to a reasonable certainty. We overrule Toshiba's issues 4 and 7a.

**b. Did SPM's damage model result in a double recovery?**
[25] In its sixth issue, Toshiba argues that two of SPM's damage elements—lost profits due to increased production costs and lost profits due to lost sales—overlap, and to allow SPM to recover both results in an impermissible double recovery. We disagree.

Toshiba argues, and we agree, that both of Gilbert's lost profit calculations hinge on the speed of the Toshiba machines. As detailed above, SPM's Gilbert testified that SPM incurred more costs and lost profits on the fluid ends actually produced because the Toshiba machines were slower than expected. Likewise, SPM lost sales because it quoted higher prices and longer delivery times to its customers based on the slower than expected speed of the Toshiba machines. Had the machines performed as expected, SPM would have realized a higher profit on the fluid ends actually made and sold *and* realized additional sales. But we disagree with Toshiba that the fact that both damage elements arise from the speed of the Toshiba machines necessarily means that the elements overlap.

To show that the elements overlap, Toshiba argues that the extra hours needed to make the fluid ends actually produced are the same hours SPM would have used to make additional fluid ends for additional sales. This may be true, but it misses the point. Toshiba confuses the issues of time and profit. The hours might be the same, but the dollars are different. Under Gilbert's analysis, if the Toshiba machines had performed as expected, SPM would have saved time and realized more profit on each of the fluid ends actually produced. With the

time saved, SPM could also have made and sold more fluid ends and made additional profit. The time used to make fluid ends is the same, but the lost profits are separate and distinct.

We overrule Toshiba's issue six.

**c. Did the trial court err by submitting broad-form damage questions?**

[26] In its eleventh issue, Toshiba argues that the trial court erred in failing to submit damage questions that provided separate blanks for each element of SPM's damage model. We disagree.

[27] Toshiba's complaint about the damage submission turns on the proposition that a trial court commits reversible error where it submits a broad-form damage issue that incorporates an element of damages on which there is no evidence. *Harris County v. Smith,* 96 S.W.3d 230, 234 (Tex.2002). Such a submission prevents the appellate court from determining whether the jury based its verdict on an improperly submitted element of damage. *Id.* Toshiba identifies lost profits as the element of damage lacking evidentiary support.

Toshiba's argument fails because we have already concluded that there is legally sufficient evidence to support the jury's award, even if the entire award consists of lost profits. We overrule Toshiba's eleventh issue.

**\*781 d. May SPM recover both its purchase money and consequential damages?**

In its first issue, Toshiba argues that a party claiming breach of contract may not recover both the purchase money paid under the contract—what Toshiba calls "rescission damages"—and consequential damages. But SPM's purchase money was not submitted to the jury as an element of SPM's contract damages. Therefore, Toshiba's first issue is moot, and we need not consider it. *See* Tex.R.App. P. 47.1.

**4. Did SPM fail to mitigate its damages?**

In issue 7b, Toshiba argues that the trial court erred by awarding damages that SPM could have avoided by cover or mitigation. Toshiba claims that SPM did nothing to mitigate its losses and therefore is barred from recovering any consequential damages.

[28] [29] A buyer may recover consequential damages that could not reasonably be prevented by cover. Tex. Bus. &

Com.Code Ann. § 2.715(b)(1) (Vernon 1994). After a breach by the seller, the buyer may "cover" by making, in good faith and without unreasonable delay, any reasonable purchase of goods in substitution for those due from the seller. *Id.* § 2.712(a). To determine if a buyer effected a proper attempt at cover, we consider "whether at the time and place the buyer acted in good faith and in a reasonable manner...." *Id.* § 2.712, cmt 2. "[I]t is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective." *Id.* The burden of establishing that damages could not have been reasonably prevented by cover is on the plaintiff. *Wilson v. Hays,* 544 S.W.2d 833, 836 (Tex.Civ.App.-Waco 1976, writ ref'd n.r.e.).

[30] [31] Mitigation of damages is a rule requiring the injured party to use reasonable diligence to minimize his damages. *LTV Aerospace Corp. v. Bateman,* 492 S.W.2d 703, 709 (Tex.Civ.App.-Tyler 1973, writ ref'd n.r.e.). Though mitigation is similar to cover, the burden of disproving mitigation lies with the defendant.

The trial court submitted the issues of cover and mitigation to the jury as limiting instructions on the breach of contract damage questions, as follows:

> Do not include in your answers any loss you find SPM could have avoided by the exercise of reasonable care. Do not include in your answer any loss that occurred after the date that replacement machining centers could have been reasonably obtained and installed by SPM.

Toshiba's argument on cover amounts to a no-evidence issue; its argument on mitigation is a conclusive evidence issue. Under either standard, we must affirm if there is more than a scintilla of evidence in SPM's favor.

[32] With regard to cover, SPM produced evidence at trial to show that it purchased two Goss Trevisan machines as cover when it became clear that the Toshiba machines would not perform as represented. Once both Goss Trevisan machines were fully operational, SPM stopped using the Toshiba machines. This is some evidence of that SPM made reasonable efforts to limit its consequential damages and is enough to support the jury's award.

[33] With regard to mitigation, SPM produced evidence to show that it limited its damages by using the Toshiba machines to the extent possible. Although the Toshiba machines did not perform as expected, they cut the time it took SPM to make a fluid end from 115 hours to 100 hours. This fifteen hour savings, when **\*782** multiplied by SPM's shop rate of $150 per hour, yielded a reduction in SPM's damages of $2,250 per fluid end. Gilbert's damage computation properly accounted for this savings.

Toshiba argues that by using the Toshiba machines, SPM aggravated its damages, not mitigated them. Toshiba reasons that SPM's damage model multiplied the number of hours SPM used the Toshiba machines by the shop rate; thus every hour SPM used the Toshiba machines increased SPM's damages by $150. But SPM claimed no such thing. SPM claimed as damages the difference between 100 hours—the time it actually took a make a fluid end with the help of the Toshiba machines—and thirty-five hours—the time Toshiba said it would take the machines to make a fluid end—and multiplied the difference by SPM's $150 per hour shop rate. If SPM had not used the Toshiba machines, its damages would have been the difference between 115 hours and thirty-five hours, multiplied by the $150 per hour shop rate. Thus, by using the Toshiba machines, SPM mitigated its damages by $2,250—15 hours times the shop rate—for every fluid end produced.

We hold that SPM presented some evidence on the question of cover and that Toshiba failed to prove conclusively that SPM did not mitigate its damages. We overrule Toshiba's issue 7b.

**5. Did the trial court err in awarding attorney's fees to SPM?**
In its eighth issue, Toshiba complains that the trial court erred by awarding attorney's fees to SPM. Toshiba's complaint has two components: First, that SPM is not entitled to attorney's fees because it did not prevail on its breach of contract claim; and second, that the trial court impermissibly enhanced SPM's "lodestar" attorney's fees.

[34] [35] [36] A party may recover reasonable attorney's fees for a valid breach of contract claim. Tex. Civ. Prac. & Rem.Code Ann. § 38.001 (Vernon

1997). Texas courts weigh the eight factors recited in rule 1.04 of the rules of professional conduct to determine the reasonableness and necessity of attorney's fees. Tex. Disciplinary R. Prof'l Conduct 1.04(b), reprinted in Tex. Gov't Code Ann., tit. 2, subtit. G, app. A (Vernon 2005) (Tex. State Bar R. art. X § 9); *Miller v. Kennedy & Minshew, Prof. Corp.,* 142 S.W.3d 325, 336–37 (Tex.App.-Fort Worth 2003, pet. denied). Those factors are (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *Miller,* 142 S.W.3d at 336–37. One method of computing a reasonable fee is the "lodestar" method, or "the product of reasonable hours times a reasonable rate." *City of Burlington v. Dague,* 505 U.S. 557, 559, 112 S.Ct. 2638, 2640, 120 L.Ed.2d 449 (1992). We review a court-ordered award of attorney's fees under the abuse of discretion standard. *Ridge Oil Co., Inc. v. Guinn Invs., Inc.,* 148 S.W.3d 143, 163 (Tex.2004).

[37] In this case, the issue of attorney's fees was submitted to the trial court, **\*783** rather than the jury, by agreement of the parties. SPM's lead counsel, Marshall Searcy, testified about SPM's attorney's fees. SPM's fee agreement with Searcy's firm consisted of three elements. First, SPM paid Searcy's firm a flat fee of $150,000 up front. Second, SPM agreed to pay Searcy's firm 5% of SPM's ultimate recovery, if any. Third, SPM agreed that Searcy's firm could keep any attorney's fees awarded by the trial court. SPM argues that this third provision contemplates a fee higher than the flat $150,000 plus 5%, contingent upon whether the trial court awarded attorney's fees.

Searcy testified that the services his firm rendered to SPM had a lodestar value of $667,114. He then testified that a reasonable fee would be $1.5 million.

To support a reasonable fee in excess of the lodestar value, Searcy testified at length about the rule 1.04 elements. Most significantly, Searcy testified that the risk his firm took of losing the case and receiving nothing over its $150,000 base fee justified the $1.5 million fee. He also testified that the lodestar value would represent a reasonable fee if SPM had paid his firm on a monthly basis; but since his firm had to wait until the conclusion of the case to collect its fee, the lodestar value was insufficient. Finally, Searcy testified that $1.5 million represented about 25% of the jury's verdict—significantly less than the 30%–50% typically charged by Tarrant County attorneys in contingent fee cases.

The trial court made findings of fact and conclusions of law that specifically took into account the rule 1.04 factors. The trial court found that the following attorney's fees were reasonable: $1.5 million through the date of judgment, plus $200,000 if Toshiba is unsuccessful in this appeal, plus $35,000 if Toshiba files a petition for review with the Supreme Court of Texas and the petition is denied, or $65,000 if the Supreme Court grants the petition but rules against Toshiba on the merits. The trial court incorporated these fees into its judgment.

Toshiba lodges two complaints about SPM's attorney's fees. First, Toshiba contends that SPM is not entitled to any award of attorney's fees because SPM did not prevail on its breach of contract claim. We have already concluded that SPM may recover for breach of contract; therefore, SPM may also recover its reasonable attorney's fees. *See* Tex. Civ. Prac. & Rem.Code Ann. § 38.001.

[38] Second, Toshiba argues that the trial court erred by awarding more than the lodestar amount. To support this argument, Toshiba cites *Dague,* 505 U.S. at 557, 112 S.Ct. at 2638, and *PPG Industries, Inc. v. JMB/Houston Centers Partners Ltd. P'ship,* 41 S.W.3d 270 (Tex.App.-Houston [14th Dist.] 2001, no pet.), *rev'd on other grounds,* 146 S.W.3d 79 (Tex.2004). The question in *Dague* was whether the attorney's fees shifting provisions of the federal Solid Waste Disposal Act and Clean Water Act permitted "enhancement" of lodestar attorney's fees where the attorney's fees were contingent. *Dague* at 559, 112 S.Ct. at 2639. The Supreme Court held that such enhancement was not permitted under the statutes in question. *Id.* at 567, 112 S.Ct. at 2648.

Since this case involves neither of those statutes, *Dague* offers little guidance and imposes no restrictions here. Moreover, Texas courts consistently allow the use of a multiplier based upon the contingent nature of a fee under Texas statutes allowing recovery of attorney's fees. *Dillard Dept. Stores, Inc. v. Gonzales,* 72 S.W.3d 398, 413 (Tex.App.-El Paso 2002, pet. denied).

Nor is Toshiba's argument supported by *PPG Industries.* In that DTPA case, the trial court awarded a "bonus" of $300,000 on top of the plaintiff's lodestar attorney's **\*784** fee. *PPG Indus.* 41 S.W.3d at 285. The court of appeals held that the trial court had no authority to consider the result obtained as a basis for awarding the bonus against the defendant. *Id.* But the court went on to affirm the bonus because there was some evidence, besides the result obtained, to show that the attorney's fee, including the bonus, was reasonable. *Id.* The court concluded that the trial court had not abused its discretion in awarding the bonus. *Id.*

In our case, as in *PPG Industries,* there is some evidence that the trial court's award of attorney's fees to SPM is reasonable. We hold that the trial court did not abuse its discretion by awarding those fees to SPM. We overrule Toshiba's eighth issue.

**6. Did the trial court err by failing to submit Toshiba's counterclaim to the jury?**

[39] In its ninth and tenth issues, Toshiba argues that the trial court erred by failing to submit Toshiba's counterclaim to the jury and failing to direct the verdict on the counterclaim. Toshiba sued SPM for the unpaid balance of the BMC–800. The amount of the unpaid balance, $658,800, was not disputed.

A buyer must pay at the contract rate for any goods accepted. Tex. Bus. & Com.Code Ann. § 2.607(a). Toshiba argues that it was entitled to a directed verdict on its counterclaim because SPM accepted the BMC–800 as a matter of law. But the jury failed to find that SPM accepted the BMC–800, and we have already concluded that Toshiba failed to prove acceptance as a matter of law. Thus, Toshiba was not entitled to a directed verdict.

Nor did the trial court err by refusing to submit

Toshiba's counterclaim to the jury. Since the amount of the counterclaim was undisputed, the only question for the jury to decide was whether SPM accepted the BMC–800. If the jury had found that SPM accepted the machine and did not revoke its acceptance, Toshiba would be entitled to judgment for the amount of its counterclaim. But because the jury failed to find that SPM accepted the BMC–800, SPM is not liable for the unpaid balance.

We overrule Toshiba's ninth and tenth issues.

### 7. SPM's non-contract claims

In its third and fifth issues, Toshiba argues that the trial court erred by submitting SPM's breach of warranty, fraud, and negligent misrepresentation claims to the jury. Because we affirm the judgment on SPM's breach of contract claims, we need not consider these two issues. *See* Tex.R.App. P. 47.1.

### B. SPM's Issue: When did prejudgment interest begin to accrue?

In its sole issue, SPM complains that the trial court chose the wrong date from which to calculate prejudgment interest. The trial court chose February 29, 2000, the date SPM filed suit. SPM contends that prejudgment interest began to accrue on May 3, 1999, 180 days after SPM sent Toshiba what SPM claims was notice of its claims. The difference is significant; using the earlier date yields an additional $493,000 in prejudgment interest.

Prejudgment interest accrues on the amount of a judgment during a period that begins on the earlier of the 180th day after the date a defendant receives written notice of a claim against it, or the date the suit is filed. Tex. Fin.Code Ann. § 304.104 (Vernon Supp.2004–05). Although section 304.101 states that "[t]his subchapter applies only to a wrongful death, personal injury, or property damage case," the Supreme Court of Texas has extended the notice provision of section 304.104 to all claims. *Id.* § 304.101; *Johnson & Higgins* **\*785** *of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 531 (Tex.1998).

[40] [41] A "claim" under section 304.104 is a demand for compensation or an assertion of a right to be paid. *MCN Energy Enters., Inc. v. Omagro de*

*Colombia, L.D.C.,* 98 S.W.3d 766, 773 (Tex.App.-Fort Worth 2003, pet. denied). A claim need not demand an exact amount or list every element of damage. *Bevers v. Soule,* 909 S.W.2d 599, 603 (Tex.App.-Fort Worth 1995, no writ).

### 1. Standard of review

Before we turn to the merits of SPM's issue, we must determine what standard of review to apply. In *MCN Energy Enterprises,* we wrote that "[t]he date from which statutory prejudgment interest should begin is a question of law that an appellate court must review de novo." 98 S.W.3d at 773. We cited as authority for that proposition *Johnson v. City of Fort Worth,* 774 S.W.2d 653, 655–56 (Tex.1989). *Johnson* did not concern prejudgment interest; instead, it stands for the general proposition that "matters of statutory construction are questions of law for the court to decide rather than issues of fact." *Id.* at 656. Implicit in *Johnson,* and necessary to bridge the gap between *Johnson* and *MCN Energy Enterprises,* is the rule that appellate courts review questions of law de novo. *See, e.g., Graves v. Alders,* 132 S.W.3d 12, 17 (Tex.App.-Beaumont 2004, pet. denied).

On the other hand, we held that "[a] trial court's award of prejudgment interest is reviewed under an abuse of discretion standard" in *Manufacturers Auto Leasing, Inc. v. Autoflex Leasing, Inc.,* 139 S.W.3d 342, 348 (Tex.App.-Fort Worth 2004, pet. denied). Our sister courts generally hold the same.[4]

[42] The San Antonio Court of Appeals described the standard of review this way:

We review a trial court's award of prejudgment interest under the abuse of discretion standard. [Citation omitted.] Under this standard, we will not disturb a trial court's findings on factual issues unless the court reasonably could have reached only one decision and it failed to do so. *Walker v. Packer,* 827 S.W.2d 833, 839–40 (Tex.1992). However, "a trial court has no discretion in determining what the law is or applying the law to the facts." *Id.* at 840.

*J.C. Penney Life Ins. Co. v. Heinrich,* 32 S.W.3d 280, 289 (Tex.App.-San Antonio 2000, pet. denied). We conclude that *Heinrich* correctly articulates the general standard for reviewing an award of prejudgment interest. The abuse of discretion standard applies to the trial court's factual findings as

they relate to prejudgment interest; but the de novo standard applies to the trial court's application of the law to the facts.

In the case before us, the trial court's award of prejudgment interest does not hinge on any factual finding. Instead, the issue turns on the interpretation of a single letter from SPM to Toshiba. The existence and contents of the letter are not in dispute. The question is whether the letter constituted notice of SPM's claims as a *786 matter of law. Therefore, as a practical matter, our review of the prejudgment interest issue in this case is de novo.

### 2. Facts and analysis

[43] On November 4, 1998, SPM sent a letter to the president of Toshiba Machine Co., Ltd. in Japan.[5] SPM complained that the BMC machines

will not perform to the specifications in the machine literature or as represented by Toshiba.... [W]e are concerned that the machines will never perform consistently to Toshiba's specifications and SPM's contract requirements.

The letter summarized twenty-one complaints about the BMC machines and Toshiba's earlier responses to those complaints. SPM stated that it had incurred damages of $998,250 and continued to incur damages at the rate of $5,775 for each day the machines did not perform. SPM concluded its letter with these words:

> SPM is prepared to litigate the issues if necessary. However, SPM prefers to resolve the issues if the machines can perform to specification and contract requirements. If this is not attainable, SPM prefers to return the machines to Toshiba, with Toshiba to absorb SPM's costs-to-date.

SPM contends that this letter was sufficient notice of its claims to trigger accrual of prejudgment interest 180 days later. Toshiba responds that the letter did not give notice of a claim because it did not make a demand for payment or assert a right to be paid.

We look to similar cases for guidance. In _Bevers,_ we held that a signed medical authorization form,

coupled with a letter asking an insurance company to "properly consider [plaintiff's] injury claim," constituted notice. _Bevers,_ 909 S.W.2d at 603. The Texarkana court reached the same conclusion where a personal injury plaintiff, at the defendant's request, signed a medical records release form that stated, "[t]his information is to be used for purposes of evaluating and handling my claim for injury." _K Mart Corp. v. Rhyne,_ 932 S.W.2d 140, 146 (Tex.App.-Texarkana 1996, no writ). Likewise, the Austin court held that a request from a plaintiff to a defendant's insurance company asking the company to pay certain medical bills, and inquiring when he would receive his next lost wages check, was a "claim" for purposes of prejudgment interest. _Robinson v. Brice,_ 894 S.W.2d 525, 529 (Tex.App.-Austin 1995, writ denied). More recently, the Beaumont court concluded that letters requesting reimbursement for medical treatment constituted written notice of a claim. _Brookshire Grocery Co.,_ 99 S.W.3d at 825.

There is a key distinction between those cases and the case now before us. In each of those cases, the claims asserted by the writings in question were certain and unconditional. The writings did not urge the recipients to avoid a contingent, future liability, but to accept an accrued, existing liability. SPM's letter does just the opposite. SPM urges Toshiba to avoid a future claim by curing the defects in the BMC machines. SPM does not demand payment or assert a right to be paid. Instead, SPM suggests that it will assert a claim and demand payment in the future if Toshiba cannot make its machines perform to specification.

We hold that SPM's November 4, 1998 letter did not constitute notice of a claim as a matter of law. The trial court properly *787 computed prejudgment interest from the date SPM filed suit. We overrule SPM's sole issue.

### IV. Conclusion

We overrule Toshiba's issues two, four, and six through eleven. We do not reach Toshiba's issues one, three, and five. We overrule SPM's sole issue. We therefore affirm the trial court's judgment in all respects. _See_ Tex.R.App. P. 43.2(a).

Footnotes

1    Toshiba sued SPM in Illinois for the unpaid balance due on the BMC–800 in November 1999. The Illinois trial court dismissed that suit for lack of jurisdiction.

2    Section 1.103 of the Texas Business and Commerce Code states that the Code should be liberally construed "to make uniform the law among various jurisdictions." Tex. Bus. & Com.Code Ann. § 1.103(a)(3) (Vernon 1994). Section 311.028 of the Texas Government Code provides that "[a] uniform act ... shall be construed ... to make uniform the law of those states that enact it." Tex. Gov't Code Ann. § 311.028 (Vernon 2005). Thus, in determining and applying the Texas version of the Uniform Commercial Code, we may consider and apply pertinent decisions from other jurisdictions. *Rogers v. Ricane Enterprises, Inc.* 930 S.W.2d 157, 171 (Tex.App.-Amarillo1996, writ denied); *Fin. Universal Corp. v. Mercantile Nat'l Bank,* 683 S.W.2d 815, 817 (Tex.App.-Dallas 1984, writ ref'd n.r.e.).

3    Toshiba's "Issues Presented" lists two issues numbered "7." We will refer to the first as "7a" and the second, discussed elsewhere in this opinion, as "7b."

4    *See, e.g., Protective Life Ins. Co. v. Russell,* 119 S.W.3d 274, 288 (Tex.App.-Tyler 2003, pet. denied); *Brookshire Grocery Co. v. Smith,* 99 S.W.3d 819, 823 (Tex.App.-Beaumont 2003, pet. denied); *Wilmer–Hutchins ISD v. Smiley,* 97 S.W.3d 702, 706 (Tex.App.-Dallas 2003, pet. denied); *Purcell Constn., Inc. v. Welch,* 17 S.W.3d 398, 402 (Tex.App.-Houston [1st Dist.] 2000, no pet.) ("We review a challenge to a trial court's award of pre-judgment interest using an abuse of discretion standard, giving limited deference to the court's application of the law to the facts."); *Marsh v. Marsh,* 949 S.W.2d 734, 744 (Tex.App.-Houston [14th Dist.] 1997, no writ).

5    Toshiba points out that the letter is not addressed to Toshiba Machine Co., America, but to its parent company, Toshiba Machine Co., Ltd. But Toshiba does not complain that it did not receive the letter, so the letter's addressee is not a factor in our analysis.

**End of Document**                                        © 2014 Thomson Reuters. No claim to original U.S. Government Works.



# TX Rules of Evidence, Rule 201

## Rule 201. Judicial Notice of Adjudicative Facts

**(a)**  **Scope**. This rule governs judicial notice of an adjudicative fact only, not a legislative fact.

**(b)**  **Kinds of Facts That May Be Judicially Noticed.** The court may judicially notice a fact that is not subject to reasonable dispute because it:

**(1)**  Is generally known within the trial court's territorial jurisdiction; or

**(2)**  can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

**(c)**  **Taking Notice**. The court:

**(1)**  may take judicial notice on its own; or

**(2)**  must take judicial notice if a party requests it and the court is supplied with the necessary information.

**(d)**  **Timing**. The court may take judicial notice at any stage of the proceeding.

**(e)**  **Opportunity to Be Heard.** On timely request, a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed. If the court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard.

**(f)**  **Instructing the Jury.** In a civil case, the court must instruct the jury to accept the noticed fact as conclusive. In a criminal case, the court must instruct the jury that it may or may not accept the noticed fact as conclusive.

**Credits**
Eff. March 1, 1998. Amended by orders of Supreme Court March 10, 2015 and Court of Criminal Appeals March 12, 2015, eff. April 1, 2015.



## § 101.101. Notice

**(a)** A governmental unit is entitled to receive notice of a claim against it under this chapter not later than six months after the day that the incident giving rise to the claim occurred. The notice must reasonably describe:

    **(1)** the damage or injury claimed;

    **(2)** the time and place of the incident; and

    **(3)** the incident.

**(b)** A city's charter and ordinance provisions requiring notice within a charter period permitted by law are ratified and approved.

**(c)** The notice requirements provided or ratified and approved by Subsections (a) and (b) do not apply if the governmental unit has actual notice that death has occurred, that the claimant has received some injury, or that the claimant's property has been damaged.

Credits
Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.



**V.T.C.A., Government Code § 311.011**

**§ 311.011. Common and Technical Usage of Words**

**(a)**     Words and phrases shall be read in context and construed according to the rules of grammar and common usage.

**(b)**     Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly.

**Credits**
Acts 1985, 69th Leg., ch. 479, § 1, eff. Sept. 1, 1985.